MIRIAM J. RAMÍREZ DE FERRER, recurrente y peticionaria, *v.* JUAN MARI BRÁS, recurrido; COMISIÓN ESTATAL DE ELECCIONES, recurrida y peticionaria.

*Número:* CT-96-14 *Resuelto:* 18 de noviembre de 1997

144

146

148

*David Rivé Rivera*, abogado de la Comisión Estatal de Elecciones, peticionaria; *Enrique J. Mendoza Méndez* y *José E. Mendoza Vidal*, de *Mendoza & Bacó*, abogados de Miriam J. Ramírez de Ferrer, peticionaria; *Juan Santiago Nieves, Carlos E. Gómez Menéndez* y *Fermín L. Arraiza Navas*, de *Nazario & Santiago*, abogados del recurrido; *Juan Mari Brás, pro se; Carlos Lugo Fiol, Procurador General*, abogado del Secretario de Justicia, parte interventora.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Nos toca resolver si es constitucional la Ley Electoral de Puerto Rico, en cuanto dispone, en sus Arts. 2.003 y 2.023 (16 L.P.R.A. secs. 3053 y 3073),([1]) que para ser elector en Puerto Rico es necesario ser ciudadano de Estados Unidos.

Con arreglo a dicha cuestión, también debemos resolver si el recurrido, Lcdo. Juan Mari Brás (en adelante Mari Brás) debe ser eliminado del registro de electores de Puerto Rico.

I

Juan Mari Brás nació el 2 de diciembre de 1927 en Mayagüez, Puerto Rico; fruto del matrimonio de dos puertorriqueños. Su padre, Santiago Mari Ramos, nació en

---

([1]) La sentencia de instancia, cuya validez se impugna ante nos, declaró inconstitucional el Art. 2.022-A de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3072a, pero evidentemente se refería al 2.023 (16 L.P.R.A. sec. 3073), que es el artículo pertinente.

San Germán, Puerto Rico; mientras que su madre, Mercedes Brás Graña, nació en Las Marías, Puerto Rico. La planilla de contribución sobre ingresos de 1995, presentada por Mari Brás ante el Departamento de Hacienda, refleja que éste es contribuyente en Puerto Rico e indica que Mari Brás reside en Mayagüez, Puerto Rico. Las partes en este caso no vacilaron en estipular que Mari Brás es residente de Puerto Rico. No cabe duda tampoco de que se trata de una persona que reconocida y recurrentemente ha participado de forma activa en los procesos políticos del pueblo puertorriqueño durante muchos años de su vida.

El 19 de diciembre de 1993, mediante una declaración jurada suscrita ante un abogado-notario en Quebradillas, Puerto Rico, Mari Brás juró renunciar a la ciudadanía de Estados Unidos. En dicha declaración, reclamó su condición de ciudadano de Puerto Rico, lo cual, a su entender, era cónsono con su nacionalidad puertorriqueña.

Así las cosas, el 11 de julio de 1994 acudió a la Embajada de Estados Unidos localizada en Caracas, Venezuela. Allí renunció voluntariamente a la ciudadanía de Estados Unidos, que había adquirido al momento de su nacimiento. A tales efectos, y como prueba de los motivos de su renuncia, presentó en la Embajada una copia de la declaración jurada, antes mencionada, otorgada en Puerto Rico.

Ese mismo día, el Cónsul de Estados Unidos en Caracas, Venezuela, emitió un certificado titulado *Certificate of Loss of Nationality of the United States*, en el cual se hace constar que Mari Brás renunció a la ciudadanía de Estados Unidos. Se trata de un documento oficial del Departamento de Estado de Estados Unidos que lleva estampado un sello indicativo de que el Director del *Office of Citizens Consular Services* del Departamento de Estado dio su aprobación a esa renuncia de ciudadanía el 22 de noviembre de 1995. Resulta necesario señalar que, a pesar de que el juramento prestado por Mari Brás ante el Cónsul de

Estados Unidos refleja que en una ocasión éste residió en Washington, D.C., al momento de renunciar a la ciudadanía de Estados Unidos, Mari Brás residía en Mayagüez, Puerto Rico.

A raíz de estos hechos, el 15 de mayo de 1996 Miriam J. Ramírez de Ferrer (en adelante Ramírez) presentó una solicitud de recusación electoral contra Mari Brás ante la Junta de Inscripción Permanente del Precinto Núm. 038 de Mayagüez. La causal aducida para esta recusación fue el hecho de que Mari Brás ya no era ciudadano de Estados Unidos.

La Comisión Local de Elecciones del Precinto Núm. 038 de Mayagüez (en adelante Comisión Local) denegó la recusación por falta de jurisdicción sobre la persona de Mari Brás, debido a supuestos defectos en el emplazamiento. La Comisión Local llegó a esta determinación a pesar de que Mari Brás compareció ante este organismo y se sometió voluntariamente a su jurisdicción. Presentada una apelación ante la Comisión Estatal de Elecciones (en adelante la C.E.E.), ésta confirmó la decisión de la Comisión Local.

Inconforme con esta determinación, Ramírez presentó una solicitud de revisión judicial ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Mari Brás compareció voluntariamente ante ese tribunal y formuló su oposición al recurso. Asimismo, comparecieron la C.E.E. y el Estado Libre Asociado de Puerto Rico (en adelante el E.L.A.).

Luego de varios trámites procesales y de celebrada una vista oral, el 21 de octubre de 1996 el tribunal de instancia dictó una extensa sentencia mediante la cual, en lo pertinente, declaró inconstitucional los artículos 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*, debido a que éstos disponen como condición para ser elector en Puerto Rico que es necesario ser ciudadano de Estados Unidos.

Como consecuencia, ordenó la desestimación y el archivo en los méritos de la recusación.

El 24 de octubre de 1996 la C.E.E. presentó un recurso de *certiorari* ante el Tribunal de Circuito de Apelaciones. En síntesis, alegó que el tribunal de instancia había errado al declarar inconstitucional los referidos artículos de la Ley Electoral de Puerto Rico. Ese mismo día, la C.E.E. presentó una petición de certificación ante nos y solicitó que eleváramos los autos del recurso presentado ante el referido foro apelativo.

El 25 de octubre de 1996 emitimos una resolución y ordenamos la expedición del mandamiento de certificación solicitado. A la vez, requerimos al tribunal de instancia que nos remitiese los autos originales. Además, debido a la proximidad de las elecciones y a la complejidad del recurso, ordenamos a la C.E.E. que mientras lo considerábamos, debía permitir a Mari Brás emitir su voto, teniéndose éste por recusado.

El 25 de octubre de 1996 Ramírez presentó su propio recurso de *certiorari* ante el Tribunal de Circuito de Apelaciones. Alegó en su recurso que el tribunal de instancia había errado: (1) al declarar inconstitucional los referidos Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico; (2) al reconocer una ciudadanía puertorriqueña independiente de la ciudadanía de Estados Unidos, y (3) al emitir un dictamen contrario a la cláusula territorial y a la de supremacía de la Constitución federal. El 28 de octubre de 1996 nos solicitó la certificación del referido recurso y su consolidación con el de la C.E.E. El 1ro de noviembre de 1996 accedimos a lo solicitado por Ramírez.

Con posterioridad a la presentación por todas las partes de sus respectivos alegatos, el 14 de abril de 1997 celebramos una vista oral a la cual comparecieron cada una de éstas.

Con el beneficio de las comparecencias de todas las partes, y de su argumentación en la vista oral, pasamos a resolver.

## II

Para decidir la importante controversia constitucional que tenemos ante nos, es menester dilucidar a fondo varios asuntos que constituyen parte esencial de dicha controversia. Es decir, la respuesta a la cuestión que nos ocupa depende de la ponderación de cinco interrogantes más concretas que están ínsitas en esa cuestión. Para decidir si la C.E.E. de Puerto Rico debe excluir a Mari Brás del registro de electores del país por éste no ser ciudadano de Estados Unidos, como lo han planteado los recurrentes en instancia y ante nos, debemos examinar las interrogantes siguientes:

1. ¿Tiene el E.L.A. facultad decisoria sobre el ejercicio del derecho al voto en Puerto Rico?

2. ¿Qué limitaciones pueden imponerse válidamente al ejercicio de ese derecho?

3. ¿Es la condición de ser ciudadano de Estados Unidos un requisito previo idóneo que pueda imponerse sobre el ejercicio del derecho al voto en Puerto Rico?

4. ¿Ha impuesto el E.L.A. de Puerto Rico tal requisito sobre el ejercicio del derecho al voto incluso a personas como Mari Brás?

5. ¿Existe jurídicamente una ciudadanía puertorriqueña, separada y distinta de la ciudadanía de Estados Unidos, de la cual surja un derecho al voto en Puerto Rico para personas como Mari Brás?

Examinemos estas interrogantes.

## III

*La facultad del Estado Libre Asociado de Puerto Rico sobre el derecho al voto*

A. *La autoridad jurídica del Estado Libre Asociado*

Por la estrecha relación que guarda con los asuntos que aquí nos conciernen, debemos comenzar nuestro análisis repasando brevemente la conocida *normativa* sobre la naturaleza y el alcance de la autoridad jurídica del E.L.A. El examen de dicha normativa es necesario porque lo que habremos de resolver finalmente en este caso dimana precisamente de la autoridad jurídica del E.L.A. y descansa, por ende, en la normativa referida.

De esa normativa depende, en primer lugar, la fundamental cuestión sobre cuál es la autoridad del E.L.A. para regular el derecho al voto en el país. El asunto medular sobre la naturaleza y el alcance de la facultad decisoria que pueda tener Puerto Rico para determinar lo relativo al derecho al voto en nuestro país depende del contenido de la normativa sobre la autoridad jurídica del E.L.A.

En segundo lugar, otros asuntos fundamentales identificados antes también dependen de la normativa aludida. Así, pues, la cuestión medular de si bajo el régimen político actual existe jurídicamente o no una ciudadanía de Puerto Rico, distinta y separada de la ciudadanía de Estados Unidos, y la de si tal ciudadanía apareja el derecho al voto en Puerto Rico para personas como Mari Brás, dependen esencialmente de la normativa sobre la naturaleza y el alcance de la autoridad jurídica del Estado Libre Asociado de Puerto Rico. Es menester, pues, repasar este asunto con algún detalle. Veamos.

## 1. *Decisiones del Tribunal Supremo de Puerto Rico, del Tribunal Supremo de Estados Unidos y de otros tribunales federales*

Desde la fundación en 1952 del cuerpo político en el que se constituyó el Pueblo de Puerto Rico, conocido como el Estado Libre Asociado de Puerto Rico, *Pueblo v. Vélez López*, 83 D.P.R. 486 (1961), este Tribunal, en numerosas ocasiones, ha dilucidado el contenido y el alcance de muchos de los poderes públicos de esa nueva entidad. Así, pues, hemos delimitado el poder de dominio eminente del Estado Libre Asociado, *E.L.A. v. Rodríguez*, 103 D.P.R. 636 (1975); la autoridad para organizar y gobernar los municipios de la isla, *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988); el poder de las cámaras legislativas para disponer su gobierno interno, *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); la facultad judicial para interpretar con finalidad las leyes y la Constitución del país, *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). En particular, hemos reconocido el ámbito amplio del poder de reglamentación del E.L.A., *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378 (1973), que incluye no sólo la facultad de legislar para proteger la seguridad, la salud y el bienestar general de la comunidad, *E.L.A. v. Márquez*, 93 D.P.R. 393 (1966), sino también el poder para legislar sobre cualquier asunto que afecte el bienestar de los puertorriqueños, *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1990), incluyendo cuestiones de estética, *Cervecería Corona, Inc. v. Srio. Obras Públicas*, 97 D.P.R. 44 (1969), y, claro está, los detalles inagotables de la política pública del país, *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988).

Debe enfatizarse que en el ejercicio de nuestra incontestable facultad constitucional no sólo hemos delimitado el contenido y el alcance de la autoridad jurídica del E.L.A., sino que hemos dilucidado también las fuentes y la naturaleza de esa autoridad. Nuestros primeros pronun-

ciamientos normativos sobre el particular los emitimos hace más de cuatro (4) décadas en *Pueblo v. Figueroa*, 77 D.P.R. 188 (1954). Resolvimos allí expresamente que la Constitución del Estado Libre Asociado de Puerto Rico prescribía un sistema de gobierno propio. Resolvimos, además, que esa Constitución no era una ley federal, sino que constituía una carta básica de gobierno local, adoptada por el pueblo de Puerto Rico mismo, que sólo podía ser interpretada con absoluta autoridad por el Tribunal Supremo de Puerto Rico. Destacamos allí también que, aunque nuestras cartas orgánicas anteriores habían sido leyes federales, la recién adoptada Constitución del Estado Libre Asociado descansaba sobre una base de autoridad distinta a las de aquéllas. Anticipamos de este modo la importante opinión, que en términos similares emitiría poco después el Tribunal federal de Apelaciones para el Primer Circuito, en *Figueroa v. People of Puerto Rico*, 232 F.2d 615 (1er Cir. 1956).[2]

■ Posteriormente, en *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964), al reconocer el amplio poder del E.L.A. para imponer tributos en Puerto Rico, examinamos más a fondo el origen de la autoridad gubernamental de ese nuevo cuerpo político. Identificamos allí las consecuencias jurídicas de los acontecimientos políticos ocurridos desde 3 de julio de 1950 cuando el Congreso de Estados Unidos aprobó la Ley Ley Pública Núm. 600 de 3 de julio

---

[2] En *Figueroa v. People of Puerto Rico*, 232 F.2d 615 (1er Cir. 1959), el eminente jurista norteamericano Calvert Magruder, Juez Presidente del Tribunal de Circuito de Apelaciones de Estados Unidos para el Primer Circuito federal, encaró la cuestión de si la Constitución del Estado Libre Asociado de Puerto Rico (Constitución del E.L.A.) era una ley federal. Magruder señaló que si el Congreso norteamericano hubiese aprobado la Constitución del E.L.A. en 1952 sin la intención de que ésta fuese una verdadera constitución, anclada esencialmente en la voluntad del pueblo puertorriqueño, ello hubiese constituido un engaño monumental a nuestro pueblo (*a monumental hoax*). Determinó, entonces, este gran juez que no existía base para imputarle al Congreso haber cometido tal engaño monumental, por lo que resolvió, como cuestión de Derecho, que la Constitución del E.L.A. era, en efecto, una Constitución auténtica; es decir, que no era una ley del Congreso que éste pudiese derogar o enmendar unilateralmente cuando así lo estimase conveniente.

de 1950, Cap. 446 (64 Stat. 931), Documentos Históricos, L.P.R.A., Tomo 1 (en adelante Ley Núm. 600) —que proveía para la organización de un gobierno constitucional por y para el Pueblo de Puerto Rico, ley que fue a su vez ratificada con el voto de la inmensa mayoría del electorado puertorriqueño que acudió entonces a las urnas— hasta que el Congreso pasó la Ley Ley Pública Núm. 447 de 3 de julio de 1952, Cap. 567 (66 Stat. 327), Documentos Históricos, L.P.R.A., Tomo 1, y así aprobó la Constitución adoptada antes por el Pueblo de Puerto Rico. Reconocimos, entonces, en *R.C.A. v. Gobierno de la Capital*, supra, pág. 426, que en virtud de "la organización de la comunidad puertorriqueña, en la forma de estado político en que esta misma quiso organizarse bajo los términos de su propia Constitución", la autoridad pública y los poderes gubernamentales del pueblo de Puerto Rico no eran, como antes, meramente delegados por el Congreso, sino que *emanaban de sí mismo, y estaban libres de una autoridad superior*, sujetos sólo "a las limitaciones de su propia Constitución ... y a aquellas obligaciones que el pueblo se impuso al aceptar las relaciones federales que habrían de existir y existen con los Estados Unidos a tenor de la Ley [Núm.] 600". *R.C.A. v. Gobierno de la Capital*, supra, págs. 428–429. Reconocimos, pues, en este caso que el Estado Libre Asociado de Puerto Rico posee un ámbito de "autoridad que le es privativa" que proviene de la única fuente que legítimamente puede dar tal autoridad: la voluntad del pueblo de Puerto Rico. Así, indudablemente lo aceptaron el Presidente y el Congreso de Estados Unidos al aprobar la Constitución del Estado Libre Asociado que dispone, en las Secs. 1 y 2 del Art. I, lo siguiente:

1. Se constituye el Estado Libre Asociado de Puerto Rico. Su poder político emana del pueblo y se ejercerá con arreglo a su voluntad, dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América.

2. El gobierno del Estado Libre Asociado de Puerto Rico ten-

drá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establece por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. Const. E.L.A., *supra*, ed. 1982, págs. 452 y 456, respectivamente.

Nuestro dictamen en *R.C.A. v. Gobierno de la Capital*, supra, sobre el ámbito de autoridad pública que le es privativa al Estado Libre Asociado de Puerto Rico, y que emana de la voluntad del pueblo puertorriqueño, estuvo anclado también en lo acontecido durante el período de gestación política de 1950 a 1952, que dio lugar a la creación del nuevo régimen constitucional vigente en nuestro país. Durante ese período todo un pueblo, hastiado de las imposiciones coloniales, acudió varias veces a las urnas, se organizó colectivamente por primera vez en su historia, convocó una Asamblea Constituyente y aprobó el documento singular que ésta acordó. No es concebible que todo ello aconteció únicamente para darle el visto bueno a otra pieza legislativa más del Congreso de Estados Unidos, o para que el Congreso norteamericano continuara ejerciendo poderes omnímodos sobre la isla.

Más aún, hoy día, en los albores del siglo XXI, cuando en todos los rincones de la tierra reina con mayor vigor que nunca antes la fe en la democracia y la exaltación de los derechos humanos, constituiría un crudo anacronismo jurídico suponer que los poderes mínimos de gobierno propio que actualmente ostenta el E.L.A. no emanan del pueblo mismo, sino que son una mera delegación de autoridad congresional. Reiteramos, pues, nuestro dictamen en *R.C.A. v. Gobierno de la Capital*, supra, de que la autoridad pública y los poderes gubernamentales del E.L.A., en el ámbito que le es privativo dentro de su relación con Estados Unidos de Norteamérica, emanan de la voluntad del pueblo de Puerto Rico y sólo pueden modificarse mediante el consentimiento consciente de ese pueblo, expresado directamente a través de las urnas.

■ Nuestra fundamental decisión en *R.C.A. v. Gobierno de la Capital*, supra, ha sido ratificada ya antes, en varias ocasiones.(³) Incluso en *Pueblo v. Castro García*, 120 D.P.R. 740 (1988), al examinar a fondo la autoridad penal del E.L.A., no sólo reiteramos nuestros pronunciamientos previos sobre la naturaleza y el origen de los poderes públicos de nuestro actual régimen constitucional, sino que abundamos extensamente respecto a los fundamentos jurídicos sobre los cuales se erigen tales pronunciamientos. Concretamente, señalamos en *Pueblo v. Castro García*, supra, que el propio Tribunal Supremo de Estados Unidos, al igual que otros importantes tribunales federales, había reconocido en varias decisiones suyas la naturaleza y el alcance de la autoridad pública y de los poderes gubernamentales del E.L.A., en términos análogos a los que formulamos previamente en *R.C.A. v. Gobierno de la Capital*, supra. Indicamos en *Pueblo v. Castro García*, supra, que la tendencia claramente prevaleciente en la jurisprudencia federal pertinente era la de destacar que, desde la aprobación de nuestra propia Constitución, Puerto Rico advino al ejercicio de una soberanía similar a la de los estados de la Unión, en lo que se refiere a su autoridad pública y a sus poderes gubernamentales. En particular, citamos en *Pueblo v. Castro García*, supra, las contundentes manifestaciones del Tribunal Supremo de Estados Unidos en *Puerto Rico v. Branstad*, 483 U.S. 219, 230 (1987), y en *Examining Board v. Flores de Otero*, 426 U.S. 572, 594 (1976), de que al crearse la entidad política del E.L.A. la intención había sido la de, "to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union, y la manifestación más tajante aun en *Posadas v. Tourism Co.*, 478 U.S. 328 (1986), en *Rodriguez v. Popular Democratic Party*, 457 U.S.

---

(³) Véase, en particular, *Pueblo v. Castro García*, 120 D.P.R. 740 (1988). Véanse, también: *Rodríguez v. Srio. de Hacienda*, 135 D.P.R. 219 (1994); *Pueblo v. Figueroa Pérez*, 96 D.P.R. 6 (1968).

160

1, 8 (1982), y en *Calero-Toledo v. Pearson Yatch Leasing Co.*, 416 U.S. 663, 672–673 (1974), de que bajo el E.L.A., "Puerto Rico, like a state, is an autonomous political entity, sovereign over matters not ruled by the [U.S.] Constitution". *Rodriguez v. Popular Democratic Party*, supra, pág. 8.

■ Finalmente, en *Pueblo v. Castro*, supra, explicamos de modo palmario que la decisión del Tribunal Supremo de Estados Unidos en *Harris v. Rosario*, 446 U.S. 651 (1980), no militaba de modo alguno contra decisiones de ese mismo Tribunal que reconocían expresamente que Puerto Rico goza de soberanía para legislar sobre sus asuntos internos. Indicamos que ello era así, porque el hecho de que el Congreso pueda legislar con respecto a Puerto Rico *sobre algunos asuntos* al amparo de la cláusula territorial de la Constitución de Estados Unidos —que fue lo que se resolvió en *Harris v. Rosario*, supra— no conllevaba de ninguna manera el que el E.L.A. no tuviese poder soberano en cuanto a *otros asuntos*, los relativos a su autogobierno. La autoridad que le es privativa al E.L.A. sólo abarca sus asuntos internos de gobierno propio. No tiene que ver con el poder que el Congreso reconocidamente aún posee para legislar con respecto a Puerto Rico sobre aquellos otros asuntos que tampoco le competen a los propios estados de la Unión. Además, el Tribunal Supremo de Estados Unidos ha reiterado sus pronunciamientos sobre la soberanía del E.L.A. en cuanto a sus asuntos internos, en decisiones suyas *posteriores* a las de *Harris v. Rosario*, supra, que han sido citadas antes en esta opinión.

En resumen, pues, nuestros deliberados pronunciamientos en *Pueblo v. Figueroa*, supra, en *R.C.A. v. Gobierno de la Capital*, supra, y en *Pueblo v. Castro García*, en lo referente a la naturaleza, el origen y el alcance de la autoridad pública del E.L.A., constituyen *las normas constitucionales pertinentes sobre el particular*, establecidas

por este Tribunal doctrinalmente, *que rigen en el país, independientemente de las preferencias políticas de unos y otros, hasta tanto el régimen constitucional vigente sea alterado por medios legítimos.* Como hemos señalado ya, esas tres decisiones nuestras reflejan la normativa que el más alto foro judicial federal ha sostenido y reiterado por espacio de dos décadas, en los casos realmente afines.[4] Reflejan, además, los numerosos pronunciamientos judiciales que desde 1953 hasta hoy han emitido otros foros federales. Aunque existen unas pocas decisiones aisladas *a contrario sensu*, por espacio de más de cuatro décadas, en docenas de opiniones, la inmensa mayoría[5] de los tribunales federales de instancia y apelativos que han considerado cuestiones afines y han reconocido el ámbito de autoridad gubernamental que le es privativo al E.L.A. Sobre el particular, véanse: *Mora v. Torres*, 113 F. Supp. 309 (D. P.R. 1953); *Mora v. Mejias*, 206 F.2d 377 (1er Cir. 1953); *Mora v. Mejias*, 115 F. Supp. 610 (D. P.R. 1953); *Consentino v. International Longshoremen's Ass'n*, etc., 126 F. Supp. 420 (D. P.R. 1954); *Carrion v. Gonzalez*, 125 F. Supp. 819

---

[4] Otras decisiones del Tribunal Supremo federal giran en torno a asuntos que forman parte del ámbito de autoridad que Estados Unidos aún ejerce sobre Puerto Rico, en virtud de la relación que existe entre ambos pueblos. Dos de ellas se refieren a los programas de beneficencia federal, que el Congreso discrecionalmente extiende a Puerto Rico o no. *Harris v. Rosario*, 446 U.S. 651 (1980); *Califano v. Torres*, 435 U.S. 1 (1978). Otras dos se refieren a los derechos fundamentales de la Constitución federal, que debemos incorporar al interpretar nuestra propia Carta de Derechos. *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147 (1993); *Torres v. Puerto Rico*, 442 U.S. 465 (1979). Sobre las primeras dos, véase los acertados señalamientos del Tribunal de Distrito Federal para el Distrito de Puerto Rico en *U.S. v. Vega Figueroa*, 984 F. Supp. 71 (D. P.R. 1997)

Aun otras decisiones del más alto Foro federal, en línea con las citadas en el texto de esta opinión, que reconocen la deferencia que se le debe a Puerto Rico bajo el Estado Libre Asociado, análoga a la que tienen los estados de la Unión, son: *P.R. Consumer Affairs Dept. v. Isla Petroleum*, 485 U.S. 495 (1988); *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982); *Wackenhut Corp. v. Aponte*, 386 U.S. 268 (1967).

[5] Existen algunas decisiones aisladas de otros foros federales que no siguen la doctrina en cuestión. Se trata de unas pocas decisiones, de foros que no son los más entendidos en la materia. De ningún modo son comparables con la clara corriente decisional mayoritaria identificada en el texto de esta opinión que proviene, además, de los foros más autorizados. Véase J. Trías Monge, *El Estado Libre Asociado ante los tribunales, 1952–1994*, 64 Rev. Jur. U.P.R. 1, 38–39 (1995).

(D. P.R. 1954); *United States v. Rios*, 140 F. Supp. 376 (D. P.R. 1956); *Figueroa v. People of Puerto Rico*, supra; *Moreno Rios v. United States*, 256 F.2d 68 (1er Cir. 1958); *Dario Sanchez v. United States*, 256 F.2d 73 (1er Cir. 1958); *Americana of Puerto Rico, Inc. v. Kaplus*, 368 F.2d 431 (3er Cir. 1966); *Alcoa Steamship Co. v. Perez*, 295 F. Supp. 187 (D. P.R. 1968); *United States v. Valentine*, 288 F. Supp. 957 (D. P.R. 1968); *Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Company*, 303 F. Supp. 414 (D. P.R. 1969); *United States v. Feliciano-Grafals*, 309 F. Supp. 1292 (D. P.R. 1970); *Long v. Continental Casualty Co.*, 323 F. Supp. 1158 (D. P.R. 1970); *Sanchez v. United States*, 376 F. Supp. 239 (D. P.R. 1974); *Garcia v. Friesecke*, 597 F.2d 284 (1er Cir. 1979); *First Fed. S. & L., Etc. v. Ruiz De Jesus*, 644 F.2d 910 (1er Cir. 1981); *Cordova & Simonpietri Ins. v. Chase Manhattan Bank*, 649 F.2d 36 (1er Cir. 1981); *Cintron-Garcia v. Romero Barcelo*, 671 F.2d 1 (1er Cir. 1982); *Enrique Molina-Estrada v. Puerto Rico Hwy. Auth.*, 680 F.2d 841 (1er Cir. 1982); *United States v. Qui[ñ]ones*, 758 F.2d 40 (1er Cir. 1985); *U.S. v. Lopez Andino*, 831 F.2d 1164 (1er Cir. 1987); *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482 (1er Cir. 1989); *Romero v. U.S.*, 38 F.3d 1204 (Fed. Cir. 1994); *Reeser v. Crowley Towing & Transp. Co., Inc.*, 937 F. Supp. 144 (D. P.R. 1996); *U.S. v. Vega Figueroa*, 984 F. Supp. 71 (D. P.R. 1997).[6] Un ejemplo sobresaliente de lo resuelto por todos estos otros tribunales federales lo constituye la ilustrada opinión del Juez Stephen Breyer, hoy juez del Tribunal Supremo de Estados Unidos, en *Cordova & Simonpietri Ins. v. Chase Manhattan Bank*, supra. Indicó el entonces juez del Tribunal Federal de Apelaciones para el Primer Circuito, *inter alia*, lo siguiente:

---

[6] Para una decisión de otro foro, en la cual el asunto se discute con particular lucidez, véase *Hilton Hotels International, Inc.*, 2 Dec. de la J.R.T. Núm. P-958, pág. 888 (1955). Véase, también, H.R. Cancio, *The Power of the Congress to Enter into a Compact with the People of Puerto Rico, The Legal Status of the Compact*, 22 Rev. C. Abo. P.R. 341 (1962).

The F[ederal Relations Act] and the Puerto Rico Constitution were intended to work a significant change in the relation between Puerto Rico and the rest of the United States. ... prior to 1950, Puerto Rico's legal status was closer to that of a "territory" than of a "state".

The F[ederal Relations Act] was intended to end this subordinate status. ...

The theme that consistently runs throughout the legislative history of Puerto Rico's attainment of Commonwealth status is that Commonwealth represents the fulfillment of a process of increasing self-government over local affairs by the people of Puerto Rico ....

. . . . . . . .

In sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. (Escolios omitidos.) *Cordova & Simonpietri Ins. v. Chase Manhattan Bank*, supra, págs. 39–41.

2. *El Gobierno de Estados Unidos ante la comunidad internacional y la Resolución 748 (VIII) de las Naciones Unidas*

Nuestras decisiones en *Pueblo v. Figueroa*, supra; *R.C.A. v. Gobierno de la Capital*, supra, y *Pueblo v. Castro García*, supra; al igual que la copiosa jurisprudencia federal citada antes, constituyen las fuentes esenciales de la normativa que le reconoce al E.L.A. un ámbito privativo de gobierno propio. Se trata de una normativa *judicial* desarrollada en función de la conocida facultad de los tribunales de interpretar con finalidad el orden constitucional prevaleciente. *City of Boerne v. Flores*, 521 U.S. 507 (1997); *Nogueras v. Hernández Colón*, supra, pág. 413. Dicha normativa no persigue, ni pretende dirimir de manera alguna, las agudas y angustiosas cuestiones que se debaten en el país sobre el *status* político de Puerto Rico. Esta normativa sólo alude a la naturaleza y el alcance de la autoridad gubernamental que abarca la Constitución del E.L.A. Se trata, pues, de una materia innegablemente *jurídica*, cuyos contornos le corresponde definir con finalidad exclusi-

vamente al Poder Judicial. *Santa Aponte v. Srio. del Senado*, supra, pág. 759.

En el caso de autos, encarados con la obligación de dilucidar *a cabalidad* los planteamientos constitucionales que nos han presentado los recurrentes y los recurridos, tenemos que adentrarnos en la consideración del historial y los contornos de nuestra Ley Fundamental, lo que inevitablemente nos lleva a la normativa jurídica aludida. Como bien se señaló en *Silva v. Hernández Agosto*, supra, en casos como el de autos es función ineludible de este Tribunal interpretar la Constitución y velar para que no se vulnere su espíritu y esquema democrático. Según dijimos allí, el mero hecho de que en un pleito se busque la protección de un derecho político, como sucede aquí, no nos releva de la responsabilidad de interpretar la Constitución y de hacer los pronunciamientos jurídicos sobre el particular que sea menester. El reclamo de derechos políticos en un litigio no significa que éste presenta una cuestión política. *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978); *Baker v. Carr*, 369 U.S. 186 (1962).

Aunque la normativa aludida no requiere mayor fundamentación que la señalada antes, es menester resaltar que determinadas decisiones y declaraciones de la comunidad internacional, *emitidas a instancias precisamente del Gobierno de Estados Unidos*, en 1953, poco después de haberse creado el E.L.A., proveen un claro apoyo a dicha normativa y son pertinentes al asunto que aquí examinamos. Somos conscientes de que el caso de Puerto Rico ante las Naciones Unidas ha dado lugar a controversias importantes, que de ningún modo nos compete adjudicar.[7] Aun así, la representación que oficialmente hizo el gobierno de Estados Unidos ante la comunidad internacional sobre el nuevo régimen político de Puerto Rico y el reconocimiento

---

[7] Véase J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1983, Vol. IV, págs. 9–59.

por la Asamblea General de las Naciones Unidas, aún vigente, sobre el grado de gobierno propio alcanzado por el pueblo puertorriqueño en 1952 tienen evidentes implicaciones *jurídicas* que deben ponderarse. Veamos.

A unos escasos meses de haberse instalado el nuevo régimen en Puerto Rico, el 21 de marzo de 1953, el embajador de Estados Unidos ante las Naciones Unidas, Henry Cabot Lodge, solicitó a ese cuerpo que se relevara a Estados Unidos de la obligación que tenía de rendirle informes periódicos sobre Puerto Rico. Según el Art. 73(e) de la Carta de las Naciones Unidas, todo miembro de esa organización que tuviese responsabilidades administrativas respecto de pueblos que no hubiesen alcanzado aún la plenitud de gobierno propio estaba obligado a presentarle periódicamente al Secretario General de la entidad determinada información sobre tales comunidades dependientes. Desde 1946 Estados Unidos había estado remitiendo esa información regularmente respecto a Puerto Rico. Con la creación del E.L.A., el Gobierno de Estados Unidos entendía que Puerto Rico había adquirido un ámbito pleno de gobierno propio respecto a sus asuntos internos y, por lo tanto, correspondía cesar el envío de tales informes. Así se lo hizo saber a las Naciones Unidas.

La solicitud de Estados Unidos fue formulada a base de un documento formal, mediante el cual el gobierno norteamericano oficialmente afirmaba, *inter alia*, los puntos siguientes:

> 2. With the establishment of the Commonwealth of Puerto Rico, the people of Puerto Rico have attained *a full measure of self-government.*
>
> . . . . . . . . .
>
> 4. As a result of the change in the constitutional position and status of Puerto Rico, as described in this memorandum, the Government of the United States considers it unnecessary to transmit further information [to the United Nations] under Article 73(e) of the Charters concerning the Commonwealth of Puerto Rico.
>
> . . . . . . . . .

166

21. ...By the various actions taken by the Congress and the people of Puerto Rico, Congress has agreed that Puerto Rico shall have, under that Constitution, *freedom from control or interference by the Congress in respect of internal government and administration* .... [8](Énfasis suplido.)

Como parte de las extensas discusiones y los debates en las Naciones Unidas en torno a la referida solicitud de Estados Unidos, uno de los miembros de la delegación norteamericana ante la ONU hizo unas declaraciones atestativas de la posición oficial de Estados Unidos sobre *los fundamentos* del nuevo *status* de Puerto Rico. Como se sabe, mediante la Ley Pública Núm. 447, *supra*, el Congreso de Estados Unidos aprobó la Constitución del E.L.A. En lo pertinente, dispone esa ley federal lo siguiente:

... [T]he Act entitled "An Act to provide for the organization of a constitutional government by the people of Puerto Rico"; approved July 3, 1950 [Public Law 600] was adopted by the Congress *as a compact* with the people of Puerto Rico, to become operative upon its approval by the people of Puerto Rico .... (Énfasis suplido.)

El 28 de agosto de 1953, Mason Sears, miembro de la delegación norteamericana, le explicó a la Asamblea General de las Naciones Unidas cuál era la naturaleza jurídica del aludido *compact*:

A compact, as you know, is far stronger than a treaty. A treaty usually can be denounced by either side, whereas a compact cannot be denounced by either party unless it has the permission of the other.[9]

Días más tarde, el 3 de noviembre de 1953, otro miembro de la delegación de Estado Unidos, Frances Bolton, miembro también del Congreso por Ohio y quien había

[8] Memorandum By The Government of the United States of America concerning The Cessation Of Transmission Of Information Under Article 73(e) of the Charter with regard to the Commonwealth of Puerto Rico. Department of State Bulletin, 4/20/53; Annex II, U.N. Doc. A/Ac. 35 /L. 121 at 8 (1953).

[9] Citado en Trías Monge, *op. cit.*, págs. 27–28.

participado en la aprobación por ese cuerpo de la legislación federal relativa a la creación del E.L.A., hizo también unos importantes señalamientos ante las Naciones Unidas. Las expresiones de Bolton son particularmente significativas, ya que contestan con claridad la manida cuestión de si al crearse el E.L.A. se efectuó algún cambio en la relación de nuestro país con Estados Unidos. Señaló lo siguiente la Congresista Bolton:

"The nature of the relations established by compact between the people of Puerto Rico and the United States, far from preventing the existence of the Commonwealth as a fully self-governing entity, *gives the necessary guarantees for the untrammeled development and exercise of its political authority. The authority of the Commonwealth of Puerto Rico is not more limited than that of any State of the Union; in fact, in certain aspects is much wider ....*"

"The Federal Relations Act to which reference has been made has continued provisions of political and economic union with the United States which the people of Puerto Rico have wished to maintain. In this sense the relationships between Puerto Rico and the United States have not changed. It would be *wrong, however, to hold that because this is so and has been so declared in Congress, the creation of the Commonwealth of Puerto Rico does not signify a fundamental change in the status of Puerto Rico. The previous status of Puerto Rico was that of a territory subject to the full authority of the Congress of the United States in all governmental matters.* The previous constitution of Puerto Rico was in fact a law of the Congress of the United States, which we called an Organic Act. Congress only could amend the Organic Act of Puerto Rico. *The present status of Puerto Rico is that of a people with a constitution of their own adoption, stemming from their own authority, which only they can alter or amend. The relationships previously established also by a law of the Congress, which only Congress could amend, have now become provisions of a compact of a bilateral nature whose terms may be changed only by common consent.*" (Escolios omitidos y énfasis suplido.)(¹⁰)

Sobre las bases de las citadas representaciones de Cabot Lodge, Sears y Bolton, y otras análogas, que expresaban

---

(¹⁰) Íd., págs. 45–46.

ante la comunidad internacional la posición oficial del gobierno de Estados Unidos sobre el recién creado E.L.A., que constituye un hecho histórico que no está sujeto a revisión, el 27 de noviembre de 1953 la Asamblea General de las Naciones Unidas emitió una resolución sobre la referida solicitud de Estados Unidos que en su parte dispositiva afirma, *inter alia,* lo siguiente:

The General Assembly

2. *Recognizes* that the people of the Commonwealth of Puerto Rico, by expressing their will in a free and democratic way, have achieved a new constitutional status;

3. *Expresses the opinion* that it stems from the documentation provided that the Association of the Commonwealth of Puerto Rico with the United States of America has been established as a mutually agreed association;

4. *Recognizes* that, when choosing constitutional and international status the people of the Commonwealth of Puerto Rico have effectively exercised their right to self-determination;

5. *Recognizes* that, in the framework of their Constitution and of the compact agreed upon with the United States of America, the people of the Commonwealth of Puerto Rico have been invested with attributes of political sovereignty which clearly identify the status of self-government attained by the Puerto Rican people as that of an autonomous political entity;

6. *Considers* that, due to these circumstances, the Declaration regarding Non–Self–Governing Territories and the provisions established under it in Chapter XI of the Charter can no longer be applied to the Commonwealth of Puerto Rico ....([11])

## 3. *Resumen*

En resumen, pues, con arreglo a las más calificadas fuentes jurídicas, *como cuestión de derecho,* el Estado Libre Asociado de Puerto Rico es una entidad política con rasgos autonómicos que posee un ámbito de gobierno propio, una esfera de poderes gubernamentales y de autoridad pública que le es privativa. Esta realidad fue recapitulada catorce años después de haberse creado el E.L.A. en un

---

([11]) Resolution No. 748 VIII, United Nations General Assembly.

informe de una Comisión del Congreso de Estados Unidos, que caracterizó el actual régimen político de Puerto Rico en los términos siguientes:([12])

> The Commonwealth relationship was novel in the method of its creation. It was established through bilateral agreement between the people of Puerto Rico and the Congress of the United States. The steps in the procedure were similar to the familiar ones of Enabling Act procedures for the admission of States to the Federal Union, but without the result of creating a federal state. There was created, instead, a new form of federal relationship. *It was based upon two spheres of government —that of constitutional self-government within Puerto Rico, and that of the Federal Government—* with the two spheres of government connected by the applicable parts of the Federal Constitution and by the Federal Relations Act. (Énfasis suplido.)

B. *Autoridad del Estado Libre Asociado sobre el sufragio*

Partiendo de todo lo señalado antes, en derecho es claro que le compete al E.L.A. el poder para reglamentar lo relativo al ejercicio del derecho al voto dentro de su jurisdicción. *Tal poder forma parte de la autoridad que le es privativa, la cual dilucidamos antes.* Ello se desprende, en primer lugar, del hecho de que en la distribución de poderes entre el Gobierno federal y los gobiernos de los estados de la Unión en el sistema constitucional norteamericano, la autoridad sobre el sistema electoral le corresponde fundamentalmente a éstos. Así lo ha resuelto reiteradamente el Tribunal Supremo federal. Lo señaló así ese foro, en términos tajantes, en *Lassiter v. Northampton Election Bd.*, 360 U.S. 45, 50 (1959):

---

([12]) El Congreso de Estados Unidos creó en 1964 una Comisión Conjunta para estudiar las relaciones presentes y futuras entre Estados Unidos y Puerto Rico. 78 Stat. 17. Sus miembros fueron nombrados por el Presidente de Estados Unidos, el Senado de Estados Unidos, la Cámara de Representantes de Estados Unidos y el Gobernador de Puerto Rico. Todos los miembros de la comisión eran personas de incuestionable categoría.

Los miembros congresionales de la comisión fueron los Senadores Henry Jackson y Jacob Javits, y los Representantes Leo O'Brien y Roger Morton. La Comisión rindió su informe el 6 de agosto de 1966.

The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised; *Pope v. Williams*, 193 U.S. 621, 633; *Mason v. Missouri*, 179 U.S. 328, 335 ....

Lo señaló de este modo en *Gray v. Sanders*, 372 U.S. 368, 379 (1963):

States can within limits specify the qualifications of voters in both state and federal elections; the Constitution indeed makes voters' qualifications rest on state law even in federal elections.

Igualmente, en *Katzenbach v. Morgan*, 384 U.S. 641, 647 (1966), se afirmó que:

Under the distribution of powers effected by the Constitution, the States establish qualifications for voting for state officers, and the qualifications established by the States for voting for members of the most numerous branch of the state legislature also determine who may vote for United States Representatives and Senators ....

■ El poder de los estados de la Unión sobre su propio sistema electoral es tan amplio e indiscutible que el Tribunal Supremo de Estados Unidos declaró nula una ley federal mediante la cual el Congreso pretendió fijar la edad de los votantes para las elecciones estatales. *Oregon v. Mitchell*, 400 U.S. 112 (1970). Se decidió allí que el Congreso carecía de autoridad constitucional para fijar las cualificaciones de los electores en comicios estatales. El Juez Black, en su opinión que anunciaba la decisión del Tribunal sobre el particular, señaló que:

... No function is more essential to the separate and independent existence of the States and their governments than the power to determine... the qualifications of their own voters .... *Oregon v. Mitchell*, supra, pág. 125.

Otras decisiones del Tribunal Supremo federal que reconocen el poder de los estados para reglamentar el sufragio son: *Marston v. Lewis*, 410 U.S. 679 (1973); *Burns v. Fortson*, 410 U.S. 686 (1973); *Evans v. Cornman*, 398 U.S.

419, 422 (1970); *McDonald v. Board of Election*, 394 U.S. 802, 807 (1969); *Carrington v. Rash*, 380 U.S. 89, 91 (1965); *Harman v. Forssenius*, 380 U.S. 528, 535 (1965). Véase, además, 3 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.31 (2da ed. 1992). Finalmente, véase la Sec. 611 del *Omnibus Appropiations Act* de 1997, Pub. Law No. 104–208 de 30 de septiembre de 1997, mediante la cual el Congreso prohíbe el voto de extranjeros en determinados comicios, excepto cuando algún estado haya autorizado su voto.

■ *Como el E.L.A. tiene, cuando menos, los mismos poderes legislativos que un estado de la Unión, es evidente que le compete el poder de reglamentar el sufragio en el país.* Así lo ha reconocido expresamente el propio Tribunal Supremo de Estados Unidos, en *Rodriguez v. Popular Democratic Party*, supra, págs. 8 y 13–14, al resolver lo siguiente:

> ... The methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference.

> ... Absent some clear constitutional limitation, Puerto Rico is free to structure its political system to meet its "special concerns and political circumstances".

Por otro lado, el hecho de que el E.L.A. posee el referido poder se desprende, además, de que, en el proceso político que dio lugar a la adopción por el pueblo de Puerto Rico de nuestra propia Constitución, el poder para determinar las condiciones del sufragio en Puerto Rico quedó fijado, inequívocamente, dentro del ámbito de la autoridad privativa del E.L.A. Antes de 1952, los términos y las condiciones esenciales de la franquicia electoral en Puerto Rico se regían por ley federal. Éstos estaban mandatoriamente dispuestos en el Art. 35 del Acta Jones, 39 Stat. 963, y este Tribunal, en varias ocasiones, resolvió que la Legislatura de Puerto Rico no tenía facultad para ampliar o restringir

las condiciones expresas contenidas en la disposición en cuestión de la referida acta orgánica federal. *Martínez Nadal v. Saldaña, Sec. Ejecutivo*, 38 D.P.R. 446 (1928); *Morales y Benet v. Junta de Inscripciones*, 33 D.P.R. 79 (1924).

Esta situación cambió radicalmente durante el proceso constitucional que aconteció de 1950 a 1952. El Art. 35 del Acta Jones, *supra*, fue expresamente derogado por la Ley Núm. 600, y nada se dispuso en la Ley de Relaciones Federales con Puerto Rico,[13] sobre la franquicia electoral. En cambio, en la Constitución del E.L.A., aprobada tanto por el Presidente como por el Congreso de Estados Unidos, se fijaron concretamente los términos y las condiciones esenciales relativas al sufragio en Puerto Rico, en el Art. II, Sec. 2 y en el Art. VI, Sec. 4, de nuestra Ley Fundamental, L.P.R.A., Tomo 1. Se trata, pues, de asuntos regidos específicamente por nuestra Constitución, por ende, libres de autoridad superior. Así lo reconoció el propio gobierno de Estados Unidos en su comunicación oficial a las Naciones Unidas sobre el E.L.A., mencionada antes, en la cual se señaló, en lo pertinente, que:

> 22. ...The people of Puerto Rico will participate effectively in their government through universal, secret and equal suffrage, in free and periodic elections ... which are assured freedom from undemocratic practices by the [Commonwealth's] Constitution itself. *These elections will be conducted ... without interference by the U.S.* (Énfasis suplido.)

En resumen, pues, el poder de determinar los requisitos para ejercer el derecho al voto en nuestra jurisdicción corresponde esencialmente al E.L.A. Se trata de una amplia facultad para determinar y reglamentar todo lo concerniente al proceso electoral, incluyendo la identificación de quiénes son los electores capacitados. *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248 (1980); *P.N.P. v. Tribunal*

---

[13] 64 Stat. 319.

*Electoral*, 104 D.P.R. 741 (1976). Esta amplia facultad está limitada únicamente por lo que disponga sobre el particular nuestra propia Constitución, incluyendo su Carta de Derechos, que estamos comprometidos a interpretar en forma armoniosa con la de Estados Unidos. *R.C.A. v. Gobierno de la Capital*, supra, págs. 427–428.

Pasemos, entonces, a precisar qué limitaciones pertinentes surgen de nuestra propia Constitución con respecto al poder del E.L.A. sobre el sufragio.

## IV

*La reglamentación del derecho al voto en Puerto Rico*

Como se sabe, el derecho al voto es una de las garantías fundamentales de nuestro ordenamiento constitucional. *P.I.P. v. C.E.E.*, supra, pág. 615; *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84 (1980). En Puerto Rico, este derecho está expresamente consagrado en nuestra Constitución. Los que formularon nuestra Ley Fundamental entendían que se trataba de uno de los valores más preciados del pueblo puertorriqueño. Entendían, además, que para darle una base plenamente democrática al orden político del país, ese derecho al voto debía tener el más alto rango constitucional y estar rodeado de la mayor protección, para así asegurar que las decisiones colectivas y el poder público en Puerto Rico respondiesen a cabalidad a la voluntad del pueblo. 4 Diario de Sesiones de la Convención Constituyente 2563 (1951); *Ortiz Angleró v. Barreto Pérez*, supra, pág. 92. Es por todo lo anterior que en *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 207 (1981), manifestamos que:

> ... el derecho al voto es la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y expresa su voluntad.

La Constitución de Estados Unidos no menciona expre-

samente el derecho al sufragio en su carta de derechos. Pero el carácter fundamental y preeminente de este derecho en el orden constitucional federal ha sido reconocido reiteradamente por el Tribunal Supremo de Estados Unidos. En *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964), se caracterizó así:

> ... Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Véanse, además: *Bullock v. Carter*, 405 U.S. 134 (1972); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966). Véase, también, *Treatise on Constitutional Law*, supra, y los casos allí citados.

Nuestra Constitución formula el derecho al voto en términos verdaderamente abarcadores. No sólo se reconoce que el derecho al sufragio será "universal, igual, directo y secreto" (Art. II, Sec. 2, Const. E.L.A., *supra*, ed. 1982, pág. 261) sino que, además, el único requisito para ser elector que allí se fija, es que la persona haya cumplido dieciocho años de edad. Expresamente se prohíbe que alguien pueda ser privado del derecho al voto por no saber leer o escribir o por no poseer una propiedad (Art. VI, Sec. 4, Const. E.L.A., *supra*).

La formulación esencial del derecho al voto en nuestra Constitución contrasta significativamente con la formulación de ese derecho en el Acta Jones. Allí, en el Art. 35, *supra*, se requería que para ser elector en Puerto Rico era necesario haber cumplido veintiún años de edad *y ser ciudadano de Estados Unidos*. El requisito de ser ciudadano de Estados Unidos, como ya se ha señalado, fue derogado por el Congreso de Estados Unidos al aprobar la Ley Núm. 600, *supra*, y no fue recogido posteriormente en nuestra Constitución, ni forma parte de la Ley de Relaciones Federales con Puerto Rico.

La referida exclusión del requisito de ciudadanía

de Estados Unidos como una de las condiciones constitucionales para ejercer el derecho al voto en Puerto Rico fue, a todas luces, deliberada. Ello se desprende, en primer lugar, del hecho de que la condición de ser ciudadano de Estados Unidos se exige, en distintos artículos de nuestra Constitución, como requisito para poder ocupar los cargos de Gobernador (Art. IV, Sec. 3, Const. E.L.A., *supra*), de miembro de la Asamblea Legislativa (Art. III, Sec. 5, Const. E.L.A., *supra*), de Juez del Tribunal Supremo (Art. V, Sec. 9, Const. E.L.A., *supra*) y de Secretario de Gobierno (Art. IV, Sec. 5, Const. E.L.A., *supra*). Quienes redactaron nuestra Ley Fundamental, pues, estaban plenamente conscientes del uso del requisito de ciudadanía de Estados Unidos para determinados propósitos en la Constitución redactada por ellos pero, aun así, no la impusieron en ésta como condición para el ejercicio del derecho al voto.

Que la referida exclusión fue deliberada se desprende, además, del hecho de que los asesores de la Convención Constituyente, en su conocido informe a ésta, expresamente discutieron el atributo de ciudadanía como una de las condiciones que habitualmente se fija para el sufragio. Escuela de Administración Pública, *La Nueva Constitución de Puerto Rico,* Escuela de Administración Pública, Río Piedras, Ed. U.P.R., 1954, pág. 306. A pesar de ello, sin embargo, no se incluyó el requisito de ciudadanía americana como condición previa para el sufragio en la Constitución del E.L.A.

 Lo anterior no significa, claro está, que el requisito de ciudadanía de Estados Unidos, como condición *legislativa* para ser elector en Puerto Rico, sea nulo per se. Todo lo que significa es que no es un requisito de orden constitucional; es decir, que no se trata de una condición tan esencial para el ejercicio del derecho al voto como tal que haya merecido ser fijada en la propia Constitución.

 Debe notarse que nuestra Ley Fundamental delega expresamente, en la Asamblea Legislativa de Puerto

Rico, la facultad para fijar "los demás requisitos" que debe cumplir una persona para ser elector en el país. Art. VI, Sec. 4, Const. E.L.A., *supra*. Los que redactaron nuestra Constitución sólo pretendieron fijar en ese documento los requisitos mínimos para el ejercicio de la franquicia electoral. Determinaron entonces que, dentro del principio general de la universalidad del sufragio, la Asamblea Legislativa estaba "autorizada para señalar las circunstancias que pueden impedir que una persona vote, tales como incapacidad mental, falta de residencia, declaración judicial de incapacidad, etc.". Diario de Sesiones, *supra*, pág. 2620.

La referida facultad de la Asamblea Legislativa, lo hemos resuelto antes, le da a esa rama de gobierno un amplio margen para legislar sobre este asunto. *P.R.P. v. E.L.A.*, supra; *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, supra; *P.N.P. v. Tribunal Electoral*, supra. Pero, como hemos señalado reiteradamente, esa amplia potestad no es una carta blanca, ni es absoluta. Íd. Por ello hemos resuelto que "[t]odo obstáculo al voto debe ser objeto de escrutinio judicial vigoroso, mas con la debida atención de dar el debido peso a los intereses apremiantes del Estado". *Ortiz Angleró v. Barreto Pérez*, supra, pág. 92. Véase, además, *P.P.D. v. Admor. Gen. de Elecciones*, supra. Una norma similar ha desarrollado el Tribunal Supremo de Estados Unidos con respecto a la garantía federal de igualdad que ampara el derecho al voto en los casos apropiados. *Kramer v. Union School District*, 395 U.S. 621 (1969); *Harper v. Virginia State Bd. of Elections*, supra; *Carrigton v. Rash*, supra.

En resumen, pues, la Asamblea Legislativa del E.L.A. tiene facultad constitucional para fijar limitaciones relativas a la capacidad para votar de una persona en nuestra jurisdicción, siempre que tales limitaciones constituyan un medio necesario para la consecución de un interés público apremiante. ¿Cumple el requisito electoral de

ser ciudadano de Estados Unidos con este riguroso criterio? Pasemos a considerar esta tercera cuestión.

## V

*La ciudadanía de Estados Unidos como condición para el ejercicio del derecho al voto*

### A. *La doctrina federal*

 Contrario a lo que muchos puedan suponer, la condición de ser ciudadano de Estados Unidos no ha sido históricamente la fuente de la mayor parte de los derechos y las obligaciones primordiales que tienen todos aquellos que forman parte de la colectividad norteamericana y quienes están sometidos a su autoridad. Desde hace más de un siglo, el Tribunal Supremo de Estados Unidos ha sostenido la norma, hoy firmemente arraigada como doctrina jurídica, de que los derechos humanos fundamentales garantizados por la Constitución federal aplican por igual tanto a ciudadanos de Estados Unidos como a meros residentes *bona fide* que no son ciudadanos. Se trata de derechos que protegen a cualquier *persona* que esté legítimamente dentro de la jurisdicción de Estados Unidos, aunque no se ostente la ciudadanía de ese país. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Ello significa, pues, que el forastero que reside lícitamente en cualquier lugar de Estados Unidos tiene derecho a las libertades de expresión, a la libertad de culto, a la libertad de asociación, al debido proceso de ley, a la igual protección de las leyes, a las garantías procesales fundamentales en favor de los acusados y a otros derechos de igual jerarquía. Véanse: L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 360; *Treatise on Constitutional Law*, supra, pág. 210.

 En particular, el Tribunal Supremo de Esta-

dos Unidos ha limitado grandemente el poder de los estados de la Unión para conceder privilegios y beneficios públicos, cuando éstos lo hacen sujeto a la condición de que el recipiente sea ciudadano de Estados Unidos. Así, pues, un estado no puede exigir la ciudadanía americana como condición para conceder servicios de educación pública. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 35 (1973); *Toll v. Moreno*, 458 U.S. 1 (1982); *Plyler v. Doe*, 457 U.S. 202 (1982); *Nyquist v. Mauclet*, 432 U.S. 1 (1977). Tampoco puede exigir la ciudadanía americana como condición para establecer un negocio o una empresa comercial privados *(Yick Wo v. Hopkins*, supra; *Truax v. Raich*, 239 U.S. 33 (1915); *Takahashi v. Fish Comm'n*, 334 U.S. 410 (1948)) ni la puede exigir como condición para ejercer una profesión como la abogacía, *In re Griffiths*, 413 U.S. 717 (1973), o la ingeniería, *Examining Board v. Flores de Otero*, supra. Aun en el servicio público, respecto de los cargos de carrera basados en el principio del mérito, ni el estado ni el propio Gobierno federal pueden excluir automáticamente a quienes no sean ciudadanos de poder ocupar tales empleos públicos. *Sugarman v. Dougall*, 413 U.S. 634 (1973); *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976). Al amparo de la referida normativa federal, y tomando en cuenta las exigencias afines de nuestra propia Constitución, este Tribunal ya ha resuelto que es *ilegal* exigir categóricamente la ciudadanía americana como condición para ser maestro de escuela pública en Puerto Rico. *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472 (1989). Más aún, un estado no puede negarle los beneficios de bienestar público y ayuda económica a indigentes, sólo porque los recipientes no sean ciudadanos americanos. *Graham v. Richardson*, 403 U.S. 365 (1971).

Por otro lado, el propio Gobierno federal ha concedido importantes privilegios e impuesto deberes básicos a personas que residen en Estados Unidos, aunque no sean ciudadanos de esa nación. Así, pues, se puede imponer el de-

ber de servir en la fuerzas armadas de Estados Unidos a extranjeros que residan en Estados Unidos. Véanse: *Astrup v. Immigration Service*, 402 U.S. 509 (1971); *McGrath v. Kristensen*, 340 U.S. 162 (1950). Igualmente, se les puede imponer el deber de pagar impuestos y contribuciones sobre ingreso, aunque no sean ciudadanos. *Commissioner v. Wodehouse*, 337 U.S. 369 (1949); *Moreno v. Toll*, 489 F. Supp. 658 (D. Md. 1980). Más aún, el poder del Congreso sobre lo relativo a inmigración y naturalización es tan amplio que éste puede conceder a personas que no sean ciudadanos el derecho a entrar libremente a Estados Unidos, y concederles, además, el derecho a residir permanentemente en Estados Unidos, aunque no adquieran la ciudadanía. *Galvan v. Press*, 347 U.S. 522 (1954); *Gonzales v. Williams*, 192 U.S. 1 (1904). Véase, también, *De Paz Lisk v. Aponte Roque*, supra. Claro está, el ciudadano americano disfruta de éstos mismos derechos por su condición como tal, sin necesidad de legislación federal alguna que los conceda. *Balzac v. Porto Rico*, 258 U.S. 298 (1922).

En resumen, pues, en muchos aspectos de gran importancia, el extranjero residente en Estados Unidos tiene una posición jurídica muy parecida a la del ciudadano de la nación norteamericana. En cuanto a la mayor parte de los derechos y deberes fundamentales, la condición de ciudadano no conlleva grandes diferencias en comparación con la del mero residente. Sin embargo, sí existe un ámbito de la vida colectiva respecto del cual ser ciudadano norteamericano tiene un especial significado. *Se trata precisamente del ámbito de las instituciones y los procesos políticos estatales.* El Tribunal Supremo de Estados Unidos ha indicado que el valor histórico de la ciudadanía americana reside en la facultad que apareja respecto al poder del estado donde el ciudadano vive, en cuanto a la determinación e implantación de la política pública de ese estado. En *Foley v. Connelie*, 435 U.S. 291, 294–296 (1978), el Supremo Foro judicial federal señaló lo siguiente:

... Indeed, aliens lawfully residing in this society have many rights which are accorded to noncitizens by few other countries. Our cases generally reflect a close scrutiny of restraints imposed by States on aliens. ...

. . . . . . . .

It would be inappropriate, however, to require every statutory exclusion of aliens to clear the high hurdle of "strict scrutiny" because to do so would "obliterate all the distinctions between citizens and aliens." ... The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation. ... The individual, at that point, belongs to the polity and is entitled to participate in the process of democratic decision-making. Accordingly, we have recognized "a State's historical power to exclude aliens from participation in its democratic political institutions." ...

... *Thus, it is clear that a State may deny aliens the right to vote, or to run for elective office*, for these lie at the heart of our political institutions. ... it represents the choice, and right, of the people to be governed by their citizen peers. (Énfasis suplido y citas omitidas.)

Antes de esta decisión, en *Sugarman v. Dougall*, supra, pág. 647, el Tribunal Supremo de Estados Unidos había intimado la normativa sobre el amplio poder de los estados para determinar la conformación de su comunidad política. Señaló entonces que:

Such power inheres in the State by virtue of its obligation, already noted above, "to preserve the basic conception of a political community". ... And this power and responsibility of the State applies, *not only to the qualifications of voters*, but also to persons holding state elective or important non-elective executive, legislative and judicial positions .... (Énfasis suplido y citas omitidas.) Íd.

Un año después de la decisión de *Foley v. Connelie*, supra, el Tribunal Supremo federal reiteró la normativa reseñada antes. En *Ambach v. Norwick*, 441 U.S. 68, 75 (1979), indicó que:

The rule for governmental functions, which is an exemption to the general standard applicable to classifications based on alienage, rests on important principles inherent in the

Constitution. The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State... It is because of this special significance of citizenship that governmental entities, when exercising the functions of government, have wider latitude in limiting the participation of noncitizens.

En virtud de la referida normativa, el Tribunal Supremo federal ha validado leyes estatales que requerían la ciudadanía de Estados Unidos como condición previa para que una persona pudiese ocupar cargos públicos, tales como el de policía, *Foley v. Connelie*, supra, y el de oficial probatorio, *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982). *También es claro que un estado de la Unión puede excluir del electorado a aquellos que no sean ciudadanos de Estados Unidos. Skafte v. Rorex,* 553 P.2d 830 (Colo. 1976)*, app. dismd. for lack of substantial federal question,* 430 U.S. 961 (1977).

Para concluir este tema, debe señalarse que si bien no puede negarse que un estado de la Unión tiene la *facultad* para requerir la ciudadanía de Estados Unidos como condición para el ejercicio del derecho al voto, también es cierto *que el estado no está obligado a hacerlo.* Es decir, por lo menos con respecto a los comicios puramente estatales, los estados de la Unión son libres de decidir qué condiciones, si alguna, le imponen al derecho al voto y a quién se lo otorgan. Sobre este amplio poder del estado, sólo recaen las limitaciones que surjan de las Enmiendas I y XIV de la Constitución federal. Lo señaló así el Tribunal Supremo de Estados Unidos en *Burdick v. Takushi*, 504 U.S. 428, 434 (1992):

... [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Véase, además, *Treatise on Constitutional Law,* supra, pág. 522.

El estado, pues, puede requerir la ciudadanía de Esta-

dos Unidos como condición previa para el ejercicio del derecho al voto. Esa es su prerrogativa. Pero, como no existe obligación constitucional federal alguna que le requiera exigir 'tal condición, el estado también puede conceder el derecho al voto a quienes son sólo ciudadanos de ese estado, aunque no sean ciudadanos de Estados Unidos. Así lo resolvió expresamente el Tribunal Supremo de Estados Unidos en *Pope v. Williams*, 193 U.S. 621, 632 (1904):[14]

> ... the privilege to vote in a State is within the jurisdiction of the State itself, to be exercised as the State may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals in violation of the Federal Constitution. *The State might provide that persons of foreign birth could vote without being naturalized* .... (Énfasis suplido.)

En efecto, aunque en la actualidad ya no es así, históricamente numerosos estados de la Unión otorgaron la franquicia electoral a residentes que no eran ciudadanos de Estados Unidos. Véase J.B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional And Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391 (1993). Véanse, además: *Crosse v. Board of Supervisors of Elections*, 221 A.2d 431 (1966); *United States v. Cruikshank et al.*, 92 U.S. 542, 549–552 (1875).

■ Dicho de otro modo, la franquicia electoral en los estados de la Unión dimana de la ciudadanía estatal, no de la ciudadanía nacional. Así lo resolvió expresamente el Tribunal Supremo de Estados Unidos en *Snowden v. Hughes*, 321 U.S. 1, 7 (1944), al afirmar que:

> ... The right to become a candidate for state office, like the right to vote for the election of state officers, ... is a right or privilege of state citizenship, not of national citizenship ....

---

[14] En *Dunn v. Blumstein*, 405 U.S. 330, 337 esc. 7 (1972), el Tribunal Supremo federal aclaró el dictamen concreto de *Pope v. Williams*, 193 U.S. 621 (1904), y rechazó cualquier *dicta* que fuese contraria a lo que se resolvió en *Dunn v. Blumstein*, supra. Nada de ello tiene que ver con la cita que aparece en el texto de esta opinión.

No hay, pues, obligación alguna que surja de la Constitución de Estados Unidos que requiera para poder votar en los comicios estatales que el elector tenga que ser ciudadano de Estados Unidos. Sólo es necesario que sea ciudadano del estado; entendiéndose, claro está, que quienes sí son ciudadanos de Estados Unidos serán automáticamente ciudadanos del estado donde residan.

### B. *La ciudadanía de Estados Unidos en Puerto Rico*

En nuestro país, la ciudadanía de Estados Unidos ha sido uno de los elementos configurativos principales de la relación entre la colectividad política puertorriqueña y la nación norteamericana. Para comprender cuán medular ha sido tal ciudadanía, es menester repasar brevemente algunos datos de la historia constitucional de Puerto Rico.

Como se sabe, cuando las tropas norteamericanas invadieron nuestra isla, por razón de la Guerra Hispanoamericana, el pueblo de Puerto Rico, según la Carta Autonómica de 1897, que fue decretada por el monarca español, disfrutaba de un régimen de gobierno propio, "varios de cuyos rasgos aún no han sido superados hasta el día de hoy". J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universitaria, 1980, Vol. I, pág. 131. Según ese régimen, los puertorriqueños eran súbditos españoles y gozaban de iguales derechos respecto a la nacionalidad y ciudadanía que los españoles peninsulares. Íd.

El Tratado de París de 1898, mediante el cual Estados Unidos adquirió de España a Puerto Rico como botín de guerra, terminó con el régimen autonómico referido. Conforme al Art. IX de dicho tratado, los derechos civiles y la condición política de los habitantes de Puerto Rico se determinarían por el Congreso de Estados Unidos. Luego de dos años de ocupación militar, el Congreso ejerció la facultad aludida y, para regir a Puerto Rico, estableció el Acta Foraker de 1900, que constituyó "un severo retroceso en la marcha del pueblo de Puerto Rico hacia un gobierno digno

y propio". Trías Monge, *op. cit.*, Vol. I, pág. 227, y Vol. II, pág. X.

Según la Sec. 7 del Acta Foraker, 31 Stat. 79, Documentos Históricos, L.P.R.A., Tomo 1, el pueblo de Puerto Rico se constituyó en un cuerpo político y sus habitantes se convirtieron en "ciudadanos de Puerto Rico". Aunque tales habitantes tendrían "derecho a la protección de los Estados Unidos", no se les concedió la ciudadanía de Estados Unidos. Íd. Así, pues, según el propio Tribunal Supremo de Estados Unidos, el pueblo de Puerto Rico se convirtió en una colectividad política con su propia ciudadanía. Lo explicó así el supremo foro judicial federal: "a body politic, under the name of The People of Porto Rico, with a citizenship of its own, is created." *Martinez v. Asociacion de Senoras*, 213 U.S. 20, 24 (1909).

Debe enfatizarse que la formalización de la ciudadanía puertorriqueña en el Acta Foraker fue un acto congresional realizado con plena deliberación. La versión original del proyecto de ley presentado por el Senador Foraker el 9 de enero de 1900 tenía una disposición mediante la cual se le concedía la ciudadanía de Estados Unidos a los habitantes de Puerto Rico. Tal disposición fue objeto de mucho debate en el Congreso y, finalmente se optó por no conceder la ciudadanía de Estados Unidos y, en su lugar, reconocer la ciudadanía de Puerto Rico. L.J. Gould, *The Foraker Act: The Roots of American Colonial Policy*, Michigan, University Microfilms, 1958, págs. 75–79. De esta manera, el Congreso seguía la misma línea que había adoptado Estados Unidos antes, al negociar el Tratado de París mediante el cual España cedió Puerto Rico a Estados Unidos. Tres décadas antes, Estados Unidos había adquirido el territorio de Alaska y en el tratado con Rusia para la cesión de éste se había acordado que los habitantes de Alaska serían ciudadanos de Estados Unidos. 15 Stat. 542 (1867). Sin embargo, en el caso de la cesión de Puerto Rico, Estados Unidos optó por no seguir el precedente de Alaska, y de otros

tratados anteriores similares,([15]) y no concedió la ciudadanía americana a los habitantes de Puerto Rico.

Es por lo anterior, que un gran conocedor de todo este asunto ha señalado, refiriéndose a Estados Unidos, que "el reconocimiento [en el Acta Foraker] de la ciudadanía de Puerto Rico ... y el de la existencia del pueblo de Puerto Rico constituido políticamente ... *recalcó la vigencia de la nacionalidad puertorriqueña,* aunque estuviera sujeta al dominio imperial de los Estados Unidos". (Énfasis suplido.)([16]) Ciertamente, la mayoría de los jueces del Tribunal Supremo de Estados Unidos en el histórico caso de *Downes v. Bidwell,* 182 U.S. 244 (1901), compartían la idea de que era incongruente extender la ciudadanía de Estados Unidos a la gente de un país como Puerto Rico, cuyos hábitos, tradiciones y modos de vida eran distintos a los de los norteamericanos.

██ Los habitantes de Puerto Rico, pues, a partir del Acta Foraker, advinieron ciudadanos de Puerto Rico. Sin embargo, como estaban sometidos a la jurisdicción de Estados Unidos ("whose ... allegiance is due to the United States"), los puertorriqueños, aun sin ser ciudadanos de Estados Unidos, no eran extranjeros (*aliens*) respecto de Estados Unidos. *Gonzalez v. Williams,* supra, pág. 13. La colectividad política que era Puerto Rico no constituía, pues, un país extranjero (*foreign country*) sino un país "doméstico",([17]) que era territorio de Estados Unidos. *De Lima v. Bidwell,* 182 U.S. 1 (1901). Durante el régimen del Acta Foraker, evidentemente, para ser elector en Puerto Rico no

---

([15]) Trías Monge, *op. cit.,* Vol. I, 1980, págs. 153–154.

([16]) A. Fernós Isern, *Estado Libre Asociado de Puerto Rico: antecedentes, creación, desarrollo de Puerto Rico,* 2da ed., Río Piedras, Ed. U.P.R., 1988, pág. 13.

([17]) En varias de las decisiones del Tribunal Supremo de Estados Unidos, según el régimen del Acta Foraker, se alude a Puerto Rico como un *país* (*country*), además de la referencia como "territorio" de Estados Unidos. Véase, por ejemplo, *Martinez v. Asociacion de Senoras,* 213 U.S. 20, 25 (1909). Véase, también, *Fourteen Diamond Rings v. United States,* 183 U.S. 176, 181–182 (1901). Para la referencia al concepto "país doméstico" (*domestic country*), véanse: *De Lima v. Bidwell,* 182 U.S. 1 (1901); *Gonzales v. Williams,* 192 U.S. 1 (1904).

se necesitaba ser ciudadano de Estados Unidos. Más bien, el elector tenía que ser ciudadano de Puerto Rico, como lo requería expresamente la Sec. 29 de dicha ley, que regía las elecciones en la isla. 31 Stat. 82, L.P.R.A., Tomo 1.

La situación descrita antes cambió en 1917, con la aprobación por el Congreso del Acta Jones. Por virtud de esta legislación se le concedió la ciudadanía de Estados Unidos a los puertorriqueños. Ello sucedió a pesar de que el representante electo del pueblo de Puerto Rico ante el Congreso de Estados Unidos, el Comisionado Residente Muñoz Rivera, se opuso a tal concesión. United States Congress, *Congressional Record*, 64th Cong., 1st Sess., Vol. 53, parte 8, pág. 7472. Se concedió la ciudadanía americana, además, sin previa consulta al pueblo de Puerto Rico, y a pesar de que el único organismo legislativo electo por el pueblo, la Cámara de Delegados, también se había opuesto a ello. Trías Monge, *op. cit.*, Vol. II, pág. 37.

En la literatura erudita se debate mucho la cuestión de si el pueblo puertorriqueño hubiese apoyado la concesión de la ciudadanía americana, de haber sido consultado respecto de ello, en 1917. Sobre lo que no hay discusión, sino un sólido acuerdo, es en cuanto a la razón que tuvo el Gobierno de Estados Unidos para concedernos la ciudadanía americana. Un distinguido puertorriqueño estudioso de la cuestión, José A. Cabranes, Juez del Tribunal de Apelaciones Federal para el Segundo Circuito, lo ha expresado así en *Citizenship and The American Empire: Notes on the Legislative History of the United States Citizenship of Puerto Ricans*, New Haven, Yale U. Press, 1978, pág. 15:

By extending United States citizenship to the Puerto Ricans after promising independence to the Filipinos, Congress intended to do little more than proclaim the permanence of Puerto Rico's political links with the United States ....

... United States citizenship thus inevitably was considered a means of acknowledging the special place of Puerto Rico among the new colonial territories and of expressing the virtually uni-

versal expectation of a permanent relationship. Cabranes, *supra*, pág. 53.

Estas conclusiones de Cabranes están ampliamente documentadas en su obra antes citada. En particular, se apoyan en claras y repetidas expresiones afines de los principales actores en el proceso decisional federal sobre este asunto, como las del Congresista William Jones, Presidente de la Comisión de Asuntos Insulares de la Cámara de Representantes de Estados Unidos y autor de la ley que concedió la ciudadanía americana, quien expresó en 1916, en relación con ésta que:

> The purpose of the United States seems clearly to be to retain Porto Rico permanently. There is no division of sentiment in the United States, so far as I am aware, on that subject. As to whether you will have statehood or remain a Territory is a matter that remains to be decided in the future.[18]

Antes, el Secretario de Guerra de Estados Unidos, Lindley Garrison, quien tenía la jurisdicción ejecutivo-federal sobre Puerto Rico, había favorecido la concesión de la ciudadanía. Le indicó al Congreso que:

> As I understand the situation, there is no sentiment whatever in the United States that the island of Porto Rico should be an independent sovereignty. There is no suggestion that it should not be connected with the United States Government *for all time*. ... (Énfasis suplido.)[19]

En efecto, la concesión de la ciudadanía respondió a la intención congresional y del Ejecutivo federal de que con tal concesión, Puerto Rico quedaría permanentemente vinculado a Estados Unidos. Véanse: Trías Monge, *op. cit.*, Vol. II, págs. 32–39, 80–82 y 109–110; A. Morales Carrión, *Puerto Rico: A Political and Cultural History*, Nueva York, Ed. W.W. Norton, 1983, págs. 162–164 y

---

[18] Hearings on H.R. 8501 before the House Comm. on Insular Affairs, 64th Cong., 1st Sess. 59 (1916).

[19] Hearings on H.R. 13818, 63 Cong., 2nd Sess. 31 (1914).

187–199; R. Serrano Geyls, *El Misterio de la Ciudadanía*, 40 Rev. C. Abo. P.R. 437 (1979). Véase, además, *Com. of Puerto Rico v. Blumenthal*, 642 F.2d 622, 633 esc. 18 (Cir. D.C. 1980), y el texto a que ésta se refiere.

Tan definitivo era el interés de las autoridades federales en asegurar la vinculación de Puerto Rico con Estados Unidos que la ciudadanía americana se concedió con cierto grado de compulsión. El Art. 5 del Acta Jones, 39 Stat. 953, L.P.R.A., Tomo 1, disponía que las personas que fuesen ciudadanos de Puerto Rico, según lo establecía la Sec. 7 del Acta Foraker, *supra*, quedaban declarados ciudadanos de Estados Unidos, *pero que podían conservar su condición de ser sólo ciudadanos de Puerto Rico* si dentro de seis meses declaraban su intención de no ser ciudadanos de Estados Unidos. Se le dio, pues, a los puertorriqueños en 1917 la opción de aceptar o no la ciudadanía americana.[20] Sin embargo, los puertorriqueños que no la aceptasen, disponía el Acta Jones, no podían ocupar cargo público alguno, (Art. 10, 39 Stat. 954, L.P.R.A., Tomo 1) ni participar en los procesos electorales del país (Art. 35, 39 Stat. 963, *supra*). Con la concesión de la ciudadanía de Estados Unidos, pues, la colectividad de Puerto Rico continuaba siendo un país, territorio de Estados Unidos, pero ahora sus ciudadanos quedaban firme y permanentemente vinculados a la nación americana por un nuevo nexo; tan fundamental que los eminentes derechos políticos del sufragio y de la conducción y dirección de los asuntos públicos, le estaban vedados a quienes repudiasen ese nexo.

Es menester señalar que el propósito del gobierno federal de darle permanencia a los vínculos entre Puerto Rico y Estados Unidos, mediante la concesión de la ciudadanía,

---

[20] Para hacer viable esta opción, se dejó vigente la Sec. 7 del Acta Foraker, 31 Stat. 79, Documentos Históricos, L.P.R.A., Tomo 1, págs. 31–32, aun después de aprobarse el Acta Jones. Es decir, para que quienes optasen por no aceptar la ciudadanía de Estados Unidos pudiesen continuar siendo ciudadanos de Puerto Rico, era necesario dejar en vigor la disposición originaria que creaba tal ciudadanía, que es la Sec. 7 del Acta Foraker, *supra*. En efecto, continua vigente todavía. 48 U.S.C. sec. 733.

eran tan claros y definitivos que muchos juristas llegaron hasta interpretar que, con tal concesión, Puerto Rico se había convertido en un territorio *incorporado* de Estados Unidos. Véase las ilustradas opiniones del Tribunal de Distrito federal en *In the Matter of Tapia*, 9 P.R. Fed. Reports 452 (1917), y del Tribunal Supremo de Puerto Rico en *Muratti v. Foote*, 25 D.P.R. 568 (1917). El Tribunal Supremo de Estados Unidos, sin embargo, se apartó, como se sabe, de la conocida doctrina de que la concesión de la ciudadanía aparejaba la incorporación y resolvió que si lo que el Congreso deseaba era incorporar a Puerto Rico, tenía que decirlo expresamente. *Balzac v. People of P.R.*, supra, pág. 306. En virtud, pues, de esta cardinal decisión del más alto foro judicial de Estados Unidos, Puerto Rico, a partir de 1917, quedaba firmemente vinculado a la nación norteamericana, *pero no formaba parte cabal de ella*. Según *Balzac v. Porto Rico*, supra, pág. 305, la concesión de la ciudadanía de Estados Unidos a los puertorriqueños no aparejaba la incorporación de nuestra isla a esa nación. Puerto Rico, por ende, continuaba y continuaría siendo lo que había sido hasta entonces: un país distinto, que estaba estrechamente ligado al norteamericano, sin estar integrado a éste. Para el Tribunal Supremo federal, la concesión de la ciudadanía americana no alteraba el carácter esencial de Puerto Rico como un pueblo propio, diferente del estadounidense.([21])

Según se ha señalado ya, en el Acápite III(B) de esta opinión, al aprobarse la Ley Núm. 600 y crearse el E.L.A. se eliminó de nuestro ordenamiento constitucional el re-

---

([21]) En *Balzac v. Porto Rico*, 258 U.S. 298, 311 (1922), el Tribunal Supremo de Estados Unidos expresamente indica que de la mera concesión de la ciudadanía americana no se podía inferir la intención congresional de "incorporate into the Union these distant ocean communities of a different origen and language from those of our continental people".

Según el Tribunal, la concesión de la ciudadanía sólo concedió un derecho adicional a los puertorriqueños: "It enabled them to move into the continental United States, and, becoming residents of any State there, to enjoy every right of any other citizen of the United States,—civil, social and political." *Balzac v. Porto Rico*, supra, pág. 308.

quisito de ser ciudadano americano como condición para ser elector en Puerto Rico. La disposición sobre el particular en el Acta Jones se derogó, y nada se preceptuó sobre ello en nuestra Constitución ni en la Ley de Relaciones Federales con Puerto Rico. Sin embargo, de ningún modo ello significa que se haya menoscabado la importancia de la ciudadanía americana en el nuevo régimen político creado con la adopción por el pueblo de Puerto Rico de nuestra propia Constitución. *Sucedió todo lo contrario.* En el Preámbulo de la Constitución de Puerto Rico se afirma, en lo pertinente, que:

> Nosotros, el pueblo de Puerto Rico, a fin de organizarnos políticamente sobre una base plenamente democrática, promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos, puesta nuestra confianza en Dios Todopoderoso, ordenamos y establecemos esta Constitución para el Estado Libre Asociado que en el ejercicio de nuestro derecho natural ahora creamos *dentro de nuestra unión con los Estados Unidos de América.*
> Al así hacerlo declaramos:
>
> . . . . . . .
>
> Que consideramos *factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América* y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas; la lealtad a los postulados de la Constitución Federal; ...." (Énfasis suplido.) L.P.R.A., Tomo 1, ed. 1982, pág. 251.

El alcance y sentido de lo que se afirma en el Preámbulo de nuestra Constitución fue explicado en la Asamblea Constituyente de Puerto Rico, con diáfana claridad, por su Presidente, el Comisionado Residente de Puerto Rico, doctor Fernós Isern:

> Cuando aquí nos reunimos ahora para organizar nuestro estado, se está afirmando, se está demostrando que Puerto Rico no es una posesión, sino de sus habitantes; que somos un pueblo con vida propia, con soberanía democrática propia, creadores de nuestro propio gobierno y de nuestro propio Estado. Esto es así, sin que nos separemos de la unión, ni ingresemos en la unión, porque nuestra autoridad y la de Estados Unidos en

Puerto Rico se han armonizado y conjugado felizmente, a virtud de un acuerdo voluntario, de un convenio, mediante el cual *se establece una unión que esperamos sea perpetua, fundamentada en la común lealtad, que aquí ratificamos, a una común ciudadanía.*

Quedan ciertos atributos de soberanía en manos del gobierno federal de Estados Unidos. ¿Los dejamos en manos de un extraño? ¿En manos de un poder que detenta nuestro derecho? No por cierto. En nuestro convenio ha quedado escrito, ha quedado ratificado, con nuestro consentimiento, *que somos no sólo ciudadanos de Puerto Rico*, sino ciudadanos de Estados Unidos, vivimos dentro del ámbito de la ciudadanía de los Estados Unidos ....

*... La ciudadanía de los Estados Unidos es lazo de unión fundamental entre el pueblo de Puerto Rico y sus conciudadanos del continente* y de las otras islas. Dentro de sus ámbitos creamos nuestro Estado. *Y más que por nada es por el vínculo de la ciudadanía que quedamos unidos a la Unión,* aunque no hemos ingresado en ella. (Énfasis suplido.)[22]

Queda claro, pues, que al incluir el Congreso la ciudadanía americana en la Ley Núm. 600, al aprobar el pueblo de Puerto Rico esa ley y al adoptar por voto directo la Constitución, la ciudadanía americana adquirió una nueva dimensión con respecto a la colectividad puertorriqueña. Lo que se había legislado unilateralmente por el Congreso en 1917 fue aceptado con plena formalidad por primera vez por el propio pueblo de Puerto Rico en 1950 y 1952, y *convertido en la piedra angular del continuado vínculo entre la nación norteamericana y la colectividad política puertorriqueña.* Más aún, por razón de ese lazo fundamental, el pueblo de Puerto Rico aceptó también la vigencia continuada en el país del ámbito de autoridad sobre Puerto Rico, que aún persiste en manos del gobierno federal. Es porque somos ciudadanos de Estados Unidos que el Congreso puede extender a Puerto Rico la misma legislación que válidamente promulga para regir en los 50 estados de la Unión. Si no fuera por esa ciudadanía, que la generalidad de los puertorriqueños ahora ostentamos de

---

[22] 1 Diario de Sesiones de la Convención Constituyente 344–345 (1951).

modo claramente libre y voluntario, la autoridad que el Congreso ejerce en Puerto Rico sería meramente un simple poder colonial, ilícito y tiránico, como es la naturaleza de tal poder. Véase C. Magruder, *The Commonwealth Status of Puerto Rico*, 15 U. Pitt. L. Rev. 1, 16 (1953). En efecto, el continuado ejercicio de autoridad por parte de Estados Unidos sobre el pueblo puertorriqueño, sólo en virtud de la ciudadanía americana, ha sido objeto de críticas tan severas que incluso se ha cuestionado si el E.L.A. no es más que una forma benigna de un régimen colonial. Aun quienes ayudaron a crear este ente político, han formulado críticas significativas respecto a sus limitaciones. Véanse: P. Muñoz Amato, *Congressional Conservatism and the Commonwealth Relationship*, 285 Annals Am. Acad. Pol. & Soc. Sci. 23 (1953); C.J. Friedrich, *Puerto Rico: Middle Road To Freedom*, Nueva York, Ed. Rinehart, 1959. Incluso, José Trías Monge, ex Secretario de Justicia de Puerto Rico, ex Presidente del Tribunal Supremo de Puerto Rico y uno de los conocidos artífices del E.L.A., ha manifestado recientemente que:

> ... Puerto Rico aún sigue siendo colonia de Estados Unidos por razón, entre otras, de que el consentimiento que prestó [al continuado ejercicio por Estados Unidos de determinados poderes sobre la isla] fue de índole excesivamente genérica. J. Trías Monge, *El E.L.A. ante los tribunales*, 64 Rev. Jur. U.P.R. 1, 47 (1995).

El asunto de si al amparo del E.L.A. la relación entre Puerto Rico y Estados Unidos perdió o no su carácter colonial, claro está, es uno que no nos compete dilucidar. Ello pertenece primordialmente al ámbito de los procesos políticos. Sólo reiteramos aquí que con la aceptación formal de la ciudadanía americana por el pueblo de Puerto Rico, desde el punto de vista constitucional, se modificó de un modo significativo la relación que había existido antes entre nosotros y la nación norteamericana. Hasta entonces sólo había existido una indudable relación de tutela, origi-

nada en el insólito traspaso de todo un pueblo como botín de guerra, de una metrópolis a otra. Las facultades de gobierno que antes ejercía Puerto Rico constituían una *mera delegación de poder* por parte del Congreso, sujeta a la revocación por éste en cualquier momento, y subordinada al poder plenario que tenía el gobierno federal sobre el país, impuesto por conquista. A partir de la creación del E.L.A., la relación adquirió un nuevo matiz al reconocérsele al pueblo de Puerto Rico el derecho a un ámbito privativo de gobierno propio, quedando así autolimitado el poder plenario que antes tenía la metrópolis norteamericana con respecto a Puerto Rico. La relación adquirió un nuevo cariz, además, porque la autoridad así demarcada que desde entonces Estados Unidos ejercería sobre nuestro país, contaría al menos con un consentimiento génerico otorgado por el pueblo puertorriqueño. Por primera vez, los poderes que Estados Unidos ejercería sobre el pueblo de Puerto Rico se apoyarían en un consentimiento expreso y formal de ese pueblo. Dicho consentimiento se expresó varias veces durante el proceso acontecido de 1950 a 1952 y fue dado con conciencia por parte del pueblo de Puerto Rico, de que comenzaba a ejercer su inalienable derecho a la autodeterminación, y con la confianza de que el tutor colonial al fin comenzaba a reconocérselo. Gran parte de toda esta importante modificación de la relación lo fue precisamente nuestra aceptación de la ciudadanía americana como uno de los factores determinantes en nuestra vida colectiva bajo el régimen vigente.

 A la luz de todo lo anterior, resulta claro en derecho que la Asamblea Legislativa de Puerto Rico tiene razón justificada para requerir, *de ordinario*, la ciudadanía americana como condición para que una persona pueda ejercer el derecho al voto en Puerto Rico. De ese modo, se reitera y resalta la esencia de la ciudadanía americana como piedra angular de nuestra relación con Estados Unidos. Se reafirma precisamente en lo más elemental del

proceso político, nuestra perdurable vinculación con Estados Unidos, que es, como el Congreso lo quiso en 1917 y de nuevo en 1950 y 1952, permanente hasta que el pueblo de Puerto Rico y el Gobierno de Estados Unidos acuerden otra cosa.[23]

Es menester añadir que, cónsono con este objetivo, existen otras razones afines que también justifican fijar, de ordinario, la ciudadanía americana como una condición para el ejercicio del derecho al voto en Puerto Rico. Por un lado, con ello se le otorga la debida *reciprocidad electoral* a los conciudadanos norteamericanos residentes y domiciliados en Puerto Rico. Como se sabe, los puertorriqueños que se mudan a Estados Unidos y establecen residencia en algún estado de la Unión tienen derecho a votar en los comicios que allí se celebren. Véanse: *Balzac v. Porto Rico*, supra; *Dunn v. Blumstein*, supra; *Atty. Gen. of Territory of Guam v. U.S.*, 738 F.2d 1017 (9no Cir. 1984); *Igartua De La Rosa v. U.S.*, 32 F.3d 8 (1er Cir. 1994). Por ello, a los norteamericanos que viven en la isla, con intención de permanecer aquí, se les debe reconocer, de ordinario, la facultad de participar en nuestros procesos electorales. La legislación de Puerto Rico, que define a los electores del país como aquellos que sean ciudadanos de Estados Unidos, así lo hace.

Por otro lado, el requisito de ser ciudadano de Estados Unidos también sirve para delimitar precisamente quiénes constituyen, de ordinario, nuestro cuerpo electoral con derecho al sufragio. Como la generalidad de los puertorriqueños son ciudadanos americanos, dicho requisito fija un criterio práctico para reconocerles su derecho al voto, a la vez

---

[23] En el informe de la Comisión creada por el Congreso de Estados Unidos en 1964 para estudiar las relaciones presentes y futuras entre Puerto Rico y Estados Unidos se indicó lo siguiente sobre la relación que existe actualmente al amparo del Estado Libre Asociado de Puerto Rico:

"A great deal has been said during the status debate of the last dozen years about the permanency of the relationship. Since the underlying validity of the relationship is its bilateral character, it will be as permanent as the people of Puerto Rico and the people of the United States wish it to be. As noted earlier, however, any future change in political status by mutual consent is not foreclosed."

que viabiliza la exclusión de los comicios a aquellos foras-
teros que residan en la isla, pero que no forman parte in-
tegral de nuestra comunidad política.

De lo anterior, es evidente, pues, que existen intereses
apremiantes del Estado que justifican la referida regla-
mentación del derecho al voto. Por ello, es errónea la de-
terminación del foro de instancia que declaró inconstitucio-
nal los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto
Rico, *supra*.

Nuestra determinación de que las aludidas disposicio-
nes de la Ley Electoral de Puerto Rico son válidas, sin em-
bargo, no concluye el examen del asunto ante nos. Debe-
mos decidir aún si dichas disposiciones son aplicables a
Mari Brás y a otros como él.

## VI

*Aplicación de la Ley Electoral de Puerto Rico al recurrido*

Antes de proceder a determinar si las disposiciones de
la Ley Electoral de Puerto Rico vigente aplican concreta-
mente a la situación ante nos, conviene reiterar la impor-
tante normativa que regula la interpretación de aquellos
estatutos que inciden sobre derechos constitucionales.

Como se sabe, nuestro ordenamiento jurídico
tiene establecido un principio fundamental de hermenéu-
tica, con arreglo al cual cualquier disposición legislativa
que impone limitaciones sobre el ejercicio de derechos
constitucionales debe interpretarse restrictivamente. *Soto
v. Srio. de Justicia*, 112 D.P.R. 477, 486 y 495 (1982); *Mari
Bras v. Alcaide*, 100 D.P.R. 506, 513 (1972); *El Pueblo v.
Padilla*, 20 D.P.R. 276, 280 (1914). En particular, hemos
señalado que tales estatutos deben ser interpretados de
manera que no derroten un propósito de orden
constitucional. *Martínez v. Tribunal Superior*, 81 D.P.R.
945, 953 (1960).

 El principio referido lo hemos aplicado con particular énfasis precisamente cuando la legislación en cuestión es la Ley Electoral de Puerto Rico. Desde *Giménez v. J.E.E.*, 96 D.P.R. 943, 955 (1968), hemos dejado claramente establecido que cuando se trata de prohibiciones o limitaciones que inciden sobre "el derecho al sufragio de una parte de la ciudadanía ... [se] hace imperativo que al interpretar [la Ley Electoral de Puerto Rico] se haga de manera restrictiva en lo relativo al alcance [de la prohibición o limitación], en orden a evitar la desigualdad de la ley en su aplicación en cuanto a ciudadanos que en el ejercicio de su prerrogativa electoral tienen derecho a la igual protección de la ley". Esta norma de interpretación, dirigida a salvar la constitucionalidad de la Ley Electoral de Puerto Rico, la hemos seguido más recientemente en decisiones como las de *García v. Luciano*, 115 D.P.R. 628, 630–631 (1984), y *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980).

Con estos vitales conceptos en mente, pasemos a examinar la cuestión de si las disposiciones en cuestión, de la Ley Electoral de Puerto Rico vigente, pueden aplicarse a la situación de autos.

Un examen minucioso del historial de la Ley Electoral de Puerto Rico revela que, al aprobarla, el Legislador no tuvo ante su consideración la *situación excepcional* que plantea el recurrido Mari Brás y otros en sus mismas circunstancias. Es decir, cuando se aprobaron en 1977 los Arts. 2.003 y 2.023 de la actual Ley Electoral de Puerto Rico, *supra*, el Legislador indicó que sólo se pretendía "conservar intactas" las disposiciones esencialmente iguales sobre el requisito electoral de ciudadanía americana que existían en leyes anteriores y que procedían originalmente de la Ley Núm. 79 de 25 de junio de 1919 (16 L.P.R.A. ant. sec. 1 *et seq.*).([24]) No hay indicios en el historial de que se

---

([24]) Véanse: Informe de la Comisión de Gobierno de la Cámara de Representantes sobre el P. de la C. 446 de 1ro de diciembre 1977, 8va Asamblea Legislativa, 2da Sesión Ordinaria; Informe del Presidente de la Comisión de Gobierno del Senado de

haya discutido en 1977 el asunto de quién debía ser elector capacitado en Puerto Rico.([25]) Tampoco se consideró, de modo alguno, la cuestión de si personas nacidas en Puerto Rico, hijos de padres puertorriqueños, que siempre han residido en la isla y que han participado activamente en el proceso político del país, pueden continuar ejerciendo el derecho al voto, aunque hayan renunciado a la ciudadanía americana. Es evidente, además, que la razón por la que esta cuestión no se consideró entonces es que no ha sido hasta sólo recientemente, en 1993, cuando personas como Mari Brás, que a la sazón tenía 67 años de edad, han renunciado a su ciudadanía americana, dando lugar así a dicha cuestión.

El dato anterior es muy pertinente a la consideración del asunto ante nos porque, como ya hemos señalado, la Asamblea Legislativa de Puerto Rico tiene amplia facultad para reglamentar el derecho al voto en Puerto Rico, y pudo haber dispuesto expresamente que personas como Mari Brás pueden participar en nuestros comicios, aun después de renunciar a la ciudadanía americana. En otras palabras, aunque el requisito electoral de ser ciudadano americano es válido de ordinario, y responde a intereses estatales apremiantes, dicho requisito no es de orden constitucional y, por lo tanto, nada impide que el Legislador pueda hacer *excepciones* a éste cuando ello esté justificado y ampliar así el registro electoral.

---

Puerto Rico en torno al P. del S. 424, 8va Asamblea Legislativa, 2da Sesión Ordinaria, Senador Oreste Ramos, pág. 23, y las expresiones del representante Misla Aldarondo sobre el particular en el debate en el hemiciclo de la Cámara el 2 de diciembre de 1977. Diario de Sesiones de la Cámara, págs. 105–106.

([25]) Al Art. 2.003 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3053, se añadió el requisito de que el elector debía ser ciudadano de Puerto Rico, además de ser ciudadano de Estados Unidos. No hemos encontrado nada en el historial legislativo que explique por qué se añadió ese requisito o cuál era su alcance. Dicho requisito, además, no se incluyó en el Art. 2.023 de la ley, *supra*, creando así una incompatibilidad entre ambas disposiciones. Es incompatible, además, con las expresiones de los líderes legislativos a cargo de la referida ley, mencionadas antes en el texto de la opinión y en el escolio anterior, de que la Ley Electoral de 1977 *conservaba intactos* los requisitos sobre el particular de la legislación anterior.

Como la cuestión ante nos en este caso no estuvo ante la consideración del Legislador en 1977 cuando se aprobó la Ley Electoral de Puerto Rico vigente, no parecería que éste tuviera entonces la intención deliberada de excluir del sufragio aun a personas como el recurrido. A base del historial de la Ley Electoral de Puerto Rico, no podemos afirmar que el Legislador, cuando la aprobó, le dio tanto peso a la condición de ser ciudadano americano que estuvo dispuesto, a base de ello, a negarle el derecho al voto, incluso a personas cuya *nacionalidad puertorriqueña es incuestionable.* Veamos.

## VII

*La ciudadanía de Puerto Rico*

Como hemos indicado ya, no hay base en el historial de la Ley Electoral de Puerto Rico para concluir que el Legislador tuvo la intención deliberada de excluir a personas como Mari Brás de ejercer el derecho al voto en Puerto Rico. Debemos ahora añadir que desde el punto de vista jurídico tampoco puede *presumirse* que el Legislador hubiese dispuesto la exclusión del registro electoral de personas como el recurrido, de haber surgido entonces la situación que nos concierne ahora aquí. No podemos suponer tal exclusión porque existen razones jurídicas, de orden constitucional todas ellas, que militan en contra de la validez de tal presunto proceder legislativo. La primera de esas razones es que, en derecho, no puede tomarse livianamente el hecho de que las personas en cuestión son indudablemente miembros integrantes de nuestro pueblo. El recurrido y otros como él no son ya ciudadanos americanos, pero no han dejado de ser *ciudadanos de Puerto Rico*, conforme lo establecido en el Art. 10(1) del Código Político de Puerto Rico, 1 L.P.R.A. sec. 7(1), *cuya continuada vigencia fue expresamente dispuesta por la Asamblea Constituyente*

*de Puerto Rico*. Dice así la referida disposición del Código Político:

> Son ciudadanos de Puerto Rico:
> 1. Toda persona nacida en Puerto Rico y sujeta a su jurisdicción.

En la Convención Constituyente, esa disposición del Código Político, que data de los tiempos del Acta Foraker, fue acogida como definitoria de la ciudadanía de Puerto Rico que habría de corresponder al E.L.A. En el informe de la Constituyente, relativo al Art. IX, Sec. 5 de la Constitución, L.P.R.A., Tomo 1, Diario de Sesiones, *supra*, Vol. 4, pág. 2626,[26] se indicó lo siguiente:

> En lo sucesivo el término "ciudadano del Estado Libre Asociado de Puerto Rico" será usado en vez de "ciudadano de Puerto Rico". Los "ciudadanos de Puerto Rico" antes de constituirse el Estado Libre Asociado de Puerto Rico están definidos en la Ley Orgánica. Sus disposiciones continúan en vigor como parte del Estatuto Puertorriqueño de Relaciones Federales. También está determinado en el Código Político de Puerto Rico, *que continuará en vigor.*
> *Son esos "ciudadanos de Puerto Rico" los que crea el Estado Libre Asociado de Puerto Rico.* Lógico es que se les denomine en lo sucesivo como ciudadanos de él. Los ciudadanos del Estado Libre Asociado no serán otras personas que los que llenen los requisitos hasta ahora establecidos para la condición de "ciudadano de Puerto Rico". La ciudadanía del Estado Libre Asociado viene a ser pues, la continuación de la ciudadanía hasta ahora designada "de Puerto Rico". (Énfasis suplido.)

Conforme a lo anterior, pues, es evidente que al amparo de la Constitución del E.L.A. las personas nacidas en Puerto Rico y sujetas a su jurisdicción son ciudadanos de Puerto Rico. Por ello, Mari Brás y otros de sus mismas circunstancias ostentan una ciudadanía puertorriqueña,

---

[26] Véase, además, las expresiones del doctor Fernós Isern, citadas antes en el Acápite V(B) del texto de esta opinión, en la cual alude a la ciudadanía de Puerto Rico en el nuevo régimen del Estado Libre Asociado de Puerto Rico.

cuyos perfiles generales intimamos parcialmente en *Maristany v. Srio. de Hacienda*, 94 D.P.R. 291 (1967).[27] Esa ciudadanía está expresamente reconocida en nuestra Constitución, varias veces, en la Sec. 5 del Art. III, en la Sec. 3 del Art. IV, en la Sec. 9 del Art. V, y en la Sec. 5 del Art. IX, L.P.R.A., Tomo 1. Fue reconocida también por el propio Gobierno de Estados Unidos en su comunicación oficial a la comunidad internacional sobre el E.L.A., de 21 de marzo de 1953, mencionada antes. En el Memorando enviado por el embajador Cabot Lodge a las Naciones Unidas se señalaba, en lo pertinente, que:

> 20. The people of Puerto Rico continue to be citizens of the United States *as well as of Puerto Rico* .... (Énfasis suplido.)

Más aún, la disposición de ley federal, mediante la cual, en 1900, se estableció la ciudadanía puertorriqueña, continúa vigente. Véase 48 U.S.C. sec. 733.[28]

■ La aludida ciudadanía de Puerto Rico no es, evidentemente, la ciudadanía nacional de un país o Estado independiente; pero tampoco significa mero domicilio. Se

---

[27] A partir de la creación del Estado Libre Asociado de Puerto Rico en 1952, hemos hecho breves referencias al concepto de ciudadanía de Puerto Rico en algunas decisiones de este Tribunal, que trataban esencialmente con cuestiones relativas al *domicilio* de alguna de las partes en los litigios que dieron lugar a esas decisiones. Tal es el caso de decisiones como *Martínez v. Vda. de Martínez*, 88 D.P.R. 443 (1963), y *Fiddler v. Srio. de Hacienda*, 85 D.P.R. 316 (1962). Evidentemente, en tales casos, nuestros pronunciamientos, de alcance muy limitado, se ciñeron al asunto concreto planteado en éstos. No tuvimos en ellos la ocasión para expresarnos propiamente sobre el asunto de la existencia de una ciudadanía puertorriqueña, como lo hacemos en esta opinión.

[28] Como se ha indicado antes, en el Acápite V(B) de esta opinión, Acta Jones de 1917 no derogó la Sec. 7 del Acta Foraker, *supra*, que establecía la ciudadanía de Puerto Rico. Por el contrario, el Acta Jones mantuvo vigente esa Sec. 7, precisamente para que los puertorriqueños que no aceptasen la ciudadanía americana concedida en 1917 pudiesen continuar siendo ciudadanos de Puerto Rico. Más aún, en 1927, el Congreso enmendó el Acta Jones para extenderle *la propia ciudadanía de Puerto Rico* a los ciudadanos de Estados Unidos que residiesen en Puerto Rico por espacio de un año. 44 Stat. 1418. Dicha disposición, que evidentemente presupone la existencia de la ciudadanía de Puerto Rico, sigue vigente. 48 U.S.C. sec. 733a. Leyes federales posteriores, relativas a inmigración y naturalización, han derogado disposiciones sobre ciudadanía de las referidas actas orgánicas, pero la aludida Sección 7 como tal, nunca ha sido derogada, y aparece como vigente en el United States Code Annotated, citado antes.

trata, más bien, de la ciudadanía que corresponde a la colectividad política que forma parte de un sistema federal. En tales federaciones, la dualidad de ciudadanía es inherente. *Martínez v. Vda. de Martínez*, supra, pág. 452. Tal ciudadanía es consustancial con los poderes y las facultades que la colectividad política tiene dentro del sistema federal. Así, la ciudadanía de Puerto Rico surge jurídicamente de la Constitución del E.L.A. y tiene efectos en relación con la autoridad pública que le es privativa al E.L.A. y que fuera discutida antes, en el Acápite III de esta opinión. Es decir, la ciudadanía de Puerto Rico existe como parte del ámbito de autoridad que le corresponde al E.L.A y es consustancial con los poderes públicos que le son privativos al actual régimen político de Puerto Rico. Aplica aquí, *por analogía*, lo que el Tribunal Supremo de Estados Unidos señaló en *United States v. Cruikshank et al.*, supra, pág. 549:

> We have in our political system a government of the United States and a government of each of the several States. Each one of these governments is distinct from the others, and each has citizens of its own who owe it allegiance, and whose rights, within its jurisdiction, it must protect. The same person may be at the same time a citizen of the United States and a citizen of a State, but his rights of citizenship under one of these governments will be different from those he has under the other.

La condición de ciudadano de Puerto Rico identifica a la persona que la ostente como miembro integral de la colectividad puertorriqueña. Es el "vínculo por excelencia ... que ata jurídicamente [a tal persona con el] Estado Libre Asociado ... en el ejercicio de todos sus poderes soberanos". *Maristany v. Srio. de Hacienda*, supra, pág. 302.

Como lo ha reconocido el propio Tribunal Supremo de Estados Unidos, se trata de una ciudadanía *propia* que tienen los integrantes del país que es Puerto Rico desde antes de haber adquirido la ciudadanía americana, *Martinez v. Asociacion de Senoras*, supra, y *que no depende de ésta, Crosse v. Board of Supervisors*, supra. Por el contra-

rio, la ciudadanía americana se concedió en 1917 *a base de la ciudadanía de Puerto Rico*, al disponerse en el Acta Jones que "[t]odos los ciudadanos de Puerto Rico ... se declaran por la presente ciudadanos de los Estados Unidos". 39 Stat. 953, *supra*, ed. 1982, pág. 81. Aunque fue establecida inicialmente por ley federal, su existencia jurídica no descansa ya en tal ley federal. El fundamento jurídico actual de la ciudadanía puertorriqueña es la propia Constitución del E.L.A. Nuestra Constitución expresamente la reconoce, y dicha ciudadanía constituye un elemento indispensable del régimen autonómico que se estableció en el país en 1952 por la voluntad del propio pueblo puertorriqueño. Su origen más fundamental, claro está, radica en el hecho incontestable de que Puerto Rico es un pueblo, un país formalmente organizado en una colectividad política, por lo que las personas que lo forman son ciudadanos suyos. Como bien ha dicho el Tribunal Supremo de Estados Unidos, "citizens ... are the people who compose the community". *United States v. Cruikshank et al.,* supra, pág. 549.

En vista, pues, de que jurídicamente existe la ciudadanía puertorriqueña, y como se da por sentado que el derecho al voto en una jurisdicción corresponde precisamente a los que son ciudadanos de ella, *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 300, no puede presumirse que el legislador en 1977 tuvo la intención de excluir de ese derecho a personas como el recurrido, que han sido y continúan siendo ciudadanos de Puerto Rico. Véase *Borinquen Furniture v. Tribl. de Distrito*, 78 D.P.R. 901, 905 (1956).

■ Nuestra Constitución expresamente declara y ordena que en Puerto Rico el poder político emana del pueblo y se ejercerá con arreglo a su voluntad. Art. I, Sec. 1, Const. E.L.A., *supra*. Ello es la esencia del sistema democrático de gobierno, según se define en el Preámbulo de la Constitución, en el cual se consagra, además, que tal sistema democrático "es fundamental para la vida de la co-

munidad puertorriqueña". Como ya hemos resuelto que el derecho al voto es la "piedra angular del sistema democrático", y que es el medio primordial a través del cual el pueblo expresa su voluntad, *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 207 y 210, tal derecho no puede negársele a ninguna persona que forme parte integral del pueblo de Puerto Rico, como lo son los ciudadanos de Puerto Rico y también, claro está, los ciudadanos de Estados Unidos residentes y domiciliados en la isla.

Por otro lado, nuestra Constitución, en su Art. II, Sec. 2, L.P.R.A., Tomo 1, ed. 1982, pág. 261, dispone que las leyes de Puerto Rico "protegerán al *ciudadano* contra *toda coacción* en el ejercicio de la prerrogativa electoral". (Énfasis suplido.) El Estado tiene la obligación de proteger ese derecho. *P.I.P. v. C.E.E.*, supra. Esta disposición constitucional, y las aludidas en el párrafo anterior, claramente militan en favor de la conclusión de que un ciudadano de Puerto Rico, en las circunstancias actuales de Mari Brás, no puede ser privado de su derecho al voto en los comicios del país. Por ser parte integral del pueblo tiene derecho a participar en los procesos electorales mediante los cuales se expresa la voluntad del pueblo.

 Una segunda razón por la que no puede presumirse que el Legislador en 1977 hubiese excluido al recurrido del registro electoral del país, es que en Puerto Rico el derecho al voto no sólo está expresamente consagrado como una de las garantías constitucionales fundamentales, sino que, además, tal derecho se formula en nuestra Constitución como de carácter "universal". El mandato de que el sufragio en Puerto Rico será universal comporta un propósito de inclusión, no de exclusión. Significa, cuando menos, que en casos de incertidumbre sobre quién tiene derecho a votar, prevalecerá aquella interpretación del estatuto electoral que favorezca el ejercicio del derecho al voto. Véase *P.P.D. v. Admor. Gen. de Elecciones*, supra.

■ Una tercera razón que impide suponer que el Legislador en 1977 hubiese excluido a Mari Brás del registro electoral de Puerto Rico es que la acción del recurrido de renunciar a la ciudadanía de Estados Unidos se realizó en el ejercicio de su incuestionable derecho a la libre expresión. Con la renuncia referida, Mari Brás ha querido propagar su particular visión del ideal de independencia para Puerto Rico, manifestar su objeción a una ciudadanía que según él fue impuesta ilícitamente, y afirmar su creencia de que Puerto Rico es una nación y su única patria. Reiteradamente hemos resuelto que en nuestro país, cualquier persona tiene derecho a ejercitar a plenitud, dentro de la más dilatada libertad, la totalidad de los derechos de expresión. Hemos reconocido la primacía de que goza la libertad de expresión en nuestro orden constitucional y que estamos obligados a su más celosa protección. *Pueblo v. Hernández Colón*, 118 D.P.R. 891 (1987); *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971); *Mari Brás v. Casañas*, 96 D.P.R. 15 (1968).

■ Por otro lado, reiteradamente también hemos condenado el discrimen por razón de ideas políticas y los intentos por menoscabar los derechos políticos de los grupos minoritarios. *Silva v. Hernández Agosto*, supra; *P.R.P. v. E.L.A.*, supra; *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982 (1972).

A la luz de lo anterior, sancionar a una persona por ejercer el derecho de su libertad de conciencia, privándolo del derecho al voto por ello, presenta, cuando menos, graves problemas constitucionales. Ciertamente es sustancial y de méritos considerables el planteamiento de que tal sanción apareja una violación al derecho de expresión y al derecho a no sufrir discrimen político que tiene Mari Brás.

Finalmente, existe una cuarta razón por la cual no puede presumirse que el Legislador en 1977 hubiese negado el derecho al voto a personas como el recurrido. Como

se ha intimado antes, la actual condición política del país es permanente, sólo mientras Puerto Rico y Estados Unidos así lo deseen. El pueblo de Puerto Rico conserva la facultad de procurar cambios de *status*. Así lo hemos resuelto antes. *P.S.P. v. E.L.A.*, supra. Así lo indicó la Asamblea Constituyente de Puerto Rico cuando en su Resolución Núm. 23 de 4 de febrero de 1952 resolvió, *inter alia*, que:

(e) El pueblo de Puerto Rico retiene el derecho de proponer y aceptar modificaciones en los términos de sus relaciones con los Estados Unidos de América, de modo que, éstas en todo tiempo sean la expresión del acuerdo libremente concertado entre el pueblo de Puerto Rico y los Estados Unidos de América.

Así también lo reconoció el entonces Presidente de Estados Unidos, Dwight Eisenhower, en su mensaje en 1953 a las Naciones Unidas, sobre el recién creado E.L.A. El mensaje, que se refería al alcance autonómico del nuevo *status* de Puerto Rico, fue el siguiente:

"... if, at any time, the Legislative Assembly of Puerto Rico adopts a resolution in favour of more complete of even absolute independence, he [the President] will immediately thereafter recommend to Congress that such independence be granted." Trías Monge, *op. cit.*, Vol. IV, 1983, pág. 53.

Así lo reconoció, además, la comunidad internacional, en el inciso (9) de la Resolución Núm. 748 VIII, que la Asamblea General de las Naciones Unidas aprobó sobre el E.L.A. el 27 de noviembre de 1953. La disposición aludida dispone:

The General Assembly,

. . . . . . . .

9. Expresses its assurance that, in accordance with the spirit of the present resolution, the ideals embodied in the Charter of the United Nations, the traditions of the people of the United States of America and the political advancement attained by the people of Puerto Rico, due regard will be paid to the will of both the Puerto Rican and American peoples in the conduct of

their relations under their present legal status, and also in the eventuality that either of the parties to the mutually agreed association may desire any change in the terms of this association.

En vista de lo anterior, como la facultad de pasar juicio sobre cualquier género de modificación sustancial al *status* político de Puerto Rico sólo le corresponde a los miembros del pueblo de Puerto Rico, *P.S.P. v. E.L.A.*, supra, la exclusión de tales procesos de miembros integrantes de la colectividad puertorriqueña, como lo son los ciudadanos de Puerto Rico como Mari Brás, evidentemente levantaría otra vez, cuando menos, serias interrogantes constitucionales. Ello, porque cualquier persona que sea puertorriqueña *bona fide* tiene un indiscutible derecho a participar en los comicios que afecten el destino final de nuestro país.[29]

Tal derecho milita en contra de presumir que los puertorriqueños que han renunciado a la ciudadanía americana quedaron privados del derecho al voto por el Legislador en 1977. No cabe tal presunción, porque la Ley Electoral de Puerto Rico en cuestión puede ser aplicable a *comicios plebiscitarios*, precisamente en cuanto a quién puede votar en ellos. Véase el Art. 7.004 de la Ley Electoral de Puerto Rico 16 L.P.R.A. sec. 3304, que así lo dispone. Por lo tanto, la exclusión del registro de electores de Puerto Rico de personas como Mari Brás puede significar, además, su exclusión incluso de procesos para decidir el *status* final de Puerto Rico, lo que, a su vez, tendría obvios visos de inconstitucionalidad. No puede presumirse que el Legislador en 1977 tuvo la intención de crear tal situación, que es de muy

---

[29] *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 606 y 608 (1978).

Debe señalarse que este derecho evidente ha sido reconocido al menos en un tratado internacional suscrito por Estados Unidos. Véase el Convenio Internacional de Derechos Civiles y Políticos (C.I.D.C.P.), suscrito por las partes el 23 de marzo de 1976 y ratificado por Estados Unidos el 8 de septiembre de 1992, Art. 1 (6 International Legal Materials 368–383 (1967)). Se trata, pues, de un derecho que forma parte del ordenamiento jurídico federal. *Missouri v. Holland*, 252 U.S. 416 (1920).

cuestionable validez. Véanse: *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618–619 (1981); *Martínez v. Tribunal Superior*, supra.

En resumen, queda claro que al aprobarse la Ley Electoral de Puerto Rico vigente no se tuvo en cuenta la situación excepcional que aquí nos concierne. Sencillamente, la cuestión sobre el derecho al voto de personas como el recurrido no fue regulada por la Asamblea Legislativa. Queda claro también que no puede suponerse válidamente que dicha situación hubiese quedado sujeta a lo legislado en 1977, de haberse conocido ésta entonces. Por el contrario, en vista de los múltiples y graves problemas de inconstitucionalidad que presenta la exclusión de Mari Brás del registro electoral, estamos obligados a darle a la Ley Electoral de Puerto Rico vigente una interpretación que evite tener que declararla inconstitucional. En varias ocasiones hemos resuelto que cuando se impugnan ante nos estatutos que adolecen de inconstitucionalidad por subinclusión, debemos salvar el impedimento constitucional mediante la extensión de los derechos en cuestión a la clase excluida. *P.R.P. v. E.L.A.*, supra; *Milán Rodríguez v. Muñoz*, supra. En particular, precisamente en un caso electoral, hemos resuelto que:

> ... nuestra misión en casos de esta naturaleza es cumplir con el mandato de ley, pero reconociendo que el legislador no puede anticipar nunca todas las posibilidades imaginables en el elenco de situaciones en que la dinámica y conducta humana se desenvuelven. En esas instancias, nuestra misión suprema es salvar —por la preeminencia del derecho envuelto— aquellas situaciones en las cuales una interpretación literal y rigurosa plantearía graves interrogantes y objeciones de carácter constitucional. *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 429.

En vista de lo anterior, en el caso de autos, resolvemos que son electores capacitados en el país, con pleno derecho al voto, quienes ostenten la ciudadanía de Estados

Unidos, *o* los que sólo sean ciudadanos de Puerto Rico, según se han definido en esta opinión, siempre que cumplan con los requisitos de residencia y domicilio correspondientes. En otras palabras, resolvemos que, independientemente del poder que tiene la Asamblea Legislativa para, de ordinario, exigir el requisito de ser ciudadano de Estados Unidos como condición para votar en el país, no puede excluirse del registro electoral local a ciudadanos puertorriqueños con las circunstancias actuales de Mari Brás, por lo que debe considerarse que tienen derecho a votar al amparo de la Ley Electoral de Puerto Rico vigente.

## VIII

Por los fundamentos expuestos, *se dictará sentencia para revocar la del foro de instancia, en cuanto declara inconstitucional lo dispuesto en los citados Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, sobre la ciudadanía americana como condición para ser elector en Puerto Rico. En su lugar, se resolverá que los artículos referidos de la Ley Electoral de Puerto Rico incluyen al recurrido entre los electores capacitados del país.*

El Juez Asociado Señor Negrón García emitió una opinión concurrente. El Juez Asociado Señor Hernández Denton emitió una opinión de conformidad. El Juez Asociado Señor Rebollo López y el Juez Asociado Señor Corrada Del Río emitieron sendas opiniones disidentes.

— O —

Opinión concurrente del Juez Asociado Señor Negrón García.

*En nuestro entorno particular puertorriqueño, el Lcdo. Juan Mari Brás es un sincero objetor de conciencia.* Como tal, en virtud de la *doctrina de objetor de conciencia,* para

poder votar no puede compelérsele, a través de la ciudadanía norteamericana, a actuar contra su conciencia y jurar lealtad a una nación por la cual no siente alianza ni afinidad política ni emocional.

*La definición del destino final político de Puerto Rico es de profundo y vital significado. En nuestra escala valorativa se trata de un sentimiento del espíritu, que cala hondamente en la conciencia del puertorriqueño y se nutre primordialmente de factores éticos. La libertad de conciencia religiosa que delimita la conducta y el ámbito individual de la existencia temporal del ser humano en esta vida y su destino final en el más allá es cónsona con la libertad de conciencia política de Mari Brás en el ámbito de su existencia y el destino final del "status" político.*

Ciertamente no estamos ante el mismo problema que en Estados Unidos dio génesis a la *doctrina de objetor de conciencia.* Pocas cosas grandes e importantes en la vida de los pueblos se dan de igual forma y manera en distintas latitudes; sin embargo, atendemos una situación axiológica muy parecida. *Lo que allá se desarrolló como excepción de conciencia religiosa, en el Puerto Rico de hoy tiene su equivalencia razonable en el problema político-moral del "status"; asunto cercano a comienzos de siglo, se encuentra en plena ebullición, y todavía se manifiesta insondablemente, en su proyección futura.*

Mari Brás ha dedicado su vida adulta a profesar vehementemente la independencia total para Puerto Rico. A su juicio, la expresión más lógica, cónsona con su ideario, es renunciar a la ciudadanía que lo une jurídicamente con Estados Unidos. Al actuar conforme a su conciencia de ideología política, se confronta con que se le quiere negar ese derecho, anulándole su voto, el instrumento efectivo y democrático para promover pacíficamente y hacer realidad sus ideas. *El diseño electoral prevaleciente le obliga a escoger entre dos (2) medios irreconciliables para adelantar la*

*separación de Puerto Rico de Estados Unidos, a saber, vo-
tar como ciudadano norteamericano —condición que es
anatema y antítesis de su ideal— o renunciar a dicha ciu-
dadanía y con ello perder su derecho como elector por ser
sólo ciudadano puertorriqueño.* No puede ser; no podemos
exiliar ni "confinar a las tinieblas aquellos que quieran al-
terar nuestra forma de gobierno". (Traducción nuestra.)[1]

## I

Con plena conciencia *histórica del presente y la relativi-
dad ínsita a las opiniones jurídicas,* recordamos las nume-
rosas ocasiones en que el quehacer judicial suele tornarse
angustioso y cómo la cambiante y escurridiza realidad
puertorriqueña no se deja atrapar ni encasillar fácilmente
en un simple *sí* o en un *no.* "La sentencia es un artículo de
la ley filtrado a través de la *conciencia del juez.*"[2] Ello
también nos recuerda la prudente admonición de un juez
experimentado a otro: "Le aconsejo un largo y minucioso
*examen de conciencia.* Explore, escrute, acuéstese con su
duda; sáquela usted de paseo. Y sólo cuando uno de los dos,
usted o ella, haya vencido, sólo aquel día vuelva usted."[3]

A modo de paréntesis, presentamos unas aclaraciones.
Múltiples razones nos impiden suscribir la opinión del Tri-
bunal emitida por el Juez Asociado Señor Fuster Berlin-
geri, con la conformidad del Juez Presidente Señor Andréu
García, la Juez Asociada Señora Naveira de Rodón y el
Juez Asociado Señor Hernández Denton. *Con todo respeto,
ésta anticipa y hace observaciones que trascienden innece-
sariamente las normas de autolimitación que, en materia*

---

[1] *Whitehill v. Elkins,* 389 U.S. 54, 55 (1967).

[2] P. Calamandrei, *Proceso y Democracia,* Buenos Aires, Eds. Jurídicas Europa-América, 1960, pág. 86.

[3] Diálogo de la obra teatral de Hugo Betti, "Corrupción *en el Palacio de Justi-cia*", en *Teatro Completo,* Madrid, Ed. Aguilar, 1960, pág. 910.

*constitucional, la doctrina de revisión judicial impone a los tribunales.*[4] *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958); *Rosa v. Tribunal Superior*, 102 D.P.R. 670, 678 (1974). "Esta prudencial regla de autolimitación evita que hagamos determinaciones constitucionales innecesariamente amplias." *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 403, 433 (1993).

Como resultado, *inintencionalmente* parte sustancial de su exposición histórica, énfasis, conceptos y abarcadoras conclusiones son susceptibles de mal interpretarse como que adelantan una postura ideológica político-partidista. No está exenta de esta falla adjudicativa la Opinión de conformidad (¿concurrente?) del Juez Asociado Señor Hernández Denton, págs. 257–262, al igual que las críticas y manifestaciones que, como *reacción*, contiene la opinión disidente del Juez Asociado Señor Corrada Del Río, págs. 328–331 y 345–365.

Para decidir este recurso no era menester desarrollar ese tipo de estructura interna, clase de análisis y asertos. *Tampoco se debió abordar y resolver prematuramente interrogantes no planteadas*; algunas de las cuales están fuera de nuestra jurisdicción. Nadie aquí ha cuestionado la au-

---

(4) Contrasta este proceder mayoritario con el seguido hace escasamente unas semanas en *García v. Hosp. Reg. de Guayama*, 143 D.P.R. 829 (1997). Allí, el Juez Asociado Señor Fuster Berlingeri, vía escolio, en su *Opinión de conformidad* consignó la siguiente queja:

"Sé que este Tribunal desde hace tiempo tiene establecida la *política judicial* de no dictaminar sobre la validez constitucional de una ley o reglamento si existen fundamentos de otra índole que permiten disponer del caso. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958). Pero ello no es una barrera infranqueable *que impida incluso anticipar, a modo de observación*, los graves problemas de inconstitucionalidad que determinado curso de acción acarrearía, sobre todo en casos tan importantes como el de autos. *Se evitan ominosos problemas futuros si se advierte a tiempo la probable invalidez de una acción cuya realización es claramente contemplable.* Por ello, considero desafortunado que los compañeros de la mayoría no hayan acogido la postura decisional que les propusimos y que hayan optado, luego, por resolver este caso estrictamente sobre limitadas bases estatutarias. Me temo que volveremos a discutir los asuntos constitucionales en cuestión, ya que con una mera enmienda legislativa queda sin efecto lo que aquí ellos deciden." (Énfasis suplido y en el original.) Íd., págs. 843, esc. 1.

toridad jurídica, al amparo de la Constitución del E.L.A., para regular "el derecho al voto en el país". Opinión del Tribunal, pág. 154. No hacía falta dedicar veintiuna (21) páginas (Opinión del Tribunal, Acápite III, págs. 154–173) al nacimiento, trámite y características del E.L.A., para concluir lo que nuestra Constitución, en su Art. VI, Sec. 4, L.P.R.A., Tomo 1, *taxativamente dispone: la existencia de esa facultad.*

Por ello no vemos la necesidad de la abarcadora y tajante afirmación mayoritaria de que los "asuntos regidos específicamente por nuestra Constitución [están] libres de autoridad superior". Opinión del Tribunal, pág. 172.[5] Al presente, ¿cuál es su significado? ¿A cuáles otros asuntos se extiende? Según la relación actual, ¿excluye la autoridad del Congreso o del Presidente? ¿A ambos? En el ámbito judicial, nuestras decisiones e interpretaciones en materia constitucional-electoral, ¿quedan ahora exentas de ser revisadas por el Tribunal Supremo federal?

Tampoco se ha cuestionado la naturaleza trascendental del voto. Innumerables decisiones *nuestras* del pasado así lo testimonian. *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995); *Marrero v. Municipio de Morovis*, 115 D.P.R. 643 (1984); *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984); *Santos v. Comisión Estatal de Elecciones*, 111 D.P.R. 351 (1981);

---

[5] En su abono se cita *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964). Adviértase, sin embargo, que esas expresiones no pueden tomarse aisladamente, pues se dan en el contexto de la premisa básica siguiente:

"Al aceptar y serle satisfactoria la Carta de Derechos de la Constitución, el Congreso habría de presumir —*y en efecto así es y deberá ser*— que poderes públicos y los tribunales del Estado Libre Asociado harán efectivas, e interpretarán las disposiciones de esa Carta de Derechos de manera compatible con la protección que ofrecen a esas libertades básicas y garantías personales iguales o similares disposiciones de la Constitución de los Estados Unidos, y no en menor grado de protección, según éstas son o sean interpretadas y aplicadas por el Tribunal Supremo de los Estados Unidos, *tanto por el hecho de que somos una comunidad que ostenta la ciudadanía de los Estados Unidos, como también porque el propio pueblo puertorriqueño hizo expresión de lealtad a los postulados de la Constitución de los Estados Unidos en el Preámbulo de la Constitución que adoptara, como uno de los factores determinantes de su vida de pueblo.*" (Énfasis suplido.) *R.C.A. v. Gobierno de la Capital*, págs. 427–428.

*P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980); *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84 (1980); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

No era preciso entrar a especular y afirmar en veinticuatro (24) páginas más (Opinión del Tribunal, acápites IV al VI, págs. 173–198) la peculiar visión mayoritaria sobre la evolución histórica de la ciudadanía norteamericana, sólo para reafirmar lo que el Preámbulo de la Constitución también expresamente expone —*factor determinante* en la relación vigente con Estados Unidos— y, aún así, sostener *cualificadamente* la validez constitucional de requerirla para votar; aunque a juicio de la mayoría, *¡"de ordinario"!*

En este último extremo, rechazamos enfáticamente la *novedosa tesis mayoritaria de relatividad constitucional* que encierra una insalvable contradicción sustantiva y procesal. En lo *sustantivo*, concluye y reconoce la existencia de "intereses apremiantes" de la Asamblea Legislativa que válidamente justifica requerir a todo elector la ciudadanía norteamericana. Opinión del Tribunal, pág. 195. Sin embargo, subsiguientemente, la mayoría ignora y le resta total eficacia constitucional a esos "intereses apremiantes" al resolver que no puede exigírsele a Mari Brás, porque la circunstancia de su renuncia no estuvo ante, ni fue anticipada, por la Asamblea Legislativa. Demás está decir que, según este *desestabilizador enfoque*, jamás faltarán en todos los órdenes de la vida situaciones meritorias no previstas por el Legislador al momento de aprobar una ley, susceptibles de ser invocadas como eximentes de su cumplimiento. *La tesis de relatividad constitucional mayoritaria socava irremediablemente los cimientos en que se apuntala la doctrina de presunción de constitucionalidad, de cuya vitalidad depende nuestra Constitución y el desenvolvimiento normal, ordenado y respetuoso de los tres poderes constitucionales bajo la forma de gobierno republicano.*

En lo *procesal*, es obvio que el trámite de recusación contra el licenciado Mari Brás es de carácter individual y

personal. *Afecta sólo a su voto.* En esencia, reclama para sí que se le reconozca como elector idóneo y adjudique, según depositado en las urnas en las elecciones pasadas. Ante el Tribunal no tenemos ninguna otra persona con idéntico trámite o reclamo. Aún así, la mayoría no se limita a remediar la improcedencia de su recusación sino que, sin sujeción alguna a los requisitos mínimos de la Regla 20 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y a nuestra jurisprudencia,(6) ha transformado su recusación individual en un *pleito de clase* y lo ha extendido automáticamente a todo independentista que renuncie dicha ciudadanía. Opinión del Tribunal, págs. 198–200 y 205–206; Opinión de conformidad del Juez Asociado Señor Hernández Denton, págs. 266–267 y 268. Si tan abarcador y absoluto remedio no se asemeja de facto a un dictamen de inconstitucionalidad, ¿qué es?

Tampoco cabe acudir a la *doctrina de subinclusión* incorporada a nuestra jurisdicción en *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618 (1981). Tanto la Ley Electoral de Puerto Rico vigente, tal como las anteriores, jamás han excluido a grupo ideológico particular alguno o a los independentistas. *No hay preterición legislativa alguna que justifique usar esa herramienta de hermenéutica e invocar esta doctrina.* Si acaso, en oposición cabría el argumento de que fue Mari Brás quien, por propia decisión, se excluyó del ámbito y de la protección de la Ley Electoral de Puerto Rico.

Finalmente nos preocupan las expresiones mayoritarias que, a modo de epílogo, introduce en materia electoral la persona *"puertorriqueña bona fide"*, para seguidamente anticipar que "tiene un indiscutible derecho a participar en los comicios que afecten el destino final de nuestro país".

---

(6) En *Cuadrado Carrión v. Romero Barceló*, 120 D.P.R. 434 (1988), y *River Castillo v. Municipio de San Juan*, 130 D.P.R. 683 (1992), se exponen los requisitos que hay que cumplir previamente para que, según el debido procedimiento de ley, un pleito sea verdaderamente de clase, a saber, solicitud, alegación de demanda, emplazamiento y notificación, numerosidad, comunidad de intereses, tipicidad y adecuada representación.

Opinión del Tribunal, pág. 206. *Lo menos que podemos decir es que son, de su faz, prematuras.*

En nuestro ordenamiento electoral conocemos el concepto de *"residencia bona fide"*, que se da en función del requisito de *domicilio* exigible a todo elector. Art. 2.004 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3054; *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 258–260 (1981). En el contexto electoral, ¿cuál es el significado de esta novedosa figura de persona *"puertorriqueña bona fide"*? ¿Cuáles son sus atributos? ¿Tiene desplazamiento extraterritorial? ¿Tiene alguna proyección generacional? ¿Está sugiriéndose que el requisito de *domicilio* de la Ley Electoral de Puerto Rico vigente es inconstitucional? ¿Quiere decir que la Asamblea Legislativa de Puerto Rico o el Congreso federal en cualquier futura legislación sobre el *status* de Puerto Rico tienen que conceder participación a toda persona *"puertorriqueña bona fide"*, irrespectivamente de que no sea residente? Por último, ante esta nueva nomenclatura electoral, ¿debemos entender que en nuestro medio existe, como contraparte, alguna persona *"puertorriqueña mala fide"*?

En resumen, aunque se dice lo contrario, un análisis crítico de la metodología y de los abarcadores pronunciamientos de la opinión del Tribunal y la de conformidad, *revela un decreto implícito de inconstitucionalidad que electoralmente deja hueca y a la deriva la ciudadanía norteamericana.* No podemos endosarlo.

Esta profunda, pero deferencial discrepancia con la metodología adjudicativa de la mayoría del Tribunal, no nos impide separadamente sostener la franquicia electoral de Mari Brás por un curso decisorio distinto.

En el fondo, la verdadera razón de decidir (*ratio decidendi*) para dirimir justicieramente esta controversia es liberarlo de un requisito válido de ley, por razón de que acatarlo va contra sus firmes e íntimas creencias *ideológi-*

*cas, esto es, contra su conciencia misma.*(⁷) Con respeto hacia otras opiniones y planteamientos —incluso los promo-, vidos e ingeniosamente elaborados por el propio recurrido Mari Brás— bajo este prisma, es que podemos únicamente considerar su pedido *jurídicamente justiciable y vindicable.* En acatamiento de una estricta disciplina judicial, nos vemos compelidos a declinar la invitación que a través de algunos de sus argumentos nos hace para que nos pronunciemos sobre extremos tales como definir el ámbito de la nación puertorriqueña, el alcance más allá de los límites geográficos de la ciudadanía puertorriqueña y otros planteamientos más, en los cuales resulta sumamente difícil, si no imposible, deslindar lo jurídico de la "cuestión política".

*Circunscribimos así la controversia real de justiciabilidad a dos (2) cuestiones puras de derecho: primero, enjuiciar la validez constitucional del requisito legislativo de la ciudadanía norteamericana y, segundo, si puede negársele el sufragio a Mari Brás por haber renunciado a dicha ciudadanía como instrumento de lucha en la consecución de sus firmes y profundas creencias políticas.*

*Según esta vía decisoria limitada, evitamos pronunciamientos sobre áreas y extremos que, tangencial o directamente, atañen al proceso y discurso político (reformulación de las relaciones políticas, soberanía y destino final de Puerto Rico)* que en la actualidad son objeto de un intenso debate ideológico entre los partidos y sectores políticos del país, y en el fondo son planteamientos(⁸) de "cuestiones po-

---

(⁷) "[Ó]rgano de la *individualidad* por el cual se representa de una manera indivisa todas nuestras actividades, y por cuyo medio *sabemos que vivimos, que sentimos, que queremos, que pensamos.*" (Énfasis suplido.) E.M. De Hostos, *Obras Completas: Tratado Moral*, La Habana, Ed. Cultural, 1939, pág. 19.

(⁸) En apoyo del decreto de inconstitucionalidad del ilustrado tribunal de instancia, en su elaborado y extenso alegato —consta de 109 páginas— Mari Brás desarrolla los temas y argumentos siguientes: un exordio; el contexto histórico de la ciudadanía puertorriqueña; el impacto del requisito de la ciudadanía americana como condición para ejercer los derechos políticos de la ciudadanía de Puerto Rico sobre la cláusula de reserva de *status* y del destino político final de nuestro país; el marco conceptual de la Constitución del Estado Libre Asociado: *la dignidad del ser humano, la libertad de expresión, asociación, pensamiento y conciencia y la prohibición de discrimen por razón de ideas políticas*; el derecho al voto en los estados de la

líticas" *disfrazadas de juridicidad*, vedadas a los tribunales dirimir.

*A fin de cuentas, todos coincidimos de que el destino político de Puerto Rico es asunto que pertenece al Pueblo y que debe resolverse en las urnas, no desde los estrados judiciales.* Por su volatividad, en abono de la más depurada imagen del Tribunal, en buena técnica adjudicativa constitucional, no cabe anticipar pronunciamientos u "observaciones" innecesarias. *Sobran razones para que, mientras menos hable la toga, mejor.*

## II

Mari Brás nació el 2 de diciembre de 1927 en Mayagüez, *Puerto Rico.* Ha vivido toda su vida aquí. *Por décadas ha sido y es un firme creyente de la causa de la independencia. Como tal, activa y dinámicamente ha participado y promovido ese ideal en la política puertorriqueña y en el escenario internacional.* Véase *Mari Brás v. Casañas*, 96 D.P.R. 15 (1968). Por decisión voluntaria, previo los trámites de rigor, *renunció a la ciudadanía de Estados Unidos adquirida al nacer.* Ella le fue oficialmente aprobada el 22 de noviembre de 1995 por el Departamento de Estado federal.

Por razón de esa renuncia, el 15 de mayo de 1996 la electora, doctora Miriam J. Ramírez de Ferrer, inició en su contra un proceso de recusación electoral. Agotados los trámites ante los organismos administrativos electorales, oportunamente el asunto fue objeto de revisión ante el Tribunal de Primera Instancia, Sala de San Juan.

---

federación; *el reclamo de protección de los derechos fundamentales* a la nacionalidad, *al voto, a la libertad de conciencia o ideas políticas* o de cualquier otra índole según el derecho internacional público: la condición de hombre o mujer sin estado; los tratados y documentos internacionales suscritos y ratificados por Estados Unidos de Norteamérica; el valor jurídico de los documentos internacionales; el valor jurídico de la declaración universal de los derechos humanos; la carta de la organización de estados americanos; el pacto internacional de derechos civiles y políticos; la convención internacional contra todas las formas de discriminación racial, y el derecho a la autodeterminación y el derecho al voto.

Los procedimientos ante dicho foro judicial, con la intervención de la Comisión Estatal de Elecciones y, subsiguientemente, el Procurador General de Puerto Rico, culminaron el 21 de octubre de 1996 con una *documentada y profunda* sentencia del Juez Hon. Ángel G. Hermida, que decretó inconstitucional el requisito de ciudadanía de Estados Unidos contenido en los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3053 y 3073.

No conforme, la Comisión Estatal de Elecciones y la doctora Ramírez de Ferrer presentaron separadamente recursos de *certiorari* ante el Tribunal de Circuito de Apelaciones y, ante nos, sendas solicitudes de certificación.[9] El 30 de octubre de 1996 acogimos las certificaciones, *consolidamos* y ordenamos al tribunal de instancia y al Tribunal de Circuito de Apelaciones *que nos remitiera* los autos. En auxilio de nuestra jurisdicción autorizamos al licenciado Mari Brás a votar en las elecciones pasadas, sujetos su validez y escrutinio a las resultas de estos recursos. Oportunamente, celebramos una vista oral.

### III

La visión de nuestra Asamblea Constituyente, según destilada en el proceso deliberativo, nos permite confirmar, sin margen de duda, *la existencia de una ciudadanía puertorriqueña* —identificada oficialmente como la del Estado

---

[9] La Comisión Estatal de Elecciones señala y argumenta que "[e]rró el Tribunal al declarar inconstitucional la Ley Electoral de Puerto Rico en cuanto esta dispone —como condición para ser elector en Puerto Rico— ser ciudadano de los Estados Unidos". Caso Núm. CT-96-14, Segunda Pieza, Alegato del Procurador General, pág. 5.

Por su parte, la doctora Ramírez de Ferrer apunta y discute lo siguiente:

"1. Erró el Tribunal de Instancia al resolver que los Artículos 2.003 y 2.022(a)(sic) de la Ley Electoral son inconstitucionales.

"2. Erró el Tribunal de Instancia al reconocer una ciudadanía o nacionalidad de Puerto Rico independiente de la ciudadanía o nacionalidad de los Estados Unidos.

"3. Erró el Tribunal de Instancia al emitir un dictamen contrario a la cláusula territorial y la cláusula de supremacía de la Constitución Federal y contrario a la legislación." Íd.

Libre Asociado—([10]) a saber, las personas nacidas en Puerto Rico (*ius soli*), sujetas a su jurisdicción, y los demás ciudadanos de Estados Unidos, *mientras sean residentes de Puerto Rico.* Sus antecedentes estatutarios se remontan a la Sec. 7 del Acta Foraker, 31 Stat. 79, y la Sec. 7 del Acta Jones, cuyas disposiciones quedaron vigentes como parte del Estatuto Puertorriqueño de Relaciones federales. 4 Diario de Sesiones de la Convención Constituyente 2626 (1952).

Decimos antecedentes estatutarios, ya que sin necesitar mucha erudición, calificar a una persona como *ciudadano de Puerto Rico* intrínsecamente vale tanto como afirmar que está unido por un *ligamen natural* con el lugar o sitio donde tiene su origen o principio: el "cordón umbilical" inquebrantable que al nacer le ata con la madre tierra *(ius soli). Se trata de un atributo esencial de la personalidad, una realidad connatural y autosuficiente que nadie puede ignorar y que ni la Constitución ni la ley, como tampoco el derecho de jueces, crea, sino simplemente reconoce.*

Se funda en el derecho originario e inherente que todos tenemos al haber nacido y vivido en un lugar; como corolario, el derecho inmanente a una plena participación política, incluso a la prédica radical de ideas antagónicas a las mayoritarias.

La renuncia de Mari Brás a la ciudadanía de Estados Unidos no puede anular su derecho, como *ciudadano de Puerto Rico,*([11]) a continuar siendo elector. No es suficiente que su renuncia pueda verse como una amenaza al orden público o statu quo.

---

([10]) Bajo el acápite *Disposiciones Transitorias*, el Art. IX, Sec. 5, Const. E.L.A., L.P.R.A., Tomo 1, dispone el siguiente lenguaje vigente: "En lo sucesivo la expresión 'ciudadano del Estado Libre Asociado de Puerto Rico' sustituirá a la expresión 'ciudadano de Puerto Rico' *según éste ha sido usado antes de la vigencia de esta Constitución.*" (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2626 (1952).

([11]) Aunque brevemente, algunos miembros de la Asamblea Constituyente discutieron incidentalmente *la posibilidad de subsistir la ciudadanía de Puerto Rico sin la norteamericana.* Al considerarse los requisitos para Gobernador —plasmados oportunamente en el Art. IV, Sec. 3 de nuestra Constitución, L.P.R.A., Tomo 1, entre

En materia de instituciones políticas encontramos cierta simbiosis entre forma —estructura y dinámica de los órganos y contenido— lo que se puede realizar. Por esta razón la clasificación de sistemas que hace el hombre político va teñida, en última instancia, de un juicio de valor en bueno o malo. Bueno es el sistema que él preconiza, el que sirve a sus propósitos; malo es el de los antagonistas en la lucha política o el que entorpece la finalidad propia. Los valores inmanentes son una rareza en el combate político. L. Fernández Martínez-Ruiz, *El político, el jurista y las leyes*, Rev. Jur. de Cataluña, pág. 872.

*Igual fenómeno de matizaciones ocurre con las decisiones judiciales: "buenas y justas", son las que coinciden con nuestros criterios político-partidistas, religiosos, penales, medio ambientales, económicos y otros; "malas e injustas", las que proponen juicios diferentes o resultados contrarios a los nuestros.*

---

ellos, que "haya sido durante los cinco años precedentes, ciudadano de los Estados Unidos de América y *ciudadano* y residente *bona fide* de *Puerto Rico*", se desarrolló el diálogo siguiente:

"Sr. REYES DELGADO: ¿Me permite una pregunta?

"Sr. PRESIDENTE: El señor Delgado.

"Sr. REYES DELGADO: *¿Se puede ser ciudadano de Puerto Rico, sin ser ciudadano de Estados Unidos?*

"Sr. GARCIA MENDEZ: *Se podía ser.*

"Sr. REYES DELGADO: No se puede ser.

"Sr. GARCIA MENDEZ: *Actualmente no.*

"Sr. REYES DELGADO: ¿Si no se puede ser, entonces lo que estaría de más no sería las palabras 'de Estados Unidos'?

"Sr. GARCIA MENDEZ: No, porque ya dice que tiene que ser requisito fundamental para el cargo, ser ciudadano de Estados Unidos.

"Sr. REYES DELGADO: Sí, pero si dice 'ciudadano de Puerto Rico', y no se puede ser ciudadano de Puerto Rico, sin ser ciudadano de Estados Unidos, lo que está demás es 'ciudadanos de Estados Unidos', si tiene razón Su Señoría en la enmienda.

"Sr. GARCIA MENDEZ: *Bueno, ya eso sería ir un poco lejos, porque se puede ser ciudadano de Puerto Rico por el sólo nacimiento y todavía no ser, por alguna razón, ciudadano de Estados Unidos*, en el caso, por ejemplo, siguiente: Cuando nazca una persona en un barco dentro de los límites jurisdiccionales de varias millas, que yo no me acuerdo, y hasta tanto no se haya determinado si el padre lo inscribió como de la nacionalidad que él ostenta, o si ha dejado que, por haber nacido aquí, sea ciudadano puertorriqueño. *Porque el nacimiento hoy, determina la ciudadanía.*" (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 3, pág. 1733.

Judicialmente el reclamo de Mari Brás debe ser valorado sensiblemente como una forma más de ejercitar *su derecho multidimensional a la libre expresión*; a saber, un repudio total a la ciudadanía norteamericana como medio para promover la causa de la independencia y resaltar su nacionalidad ideológica política. *Para algunos su aceptación puede ser cuestión de conveniencia política; para él se trata de un rechazo imperativo de libertad de conciencia política.* Esa conducta se mueve dentro de la polaridad tan característica de los valores y sus tensiones, de lo mayoritario y lo peyorativo; a fin de cuentas, en este caso, de lo justo y lo injusto. *Hablar de democracia en Puerto Rico e impedirle al recurrido Mari Brás esa participación electoral es una incoherencia, un contrasentido constitucional.* Nos explicamos.

## IV

Toda Constitución tiene consigo un significado histórico y jurídico-político que refleja las vicisitudes de su proceso creador, del contenido y tenor de sus normas, valores e instituciones, consideradas como un ente total. La nuestra no es la excepción. Sin mucha elucubración, una serena mirada integral revela una *fórmula política* (Estado Libre Asociado), una *ideología demócrata-liberal.* El cuerpo constitucional reafirma la dignidad de la persona y los derechos inherentes (libertad, sufragio, justicia, *libertad de expresión, religiosa, política, igualdad*), y una organización jurídico-política de tres (3) poderes: *Ejecutivo, Legislativo y Judicial.*

Así concebida, la legitimidad del Gobierno depende del consentimiento; esto es, *"la voluntad del pueblo es la fuente del poder público".* (Énfasis suplido.) Preámbulo de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 251. Damos este consentimiento mediante el voto en elecciones imparciales y justas. *Aspiramos a que*

*cada elector vote libremente sobre sus preferencias, sólo con arreglo a su conciencia.* Por lo tanto, nuestra Carta de Derechos constitucionales proclama la inviolabilidad del ser humano, la esencial igualdad ante la ley y prohíbe "discrimen alguno por motivo de ... *ideas políticas* o religiosas". (Énfasis suplido.) Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257. *La dignidad de la persona en nuestra Constitución significa la materialización de una idea que centra el orden político y social al servicio de una concepción humanista.* Ello impone a los tribunales la obligación de velar y hacer respetar la vigencia de dicho principio y ejercer la tutela del libre desarrollo de la personalidad, según la concepción dinámica de la igualdad y la libertad de conciencia.[12] Manda, además, que "[l]as leyes garanti[cen] la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y prote[jan] al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. E.L.A., *supra*, pág. 261. De igual modo prohíbe *"aprobar ... ley alguna* que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios". (Énfasis suplido.) Art. II, Sec. 4, Const. E.L.A., *supra*, pág. 265.

*Para que la democracia funcione y alcance su más alto potencial es menester que los electores puedan considerar y deliberar todas sus opciones en un espíritu de libertad de conciencia, de pensamiento y de expresión.*

Las disposiciones constitucionales antes citadas van dirigidas a garantizar que el proceso democrático de deliberación *permanezca libre y que no sea discriminatorio. Una de las funciones principales de la libertad de expresión es*

---

[12] "Sin dignidad no hay vida." E.M. De Hostos, tomado de T. Sarramía Roncero, *Diccionario de frases de puertorriqueños ilustres*, San Juan, Ed. I.C.P., 1996, pág. 44. Nacemos iguales en dignidad; esto es, no puede ignorarse el respeto y la estimación debida a todo ente humano como tal, prescindiéndose de cualquier contingencia o accidente diferencial, que no puede ser tomado como sustancial.

*fortalecer el debate de las ideas políticas.* No puede haber consentimiento democrático cuando no se pueden expresar opiniones contrarias, disidentes o heterodoxas. Ello representaría la parálisis, más aún, la negación de nuestro sistema democrático de gobierno. Igualmente, al establecer el derecho al voto, la Sec. 2 del Art. II de nuestra Constitución, *supra*, lo entrelaza con su propósito ulterior: garantizar la expresión libre de la voluntad ciudadana. La libertad de asociación integra estos dos (2) derechos al preservar un espacio en el cual los ciudadanos puedan congregarse en organizaciones, con el fin de unir sus voces y expresar sus preferencias políticas. Finalmente, cabe recordar que "en el área del derecho a la intimidad nuestra Carta de Derechos es de 'factura más ancha' que su homóloga federal". *RDT Const. Corp. v. Contralor I*, 141 D.P.R. 424, 441 (1996). Véanse: *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975).

*La libertad de expresión es el detente que impide que el Gobierno directamente acalle aquellas voces disidentes.* "No es posible encarcelar a los hombres en la incómoda jaula de un 'standard' fetiche que la democracia ha inventado para evitarse las complicaciones que suelen engendrar las diferencias."[13]

## V

Una lectura reflexiva de los debates de la Asamblea Constituyente revela que en el ambiente en que se discutió y aprobó la Constitución del Estado Libre Asociado, *la ciudadanía de Estados Unidos quedó plasmada como el principal elemento jurídico vinculante en nuestra actual relación con Estados Unidos.* Diario de Sesiones, *supra*, Vol. 3,

---

[13] A.S. Pedreira, tomado de Sarramía Roncero, *op. cit.*, pág. 39.

págs. 1731–1739, 1895–1898 y 2555–2556. De hecho, la ciudadanía norteamericana siempre ha sido un requisito para votar en toda elección, plebiscito o referéndum, incluso aquellos que precedieron y culminaron con la aprobación de nuestra Constitución. Además de ésta, la ciudadanía de Puerto Rico también siempre ha sido un requisito *implícito* o *expreso* para ser elector. *Como consecuencia, nuestra Constitución fue ratificada por electores que ostentaban las dos (2) ciudadanías.*

Sin embargo, en la propia Constitución *no se incluyó la ciudadanía norteamericana como requisito para ser elector cualificado.* Sólo se elevó a categoría constitucional, para ser miembro de la Asamblea Legislativa (Art. III, Sec. 5), Gobernador (Art. IV, Sec. 3), Secretario de Departamento de rango constitucional (Art. IV, Sec. 5) y Juez de este Tribunal Supremo (Art. V, Sec. 9).

Ahora bien, aun cuando la Constitución no exigió la ciudadanía norteamericana como requisito para ser elector, facultó a la Legislatura para fijarla por ley, lo cual hizo, al disponer todo lo concerniente al proceso electoral e inscripción de electores. Art. VI, Sec. 4, Const. E.L.A., *supra.*[14] *P.R.P. v. E.L.A.*, supra; *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 256 (1980); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 744–745 (1976). Al respecto, el Art. 2.003 de la Ley Electoral de Puerto Rico, *supra*, requiere ser *"ciudadano de los Estados Unidos de América y de Puerto Rico domiciliado en la Isla* que, a la fecha de una elección haya cumplido los diez y ocho (18) años de edad, esté debidamente calificado con antelación a la misma, y no se encuentre legalmente incapacitado para votar". (Énfasis suplido.) Más adelante, su Art. 2.023(a) establece como fundamento de recusación "[q]ue el *elector no es ciu-*

---

[14] El mandato constitucional de que la Asamblea Legislativa reglamente los requisitos electorales, no significa otra cosa que la necesidad de la *interpositio legislatoris* —no para conceder lo que *ex proprio vigore* reconoce la Constitución— sino como las mismas palabras indican para determinar y regular el derecho en términos *que hagan viable su plena aplicabilidad y eficacia.*

*dadano de los Estados Unidos de América*". 16 L.P.R.A. sec. 3073(a).

A la luz de esos antecedentes, no es válida la interpretación antihistórica del Juez Asociado Señor Hernández Denton (Opinión de conformidad, págs. 270–272), basada en el argumento de índole gramatical (disyuntivocopulativo); esto es, que allí donde la Ley Electoral de Puerto Rico dice "y" debemos leer "o". Sin margen de duda, implícita o expresamente, tanto ayer como ahora, nuestras leyes electorales han requerido las dos (2) ciudadanías —la puertorriqueña y la norteamericana— para ser elector capacitado y *nada hay de inconstitucional en exigirlas.*

Erró, pues, el ilustrado tribunal de instancia al decretar inconstitucional el requisito de ciudadanía estadounidense.

## VI

Esta conclusión no derrota el reclamo de Mari Brás. Según dijimos, *en nuestro entorno particular puertorriqueño* es un *sincero objetor de conciencia.*[15] Definimos libertad de conciencia como "el derecho incoercible y el deber supremo que cada uno tiene de seguir la voz y el dictamen de su razón, de su conciencia, en el ordenamiento de sus operaciones racionales".[16] El reconocimiento de esa libertad de conciencia prohibe imponerle, como condición para retener su derecho a votar, que renuncie a sus convicciones. Elaboremos:

En la casuística[17] y doctrina jurídica,[18] ¿qué es un ob-

---

[15] "Muchas veces se piensa en la ciudadanía *en términos de lealtad.*" (Traducción y énfasis nuestros.) T.A. Aleinikoff, *Theories of Loss of Citizenship*, 84 Mich. L. Rev. 1471, 1473 (1986).

[16] J. Castán Tobeñas, *Los Derechos del Hombre*, Madrid, Ed. Reus, 1985, pág. 20, citando a Luiz Izaga.

[17] *Law Students Research Council v. Wadmond*, 401 U.S. 154, 174 y 179 (1971). *Board of Education v. Barnette*, 319 U.S. 624 (1943), negarse a jurar la bandera de Estados Unidos por razones políticas y religiosas; *Wooley v. Maynard*, 430 U.S. 705 (1977), mutilar la tablilla de un vehículo para obscurecer las palabras "Vive Libre o Muere" (*Live Free or Die*), por considerarlas contrarias a una ideología moral,

jetor de conciencia? Esta doctrina, cuyo fundamento original es la libertad religiosa, ¿está inmersa en la libertad de expresión consagrada en *nuestra Constitución?* ¿Cabe aplicarla a *Mari Brás* ante sus legítimos reclamos basados en la libertad de conciencia política?([19])

religiosa y política; *Communist Party of Indiana v. Whitcomb,* 414 U.S. 441 (1974), rehusarse a jurar lealtad a Estados Unidos e indicar que no aboga por derrocar al Gobierno federal y estatal *antes de participar en unas elecciones; Goetz v. Ansell,* 477 F.2d 636 (2do Cir. 1973); *Frain v. Baron,* 307 F. Supp. 27 (E.D. N.Y. 1969); *Russo v. Central Sch. Dist. No. 1, Towns of Rush, etc., N.Y.,* 469 F.2d 623 (2do Cir. 1972), *cert.* denegado, 411 U.S. 932 (1972); *Hanover v. Northrup,* 325 F. Supp. 170 (D. Conn. 1970), negarse a jurar lealtad a la bandera estadounidense por no creer en las aseveraciones de la jura; *In re Summers,* 325 U.S. 561 (1945); *Law Students Research Council v. Wadmond,* supra, pág. 161, no juramentar antes de poder ejercer la profesión jurídica, por encontrarlo contrario a sus creencias; *Kennedy v. City of Moscow,* 39 F. Supp. 26 (D. Idaho 1941), no obtener una licencia por existir como requisito el juramento a la bandera de Estados Unidos y estimarlo contrario a sus convicciones; *Sheldon v. Fannin,* 221 F. Supp. 766 (D. Ariz. 1963), negarse a cantar el himno nacional de Estados Unidos debido a convicciones religiosas y políticas; *Girouard v. United States,* 328 U.S. 61 (1946), limitar su juramento al solicitar la naturalización por sus convicciones religiosas, que no le permiten combatir en caso de guerra.

([18]) Entre la literatura consultada, destacamos: J.E. Capizzi, *Selective Conscientious Objection in the United States,* 38 J. Church & St. 339 (1996); T.R.S. Allan, *Citizenship and Obligation: Civil Disobedience and Civil Dissent,* 55 Cambridge L.J. 89 (1996); Ch. A. Wright, *My Favorite Opinion—The Second Flag—Salute Case,* 74 Tex. L. Rev. 1297 (1996); A.S. Greene, *The Pledge of Allegiance Problem,* 64 Forham L. R. 451 (1995); M. Major, *Conscientious Objection and International Law: A Human Right?,* 24 Case W. Res. J. Int'l. L. 349 (1992); M. Lippman, *The Recognition of Conscientious Objection to Military Service as an International Human Right,* 27 Cal. W. L. Rev. 31 (1990–1991); L.H. Bloom Jr., *Barnette and Johnson: A Tale of Two Opinions,* 75 Iowa L. Rev. 417 (1990); J.J. Concannon III, *The Pledge of Allegiance and the First Amendment,* 23 Suffolk U. L. Rev. 1019 (1989); D. A.J. Richards, *Toleration and The Constitution,* Nueva York, Oxford U. Press, 1986, págs. 67–102 y 165–227; F.L. Brown *et al., Conscientious Objection: A Constitutional Right,* 21 New Eng. L. Rev. 545 1985–1986; L.H. Pollak, *The Republic for Which it Stands,* 24 Land & Water L. Rev. 565 (1989); S.W. Gard, *The Flag Salute Cases and the First Amendment,* 31 Clev. St. L. Rev. 419 (1982); R.P. Fox, *Conscientious Objection to War: The Background and a Current Appraisal,* 31 Clev. St. L. Rev. 77 (1982); Comentario, *Conscientious Objection and the First Amendment,* 14 Akron L. Rev. 71 (1980).

([19]) Aparte de la jurisprudencia sobre la negativa a jurar bandera, lealtad o cantar el himno, la protección de la libertad de conciencia en ámbitos *no religiosos* también se ha desarrollado en situaciones de *objetores de conciencia* que rehusan participar en el proceso militar obligatorio. Desde *United States v. Macintosh,* 283 U.S. 605 (1931) —revocado en parte por *Girouard v. United States,* supra— y *Dickinson v. United States,* 346 U.S. 389, 395 (1953), en lo militar, los objetores de conciencia no están protegidos por la Constitución de Estados Unidos, *sino por el Congreso.* La legislación se limita a proteger personas por *convicciones religiosas,* no ampara a quienes se niegan a ir a la guerra por razones políticas, sociológicas o económicas. Aun así, varios tribunales han sostenido que, además de la cubierta estatutaria del *Estatuto del Servicio Militar Selectivo (Military Selective Service Act),*

La cuestión, compleja de por sí, se centra en uno de los grandes dilemas éticos que siempre ha angustiado no sólo a jueces,([20]) sino a filósofos del derecho. La relación entre el

---

los objetores de conciencia también están protegidos *constitucionalmente*. *United States v. Seeger*, 380 U.S. 163 (1965); *United States v. Sisson*, 297 F. Supp. 902 (D. Mass. 1969). Véanse: *Murray v. Vaughn*, 300 F. Supp. 688, 707 (D. R.I. 1969); *Murray v. Blatchford*, 307 F. Supp. 1038, 1057 (D. R.I. 1969). Por su parte, el Tribunal Supremo federal ha extendido el sentido de "creencia religiosa" protegido por el estatuto federal para incluir creencias sobre el bien y el mal que tengan la necesaria fuerza de las convicciones religiosas tradicionales. *United States v. Seeger*, supra; *Welsh v. United States*, 398 U.S. 333 (1970).

En *United States v. Sisson*, supra, el Juez Wyzanski extendió la protección ante una objeción a pelear en la guerra de Vietnam por *pensar* que dicho conflicto era inmoral e injusto. Esa creencia se basaba en unas convicciones profundas y un sentido ético, *que dicho tribunal equiparó a una convicción religiosa. Concluyó dicho foro, luego de un balance de intereses, que la libertad de conciencia no religiosa de Sisson debería prevalecer sobre el interés gubernamental en ese momento*. El Tribunal Federal se negó a revisar por carecer de jurisdicción. *United States v. Sisson*, 399 U.S. 267 (1970).

Sin embargo, en *Gillette v. United States*, 401 U.S. 437, 446 (1971), el más Alto Foro federal señaló que, a diferencia de las expresiones en *United States v. Sisson*, supra, el *Estatuto Militar del Servicio Selectivo de 1967, (Military Selective Services Act of 1967)*, 50 U.S.C.App. ec. 456(j), era *constitucional* a pesar de que sólo eximía personas por objeción de conciencia religiosa. Aunque no revocó expresamente, ni cuestionó que en el caso particular de *United States v. Sisson*, supra, las convicciones no religiosas eran de la misma intensidad que una convicción religiosa, puede decirse que ello debilitó grandemente esa conclusión.

Otros tribunales han criticado *United States v. Sisson*, supra, esencialmente en cuanto a los pronunciamientos que declaran inconstitucional el estatuto y que reconocen los objetores de conciencia selectivamente. Véanse: *Font v. Laird*, 318 F. Supp. 891, 895 *et seq.* (D. Maryland 1970); *Gillette v. United States*, supra. Específicamente, en *United States v. Al-Majied Muhammad* 364 F.2d 223 (4to Cir. 1966), se rechazó un objetor de conciencia a la guerra por puras razones políticas.

([20]) En una *reflexiva y justiciera* sentencia en *United States v. Feliciano-Grafals*, 309 F. Supp. 1292 (D. P.R. 1970), el Hon. Juez Hiram Cancio reconoció que el esquema congresional del *Estatuto de Servicio Militar Selectivo* no le permitía absolver a Edwin Feliciano-Grafals —de convicciones independentistas— por negarse a ingresar a las fuerzas armadas al alegar que su aplicación, por diversas razones, era inconstitucional e inválida.

Dicho magistrado estaba obligado por la adjudicación previa en *United States v. Valentine*, 288 F. Supp. 957 (D. P.R. 1968), en el que se atacó *sin éxito* el aludido estatuto a base de que no era aplicable a los *ciudadanos del Estado Libre Asociado* por los fundamentos siguientes: que carecíamos de representación y voto en el Congreso y no participábamos en las elecciones del Presidente; que no existía un pacto entre Puerto Rico y Estados Unidos y, de haberlo, el estatuto lo violaba; que aplicarlo era incompatible con el derecho al gobierno propio del preámbulo de la Ley Pública Núm. 600, y que según las leyes españolas, la cesión de Puerto Rico a Estados Unidos por el Tratado de París era ilegal.

Al momento de dictar sentencia, expuso estar imposibilitado de declarar la ley nula o inconstitucional a pesar de considerarla injusta y antidemocrática; aun así, decidió aplicarla en la forma más leniente posible. Al respecto, aunque concluyó que

ordenamiento jurídico y su aplicación estricta frente al comportamiento individual. Para entender la evolución judicial de la *doctrina de objeción de conciencia*, más allá del campo teórico y de las disertaciones académicas, se impone señalar unas breves observaciones. Partimos de la premisa del *derecho positivo* como un instrumento de organización social: las relaciones humanas —conducta, obligaciones y derechos— de ordinario se rigen por la Constitución, las leyes y demás reglamentos. En particular, sabemos que esas disposiciones jurídicas comunitarias sirven de instrumento para ordenar y regular los valores y la conducta, según la sociedad lo considera necesario. *Se trata de valores —algunos cambiantes y otros permanentes— que en el fondo tienen una inspiración ética y que, de ordinario, son el resultado de las concepciones morales dominantes en esa sociedad.*

Con este trasfondo conceptual en mente, no es difícil entender entonces la posible colisión entre el derecho positivo y los imperativos de la conciencia individual en una (1) de dos (2) vertientes: respecto de los valores mismos que persigue el derecho o en relación con los medios elegidos por el Estado para actuar, realizar o adelantar esos valores. Ante situaciones concretas puede darse un disloque importante entre el principio general de que la ley obliga la conciencia y el activarse una dinámica a la inversa: *la conciencia individual obliga no acatar la ley.*

*La objeción de conciencia es la negativa de un individuo, por motivos éticos dimanantes de una conciencia sincera, a someterse a una conducta (norma legal) que en principio resultaría jurídicamente exigible a la sociedad en general a la que pertenece.* Su propósito final es negarse activa y *per-*

---

Feliciano-Grafals no era *estrictamente* un objetor de conciencia según la referida ley federal, *lo clasificó como un verdadero objetor de conciencia dada la situación y "status" político particular de Puerto Rico, y en consideración a sus atributos de buena fe, sinceridad y honestidad, producto de sus creencias independentistas.* El Juez Cancio, en vista de que el estatuto visualizaba pena máxima, sin fijar una mínima, satisfizo su conciencia judicial e impuso una sentencia *nominal* de una (1) hora de detención, preferiblemente en la Oficina del Alguacil.

*sonalmente* a seguir mandatos establecidos directamente en la norma jurídica general. Esta definición pone de manifiesto una característica importante, la *individualidad*, corolario del elemento personalísimo rector, no transferible que la nutre: *la conciencia*. Se trata de la suma total de imperativos personales de conducta —de raíces religiosas, políticas o de imperativos éticos— que para el individuo poseen un rango superior a cualquier mandato normativo jurídico. *Por su naturaleza misma, cada caso requiere un análisis fáctico y jurídico individualizado.*

La característica que la conforma también revela, sin duda, que el análisis jurídico para activar y aplicar la *doctrina de objeción de conciencia* debe realizarse en función de los derechos fundamentales que le dan génesis. Hablar de libertad de conciencia es hablar de libertad religiosa, de expresión y de igualdad política. Estas libertades impiden al Estado enjuiciar, negativa o positivamente, las opciones de conciencia. Resulta indiferente que esos juicios valorativos sean con arreglo a criterios religiosos, políticos, intelectuales u otros. Si el Estado puede calificar de forma negativa una creencia religiosa o política, no importa lo irrazonable que ésta pueda parecer desde un punto de vista objetivo (a la postre esto sería desde la perspectiva de su aceptación mayoritaria social), puede calificarlos todos. Ante conflictos de esa naturaleza, *los principios de neutralidad constitucional religiosa y política inmersos en la Constitución* suponen que el análisis judicial se circunscriba a comprobar, como cuestión de hecho, *la sinceridad de los imperativos de conciencia expuestos individualmente. O sea, la encuesta judicial fáctica no será la verdad objetiva, sino sólo su sinceridad individual*; ello con el propósito de corroborar que la conducta manifestada en los otros ámbitos de la vida ha sido afín y coherente con los imperativos éticos en que se funda ahora la objeción de conciencia; la prueba se limita a hechos externos constatables.

*Finalmente, la doctrina no es aplicable a un pleito de clase.* Se impone un análisis judicial singularizado, en aras

de evitar que al amparo del pretexto de la libertad de conciencia se atente contra la seguridad jurídica y en fraude de las normas jurídicas prevalecientes. Repetimos, cada situación presenta peculiaridades fácticas propias. Éstas serán ponderadas en el momento mismo de su valoración y a la luz del ordenamiento vigente. No caben respuestas a priori; dependerá de las singularidades de cada caso, identificación de valores e intereses en conflicto.

## VII

Bajo esta perspectiva, el derecho a la libertad de conciencia se deriva lógicamente de los derechos fundamentales del individuo, no sólo del derecho a la libertad de religión y de expresión, sino también de las garantías del debido proceso de ley de nuestra Constitución.[21] Forzoso es concluir que nuestra Constitución no sólo protege el espíritu del objetor de conciencia, sino también su intelecto. *Supone no sólo el derecho a formar libremente la propia conciencia, sino también a obrar conforme a sus imperativos.*

Al amparo de estos principios constitucionales, el Estado no está facultado para exigir un requisito electoral que obligue a Mari Brás a actuar contra los dictados de su conciencia.[22]

---

[21] También de la quinta y decimocuarta enmiendas federales, que crean un "espacioso reino de libertad de conciencia, y delimita una 'esfera de intelecto y espíritu' constitucionalmente protegida de las maquinaciones y manipulaciones del gobierno". (Citas omitidas y traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1315.

[22] En varias jurisdicciones norteamericanas se ha planteado la constitucionalidad de requerirle a un elector un juramento de lealtad al gobierno estatal y al gobierno federal, antes de poder votar. No hay una doctrina uniforme. Algunos tribunales han resuelto que tal requisito es inconstitucional, otros lo han validado. C.T. Foster, Anotación, *Oath of Allegiance or Loyalty*, 18 A.L.R.2d 268 (1951). *Opinion of the Justices*, 40 So. 2d 849, 855 (1949).

En ocasiones, los tribunales federales han establecido que el requisito de jurar lealtad al Gobierno y a las leyes de Estados Unidos no tiene indicios de inconstitucionalidad. Los maestros, abogados y algunos empleados públicos deben demostrar su intención de respetar el ordenamiento jurídico federal y estatal. *Law Students Research Council v. Wadmond*, supra; *Bessard v. California Community Colleges*, 867 F. Supp. 1454 (E. D. Cal. 1994).

Al igual que la religión, la política pertenece al profundo ámbito de la conciencia. "Muchos tratadistas *incluyen como primer deber del ciudadano el de fidelidad o patriotismo, concediendo que es un deber moral o de conciencia.*" L. Muñoz Morales, *Derechos y Deberes del Ciudadano*, IV Rev. Der. Leg. Jur. C. Abo. P.R. 31, 69 (1939).

Lo que en Estados Unidos fueron fundamentos político-religiosos para la doctrina de objetor de conciencia, aquí, con la misma fuerza e intensidad, se extienden al ámbito político-ético. *Definir el destino final político de Puerto Rico es de profundo y vital significado al espíritu y conciencia soberana del puertorriqueño.*

No puede obligarse a Mari Bras a que a través de la ciudadanía norteamericana jure lealtad a la bandera de Estados Unidos —que no considera su patria— si no está de acuerdo con lo que ello implica y significa; hacerlo sería institucionalizar la hipocresía.[23]

En su sustrato, la declaración jurada[24] suscrita por Mari Brás, al igual que su renuncia a la ciudadanía norteamericana, son expresiones exteriores visibles, protegidas por nuestra Constitución y la Primera Enmienda federal, que sólo deben ceder ante la *doctrina del peligro claro y presente (clear and present danger).*[25] Más allá de su impacto político, no estamos ante una conducta subversiva de naturaleza tal que configure la situación excepcional de "peligro claro y presente". *Tampoco su renuncia promueve el fraude electoral, tal y como lo admitió en la vista oral el señor Procurador General, Hon. Carlos Lugo Fiol.*

---

Entre las opiniones disidentes, advertimos que muchas veces las diferencias estriban en conceptualizar la distinción entre *creencia* prohibida y *conducta* prohibida. *Aun así, es ineludible señalar que todas las creencias y convicciones tienen un común denominador: se manifiestan a través de una conducta.*

[23] *Board of Education v. Barnette*, supra; *Goetz v. Ansell*, supra; *Frain v. Baron*, supra; *Russo v. Central Sch. Dist. No.1, Towns of Rush, etc., N.Y.*, supra; *Hanover v. Northrup*, supra.

[24] Declaración jurada sometida por Mari Brás ante las autoridades federales como parte del trámite de renuncia a la ciudadanía de Estados Unidos, cuando juró que Puerto Rico es su única patria y su única nacionalidad es la puertorriqueña. Hace un recuento de su percepción de la realidad histórica entre Estados Unidos y Puerto Rico y la ciudadanía estadounidense en Puerto Rico.

[25] *Board of Education v. Barnette*, supra.

## VIII

No pasamos por alto el argumento de que Mari Brás renunció voluntariamente y con conocimiento de causa a la ciudadanía norteamericana.([26]) Aun así, ello no nos debe impedir la aplicación de la *doctrina de objeción de conciencia.*

Esta doctrina es susceptible de activarse frente a la imposición de una norma legal en términos *absolutos*, esto es, cuando incumplirla conlleva una sanción penal o, incluso, obligar a la sumisión mediante la coacción física.([27]) Pero también se activa ante objeciones jurídicas *relativas*, a saber: aquellas en que la persona no es coaccionada penal o físicamente sino que, de no acatar, *sufre de determinado perjuicio o deja de obtener determinado beneficio, pierde un derecho o sufre de ostracismo social o cultural.*

Por Mari Brás actuar conforme a sus dictados de conciencia y convicciones políticas independentistas, se le pretende privar de su derecho electoral; someterlo a un trato desigual por razón derivada de sus opciones ideológicas. Nuestra democracia liberal nutre su fuerza creadora y renovadora no sólo del derecho individual a diferir, sino de darle plena oportunidad a quien disiente para que, individual o colectivamente, participe de la contienda política a través de las urnas.

Sabido es que en Puerto Rico coexisten y se debaten básicamente tres (3) pensamientos ideológicos legítimos respecto de su destino político final: estadidad federada, autonomía e independencia. *Promover la ciudadanía esta-*

---

([26]) Hemos evaluado el impacto de reconocer el voto a Mari Brás y su adjudicación en cuanto al candidato a Comisionado Residente en Washington pues, en apariencia, representa una anomalía que quien no es ciudadano norteamericano elija a un funcionario que va a servir en el Congreso. En su sustrato, el valor de un voto y la representación que éste genera depende de la eficacia de ese voto. Sabido es que el Comisionado Residente puede votar libremente en los *Standing Committees* y debatir, pero no puede votar en el seno de la Cámara.

([27]) A modo de ejemplos, obligar determinado tratamiento médico (transfusión sanguínea); compeler a prestar servicio militar.

*dounidense sólo adelanta las dos (2) ideologías que promulgan mantener una vinculación jurídico-política permanente con Estados Unidos, ideologías contrarias a las de quienes abogan por la completa separación de Puerto Rico y Estados Unidos.* "Si el interés del Estado es fomentar una ideología, no importa cuán aceptable sea para algunos ese interés, no puede superar el derecho según la Primera Enmienda de no ser el mensajero de esa ideología". (Traducción nuestra.)[28] *Requerirle a Mari Brás permanecer como ciudadano norteamericano en contra de sus creencias, para poder votar, únicamente sirve como instrumento para fomentar las ideologías mayoritarias de unión con Estados Unidos que, en conciencia, él encuentra inaceptables y ofensivas. El Estado estaría interfiriendo así en la esfera intelectual y espiritual de Mari Brás como elector. Es decir, intervendría indebidamente con su objeción de conciencia.*

El ordenamiento constitucional es claro: nadie puede establecer qué ideas son las adecuadas en la política, la religión y el nacionalismo.[29] En palabras del Juez Hugo Black, "[e]l amor a un país tiene que surgir de corazones dispuestos y mentes libres... Cuando se obliga a los objetores por conciencia, lo ceremonial, probablemente derrota, más que fomenta, su propósito; es un instrumento de persecución disfrazado". (Traducción nuestra.)[30]

*No hay duda de que el Preámbulo de nuestra Constitución elevó a rango jurídico estimable la ciudadanía norteamericana y, en consecuencia, la Asamblea Legislativa tiene un interés legítimo y apremiante en promoverla; lo impermisible es pretender elevarla e imponerla compulsivamente a título de único dogma de fe.*

---

[28] *Wooley v. Maynard*, supra, pág. 717.

[29] En *Board of Education v. Barnette*, supra, pág. 642, el Tribunal Supremo federal proclamó que "[s]i hay alguna estrella fija en nuestro firmamento constitucional, es que ningún funcionario, de alta o baja jerarquía, puede prescribir lo que será ortodoxo en la *política, en el nacionalismo,* en la religión o *en otros temas de opinión*". (Traducción y énfasis nuestros.)

[30] *Board of Education v. Barnette*, supra, pág. 644.

No importa la teoría que endosemos —modelo del libre mercado de ideas, modelo del proceso democrático, modelo de libertad, o modelo de tolerancia— promover el desarrollo saludable en una sociedad democrática implica [que] [n]uestras opiniones y las de[l] prójimo, sean o no prejuiciadas, no pueden ser objeto de control gubernamental. Ello atentaría contra la naturaleza humana y sofocaría el libre pensamiento y la libre expresión. *Noriega v. Gobernador*, 130 D.P.R. 919, 925 (1992).

*Negarle a Mari Brás ejercer su derecho al voto es criminalizar su ideario; abrirle de nuevo una carpeta de subversivo, pero más sofisticada. Equivale a convertirlo en un reo político dentro de su propia patria, castigo que ni siquiera se le impone.a los delincuentes convictos y en prisión por delito grave, a quienes la Ley Electoral de Puerto Rico les reconoce el derecho al sufragio. Perpetuaríamos un ignomioso e irrazonable discrimen, inconcebible al amparo de una Constitución que se funda en la democracia.*

*A fin de cuentas, la renuncia del licenciado Mari Brás no interfiere con el derecho de la doctora Ramírez de Ferrer y de aquellos cientos de miles de ciudadanos puertorriqueños que legítimamente ostentan, mantienen, predican y desean conservar la ciudadanía norteamericana.* Convertir dicha renuncia en óbice para negarle el derecho al voto, sí lo haría.

## IX

No ignoramos que el Art. VI, Sec. 16 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 377, requiere a "[t]odos los funcionarios y empleados del Estado Libre Asociado, sus agencias, instrumentalidades y subdivisiones políticas presta[r], antes de asumir las funciones de sus cargos, un juramento de fidelidad a la Constitución de los Estados Unidos de América y a la del Estado Libre Asociado de Puerto Rico". Según el Informe de la Asamblea

Constituyente, "[e]sta sección es completamente clara. Si los *ciudadanos de Puerto Rico tenemos una ciudadanía común con los ciudadanos de Estados Unidos* y el juramento a nuestra constitución y a nuestras leyes no ha de ser incompatible con el juramento a la Constitución de los Estados Unidos, *debe prestarse un juramento de fidelidad a ambas constituciones*". (Énfasis suplido.) Diario de Sesiones, *supra*, págs. 2622-2623.

Ciertamente, el reclamo de elector de Mari Brás entra en conflicto con el ordenamiento e interés apremiante que representa el requisito electoral válido de la ciudadanía norteamericana. Al sopesar ese interés con los derechos fundamentales de Mari Brás como *objetor de conciencia*, el medio que utiliza el Gobierno para promoverlo es impermisiblemente oneroso.

Admitidamente, "la falta de lealtad o el rechazo de lealtad de una persona puede verse por algunos, como el cercenar el vínculo entre el ciudadano y la nación, confiriendo al Estado el derecho a desnacionalizarlo". (Traducción nuestra.) T.A. Aleinikoff, *Theories of Loss of Citizenship*, 84 Mich. L. Rev. 1471, 1473 (1986). Como jueces, nuestro juramento al asumir el cargo no nos resulta incompatible con reconocer, tutelar y reivindicar la conciencia política de Mari Brás *mediante la aplicación de la doctrina de objetor de conciencia*. La cuestión pone a prueba y mide nuestra *sensibilidad judicial* hacia sus derechos como persona nacida y residente en Puerto Rico que promueve la independencia.[31]

Por los fundamentos expuestos, *son constitucionales los requisitos para ser elector, de ser ciudadano de Estados Unidos de América y ciudadano de Puerto Rico, domici-*

---

[31] No estamos creando judicialmente un estatuto singular, sino valorando intensamente en su caso el respeto hacia la libertad de expresión y conciencia, que también forman parte integral de nuestro esquema constitucional. *En la medida en que el Estado garantice esas libertades, reconoce y protege el comportamiento de Mari Brás como* sincero y legítimo objetor de conciencia, lo que es también un interés público apremiante.

*liado en la isla, dispuestos en los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, supra.* Sin embargo, como toda revisión se da contra el dictamen, no sus fundamentos, concluimos que Mari Brás es un *sincero objetor de conciencia* y procede dispensársele del requisito de la ciudadanía norteamericana para *continuar ejerciendo el derecho al sufragio en lo que es, para su espíritu, su única patria: Puerto Rico.*

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

La ciudadanía de Puerto Rico tiene una vitalidad propia, independiente de la ciudadanía de Estados Unidos, y su fuente jurídica es la propia Constitución del Estado Libre Asociado de Puerto Rico. Esa ciudadanía es la expresión jurídica de la realidad sociológica de que los puertorriqueños compartimos una cultura distinta a la de los demás pueblos del mundo. Ella, además, formaliza un vínculo entre quienes nacimos aquí y la comunidad política que hemos organizado. Por ello, una persona nacida y domiciliada en Puerto Rico que voluntariamente renuncie a la ciudadanía de Estados Unidos continúa siendo ciudadano de Puerto Rico. En virtud del vínculo que esta condición jurídica genera con la comunidad política de Puerto Rico, los ciudadanos de Puerto Rico tienen derecho a votar en los procesos electorales del país.

Decidir lo contrario implicaría discriminar contra los puertorriqueños que, en el ejercicio de sus derechos constitucionales a la libertad de expresión y de conciencia, optan por rechazar cualquier vínculo jurídico con Estados Unidos, más no así con Puerto Rico y con la entidad política que constituimos en 1952, cuando aprobamos la Constitución del Estado Libre Asociado de Puerto Rico. Por ende, estamos conformes con la opinión del Tribunal en que el

Lcdo. Juan Mari Brás, en virtud de haber nacido y estar domiciliado. en Puerto Rico, tiene derecho a votar en las elecciones en nuestro país y a que el voto emitido por él en las elecciones pasadas sea contado.

## I

Este caso tiene su génesis cuando la Dra. Miriam Ramírez de Ferrer presenta ante la Junta de Inscripción Permanente del Precinto Núm. 38 de la Comisión Estatal de Elecciones una solicitud para eliminar de las listas electorales al Lcdo. Juan Mari Brás por razón de no ser ciudadano de Estados Unidos. El licenciado Mari Brás había renunciado formalmente a la ciudadanía estadounidense el 11 de julio de 1994 al completar el trámite requerido para ello ante un funcionario consular en la Embajada de Estados Unidos en Venezuela.[1] Eventualmente, el Departamento de Estado le remitió un documento acreditativo de esa renuncia a su residencia en Mayagüez, Puerto Rico. Luego de ello, el licenciado Mari Brás ha continuado viviendo en su hogar en Puerto Rico sin ser increpado en modo alguno por el Servicio de Naturalización e Inmigración de Estados Unidos o alguna otra agencia del Gobierno federal de ese país o de Puerto Rico.

Luego de que el Precinto Núm. 38 y, eventualmente, la Comisión Estatal de Elecciones desestimaran la solicitud de recusación por alegada falta de jurisdicción, Ramírez de Ferrer acudió ante el Tribunal de Primera Instancia. Éste,

---

[1] La Sec. 1481(a)(5) de la Ley de Inmigración y Naturalización de Estados Unidos dispone, en lo pertinente:

"*Sec. 1481. Loss of nationality by native-born or naturalized citizen; voluntary action; burden of proof; presumptions.*

"(a) A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntary performing any of the following acts with the intention of relinquishing United States nationality—

"(5) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State; ...." 8 U.S.C. sec. 1481(a)(5).

al concluir que era improcedente la desestimación del recurso en virtud de que el licenciado Mari Brás se había sometido voluntariamente a la jurisdicción del foro administrativo, determinó que el licenciado Mari Brás tenía derecho a votar en las elecciones generales que se celebrarían en Puerto Rico y en cualquier otro evento electoral por dos (2) razones. Primero, resolvió que al renunciar a la ciudadanía estadounidense, el licenciado Mari Brás continuó siendo ciudadano de Puerto Rico. Y segundo, determinó que el requisito de ser ciudadano estadounidense contenido en el Art. 2.003 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3053, así como la disposición que permite la recusación de un elector por no poseer esa ciudadanía, Art. 2.023(a), 16 L.P.R.A. sec. 3073(a), son inconstitucionales, al amparo de la cláusula de la Constitución del Estado Libre Asociado que garantiza a las personas igual protección ante las leyes, Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1,[2] por atentar contra un derecho fundamental como lo es el derecho al sufragio.

Contra esta determinación la Comisión Estatal de Elecciones y la doctora Ramírez de Ferrer acudieron por separado ante el Tribunal de Circuito de Apelaciones, Circuito Regional I. Inmediatamente, presentaron una solicitud de certificación ante nos.

Aceptamos expedir. Al así hacerlo, y ante la proximidad de las Elecciones Generales de 5 de noviembre de 1996, ordenamos a la Comisión Estatal de Elecciones que permitiera votar al licenciado Mari Brás, sujeto a que su voto fuese recusado y sus papeletas de votación mantenidas en un sobre sellado y lacrado hasta tanto resolviéramos el recurso. Éste, en síntesis, requiere que consideremos la constitucionalidad de los Arts. 2.003 y 2.023-A, de la Ley

---

[2] Dispone, en parte, esta disposición constitucional que: "Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes." Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275.

Electoral de Puerto Rico, *supra*, y si existe una ciudadanía puertorriqueña según lo resolvió el foro recurrido.

En esta tarea partimos de varias premisas fundamentales. Primero, no está en controversia que el licenciado Mari Brás haya dejado de ser ciudadano de Estados Unidos. Ninguna de las partes ha cuestionado ese hecho. Además, existe un documento gubernamental expedido bajo el sello del Departamento de Estado federal que posee una presunción de validez que en la actualidad no ha sido rebatida. Segundo, la controversia exclusiva que tenemos ante este Tribunal es el efecto de la renuncia de la ciudadanía de Estados Unidos, en cuanto a un acto de trascendencia interna. En este sentido, la resolución del caso requiere precisar el alcance de esa renuncia en cuanto a una actividad con efectos puramente nacionales. Y tercero, se impugna el derecho estatutario de Puerto Rico. El asunto ante nuestra consideración es si la determinación contenida en la Ley Electoral de Puerto Rico que exige la ciudadanía de Estados Unidos para considerar a una persona como elector hábil es consecuente con nuestra Constitución.

Luego de evaluar los escritos de las partes, la extensa documentación que obra en los autos y las incidencias de la vista oral celebrada ante esta Curia, concluimos que el licenciado Mari Brás es un ciudadano de Puerto Rico y, como tal, tiene derecho a participar en los procesos electorales de Puerto Rico.

## II

Antes de analizar las controversias planteadas ante nos, consideramos apropiado esbozar con brevedad los fundamentos que llevaron al tribunal de instancia a resolver que los Arts. 2.003 y 2.023(a) de la Ley Electoral de Puerto Rico, *supra*, son inconstitucionales.

A juicio del foro de instancia, un análisis de la trayecto-

ria constitucional de Puerto Rico revela que en nuestro país existe una ciudadanía de Puerto Rico con vitalidad independiente de la ciudadanía de Estados Unidos. Al respecto, estimó que el Art. 7 del Acta Foraker, 31 Stat. 79, Documentos Históricos, L.P.R.A., Tomo 1, y el Art. 10 del Código Político de Puerto Rico de 1902 (1 L.P.R.A. sec. 7) son la fuente jurídica de esa ciudadanía de Puerto Rico, que ningún estatuto federal o de Puerto Rico vigente ha alterado. En vista de ello, en la medida en que la Ley Electoral de Puerto Rico establece como condición para ejercer el derecho al voto en Puerto Rico ser ciudadano de Estados Unidos, necesariamente excluye del ejercicio de ese derecho al grupo de personas constituidas por los ciudadanos de Puerto Rico que no son simultáneamente ciudadanos de Estados Unidos, como es la condición del licenciado Mari Brás.

El tribunal de instancia estimó que esta clasificación —ciudadanos de Puerto Rico que no son simultáneamente ciudadanos estadounidenses— es inherentemente sospechosa por incidir sobre un derecho fundamental como lo es el derecho al voto. Por tal razón, su validez a la luz de la disposición constitucional que impone al Estado la obligación de dar a las personas igual protección ante las leyes, está sujeta a que resista un escrutinio de análisis estricto.

Como se sabe, según tal escrutinio de análisis, la clasificación impugnada se presume inconstitucional y sólo será validada si la parte que postula su validez constitucional demuestra que existe un interés gubernamental apremiante que es adelantado por la clasificación y que no hay medio menos oneroso para adelantarlo. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). Luego de hacer este análisis, el foro de instancia estimó que el Estado no probó la existencia de un interés apremiante. Concluyó que la exclusión del proceso eleccionario de aquellos que no son ciudadanos de Estados Unidos, aunque sí de Puerto Rico, no contribuye a evitar fraudes electorales ni a

proteger el esquema electoral de Puerto Rico. En vista de ello, estimó que era forzoso concluir que la referida clasificación era inconstitucional y, por lo tanto, que los Arts. 2.003 y 2.023(a) de la Ley Electoral de Puerto Rico, *supra*, en tanto en cuanto se amparan en esa clasificación, también eran inconstitucionales. Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 74–77.

Como puede apreciarse, la consideración de este recurso plantea como controversia de umbral si existe una ciudadanía de Puerto Rico con vitalidad independiente de la ciudadanía de Estados Unidos. Luego de ello, es preciso evaluar las disposiciones estatutarias impugnadas para determinar si de ellas surge el vicio constitucional señalado por el foro de instancia. Sin embargo, antes de abordar esta tarea debemos aclarar un aspecto.

Somos plenamente conscientes de que, aunque nos encontramos ante una controversia estricta de derecho, su resolución se enmarca en el fragor de la contienda ideológica que ha matizado la historia contemporánea de Puerto Rico. Véase J. Trías Monge, *Puerto Rico: The Trials of the Oldest Colony in the World*, New Haven, Yale U. Press, 1997. Esto, no obstante, no es justificación para eludir la obligación que hoy se cierne sobre este Tribunal. Estamos ante un caso enteramente justiciable en el que no concurren los criterios jurisprudenciales que hemos adoptado para abstenernos de considerar una controversia sometida ante nos, ya sea por encontrarnos ante una cuestión política o ante alguna de las otras circunstancias que prudencialmente aconsejarían nuestra abstención. Véanse: *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Silva v. Hernández Agosto*, 118 D.P.R. 45, 54 (1986).

La resolución del caso de autos no requiere que entremos a considerar un asunto que ha sido dejado a la exclusiva competencia de otras ramas del Gobierno. Tampoco requiere emitir un juicio sobre política pública. Aunque la

determinación de quién puede ser considerado como elector es un asunto que le compete establecer a la Asamblea Legislativa, lo cierto es que el ejercicio de esa facultad está circunscrito a lo preceptuado por la Constitución del Estado Libre Asociado de Puerto Rico. El mero hecho de que la Asamblea Legislativa haya legislado sobre un aspecto no convierte una impugnación del juicio emitido por ese cuerpo en una cuestión política que amerite abstenernos de ejercer nuestra función constitucional.

Asimismo, el hecho de que un caso tenga tangencia con el debate político no impide de por sí la intervención judicial. Ante una alegación de inconstitucionalidad de una ley o de un acto gubernamental, compete a los tribunales determinar la validez de tal reclamo.

En el caso de autos no nos corresponde expresarnos sobre la naturaleza de la relación política entre Puerto Rico y Estados Unidos, ni sobre la conveniencia o sabiduría de la fórmula del Estado Libre Asociado. No obstante, en estricta juridicidad, la capacidad *jurídica* del Estado Libre Asociado para establecer quiénes son sus electores capacitados es una controversia *justiciable*. De hecho, no es una controversia extraña a este Foro. También es una controversia justiciable la capacidad del Estado Libre Asociado para establecer quiénes son sus ciudadanos y el carácter de esa ciudadanía.

En el caso de autos es *pertinente* y *justiciable* delimitar el ámbito de autonomía que le es privativa al Estado Libre Asociado, ya que la existencia de una ciudadanía puertorriqueña con vitalidad independiente a la ciudadanía estadounidense, según postula el licenciado Mari Brás, sólo puede darse en función de ese ámbito de poder que es privativo de los puertorriqueños, independientemente del carácter de la relación política del Estado Libre Asociado con Estados Unidos.

A la luz de lo anterior, estimamos que en el caso de autos no concurren las circunstancias que permitirían invocar con éxito la doctrina de la cuestión política.(³)

Asimismo, tampoco estamos ante un caso académico. Aunque las elecciones de 5 de noviembre de 1996 fueron celebradas y los candidatos electos ya han tomado posesión de sus cargos, el voto del licenciado Mari Brás aún está en espera del resultado de este caso. En virtud de lo anterior, estamos compelidos a examinar los méritos del recurso de autos.

Aclarado lo anterior, evaluemos la controversia de umbral que tenemos ante nos: ¿existe una ciudadanía de Puerto Rico con vitalidad independiente de la ciudadanía de Estados Unidos?

## III

La resolución de esta primera interrogante requiere abordar con brevedad el desarrollo constitucional de Puerto Rico durante este siglo.

A. Como se sabe, el Tratado de París de 10 de diciembre de 1898 puso fin a la Guerra Hispanoamericana que a finales del siglo XIX libraron Estados Unidos y España. En dicho documento, Puerto Rico y otras posesiones coloniales españolas fueron cedidas a Estados Unidos y se dispuso expresamente que el Congreso de Estados Unidos determinaría "[l]os derechos civiles y la condición política de los habitantes naturales de los territorios ... cedidos". Art. IX del Tratado de París de 10 de diciembre de 1898, L.P.R.A., Tomo 1, ed. 1982, pág. 22.

En 1900 el Congreso de Estados Unidos ejerció esa prerrogativa y aprobó el Acta Foraker para, entre otras cosas,

---

(³) Las partes coinciden en que en el caso de autos no aplica la doctrina de la cuestión política y que este Tribunal está obligado a expresarse sobre los méritos de lo alegado por ellos en sus escritos. Así lo manifestaron expresamente ante preguntas de este Tribunal en la Vista Oral de 14 de abril de 1997.

crear un gobierno civil provisional en la isla. Ley de 12 de abril de 1900, 31 Stat. 77, Documentos Históricos, L.P.R.A., Tomo 1. Véanse: Trías Monge, *Puerto Rico: The Trials of the Oldest Colony in the World, op. cit.*, págs. 36–51; J. Trías Monge, *Historia constitucional de Puerto Rico*, Río Piedras, Ed. Universitaria, 1980; C.I. Raffucci de García, *El gobierno civil y la Ley Foraker*, Río Piedras, Ed. U.P.R., 1981; L.J. Gould, *La Ley Foraker: raíces de la política colonial de los Estados Unidos*, Río Piedras, Ed. U.P.R., 1969.

El Art. 7 del Acta Foraker, *supra*, reconoció a Puerto Rico como una *comunidad política* distinta a la de Estados Unidos, a la cual llamó *El Pueblo de Puerto Rico*. Dispuso, además, que esta comunidad política quedaba constituida por dos (2) categorías de personas: (1) por una categoría jurídica a la que llamó *ciudadanos de Puerto Rico*, la que, a su vez, quedaba constituida por "los habitantes que contin[uaron] residiendo [en Puerto Rico], los cuales eran súbditos españoles al día once de abril de mil ochocientos noventa y nueve, y ... resid[ían] en Puerto Rico, y sus hijos con posterioridad nacidos allí", y (2) por "los ciudadanos de Estados Unidos que resid[ían] en Puerto Rico".(⁴) Const. E.L.A., *supra*, ed. 1982, págs. 31–32. De esa forma fue que Estados Unidos definió la situación jurídica de Puerto Rico y los puertorriqueños en la primera ley orgánica que aprobó para el país.

---

(⁴) El texto completo del Art. 7 del Acta Foraker, Documentos Históricos, Const. E.L.A., *supra*, págs. 31–32, dispuso:

"Que todos los habitantes que continúen residiendo allí, los cuales eran súbditos españoles el día once de abril de mil ochocientos noventa y nueve, y a la sazón residían en Puerto Rico, y sus hijos con posterioridad nacidos allí, serán tenidos por ciudadanos de Puerto Rico, y como tales con derecho a la protección de los Estados Unidos; excepto aquellos que hubiesen optado por conservar su fidelidad a la Corona de España el día once de abril de mil novecientos, o antes, de acuerdo con lo previsto en el Tratado de Paz entre los Estados Unidos y España, celebrado el día once de abril de mil ochocientos noventa y nueve; y ellos, en unión de los ciudadanos de los Estados Unidos que residan en Puerto Rico, constituirán un cuerpo político bajo el nombre de "El Pueblo de Puerto Rico" con los poderes gubernamentales que se confieren más adelante, y la facultad de demandar y ser demandados como tales. Acta Foraker, Art. 7, 31 Stat. 79.

Se ha señalado que el trato dado a Puerto Rico, tanto en el Tratado de París como en el Acta Foraker, contrastó con el dado a otras posesiones de Estados Unidos que eventualmente fueron admitidas como estados federados de Estados Unidos. Véase Trías Monge, *Historia constitucional de Puerto Rico, op. cit.*, págs. 153–154 y 229 *et seq.* Las razones que motivaron ese proceder han sido objeto de debate.([5]) Sin embargo, el análisis del debate legislativo que precedió a la aprobàción del Acta Foraker y de la jurisprudencia federal que se originó en ese período revela que, además de consideraciones constitucionales y políticas, la decisión del Congreso de Estados Unidos de reconocer a los puertorriqueños como detentadores de una ciudadanía distinta a la estadounidense estuvo claramente matizada por consideraciones raciales y culturales, ya que ese país reconoció a Puerto Rico como un pueblo de hábitos, tradiciones y modos de vida extraños a los estadounidenses, que justificaban no otorgarles la ciudadanía de ese país. Véanse: J.A. Cabranes, *Citizenship and the American Empire: Notes on the Legislative History of the United States Citizenship of Puerto Ricans*, 127 U. Pa. L. Rev. 391, 430 (1978); E. Rivera Ramos, *The Legal Construction of American Colonialism: The Insular Cases (1901–1922)*, 65 Rev. Jur. U.P.R. 225 (1996).

En virtud de lo anterior, se ha afirmado que el reconocimiento de la ciudadanía puertorriqueña por Estados Unidos fue producto natural de "la vigencia de la nacionalidad puertorriqueña, aunque estuviera sujeta al dominio imperial de los Estados Unidos". A. Fernós Isern, *Estado Libre Asociado de Puerto Rico: antecedentes, creación y desarrollo hasta la época presente*, 2da ed., Río Piedras, Ed. U.P.R.,

---

([5]) La propuesta original del congresista Foraker incluía la concesión de la ciudadanía estadounidense a los puertorriqueños como había sido la práctica sobre los habitantes de los territorios que Estados Unidos iba adquiriendo. Sin embargo, ésta tuvo que ser suprimida ante la férrea oposición que enfrentó la propuesta en el Congreso. Véase C. Raffucci de García, *El gobierno civil y la Ley Foraker*, Río Piedras, Ed. U.P.R., 1981, págs. 83–89.

1988, pág. 13.([6]) Independientemente de las razones que llevaron a Estados Unidos a reconocer a Puerto Rico como un pueblo diferenciado y, como derivado de ello, a conferirle a los puertorriqueños una ciudadanía distinta a la estadounidense, el Acta Foraker no definió ni delimitó los contornos prácticos de la recién reconocida ciudadanía puertorriqueña.

En 1902, la Asamblea Legislativa de Puerto Rico, creada en virtud de la propia Acta Foraker, aprobó el Código Político. Éste recogió en su Art. 10, *supra*, las categorías de individuos que el Acta Foraker había reconocido como "ciudadanos de Puerto Rico" y los incluyó en la definición que adoptó de ese concepto. Al respecto, dispuso:

> Son ciudadanos de Puerto Rico:
> 1. Toda persona nacida en Puerto Rico y sujeta a su jurisdicción.
> 2. Toda persona nacida fuera de Puerto Rico que sea ciudadano de los Estados Unidos y resida dentro del territorio.
> 3. Toda persona que haya sido súbdito español y, residiendo en Puerto Rico el día once de abril de 1899, no hubiese optado por conservar su fidelidad a la Corona de España .... 1 L.P.R.A. sec. 7.

Con esa actuación de la Asamblea Legislativa de Puerto Rico, "la ciudadanía de Puerto Rico fue extendida a personas que técnicamente no fueron incluidas en los parámetros establecidos por el Acta Foraker; pero, permanecían

---

([6]) De hecho, desde temprano en este siglo, algunos de los jueces del Tribunal Supremo de Estados Unidos compartían la noción de que Puerto Rico era un país con una cultura diferente. Al respecto, son particularmente ilustrativas las expresiones del Juez Brown en *Downes v. Bidwell*, 182 U.S. 244, 282 (1901), cuando señala:

"It is obvious that in the annexation of outlying and distant posessions grave questions will arise from differences of race, habits, laws and customs of people, and from differences of soil, climate and production, which may requiere action on the part of Congress that would be quite unnecessary in the annexation of contiguos territory inhabited only by people of the same race, or by scattered bodies of native Indians."

El sustrato de esta percepción fue recogido años más tarde por las expresiones del Juez Presidente Taft en *Balzac v. Porto Rico*, 258 U.S. 298, 311 (1922):

"We need not dwell on another consideration which requires us not lightly to infer ... an intention to incorporate in the Union three distant ocean communities of a different origin and language from those of our continental people."

bajo la responsabilidad de Estados Unidos de conformidad con el Tratado de París". (Traducción nuestra.) J.L.A. De Passalacqua, *Voluntary Renunciation of the United States Citizenship by Puerto Rican Nationals*, 66 Rev. Jur. U.P.R. 269, 283 (1997). De igual forma, tanto el Acta Foraker como el Código Político tuvieron el efecto de que "los puertorriqueños que al momento de la cesión eran ciudadanos españoles perdieron su ciudadanía sin adquirir otra ciudadanía de un Estado Miembro de la Comunidad Internacional". Íd. De este modo, mientras el vínculo interno con la comunidad política reconocida por Estados Unidos en el Acta Foraker lo establecía la ciudadanía de Puerto Rico, frente a la comunidad internacional los ciudadanos de Puerto Rico sólo tenían "derecho a la protección de los Estados Unidos", según el texto del Art. 7 del Acta Foraker, *supra*.

La situación jurídica originada por el Acta Foraker fue definida por el propio Tribunal Supremo de Estados Unidos en los términos siguientes:

> By section 7 the inhabitants of Porto Rico, who were Spanish subjects on the day the treaty was proclaimed, including Spaniards of the Peninsula who had not elected to preserve their allegiance to the Spanish Crown, were to be deemed citizens of Porto Rico, and they and citizens of the United States residing in Porto Rico were constituted a body politic under the name of The People of Porto Rico. (Escolio omitido.) *Gonzalez v. Williams*, 192 U.S. 1, 11 (1904).

La situación en torno a la ciudadanía de Puerto Rico y la ciudadanía de Estados Unidos, a principios de este siglo, estaba clara. Ambas ciudadanías eran independientes, aunque de diversas dimensiones en el ámbito internacional.

B. En 1917 el Congreso de Estados Unidos legisló de nuevo para Puerto Rico y aprobó la Ley Orgánica de 2 de marzo de 1917 (Acta Jones), 39 Stat. 951 *et seq.*, Documentos Históricos, L.P.R.A., Tomo 1. En esa ocasión, extendió

de forma expresa la ciudadanía estadounidense a los puertorriqueños. En lo pertinente, dispuso en su artículo 5:

> Todos los ciudadanos de Puerto Rico, según se definen en la sec. 7 de la Ley de 12 de abril de 1900 "Para proveer, temporalmente, de rentas y un gobierno civil a Puerto Rico, y para otros fines" y todos los nativos de Puerto Rico que estaban temporalmente ausentes de la Isla el 11 de abril de 1899, y hayan regresado después y estén residiendo permanentemente en dicha isla, y no sean ciudadanos de ningún país extranjero, se declaran por la presente ciudadanos de los Estados Unidos, y serán considerados y tenidos como tales .... Art. 5 del Acta Jones, 39 Stat. 953, *supra*, pág. 80.

El Acta Jones tuvo el efecto de extender colectivamente la ciudadanía estadounidense a aquellos que según el Acta Foraker eran reconocidos como ciudadanos de Puerto Rico. Lo significativo de la nueva legislación fue que ella "adoptó el concepto de ciudadanía de Puerto Rico como base para la ciudadanía de Estados Unidos que confería". (Traducción nuestra.) De Passalacqua, *supra*, pág. 285. Es decir, el Acta Jones otorgó la ciudadanía de Estados Unidos al grupo de personas que mediante el Acta Foraker eran ciudadanos de Puerto Rico. La interrogante que suscitó la nueva legislación fue, y sigue siendo, si la extensión de la ciudadanía estadounidense a los puertorriqueños tuvo el efecto de suprimir la existencia de la ciudadanía de Puerto Rico reconocida en el Acta Foraker.

El Acta Jones no derogó expresamente la totalidad del Acta Foraker. La cláusula derogatoria que contenía tan sólo derogó toda aquella legislación o disposiciones de ley que fueran incompatibles con la nueva ley. Art. 58 del Acta Jones, 39 Stat. 968, *supra*, pág. 142. Por lo tanto, la pregunta obligada en el caso de autos lo es si la extensión de la ciudadanía de Estados Unidos a los puertorriqueños es incompatible con el Art. 7 del Acta Foraker, *supra*, y el Art. 10 del Código Político, *supra*, de forma tal que en 1917 estas disposiciones quedaron implícitamente derogadas.

Aunque el Acta Jones nada expresó sobre la vigencia o

derogación de la ciudadanía de Puerto Rico, resulta significativa la disposición contenida en su Art. 5, *supra*, en términos de que *"cualquier persona de las descritas anteriormente podrá conservar su presente "status" político*, haciendo una declaración, bajo juramento, de su resolución a ese efecto". (Énfasis suplido.) Así, el Acta Jones estableció claramente un esquema mediante el cual los ciudadanos de Puerto Rico que no desearan poseer la ciudadanía de Estados Unidos preservaran su condición jurídica previa. ¿Cuál era esa condición? La respuesta es sencilla: aquellos que siendo ciudadanos de Puerto Rico según el Acta Foraker optaron por no adquirir la ciudadanía de Estados Unidos, continuaron siendo ciudadanos de Puerto Rico con derecho a la protección de Estados Unidos en el ámbito internacional. De esta manera, la misma disposición que concedió la ciudadanía estadounidense en 1917 permitió que las personas conservaran *únicamente* la ciudadanía de Puerto Rico.

Podría argumentarse que, según este esquema, quienes no ejercieron la opción de rechazar la ciudadanía de Estados Unidos, al convertirse en tales, perdían automáticamente la ciudadanía de Puerto Rico. Sin embargo, este análisis pierde de perspectiva que según el ordenamiento jurídico de Estados Unidos una persona puede poseer doble ciudadanía, no sólo en términos del sistema federativo de gobierno —en el cual una persona posee la ciudadanía estatal o provincial y la ciudadanía propia de Estados Unidos, única entidad soberana con personalidad jurídica en el ámbito internacional, véase *United States v. Cruikshank et al.*, 92 U.S. 542 (1875)— ([7]) sino en el sentido propio del

---

([7]) El Tribunal Supremo de Estados Unidos afirmó en *United States v. Cruikshank et al.*, 92 U.S. 542, 549 (1875):

"We have in our political system a government of the United States and a government of each of the several States. Each one of these governments is distinct from the others, and each has citizens of its own who own it allegiance, and whose rights, within its jurisdiction, it must protect. The same person may be at the same time a citizen of the United States and a citizen of a State, but his rights of citizenship under one of these governments will be different from those he has under the other." (Cita omitida.)

Derecho Internacional Público, a la luz del cual una persona puede ser ciudadano de Estados Unidos y, a su vez, ser ciudadano de otro Estado miembro de la comunidad internacional. *Perkins v. Elg*, 307 U.S. 325 (1939); *Jalbuena v. Dulles*, 254 F.2d 379 (3er Cir. 1958). Véase, además, J.L. Cable, *Decisive Decisions of United States Citizenship*, Charlottesville, The Michie Co., 1967, pág. 51 *et seq.*

Las enmiendas posteriores efectuadas al Acta Jones no parecen haber alterado la situación jurídica de la ciudadanía de Puerto Rico. Dichas enmiendas tan sólo sirvieron para corregir algunas deficiencias de su Art. 5, *supra*, "que causaban la exclusión de diversos grupos del ámbito de la ciudadanía o diferenciaban indebidamente entre ciudadanos americanos por naturalización y ciudadanos por nacimiento".[8] Trías Monge, *Historia Constitucional de Puerto Rico, op. cit.*, Vol. II, pág. 90. Sin embargo, al perseguir ese objetivo, el propio Congreso de Estados Unidos volvió a referirse a la ciudadanía de Puerto Rico.

Por ejemplo, en 1927 Jones fue enmendada con el propósito de que los ciudadanos de Estados Unidos que residieran en Puerto Rico por un (1) año, con posterioridad al 4 de marzo de 1927, serían ciudadanos de Puerto Rico. Expresamente dispuso que: "Todos los ciudadanos de los Estados Unidos que han residido, o que en lo sucesivo residieren, en la isla por un año, serán ciudadanos de Puerto Rico." Art. 5a del Acta Jones, 44 Stat. 1418, *supra*, pág. 81. Nótese la clara referencia a la ciudadanía de Puerto Rico, que ya los puertorriqueños poseían al nacer. Con la nueva actuación congresional, los extranjeros ciudadanos estadounidenses adquirirían mediante la permanencia en Puerto Rico por el término de un (1) año la condición de ciudadanos de Puerto Rico.[9] Más aún, en el mismo artículo aña-

---

[8] Las enmiendas fueron incorporadas en 1927, 1934, 1938, 1940 y 1952.

[9] Nótese, sin embargo, que al amparo del Art. 10 del Código Político, 1 L.P.R.A. sec. 7, los nacidos fuera de Puerto Rico que eran ciudadanos de Estados Unidos adquirían la ciudadanía de Puerto Rico por tener su domicilio en el país.

dido en 1927, el Congreso de Estados Unidos dispuso que "las personas que [en 1917] eligieron retener el status político de ciudadanos de Puerto Rico" podrían hacerse ciudadanos de Estados Unidos dentro del término de un (1) año. Íd.

Si alguna duda quedaba sobre la existencia de la ciudadanía de Puerto Rico luego de 1917, ésta quedó disipada por el propio Congreso de Estados Unidos. Ninguna de las enmiendas posteriores al Acta Jones derogó expresa o implícitamente el Acta Foraker en aquella parte que reconocía la ciudadanía de Puerto Rico. Tampoco hizo incompatible la coexistencia de ambas ciudadanías.

Fue en ese contexto que el Tribunal Supremo de Estados Unidos expresó que la condición jurídica impuesta colectivamente a los puertorriqueños mediante el Acta Jones les permitió "mudarse a Estados Unidos y, al establecer su domicilio allí, incorporarse a ese cuerpo político para disfrutar así de todo derecho civil, social y político que disfrutan los ciudadanos estadounidenses". (Traducción nuestra.) *Balzac v. Porto Rico*, 258 U.S. 298, 308 (1922). Es decir, los puertorriqueños, en tanto en cuanto eran ciudadanos estadounidenses, podían entrar libremente a Estados Unidos y, mientras permanecieran allí, podían disfrutar de todos los derechos y privilegios que disfrutaban los ciudadanos estadounidenses en suelo continental. Sin embargo, en Puerto Rico la situación era la misma desde la aprobación del Acta Foraker. En otras palabras, "el puertorriqueño natural de la [I]sla era ciudadano de Puerto Rico en Puerto Rico, pero no tenía que naturalizarse para incorporarse a cualquier estado de la Unión". A. Fernós, *La ciudadanía puertorriqueña; y otras controversias del llamado caso del Lic. Juan Mari Brás*, 30 Rev. Jur. U.I.P.R. 341, 349 (1996). Véase, además, A. Fernós, *La ciudadanía nacional de los puertorriqueños*, Santurce, Ed. Situm, 1996.

C. Los posteriores esfuerzos de conferirle a Puerto Rico un mayor poder autonómico tampoco afectaron la

existencia de la ciudadanía de Puerto Rico, según fue reconocida en el Acta Foraker. Un análisis del proceso que culminó en la ratificación de la Constitución del Estado Libre Asociado a principios de la década de 1950 revela que los constituyentes estaban plenamente conscientes de la existencia de la ciudadanía de Puerto Rico, según codificada en el Acta Foraker y en el Art. 10 del Código Político de Puerto Rico, *supra*. Aunque este tema fue objeto de poca discusión, las instancias específicas en que fue tratado no deja lugar a dudas al respecto.[10] De hecho, los constituyentes decidieron hacer una alusión expresa al concepto "ciudadanía de Puerto Rico" en la propia Constitución, al sustituir la expresión "ciudadano de Puerto Rico" por "ciudadano del Estado Libre Asociado".[11] Aunque la frase con la que se designa a la ciudadanía puertorriqueña es distinta antes y después de 1952, el contenido jurídico de ambas es el mismo. Passalacqua, *supra*, pág. 291.

En este contexto, una de las figuras protagónicas del nuevo ordenamiento entre Puerto Rico y Estados Unidos y miembro destacado de la Convención Constituyente de la Constitución del Estado Libre Asociado de Puerto Rico, Dr. Antonio Fernós Isern, escribió lo siguiente sobre el tema que nos ocupa:

> Creer que la ciudadanía de Estados Unidos suplantó, en 1917, la ciudadanía de Puerto Rico es error, por cierto muy difundido. La ciudadanía de Puerto Rico subsistió en 1917. Coexiste hoy en nosotros con la ciudadanía de Estados Unidos. .... No existe estado republicano sin ciudadanía. A. Fernós Isern, "La ciudadanía dual, 7 de septiembre de 1954", en *Filosofía y doctrina del estadolibrismo puertorriqueño,* 12 Homines 93 (1996).

---

[10] Véase 1 Diario de Sesiones de la Convención Constituyente 515–519 (1941); Diario de Sesiones, *supra*, Vol. 2, págs. 1200, 1313 y 1380; Diario de Sesiones, *supra*, Vol. 3, págs. 1730–1740, 1893–1894, 1918 y 2169.

[11] Dispone el Art. IX, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, pág. 387:

"En lo sucesivo la expresión 'ciudadano del Estado Libre Asociado de Puerto Rico', sustituirá a la expresión "ciudadano de Puerto Rico" según ésta ha sido usada antes de la vigencia de esta Constitución.

Más adelante explica la situación jurídica de Puerto Rico de la forma siguiente:

> Los ciudadanos de Puerto Rico, hasta 1952, formábamos un cuerpo político creado por [el] Congreso, un estado con atributos sólo de cuasi soberanía, llamado "El Pueblo de Puerto Rico". Se regía este cuerpo político por una ley Orgánica otorgada por el Congreso de Estados Unidos. En 1950 se convino por los ciudadanos de Puerto Rico con el gobierno de Estados Unidos que, dentro de ciertas condiciones, la Ley Orgánica del Gobierno de Puerto Rico fuera sustituida por una constitución adoptada por los ciudadanos de Puerto Rico para crear ellos mismos su propio gobierno. Los ciudadanos de Puerto Rico crearon, al adoptar su Constitución, un estado con soberanía propia. El Congreso ratificó la creación del Estado. Así nació el Estado Libre Asociado que sustituyó al "Pueblo de Puerto Rico". Así los ciudadanos de Puerto Rico nos convertimos en ciudadanos del Estado Libre Asociado, asociados a Estados Unidos por la común ciudadanía de Estados Unidos y por un convenio que regula las relaciones de ambos gobiernos y establece y delimita sus respectivas esferas de autoridad. (Citas omitidas.) Fernós Isern, "La ciudadanía dual, 7 de septiembre de 1954", *supra*, pág. 93.

El desarrollo constitucional de Puerto Rico al amparo de la soberanía del Congreso de Estados Unidos conduce a la conclusión de que en Puerto Rico existe una ciudadanía de Puerto Rico con vitalidad independiente de la ciudadanía estadounidense. Esa ciudadanía de Puerto Rico fue conferida en sus orígenes por el Congreso federal como respuesta al hecho evidente de que el pueblo puertorriqueño era un pueblo de costumbres, hábitos y tradiciones extrañas a las del pueblo estadounidense. Esto es, la ciudadanía de Puerto Rico es la expresión jurídica de un hecho sociológico: Puerto Rico es a los ojos del mundo una nación.

Eventualmente, en 1952 esa expresión sociológica, reconocida jurídicamente por el Congreso de Estados Unidos, adquirió una dimensión constitucional al ser objeto de debate en la Asamblea Constituyente y al incorporarse una referencia al respecto en la Constitución del Estado Libre Asociado. Lo que antes era una expresión jurídica del Congreso de Estados Unidos y de la Legislatura de Puerto Rico

se convirtió en una expresión jurídica de dimensiones constitucionales.

Al respecto, coincidimos con la opinión del Tribunal cuando expresa que

... la ciudadanía de Puerto Rico surge jurídicamente de la Constitución del E.L.A. y tiene efectos en relación con la autoridad pública que le es privativa al E.L.A. .... Es decir, la ciudadanía de Puerto Rico existe como parte del ámbito de autoridad que le corresponde al E.L.A. y es consustancial con los poderes públicos que le son privativos al actual régimen político de Puerto Rico. Opinión mayoritaria, pág. 201.

También coincidimos cuando, más adelante, señala:

Aunque [la ciudadanía de Puerto Rico] fue establecida inicialmente por ley federal, su existencia jurídica no descansa ya en tal ley federal. El fundamento jurídico actual de la ciudadanía puertorriqueña es la propia Constitución del E.L.A. Nuestra Constitución expresamente la reconoce, y dicha ciudadanía constituye un elemento indispensable del régimen autonómico que se estableció en el país en 1952 por la voluntad del propio pueblo puertorriqueño. *Su origen más fundamental, claro está, radica en el hecho incontestable de que Puerto Rico es un pueblo, un país formalmente organizado en una colectividad política, por lo que las personas que lo forman son ciudadanos suyos.* (Énfasis suplido.) Opinión mayoritaria, pág. 202.

No hemos hallado ninguna disposición de ley que sugiera que para poseer la ciudadanía de Puerto Rico necesariamente se tenga que ser ciudadano de Estados Unidos o que ésta sea necesaria para poseer la ciudadanía de un estado de Estados Unidos. De hecho, al menos un Tribunal Supremo estatal de Estados Unidos ha resuelto que no es necesario que un individuo sea ciudadano estadounidense para ser ciudadano de un estado y así poder participar en los asuntos internos de ese estado. *Crosse v. Board of Supervisors of Elections,* 221 A.2d 431, 433 (1966).

Por otro lado, aunque la fuente jurídica de la ciudadanía de Puerto Rico es la Constitución del Estado Libre Asociado, tampoco hemos encontrado alguna disposición de ley que haya derogado el Art. 7 del Acta Foraker, *supra.* Por el contrario, la colección oficial de leyes del Congreso Federal

de Estados Unidos, el *United States Code* (U.S.C.), en la actualidad publica como un estatuto vigente el Art. 7 del Acta Foraker, *supra.* 48 U.S.C. sec. 731.

Los peticionarios, sin embargo, nos señalan que con la concesión de la ciudadanía de Estados Unidos a los puertorriqueños, la ciudadanía de Puerto Rico adquirió otro carácter y pasó a ser meramente un sinónimo de residencia. Como derivado de ello, plantean que la ciudadanía puertorriqueña es tan variable como la residencia de quien la ostenta. Arguyen, además, que esa fue precisamente la determinación de este Foro en *Lokpez v. Fernández,* 61 D.P.R. 522 (1943), en donde, sin el análisis del historial legislativo que hoy hemos efectuado, expresamos que la aprobación del Acta Jones tuvo el efecto de alterar el alcance del concepto "ciudadanos de Puerto Rico" "de un status político general [a] meramente el de un status político restringido al de la *residencia* en Puerto Rico". (Énfasis en el original.) Íd., pág. 533.

Este planteamiento, sin embargo, soslaya el hecho de que las expresiones hechas en dicho caso no giraban en torno a la controversia específica de si existía una ciudadanía puertorriqueña de la cual se derivan derechos políticos. Además, pasa por alto el desarrollo constitucional ocurrido en Puerto Rico en la década de 1950 cuando se aprueba la Constitución del Estado Libre Asociado y la jurisprudencia posterior de esta Curia que ha reconocido que la ciudadanía de Puerto Rico posee un alcance jurídico mayor que el que contiene el concepto "residencia". Véanse: *Maristany v. Srio. de Hacienda,* 94 D.P.R. 291 (1967); *Martínez v. Vda. de Martínez,* 88 D.P.R. 443 (1963); *Fiddler v. Srio. de Hacienda,* 85 D.P.R. 316 (1962). De este modo, nuestras posteriores expresiones rectificaron implícitamente a *Lokpez v. Fernández,* supra, en cuanto al alcance de la ciudadanía de Puerto Rico y, a la luz del análisis que hoy realizamos, nos lleva a concluir que lo expresado en *Lokpez* al respecto ha perdido cualquier vigencia jurídica.

Ahora bien, ¿qué significa decir que existe una ciudadanía de Puerto Rico y qué implicaciones tiene ello para el

ejercicio del derecho al voto? Para responder lo anterior, debemos aclarar varios conceptos.

## IV

La ciudadanía es el vínculo jurídico-político que existe entre un *individuo* y una *comunidad política organizada.* Es ciudadano aquella "[p]ersona a quien la legislación de un Estado reconoce que posee las condiciones necesarias para gozar del derecho de su ciudadanía". R. Garzaro, *Diccionario de política*, 2da ed. rev., Salamanca, Librería Cervantes, 1987, pág. 58. De ese vínculo se derivan responsabilidades, deberes y derechos que reconoce la comunidad política a la cual se pertenece. Por ello, de ordinario, los derechos políticos les son reconocidos en una comunidad política a aquellos que son sus ciudadanos.

Decir que existe una ciudadanía de Puerto Rico es decir que existe un vínculo entre unos individuos nacidos aquí y una comunidad política organizada llamada Puerto Rico. De Passalacqua, *supra*, pág. 285. Ya en el pasado hemos advertido la importancia de este vínculo al afirmar que "[l]a ciudadanía condiciona y define importantes derechos y obligaciones en nuestra sociedad. Basta decir que sirve de fundamento al ejercicio de los derechos políticos". *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 487 (1989).

Asimismo, en *Maristany v. Srio. de Hacienda,* supra, pág. 302, reconocimos que la ciudadanía de Puerto Rico era el vínculo que legitimaba el ejercicio de tributación del Estado sobre un individuo. Sobre este extremo expresamos:

... Es incuestionable también que en el ejercicio de ese poder [de tributación] debe existir desde el punto de vista de las limitaciones constitucionales aplicables, algún vínculo racional entre el Estado que tributa y el sujeto u objeto del tributo.

En el caso ante nos, ese vínculo existe. Es la ciudadanía de Puerto Rico del contribuyente Dr. Maristany y su domicilio y residencia permanentes en Puerto Rico .... Esta ciudadanía y domicilio en el orden político es el vínculo por excelencia ... que ata jurídicamente al Estado Libre Asociado con el demandante en el ejercicio de todos sus poderes soberanos, entre ellos el

fundamental de imponer tributo, y sujeta al demandante a dichos poderes de soberanía. (Escolio omitido.) *Maristany v. Srio. de Hacienda*, supra, pág. 302.

El Tribunal Supremo federal también se ha expresado sobre la trascendencia de la investidura de una persona con la condición jurídica de ciudadano al afirmar que:

> El acto de convertirse en ciudadano es algo más que un ritual sin contenido, más allá que el ceremonial. Un nuevo ciudadano se convierte en un miembro de la Nación, es parte de un pueblo diferente a otros .... El individuo, en ese momento, pertenece a la comunidad política y está facultado para participar en el proceso democrático deliberativo. (Traducción nuestra.) *Foley v. Connelie*, 435 U.S. 291, 296 (1978).

La nacionalidad es un concepto distinto. Existe consenso en la literatura especializada en cuanto a que la nacionalidad es una categoría sico-sociológica que se refiere al vínculo de un *individuo* con una *nación*. Ha sido definida como:

> [el s]entimiento común a un grupo de personas que surge en virtud de estar todas en contacto con unos elementos tales como idioma, territorio, creencias, tradiciones, costumbres, pasado histórico, etc. que hace que se sientan vinculadas entre sí y a la vez diferentes a otros grupos. La nacionalidad es categoría sico-sociológica. Garzaro, *op. cit.*, pág. 264

Es "un nacional" aquél que pertenece a determinada nación, la cual de ordinario se conforma a la luz de la existencia de una misma lengua, costumbres, tradiciones, historia y aspiraciones comunes, entre otros factores. Véanse: C. Rousseau, *Droit International Public*, Paris, Ed. Sirey, 1974, T. 2, pág. 19 *et seq.*; A. Ulloa, *Derecho Internacional Público*, 4ta ed., Madrid, Ed. Iberoamericana, 1957, Vol. 1, pág. 130 *et seq.*; J. Diena, *Derecho Internacional Público*, Barcelona, Ed. Bosch, 1948, págs. 60–61.

La literatura erudita reconoce que, en su dimensión sico-sociológica, Puerto Rico es una nación. Al respecto, se ha expresado que

> ...el concepto nación ... incorpora elementos antropológicos, sociales, económicos, políticos, históricos, geográficos, cultura-

les y psicológicos fundamentales, que distinguen a los puertorriqueños de cualquier otro pueblo; además, de la conciencia de su propia identidad que los definen como un pueblo diferenciado y como una nación. (Traducción nuestra.) De Passalacqua, *supra*, pág. 300.

En este contexto, la Comisión de Derechos Humanos y Constitucionales del Colegio de Abogados de Puerto Rico expresó recientemente que "existe ... consenso en la comunidad jurídica puertorriqueña de que Puerto Rico, en su sentido cultural, es una nación aunque subsista la polémica de si es un Estado, en sentido político, por carecer de soberanía". Informe de la Comisión de Derechos Humanos y Constitucionales sobre las Implicaciones Jurídicas, Históricas y Sociológicas de la Ciudadanía Puertorriqueña, San Juan, Puerto Rico, 4 de junio de 1997.

Por otro lado, como fenómeno jurídico, Puerto Rico es una comunidad política con atributos de soberanía de trascendencia interna e internacional en aquellas áreas en que ha sido reconocida por las entidades correspondientes. Véase L. Oppenheim, *Tratado de Derecho Internacional Público*, Barcelona, Ed. Bosch, 1961, Vol. 1, pág. 127. En virtud de esta situación política y jurídica es que los puertorriqueños aprobamos una Constitución a la luz de la cual nos gobernamos y establecemos nuestras propias leyes.[12]

El Estado Libre Asociado es una entidad jurídico-política que ostenta autonomía plena en diversos ámbitos de

[12] Aunque la Nación y el Estado de ordinario suelen coincidir, la historia ha demostrado que esto no siempre ocurre así. Por ello, existen naciones multiestatales y Estados compuestos de múltiples naciones o multinacionales. De ahí que la naturaleza jurídica no siga necesariamente a la condición sociológica de un grupo de individuos, ya que "la Nación es una comunidad en que concurren elementos que pueden o no existir en el Estado". A. Ulloa, *Derecho Internacional Público*, 4ta ed., Madrid, Ed. Iberoamericana, 1957, T. 1, pág. 131.

Con relación al Derecho Internacional, Alfred Verdross expresa: "el concepto de *nacionalidad* ..., de carácter *jurídico-internacional*, no coincide con el de *ciudadanía* ..., que es de carácter *jurídico-interno*." A. Verdross, *Derecho Internacional Público*, 6ta ed., Madrid, Ed. Aguilar, 1982, pág. 285. A pesar de que en el pasado hemos advertido estas claras distinciones que existen entre ambos conceptos, hemos señalado que desde el punto de vista de las garantías constitucionales que confiere el Art. II, Sec. 7 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, ambos conceptos representan idéntico valor. *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 485 esc. 3 (1989).

nuestra vida como pueblo y con suficientes atributos de soberanía, aunque no en su acepción clásica. *Pueblo v. Castro García*, 120 D.P.R. 740, 765–766 (1988). Véase Oppenheim, *op. cit.*, pág. 127 *et seq.*, en el que se discute la naturaleza jurídica de los Estados no plenamente soberanos. Véase, además, *U.S. v. Vega Figueroa*, 984 F. Supp. 71 (D. P.R. 1997). Por ello, estamos conformes con la opinión del Tribunal cuando expresa que:

> ... con arreglo a las más calificadas fuentes jurídicas, como cuestión de derecho, el Estado Libre Asociado de Puerto Rico es una entidad política con rasgos autonómicos que posee un ámbito de gobierno propio, una esfera de poderes gubernamentales y de autoridad pública que le es privativa. (Énfasis suprimido.) Opinión mayoritaria, pág. 168.

En específico, el Estado Libre Asociado tiene autonomía plena para regular los aspectos concernientes al proceso de elección de funcionarios a puestos electivos. El propio Tribunal Supremo de Estados Unidos ha reconocido este hecho al afirmar que aunque Puerto Rico no es uno de los estados de Estados Unidos de América, goza de similar independencia que éstos en cuanto a la capacidad de regular los aspectos concernientes al derecho al voto. *Rodríguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982).[13]

En este contexto, nuestra Constitución dedica al menos dos (2) de sus disposiciones a aspectos relacionados con el derecho al voto de las personas. Una de ellas es la Sec. 4 del Art. VI, L.P.R.A., Tomo 1, ed. 1982, pág. 367, preceptiva, en parte, de que:

> Será elector toda persona que haya cumplido dieciocho años de edad, y reúna los demás requisitos que se determine por ley. Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad.

---

[13] Existe una vasta jurisprudencia federal que reconoce la potestad de los estados de regular los aspectos concernientes a las cualificaciones para ser elector. Véanse, por ejemplo: *Dunn v. Blumstein*, 405 U.S. 330 (1972); *Kramer v. Union School District*, 395 U.S. 621 (1969); *Katzenbach v. Morgan*, 384 U.S. 641 (1966); *Gray v. Sanders*, 372 U.S. 368 (1963).

· Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.

El texto constitucional antes transcrito establece, en primer lugar, un requisito para ser elector —poseer una edad mínima de dieciocho (18) años— y una circunstancia que no puede ser considerada para privar a una persona del derecho al voto— no saber leer y escribir. Correspondió, entonces, a la Asamblea Legislativa establecer los demás requisitos que debían ser satisfechos para que una persona cualificara como elector. Véanse: *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 636–637 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 256 (1980).

Sin embargo, al cumplir esa encomienda, la Legislatura no debía, ni debe, actuar de forma contraria a la propia Constitución. De hecho, la Carta de Derechos de ésta establece de forma expresa que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261.

En vista de lo anterior, la Legislatura tiene la facultad para establecer aquellas condiciones que estime apropiadas para cualificar a las personas para que puedan participar en los procesos electorales en el país. Sin embargo, esa facultad, si bien no está limitada por imperativos federales relativos a requisitos electorales,[14] debe ser consecuente con los principios que dimanan tanto de la Constitución de Estados Unidos como de la del Estado Libre Asociado de Puerto Rico. En ese sentido, los requisitos estatutarios que la Legislatura establece pueden ser examinados por los tribunales para determinar si estos son consecuentes con sus postulados.

---

[14] En *Snowden v. Hughes*, 321 U.S. 1, 7 (1943), el Tribunal Supremo de Estados Unidos afirmó lo siguiente: "The right to become a candidate for state office, like the right to vote for the election of state officers, ... is a right or privilege of state citizenship, not of national citizenship." (Citas omitidas.)

Examinemos, pues, si el requisito de ser ciudadano de Estados Unidos para ejercer el derecho al voto que contienen los Arts. 2.003 y 2.073 de la Ley Electoral de Puerto Rico, *supra*, es constitucionalmente válido.

## V

La Asamblea Legislativa de Puerto Rico ha legislado en varias ocasiones para disponer todo lo concerniente a los procesos electorales.[15] En 1977 aprobó la Ley Núm. 4 de 20 de diciembre de 1977, conocida como Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 *et seq.*, la cual, con algunas enmiendas, permanece vigente.

El Art. 1.002 de la Ley Electoral de Puerto Rico propugna como propósitos cardinales "la aspiración de los ciudadanos a una amplia participación en todos los procesos electorales que les rigen"; a que los ciudadanos puedan "emitir el voto con arreglo a los dictados de su conciencia", y propiciar "la capacidad de expresión con independencia de afiliación partidista para la protección de todos los ciudadanos que así lo desean". 16 L.P.R.A. sec. 3002. De igual forma consagra "[l]a garantía de cada persona del derecho al voto, igual, libre, directo y secreto" y "[l]a prevalencia de los derechos electorales del ciudadano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas". Art. 2.001(11) (16 L.P.R.A. sec. 3051(11)). Se trata de principios fundamentales que matizan todo el esquema electoral de Puerto Rico y que deben tenerse presentes al momento de interpretar sus disposiciones.

En este contexto, el Art. 2.003 de la Ley Electoral de Puerto Rico, *supra*, dispone:

Será elector de Puerto Rico todo ciudadano de los Estados Unidos de América y de Puerto Rico domiciliado en la Isla que, a la fecha de una elección haya cumplido los diez y ocho (18)

---

[15] Véanse: Ley Núm. 91 de 26 de junio de 1965 (2 L.P.R.A. sec. 26n); Ley Núm. 1 de 13 de febrero de 1974, conocida como Código Electoral de Puerto Rico, 16 L.P.R.A. ant. sec. 2001 *et seq.*

años de edad, esté debidamente calificado con antelación a la misma, y no se encuentre legalmente incapacitado para votar.

Una lectura del texto anterior revela con claridad que para poder ser elector en Puerto Rico se tiene que ser ciudadano de Estados Unidos. Además, varios artículos de la Ley Electoral de Puerto Rico reafirman este requisito.([16]) Sin embargo, la Ley Electoral de Puerto Rico en la disposición estatutaria antes transcrita establece algo más: hay que ser ciudadano de Estados Unidos y de Puerto Rico y, a su vez, estar domiciliado en la isla. Vemos así que los primeros tres (3) requisitos que establece el artículo declarado inconstitucional por el foro a quo son: (*a*) ser ciudadano de Estados Unidos; (*b*) ser ciudadano de Puerto Rico, y (*c*) estar domiciliado en la isla.

Por otro lado, el Art. 2.073, también declarado inconstitucional por el foro recurrido, dispone:

> Para que se proceda a la eliminación de un elector que aparezca en la lista de peticiones de inscripción, deberá presentarse ante el Presidente de la Comisión Local de Elecciones una solicitud de exclusión de dicho elector, por uno o más de los siguientes fundamentos:
> (a) Que el elector no es ciudadano de los Estados Unidos de América. ... 16 L.P.R.A. sec. 3073(a).

Requerir la ciudadanía de Puerto Rico es el resultado lógico del hecho de que de ella se deriva el vínculo jurídico de un individuo con la comunidad política organizada que es el Estado Libre Asociado. Requerir la ciudadanía de Estados Unidos, por su parte, se deriva del hecho de que según el esquema constitucional de Puerto Rico, la ciudada-

---

([16]) Véanse: Art. 2.007 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3057, que dispone, en lo pertinente, que "[t]odo peticionario de inscripción comparecerá personalmente a un local de inscripción en el precinto de su domicilio ... y ... consignará, bajo juramento, la siguiente información: ... (f) si es ciudadano de los Estados Unidos"; Art. 2.023 (16 L.P.R.A. sec. 3073), que expresa como uno de los fundamentos para la eliminación de un elector de las listas de petición de inscripción "[q]ue el elector no es ciudadano de los Estados Unidos de América", y el Art. 5.031 (16 L.P.R.A. sec. 3234), que consagra como fundamento para la recusación de un elector, tener motivos fundados para creer que el elector "no [es] ciudadano de los Estados Unidos de América".

nía estadounidense ocupa un sitial de importancia singular. Ésta constituye un eslabón esencial en la relación entre Puerto Rico y Estados Unidos establecida en el ordenamiento constitucional vigente. La pregunta que tenemos ante nos es si la exigencia de ambas ciudadanías para ejercer el derecho al voto es constitucionalmente permisible.

El Procurador General, la Comisión Estatal de Elecciones y la doctora Ramírez de Ferrer arguyen que el texto claro de la Ley Electoral de Puerto Rico no deja lugar a dudas de que quien no sea ciudadano de Estados Unidos no puede ser elector en el país. Señalan que una lectura cabal de la ley revela el sitial preferente de la ciudadanía de Estados Unidos dentro del esquema electoral de Puerto Rico.

Asimismo, nos plantean que al evaluar la clasificación creada por los artículos declarados inconstitucionales —la de ciudadanos de Puerto Rico que no sean simultáneamente ciudadanos de Estados Unidos— a la luz de la cláusula constitucional que impone al Estado la obligación de dar a las personas un trato igual ante las leyes, debe ser aplicado un escrutinio de nexo racional y no el escrutinio estricto que aplicó el tribunal de instancia. Al respecto citan jurisprudencia federal que señala la conveniencia de usar un escrutinio de evaluación constitucional menos riguroso que el estricto cuando se evalúan clasificaciones que distinguen entre ciudadanos y extranjeros para desempeñar funciones públicas o políticas (*political functions*). Véanse: *Ambach v. Norwick*, 441 U.S. 68 (1979); *Perkins v. Smith*, 426 U.S. 913 (1976); *Sugarman v. Dougall*, 413 U.S. 634 (1973); *Foley v. Connelie*, supra. En la alternativa, nos plantean que aún aplicando un escrutinio estricto, el Estado prevalecería.

La propuesta de la Comisión Estatal de Elecciones, del Procurador General y de la doctora Ramírez de Ferrer pasa por alto nuestros pronunciamientos previos en los que hemos advertido que el derecho al voto es un derecho fundamental de nuestra sociedad democrática y que "[t]odo obstáculo al voto debe ser objeto de escrutinio judicial vi-

goroso, mas con la debida atención de dar el debido peso a los intereses apremiantes del Estado". *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 92 (1980). Véanse: *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 221 (1981). Véase, además, *Sánchez y Colón v. E.L.A. II*, 134 D.P.R. 501, 519 (1993), opinión de conformidad.

Asimismo, soslaya las ocasiones en las que hemos afirmado "que las clasificaciones fundamentadas en nacionalidad [son] inherentemente sospechosas y, por lo tanto, est[án] sujetas a un riguroso análisis constitucional". *De Paz Lisk v. Aponte Roque*, supra, pág. 485. Véanse: *León Rosario v. Torres*, 109 D.P.R. 804 (1980); *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972). Ante una impugnación de una clasificación basada en extranjería, compete al Estado demostrar que ella debe ser substraída de esta norma general. *De Paz Lisk v. Aponte Roque, supra*, pág. 488. En consecuencia, en el caso de autos, corresponde al Estado demostrar que posee un interés apremiante que valida la clasificación impugnada.

Ante nos, sin embargo, dicha prueba no ha sido presentada. Sorprendentemente, en la vista oral celebrada por este Tribunal, el Procurador General tan sólo nos expresó que el interés apremiante del Estado consiste en que el establecimiento del requisito de la ciudadanía estadounidense constituye una actuación legislativa que debe ser protegida.

Aunque ciertamente la ciudadanía estadounidense es uno de los pilares de la actual situación política puertorriqueña y de la relación actual que existe con Estados Unidos, no debemos pasar por alto que su exigencia para ejercer el derecho al voto es un requisito establecido por disposición estatutaria. No existe imperativo constitucional federal o de Puerto Rico que lo exija. De igual forma, acoger la propuesta del Estado de que existe un interés apremiante meramente porque es una ley aprobada por la Legislatura tendría como resultado lógico que cualquier

actuación legislativa sería constitucionalmente inimpugnable por el mero hecho de ser "actividad legislativa".

Asimismo, la interpretación de la Ley Electoral de Puerto Rico que proponen los peticionarios tendría como resultado que una persona, como el licenciado Mari Brás, que no es ciudadano de Estados Unidos, pero que aún tiene un vínculo jurídico con la comunidad política de Puerto Rico, pueda ser excluida de los procesos electorales del país. De este modo, según la interpretación que nos proponen los peticionarios, la Ley Electoral de Puerto Rico, que por disposición constitucional debe garantizar "la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto" y que debe "proteger al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral", Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261, excluiría del disfrute de los derechos políticos a aquellas personas que forman la comunidad política a la cual se está vinculado. Esta interpretación, además, tendría el claro efecto de lesionar derechos fundamentales de aquellas personas que, en el ejercicio de sus derechos a la libertad de expresión y de conciencia, optan por renunciar a la ciudadanía de Estados Unidos. No podemos refrendar este resultado.

Como realidad histórica, a partir de 1917, quien ostentara la ciudadanía de Puerto Rico, como norma general, poseía de forma simultánea la ciudadanía estadounidense. Sólo aquellas personas que la renunciaron de acuerdo con el procedimiento establecido para ello tenían sólo la ciudadanía de Puerto Rico. Con la renuncia de la ciudadanía estadounidense por parte del licenciado Mari Brás en 1994 y su pretensión de participar en las elecciones generales de 1996 surgió una situación anómala, quizás no prevista, que amerita que el Poder Judicial atempere su realidad jurídica y la de otros puertorriqueños que pudieran advenir a similar situación, a la realidad constitucional de Puerto Rico que reconoce el derecho al sufragio como un derecho fundamental y consagra la libertad de expresión y

de conciencia como elementos fundamentales de nuestro pueblo democrático.

No cabe concluir que al renunciar voluntariamente a la ciudadanía estadounidense, el licenciado Mari Brás formalizó, a su vez, un acto de renuncia a su derecho al voto. No es lógico ni razonable concluir que la consecuencia jurídica de perder el derecho al voto fue autoinfligido por el licenciado Mari Brás porque conocía a priori tal consecuencia. Varios fundamentos militan contra tal razonamiento.

La condición jurídica de un puertorriqueño que renuncia a la ciudadanía estadounidense nunca antes había sido motivo de una expresión por parte de este Foro. Hasta hoy tal condición jurídica era confusa. Por ello, perder el derecho al voto como resultado de renunciar a la ciudadanía de Estados Unidos no era necesariamente una consecuencia previsible. De hecho, la confusión existente sobre la condición jurídica a la que advienen los puertorriqueños que renuncian a la ciudadanía de Estados Unidos ha sido de tal magnitud que la propia Comisión Estatal de Elecciones, que hoy postula que el licenciado Mari Brás no tiene derecho a votar en Puerto Rico, había decidido permitirle votar antes de que este caso llegara al foro judicial.

Asimismo, en la declaración jurada que prestó el 19 de diciembre de 1993 en el pueblo de Quebradillas, cuya copia fue entregada a funcionarios del Gobierno federal en la Embajada de Venezuela, Mari Brás reclamó de forma específica todos los privilegios que le confería su ciudadanía puertorriqueña, la cual aún ostenta.[17] Implícita en esa ciudadanía puertorriqueña, preservada y elevada a rango constitucional en 1952, se enmarca su derecho al voto. La renuncia del licenciado Mari Brás a la ciudadanía estadounidense apareja sólo una renuncia a los derechos que os-

[17] En la declaración jurada que suscribió el 19 de diciembre de 1993, el licenciado Mari Brás consignó, en parte:

"... juro renunciar a la ciudadanía norteamericana y reclamo mi condición de ciudadano de Puerto Rico, condición cónsona como mi nacionalidad puertorriqueña; asimismo reclamo el derecho inalienable a vivir en paz en mi única patria, Puerto Rico y a disfrutar de todos los privilegios que conlleva mi nacionalidad y ciudadanía puertorriqueña." Caso Núm. CT-96-14, Primera pieza, pág. 218.

tentaba en virtud de esta ciudadanía y que con su renuncia no podría reclamar prospectivamente. Hoy resolvemos que el derecho al voto es consustancial a la condición jurídica de ciudadano de Puerto Rico, por ello no puede razonablemente concluirse que Mari Brás, al no ser ciudadano estadounidense, pero sí ciudadano puertorriqueño, haya perdido su derecho al voto.

Por otro lado, la renuncia a la ciudadanía de Estados Unidos por parte de Mari Brás constituye un ejercicio de su derecho a la libre expresión. No está en controversia que Mari Brás defiende la independencia de Puerto Rico. Su renuncia a la ciudadanía de Estados Unidos es, así, consecuente con las ideas que por años ha defendido y promovido. De igual modo, su renuncia a la ciudadanía de Estados Unidos no constituye una actuación aislada. En los últimos años, algunos de los críticos de la actual relación política entre Puerto Rico y Estados Unidos han visto en la renuncia de la ciudadanía de Estados Unidos un acto de protesta y de afirmación de sus ideas. Se trata de una actuación que comunica su inconformidad con la relación política actual entre Estados Unidos y Puerto Rico, y que según nuestro ordenamiento jurídico es legítima y, como tal, debe ser protegida por este Tribunal.

Por ello, pretender arrebatarle a personas como Mari Brás su derecho a votar en los procesos electorales en Puerto Rico por razón de no ser ciudadanos de Estados Unidos implicaría pretender castigarlos con la privación de sus derechos políticos. Refrendar la posición propuesta por los peticionarios sería, en efecto, criminalizar a un sector de la población que ve en el curso de acción seguido por el licenciado Mari Brás una conducta consecuente con sus ideas políticas.

La discusión anterior impide que adoptemos la propuesta de los peticionarios, ya que en última instancia implicaría refrendar una evidente clasificación sospechosa que, por incidir sobre un derecho fundamental, ameritaría ser evaluada a la luz del escrutinio estricto. No obstante, nuestro análisis de las disposiciones estatutarias impugna-

das nos convence de que el escrutinio constitucional puede ser evadido a la luz de las normas jurisprudenciales desarrolladas por vasta jurisprudencia de este Tribunal y de otras jurisdicciones. Debemos, por lo tanto, leer el texto de la Ley Electoral de Puerto Rico de forma consecuente con los postulados que dimanan de nuestra Constitución.

## VI

Como se sabe, un principio elemental de hermenéutica es que al interpretar una disposición específica de un estatuto los tribunales debemos considerar los propósitos perseguidos por el Legislador. De este modo, "[a]l interpretar y aplicar un estatuto hay que hacerlo teniendo presente el propósito social que lo inspiró". *Vázquez v. A.R.Pₑ.*, 128 D.P.R. 513, 523 (1991). Véase, además, *González Pérez v. E.L.A.*, 138 D.P.R. 399 (1995).

Asimismo, hemos afirmado que "[a] toda ley le daremos la interpretación que mejor responda a los propósitos que persigue. Interpretaremos la ley como un ente armónico, dándole sentido lógico a sus diferentes secciones, supliendo las posibles deficiencias cuando esto fuere necesario". Véanse: *González Pérez v. E.L.A.*, supra; *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740, 749 (1992) *Gobernador v. Alcalde de Coamo*, 131 D.P.R. 614, 621 (1992); *Torres v. Castillo Alicea*, 111 D.P.R. 792, 801 (1981). De este modo, se logra que la interpretación de una ley se ajuste al fundamento racional o fin esencial de la ley y la política pública que la inspira. Art. 19 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 19. Véanse, además: *Vázquez v. A.R.Pₑ.*, supra; *Asoc. Médica de P.R. v. Cruz Azul*, 118 D.P.R. 669 (1987); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772 (1968).

De igual modo, es un principio elemental de interpretación estatutaria que cuando la validez de una ley está en entredicho y existen dos (2) posibles interpretaciones, una de las cuales sería inconstitucional, los tribunales debemos adoptar la interpretación que sostendría su validez constitucional "aún cuando la interpretación adoptada no pa-

rezca ser tan natural como la otra". (Traducción nuestra.) 16 Am.Jur.2d 220.

Del mismo modo, los tribunales debemos darle fuerza de ley a un estatuto cuya constitucionalidad haya sido impugnada, siempre y cuando pueda ser interpretado y aplicado de una manera que evada cualquier conflicto con la Constitución. En este sentido, los tribunales estamos obligados a interpretar los estatutos de forma tal que en su aplicación no se prive a una persona de privilegios o derechos constitucionalmente reconocidos.

Nuestro análisis de las disposiciones impugnadas nos lleva a concluir que éstas no adolecen de ambigüedad o vaguedad. El requisito de ser ciudadano de Estados Unidos para ser elector hábil se deriva de la totalidad del estatuto. Sin embargo, la aplicación de tal requisito a personas nacidas y domiciliadas en Puerto Rico que no son ciudadanos de Estados Unidos llevaría al absurdo conceptual de que tales personas perderían sus derechos políticos, aún cuando, por preservar la ciudadanía de Puerto Rico, le guardan fidelidad a la comunidad política que constituimos los puertorriqueños. Esto es una contradicción constitucional inadmisible.

Además, la ausencia de argumentos por parte del Estado y de los demás peticionarios que sustenten su contención de que la exigencia de la ciudadanía estadounidense para ejercer el derecho al voto protege un interés apremiante del Estado, crea un potencial problema de inconstitucionalidad en los Arts. 2.003 y 2.073 de la Ley Electoral de Puerto Rico, *supra*. Ante lo anterior, tenemos la ineludible obligación de rectificar el problema conceptual que se nos plantea.

Estimamos que para lograr ese objetivo es factible hacer un ejercicio de interpretación estatutaria en el cual, siguiendo las normas de hermenéutica, leamos el texto impugnado en el sentido de que para ser elector en Puerto Rico se requiere ser ciudadano de Estados Unidos *o* ciudadano de Puerto Rico, sin que sea requisito estatutario poseer ambas ciudadanías. R.E. Bernier y J.A. Cuevas Sega-

rra, *Aprobación e interpretación de las leyes de Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. II, pág. 353. Véanse, además: *Pueblo v. Villafañe, Contreras*, 139 D.P.R. 134 (1995); *Pueblo v. Colón Rosa*, 96 D.P.R. 601, 607 esc. 4 (1968); *Pueblo v. Febres Colón*, 95 D.P.R. 172, 175 (1967); *Pueblo v. Mantilla*, 71 D.P.R. 36, 42–43 (1950).

En este sentido, estimamos que el Art. 2.003 de la Ley Electoral de Puerto Rico, *supra*, debe ser interpretado en el sentido de que "[s]erá elector de Puerto Rico todo ciudadano de los Estados Unidos de América *o* de Puerto Rico *domiciliado en la Isla*". (Énfasis suplido.) De esta forma serán concebidos como electores hábiles aquellos ciudadanos de Estados Unidos domiciliados en Puerto Rico, según lo dispone la Ley Electoral de Puerto Rico, y los ciudadanos de Puerto Rico que, siendo o no ciudadanos de Estados Unidos, estén domiciliados en el país. Esta interpretación es perfectamente cónsona con los principios democráticos que subyacen en nuestro esquema jurídico electoral. Además, preserva el derecho a votar en los procesos electorales de aquellas personas ciudadanas estadounidenses domiciliadas en el país.

Ante nos, los peticionarios plantean que el análisis que hoy proponemos es inconsecuente con un análisis integral de la Ley Electoral de Puerto Rico, ya que ella establece el no ser ciudadano estadounidense como un fundamento para la recusación de un elector, mientras que disposición similar no se incluye con relación a quienes no sean ciudadanos de Puerto Rico. Tal razonamiento es lógico, tan sólo, en apariencia.

Resulta enteramente razonable que la Ley Electoral de Puerto Rico contenga una disposición para recusar a un elector por razón de no ser ciudadano estadounidense, mas no así para las personas que no sean ciudadanos de Puerto Rico, por una sencilla razón. Por la diversa trascendencia de ambas ciudadanías, existe un procedimiento que permite que un ciudadano de Estados Unidos pueda despojarse de esta condición jurídica. Tal procedimiento no existe para que una persona se desvincule de la ciudadanía

de Puerto Rico. No existen propiamente actos de expatriación para los nacidos en Puerto Rico que están sujetos a su jurisdicción. Además, como antes señalamos, un ciudadano de Puerto Rico que renuncia a la ciudadanía de Estados Unidos no se convierte en extranjero con relación al Estado Libre Asociado de Puerto Rico.

Por lo anterior, estamos conformes con la opinión del Tribunal cuando resuelve que:

> ... son electores capacitados en el país, con pleno derecho al voto, quienes ostenten la ciudadanía de Estados Unidos, *o* los que sean ciudadanos de Puerto Rico, según se han definido en esta opinión, siempre que cumplan con los requisitos de residencia y domicilio correspondientes. En otras palabras, resolvemos que, independientemente del poder que tiene la Asamblea Legislativa para, de ordinario, exigir el requisito de ser ciudadano de Estados Unidos como condición para votar en el país, no puede excluirse del registro electoral local a ciudadanos puertorriqueños con las circunstancias actuales de Mari Brás, por lo que debe considerarse que tienen derecho a votar al amparo de la Ley Electoral de Puerto Rico vigente. Opinión mayoritaria, págs. 207–208.

## VII

En resumen, existe una ciudadanía de Puerto Rico diferenciada de la ciudadanía de Estados Unidos. Su fundamento sociológico es la nación puertorriqueña. Su fundamento jurídico es la Constitución del Estado Libre Asociado de Puerto Rico y ha vivido toda su vida en este país. Además, ha dedicado toda su vida a la causa de la independencia de Puerto Rico y su decisión de renunciar a la ciudadanía de Estados Unidos constituye un acto de protesta contra la relación actual entre Puerto Rico y Estados Unidos y una afirmación de los ideales que siempre ha defendido. Al renunciar a la ciudadanía estadounidense continuó ostentando la ciudadanía de Puerto Rico reconocida por la Constitución del Estado Libre Asociado de Puerto Rico. En virtud de ese ordenamiento jurídico y de la realidad socio-política de Puerto Rico, Mari Brás preserva un nexo jurídico con la comunidad política que constitui-

mos los puertorriqueños. De ese vínculo se deriva su derecho constitucional al voto. Por ende, el voto emitido por él en las Elecciones Generales de 5 de noviembre de 1996 debe ser contado. Asimismo, estamos conformes en que los citados Arts. 2.003 y 2.073 de la Ley Electoral de Puerto Rico son constitucionales.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Los tribunales, en ocasiones, han actuado con un gran grado de habilidad en sus esfuerzos por encontrar alguna justificación para arrancar de las palabras de un estatuto un significado no expresado literalmente, para poder escapar de consecuencias consideradas como absurdas o severas. *Pero la aplicación de este principio se aproxima tanto a las fronteras entre el ejercicio del poder judicial y el del poder legislativo*, que *se requiere una gran cautela y circunspección para evitar que se lleve a cabo una usurpación del poder legislativo.* No es suficiente el que una ley produzca consecuencias severas o absurdas .... *En ese caso el remedio a tal situación debe ser suministrado por la autoridad legislativa y no por la Corte.* (Énfasis suplido.) *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930), citado por este Tribunal en *Clínica Juliá v. Secretario de Hacienda*, 76 D.P.R. 509, 521 (1954).

En el día de hoy nos vemos obligados, *una vez más*, a disentir vehementemente del criterio mayoritario de este Tribunal. *En esencia*, la Mayoría curiosamente sostiene que aun cuando una ley aprobada por nuestra Asamblea Legislativa sea constitucionalmente válida, este Tribunal tiene el poder o la facultad de no aplicar la misma en un caso en específico cuando entienda, *a su discreción o capricho*, que el legislador no contempló la situación particular de quien impugna su validez. *Esto es*, según la opinión mayoritaria emitida en el día de hoy, este Tribunal tiene autoridad para convertirse en la *"conciencia del legislador"*,

quedando en libertad de determinar *lo que tomó o debió tomar en cuenta* la Asamblea Legislativa al delimitar quiénes formarían parte de nuestra comunidad política.

Esta abrogación de poder por parte de la Rama Judicial es, *cuando menos,* alarmante y la misma atenta contra la separación de poderes que es fundamental a nuestro sistema democrático de gobierno. No estamos facultados para ir contra la "sabiduría" del legislador por mero capricho. Asimismo, no podemos invalidar los efectos jurídicos de la aplicación de una ley, *constitucionalmente válida,* por simplemente no estar de acuerdo con las implicaciones políticas e ideológicas que la misma acarrea. *Repetimos,* el precedente establecido por la mayoría del Tribunal en el día de hoy es uno peligroso y ominoso.

I

Concurrimos con la Mayoría en tanto en cuanto convalida la constitucionalidad de los Arts. 2.003 y 2.023 de la Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. secs. 3053 y 3073) conocida como la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 *et seq.* Esencialmente, dichos artículos requieren la ciudadanía americana para ejercer el derecho al voto en Puerto Rico, el cual derecho está consagrado en nuestra Constitución.

*No* debe quedar duda sobre la validez constitucional de este requisito. *De manera general, en el preámbulo de nuestra Constitución quedó consignado el importante papel que desempeña la ciudadanía americana dentro de nuestro quehacer e identidad como pueblo.* Se estableció allí, en lo pertinente a la controversia ante nos, que se consideran *"factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América* y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas; la lealtad a los postulados de la Constitución Federal; la convivencia en Puerto Rico de las dos grandes culturas

del hemisferio americano ...". (Énfasis suplido.) Preámbulo, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.

De otra parte, en cuanto al derecho al voto, nuestra Constitución establece unos requisitos básicos para ser elector en Puerto Rico. La misma *delega* en la Asamblea Legislativa el poder de reglamentar el procedimiento electoral. Específicamente en su Art. VI, Sec. 4, de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 367, dispone que:

> Será elector toda persona que haya cumplido dieciocho años de edad, y reúna los *demás requisitos que se determine por ley.* Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad. (Énfasis suplido.)

La Asamblea Legislativa, en el ejercicio válido de la *facultad delegada* por la Constitución de reglamentar todo lo relativo a los procedimientos electorales,([1]) dispuso en el Art. 2.003 de la Ley Electoral de Puerto Rico, ante, *que será elector de Puerto Rico todo ciudadano de Estados Unidos de América y de Puerto Rico domiciliado en la Isla* que, a la fecha de una elección haya cumplido los diez y ocho (18) años de edad, esté debidamente calificado con antelación a la misma y no se encuentre legalmente incapacitado para votar. *Es de notar* que el Art. 2.023, ante, de la referida pieza legislativa señala, en lo pertinente, *como primera causal para solicitar la recusación de un elector el que éste no sea ciudadano de Estados Unidos de América.*([2])

No obstante el *mandato claro* del legislador, el recurrido Juan Mari Brás pretende que este Tribunal interprete que el requisito de ser "ciudadano de Estados Unidos de Amé-

---

([1]) Potestad que ha sido reconocida reiteradamente por este foro y por el Tribunal Supremo de Estados Unidos. *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 256 (1980); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 744 (1976); y *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982).

([2]) Es preciso señalar que este artículo, al esbozar las causas para la recusación de un elector, especifica que la falta de la ciudadanía americana es una de ellas, mientras que no hace referencia alguna a la falta de la "ciudadanía puertorriqueña" para ser recusado.

rica y de Puerto Rico" equivale a exigir solamente una de las dos (2) ciudadanías. Esto es, el recurrido nos invita a sustituir la conjunción "y" por la disyuntiva "o", para así concluir que el requisito de la ciudadanía americana o la puertorriqueña resulta ser suficiente en la alternativa. *No podemos estar de acuerdo con dicha pretensión; la cual, de manera errónea, adopta la mayoría de este Tribunal en el día de hoy.*

*Existe un mandato claro y expreso por parte de la Asamblea Legislativa de que la ciudadanía de Estados Unidos sea una condición sine qua non para poder ser elector en Puerto Rico.*([3]) *La utilización de la conjunción "y" denota la intención indubitada de que la misma es mandatoria. Dicha conjunción podrá ser sustituida por un tribunal por la disyuntiva "o" únicamente cuando ello sea necesario para llevar a cabo el propósito del legislador.*([4]) *Esa, ciertamente, no es la situación en el caso ante nos. Veamos.*

*Desde la promulgación de la Ley Núm. 79 de 25 de junio de 1919*([5]) *(16 L.P.R.A. ant. sec. 1 et seq.) hasta la hoy vigente Ley Electoral de Puerto Rico, surge claramente la intención del legislador puertorriqueño de exigir como requisito la ciudadanía de Estados Unidos como condición previa al ejercicio del derecho al voto. Ese claro propósito legislativo no ha sido alterado por legislación posterior alguna.*

*De hecho*, en cuanto a la "ciudadanía puertorriqueña", la misma no fue incorporada, como requisito previo al ejercicio del derecho al voto, sino hasta el 1977, mediante la Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3001); *contrario al caso del requisito de la ciudadanía ame-*

---

([3]) La imposición de dicha condición, como discutiremos más adelante, es válida constitucionalmente.

([4]) *Pérez, Pellot v. J.A.S.A.P.*, 139 D.P.R. 588 (1995); *Pueblo v. Colón Rosa*, 96 D.P.R. 601, 607 (1968); *Pueblo v. Mantilla*, 71 D.P.R. 36, 42–43 (1950); R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da. ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 359.

([5]) Primer intento por parte de la Asamblea Legislativa de reglamentar el procedimiento eleccionario en Puerto Rico.

*ricana el cual siempre ha sido condición para ser elector o
electora en Puerto Rico.*(⁶)

En vista de lo anterior, y ante el claro mandato legislativo de que únicamente será elector "todo ciudadano de los Estados Unidos de América *y* de Puerto Rico domiciliado en la Isla[...]", hay que necesariamente atender a la *regla de hermenéutica* contenida en el Art. 14 de nuestro Código Civil, 31 L.P.R.A. sec. 14. En dicho precepto, como se sabe, se establece que "[c]uando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Íd.

El referido Art. 14 ha sido invocado anteriormente por este Tribunal al establecer el *principio rector de abstención judicial,* referente el mismo a que un tribunal está impedido de legislar por la vía judicial ante el mandato claro del legislador. Lo contrario equivaldría a la abrogación por parte de la Rama Judicial de un poder tradicional y exclusivamente reservado a la Rama Legislativa. *Más que una interpretación de la Ley en cuestión, lo pretendido por el recurrido, y adoptado hoy por la Mayoría, constituye una redacción distinta del estatuto en cuestión, intercalándole*

---

(⁶) Del historial legislativo no surge razón particular alguna por la cual el legislador incorporó la condición de ser "ciudadano puertorriqueño" en el 1977. Sin embargo, referente al carácter o alcance de dicha ciudadanía, con motivo de un debate surgido con relación al requisito de la ciudadanía americana y de Puerto Rico para ser gobernador, el señor García Méndez cualificó:

"... se puede ser ciudadano de Puerto Rico por el sólo nacimiento y todavía no ser, por alguna razón, ciudadano de Estados Unidos, en el caso, por ejemplo, siguiente: Cuando nazca una persona en un barco dentro de los límites jurisdiccionales de varias millas, que yo no me acuerdo, y hasta tanto no se haya determinado si el padre lo inscribió como de la nacionalidad que él ostenta, o si ha dejado que, *por haber nacido aquí, sea ciudadano puertorriqueño. Porque el nacimiento hoy, determina la ciudadanía.*" (Énfasis suplido.) 3 Diario de Sesiones de la Asamblea Constituyente 1733 (1961).

Por otro lado, contrario a lo aseverado por la Mayoría, al escolio 26, en cuanto a que la no inclusión del requisito de la "ciudadanía puertorriqueña" en el Art. 2.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3073, crea una "inconsistencia", es preciso destacar que esto es así sólo en cuanto a la "ciudadanía puertorriqueña", mas no en cuanto a la ciudadanía americana. Esto es, la exigencia del requisito de la ciudadanía americana es constante, en lo relevante, a través de la legislación electoral; indicativo de la indubitada intención del legislador respecto a la indispensabilidad de la misma.

*al mismo limitaciones y cualificaciones que el legislador no tuvo a bien incluir.*(⁷)

Asimismo, este Tribunal ha establecido que "[l]a literalidad [únicamente] puede ser ignorada [por los tribunales] cuando es claramente contraria a la verdadera intención o propósito legislativo *según surja éste de la totalidad del estatuto* o de la totalidad de la sección [sic] envuelta. Ya es doctrina inconmovible en nuestra jurisprudencia que la 'ley hay que leerla y considerarla *en su totalidad, no fraccionalmente* y para encontrarle su significado el tribunal tiene que tener en cuenta el propósito de la misma' ". (Énfasis suplido y cita omitida.) *Rivera Cabrera v. Registrador*, 113 D.P.R. 661, 665 (1982).(⁸)

En atención a este principio, analizamos brevemente, en conjunto, otras disposiciones pertinentes contenidas en la Ley Electoral de Puerto Rico.

La Ley Electoral de Puerto Rico hace referencia a la ciudadanía americana en varios artículos de la misma. Dos (2) de dichos artículos son los que hoy están siendo impugnados ante nosotros, a saber: el Art. 2.003, ante, estableciendo los requisitos para ser elector; y el Art. 2.023, ante, estableciendo el procedimiento y las causales para la recusación de un elector. En ambos artículos, *la ciudadanía americana resulta ser indispensable*: en el primero, siendo condición sine qua non para ser elector; y en el segundo, constituyendo, la falta de la misma, motivo de recusación del elector.

Por otro lado, en el Art. 2.007 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3057, se establece el procedimiento de *petición de inscripción* como elector. En el mismo

---

(⁷) Véanse: *Rivera Cabrera v. Registrador*, 113 D.P.R. 661, 665 (1982); *Ferretería Matos Inc. v. P.R. Tel. Co.*, 110 D.P.R. 153, 156 (1980); *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 686 (1966); *Atiles, Admor. v. Comisión Industrial*, 77 D.P.R. 16, 20 (1954); *Clínica Juliá v. Secretario de Hacienda*, 76 D.P.R. 509, 521–523 (1954).

(⁸) Véanse: *Xerox Corp. v. Srio. de Hacienda*, 115 D.P.R. 668 (1984); *Cancora Marina, Inc. v. Srio. de Hacienda*, 114 D.P.R. 248, 254 (1983); *P.P.D. v. Gobernador*, 111 D.P.R. 8 (1981); *Fraticelli v. Comisión Industrial*, 105 D.P.R. 363, 367 (1976); *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 386 (1973).

se requiere que el peticionario consigne bajo juramento el hecho *de que es ciudadano de los Estados Unidos.*

Es preciso destacar que *ni* en el Art. 2.007, ante, *ni* en el Art. 2.023, ante, siendo éstos los que determinan quién será elector y quién será excluido, se hizo referencia alguna respecto a la "ciudadanía puertorriqueña". Es decir, *la "ciudadanía puertorriqueña" no es un factor imprescindible al momento del elector inscribirse, ni su ausencia es tan siquiera considerada al momento del elector ser recusado.* De manera que, contrario a lo que sostiene la Mayoría, *la existencia o no de la "ciudadanía puertorriqueña" y el hecho de que el licenciado Mari Brás y "otros como él" la invoquen, resulta ser inmaterial a la disposición de la controversia ante nos.*(⁹)

Ello, sencillamente, porque es la *ciudadanía americana* la que el legislador estableció como *"criterio" determinante* para delimitar, y excluir, quién será elector en Puerto Rico. *Hasta tanto la Asamblea Legislativa no disponga lo contrario, ése es el marco de derecho vigente del cual el licenciado Mari Brás optó por autoexcluirse.*

Así, analizadas en conjunto las disposiciones pertinentes de la Ley Electoral, resulta forzosa la conclusión de que es la ciudadanía americana, *de manera principal y exclusiva,* la que delimita la composición de nuestra comunidad política. De esa manera lo dispuso el legislador, y sólo *mediante actuación legislativa* a esos efectos podría variarse el estado de derecho vigente.(¹⁰)

---

(⁹) Esto es, aun si concediéramos la existencia de la "ciudadanía puertorriqueña" —y que la misma tuviera alcance más allá de nuestra extensión territorial; aun si incorporáramos al texto de los Arts. 2.023, ante, y 2.007 (16 L.P.R.A. sec. 3057), la "ciudadanía puertorriqueña" como criterio adicional para solicitar la recusación y para solicitar la inscripción, respectivamente; no estando facultados para intercambiar la "y" por la "o", por ello no ser necesario para cumplir con el propósito del legislador; *aun con todo lo anterior,* el recurrido Mari Brás todavía estaría impedido de votar, ya que *al menos* serían requisito *ambas* ciudadanías.

(¹⁰) A esos efectos, nos resulta curioso que la Mayoría reconoce que el Estado puede *válidamente* requerir la ciudadanía de Estados Unidos como condición previa para el ejercicio del derecho al voto. Sin embargo, razona que, en vista de que "no existe obligación federal alguna que le requiera exigir tal condición", el Estado puede optar por también conceder el derecho al voto a los que son sólo ciudadanos de ese

Establecido el claro mandato legislativo contenido en la Ley Electoral de Puerto Rico, nos corresponde entonces analizar la *constitucionalidad* del mismo a la luz de los preceptos constitucionales locales y federales y los pronunciamientos judiciales, tanto de este Tribunal como del foro federal.

*De entrada, debe quedar firmemente establecido que el derecho al voto es uno fundamental,*([11]) *cuya renuncia debe ser voluntaria e informada y cualquier limitación al mismo deberá sobrepasar el escrutinio estricto.*([12])

El licenciado Mari Brás en ningún momento ha planteado que la voluntariedad de su renuncia esté, de algún modo, viciada. De hecho, como parte del procedimiento de renuncia a la ciudadanía de Estados Unidos, el licenciado Mari Brás declaró bajo juramento, en lo pertinente, que ejercía voluntariamente su derecho a la expatriación de los Estados Unidos; que estaba consciente de que se convertía en extranjero con respecto a Estados Unidos; que de no adquirir o poseer otra nacionalidad sería un apátrida (*stateless person*); y que llevaba a cabo su renuncia conociendo las repercusiones de la misma.

No siendo la voluntariedad de la renuncia, entonces, motivo de controversia, huelga cualquier otro comentario a esos efectos.

*Ahora bien, siendo el derecho al voto uno fundamental, el análisis constitucional sobre la validez de la limitación o restricción al mismo, necesariamente ha de efectuarse mediante el escrutinio estricto.*([13])

---

Estado. *Estamos de acuerdo*; pero, distinto a la Mayoría, somos de la opinión de que *DICHA FACULTAD COMPETE A LA RAMA LEGISLATIVA, NO A ESTE TRIBUNAL.*

([11]) Véanse: *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 615 (1988); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 221 (1981). En lo federal, véanse: *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964); *Bullock v. Carter*, 405 U.S. 134 (1972).

([12]) Véanse: *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 92 (1980); *P.P.D. v. Admor. General de Elecciones*, ante, pág. 207.

([13]) Cabe notar, que en la jurisdicción norteamericana, el Tribunal Supremo federal ha señalado reiteradamente que las restricciones al ejercicio del derecho al voto basadas en edad, domicilio y *ciudadanía* no son sospechosas, por lo que deberán ser sometidas al escrutinio racional. *Hill v. Stone*, 421 U.S. 289, 295 (1975), *Sugar-*

El escrutinio estricto es el más riguroso de los tres (3) escrutinios existentes para atender la impugnación de un estatuto cuya validez constitucional se impugna a la luz de la cláusula de igual protección de las leyes.[14] Dicho escrutinio se utiliza para analizar las llamadas clasificaciones sospechosas o cuando la clasificación afecta un derecho fundamental.[15] Bajo el mismo, se presume la inconstitucionalidad de la ley impugnada y el Estado tiene el peso de probar que la misma no es arbitraria, y, además, que constituye el medio menos oneroso para adelantar un interés público tan apremiante que hace necesaria la clasificación.[16]

Este Tribunal ha señalado que "están sujetas a un minucioso examen judicial, por considerarse inherentemente sospechosas, todas las clasificaciones tangentes con la dignidad del ser humano y con el principio de la igualdad ante la ley" y que "[c]aen bajo esta categoría las clasificaciones o discrímenes por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y *nacionalidad*".[17] (Énfasis suplido.) *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562, 582 (1992).

La ciudadanía, o nacionalidad, como clasificación o cri-

---

*man v. Dougall*, 413 U.S. 634, 642 (1973); *Kramer v. Union School District*, 395 U.S. 621 (1969).

De hecho, en atención a dichos pronunciamientos del más alto foro judicial federal, el Tribunal Supremo del estado de Colorado sostuvo que el requisito de la ciudadanía para ejercer el derecho al voto no entraba en conflicto alguno con la cláusula de igual protección de las leyes contenida en la Decimocuarta Enmienda de la Constitución federal. *Shafte v. Rorex*, 553 P.2d 830, 832 (1976).

Sin embargo, como se sabe, en nuestra jurisdicción el derecho al voto goza de carácter fundamental con rango constitucional, siendo esto lo que activa la aplicación del escrutinio estricto. Art. II, Sec. 2, Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

[14] Aclaramos que el tercero de dichos criterios, el llamado escrutinio intermedio, no ha sido adoptado en Puerto Rico. *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405 (1993).

[15] *San Miguel Lorenzana v. E.L.A.*, ante, págs. 430–431; *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 537 (1984); *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980).

[16] *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28 (1993); *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992); *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988), *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987).

[17] *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972).

terio para otorgar o retirar mediante legislación algún derecho o privilegio, ha sido evaluada tanto por el Tribunal Supremo federal, como por este Tribunal. Los resultados han sido diversos. Veamos.

El Tribunal Supremo federal ha invalidado la utilización del criterio de ciudadanía en las siguientes circunstancias: para otorgar beneficios de bienestar social, *Graham v. Richardson*, 403 U.S. 365 (1971); para practicar la profesión legal en un estado, *In re Griffiths*, 413 U.S. 717 (1973); para ocupar un puesto en el servicio civil estatal *(state civil service)*, *Sugarman v. Dougall*, 413 U.S. 634 (1973); para ser notario público, *Bernal v. Fainter*, 467 U.S. 216 (1984); para ocupar un puesto en el servicio civil federal, *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976); y para imponer una cuota para cubrir la educación pública a no ciudadanos de edad escolar, *Plyler v. Doe*, 457 U.S. 202 (1982).

De otra parte, dicho Tribunal ha validado la utilización del criterio de la ciudadanía: para ocupar un puesto electivo (ya sea ejecutivo, legislativo o judicial) o puestos no electivos importantes en cualquiera de las ramas del Gobierno estatal, *Sugarman v. Dougall*, ante; para ocupar la posición de policía estatal, porque están comprometidos en la ejecución de política pública y ejercen un amplio grado de discreción al hacerlo, *Foley v. Connelie*, 435 U.S. 291 (1978); para ocupar la posición de maestro de escuela pública, por considerarse ésta una función gubernamental, *Ambach v. Norwick*, 441 U.S. 68 (1979); para ocupar la posición de ayudante de oficial probatorio, *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982), y, finalmente, para poder recibir los beneficios de Medicare, se validó el requisito impuesto por el Congreso de que los no ciudadanos debían tener residencia permanente y residir ininterrumpidamente en los Estados Unidos por espacio de cinco (5) años, *Matthews v. Diaz*, 426 U.S. 67 (1976).

Específicamente en cuanto al derecho al voto, el Tribunal Supremo federal ha validado la imposición, mediante estatuto, del requisito de la ciudadanía americana. En el

caso de *Sugarman v. Dougall*, ante, pág. 647, ese Tribunal sostuvo lo siguiente:

> This Court has *never held that aliens have a constitutional right to vote* or to hold high public office under the Equal Protection Clause. Indeed, implicit in many of this Court's voting rights decisions is the notion *that citizenship is a permissible criterion for limiting such rights.* [A]lienage itself is a factor that reasonably could be employed in defining 'political community'. (Citas omitidas y énfasis suplido.)

Contrario al desarrollo jurisprudencial en la esfera federal, con relación a la utilización del criterio de la ciudadanía como restrictivo del derecho al sufragio, este Tribunal no ha tenido oportunidad de expresarse al respecto.

Sin embargo, en *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472 (1989), tuvimos ante nuestra consideración la constitucionalidad de una disposición legal que requería la ciudadanía americana para ser maestro de escuela pública. En dicha ocasión, utilizando el escrutinio estricto, una mayoría de este Tribunal invalidó la misma por considerar que tal condición —de ciudadano americano— no era indispensable a la idoneidad profesional del maestro, o irremplazable, en cuya ausencia el maestro "no puede ser portavoz adecuado de los valores comunitarios de la sociedad puertorriqueña".([18]) Esto es, una mayoría de este Tribunal encontró que el exigir la ciudadanía americana para asegurarse de que los maestros de escuelas primarias puedan educar a nuestros hijos y transmitir de forma apropiada nuestros valores no constituye un interés apremiante del Estado, por existir medios menos onerosos.

En cuanto al caso que nos ocupa, es preciso determinar si existe algún *interés apremiante* por parte del Estado al exigir la ciudadanía americana como requisito previo al ejercicio del derecho al voto. Ello, ya que, como dijéramos

---

([18]) *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 488 (1989). En aquella ocasión, como hoy, sostuvimos —mediante opinión disidente— la validez incuestionable de la ciudadanía americana como criterio para delimitar quienes forman parte de nuestra comunidad política. Íd., pág. 526.

anteriormente, en nuestro ordenamiento la ciudadanía constituye una clasificación inherentemente sospechosa y estamos ante un derecho que goza de carácter fundamental.

*No* albergamos duda sobre la existencia de intereses apremiantes por parte del Estado que justifican la referida intervención sobre el derecho al voto. En este sentido, *concurrimos* con la Mayoría. Veamos.

*Mediante la exigencia del requisito de la ciudadanía de Estados Unidos, la LEGISLATURA no hace otra cosa que hacerse eco de los pronunciamientos contenidos en nuestra Constitución, resaltando la esencia de la ciudadanía americana como parte integral de nuestra identidad como pueblo y piedra angular de nuestro vínculo a los Estados Unidos.* Además, mediante dicha actuación, nuestra Asamblea Legislativa llevó a cabo la afirmación última de definir nuestra comunidad política.[19]

Es decir, cónsono con lo dicho anteriormente, el requisito de la ciudadanía americana para ser elector en Puerto Rico sirve para *delimitar* quién es parte de nuestro cuerpo electoral y para *excluir* a aquellos forasteros que residen en la Isla, pero que nuestro Legislador no ha querido que formen parte de nuestra colectividad política. Por último, según sostiene la Mayoría "con ello se le otorga la debida *reciprocidad electoral* a los ciudadanos norteamericanos residentes y domiciliados en Puerto Rico". (Énfasis en el original.) Opinión mayoritaria, pág. 194.

Así, pues, es inescapable la conclusión de que el requisito de la ciudadanía americana, incorporado en los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, ante, es constitucional.

---

[19] Nos reiteramos en nuestros pronunciamientos que hiciéramos en nuestra opinión disidente en *De Paz Lisk v. Aponte Roque*, ante, pág. 526, a los efectos de que: "La ciudadanía es un estado y relación continua con una sociedad; significa algo más importante que la mera presencia física o residencia en un país. *Implica una adhesión a nuestros valores y un compromiso solemne con los postulados de nuestro sistema constitucional democrático.*" (Énfasis en el original y escolio omitido.)

## II

De todo lo antes expuesto surge con meridiana claridad, *en resumen*, que: el requisito de la ciudadanía americana es uno que, por mandato legislativo, resulta ser imprescindible y necesario para poder ejercer el derecho al voto en nuestra jurisdicción; este requisito, contrario incluso al de la "ciudadanía puertorriqueña", es uno que se ha exigido desde tiempo inmemorial por el legislador puertorriqueño; y que la exigencia de dicho requisito es una completamente válida desde un punto de vista constitucional.[20]

*Esa situación es una que puede, o no, gustarle a los integrantes de este Tribunal*; de hecho, personalmente simpatizamos con la posición del peticionario Juan Mari Brás. *Ello, sin embargo, es completamente inmaterial a la correcta solución jurídica de este caso ya que se supone que nuestras preferencias ideológicas, gustos y criterios personales no influyan sobre nuestras decisiones.* La determinación de si la situación jurídica que plantea el caso ante nuestra consideración debe, o no, ser alterada corresponde hacerla, *de manera exclusiva*, al poder legislativo.

En fin, *no* podemos suscribir la opinión mayoritaria emitida en el presente caso por razón de que la misma constituye un claro acto de usurpación judicial de la facultad que nuestra Constitución delegó en la Rama Legislativa.

Es por ello que nos vemos obligados a disentir.

---

[20] Haciendo referencia a criterios de hermenéutica para justificar la no aplicación de un estatuto perfectamente válido constitucionalmente, la Mayoría cita en apoyo de su actuación principalmente seis decisiones de este Tribunal; a saber: *Giménez v. J.E.E.*, 96 D.P.R. 943 (1968); *Ortiz Angleró v. Barreto Pérez*, ante; *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980); *P.P.D. v. Admor. General de Elecciones*, ante; y *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981).

No hay duda de que un análisis superficial de los referidos casos causa la impresión de que algunas de las expresiones hechas en dichos casos por este Tribunal sostienen la errónea actuación en que hoy incurre la Mayoría. Un examen jurídico un poco más profundo de dichas decisiones, sin embargo, demuestra que las mismas tienen que ser tomadas y analizadas a la luz, y en el contexto, de las situaciones de hechos en que dichas expresiones fueron hechas; situaciones de hechos que son completamente distintas a la del caso que hoy ocupa nuestra atención, razón por la cual dichas expresiones no son aplicables al caso de autos. La acción de la Mayoría al citar las referidas decisiones no pasa de ser un atropellado, y erróneo, intento de justificar un burdo acto de legislación judicial.

— O —

Opinión disidente emitida por el Juez Asociado Señor Corrada del Río.

*Que consideramos factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América* y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas; *la lealtad a los postulados de la Constitución Federal*; la convivencia en Puerto Rico de las dos grandes culturas del hemisferio americano .... Preámbulo, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.

Así dispone uno de los principios rectores de nuestra vida colectiva, el Preámbulo de la Constitución del Estado Libre Asociado, como fiel reflejo de la realidad jurídico-política en la que vivimos —la cual se encuentra enmarcada dentro del sistema político federal de Estados Unidos— y que ha sido avalado por la voluntad de todos los puertorriqueños en nuestra Ley Suprema, independientemente de las afiliaciones político-partidistas particulares. La ciudadanía es la manifestación jurídica del vínculo que une a una persona con la comunidad política a la que pertenece y es como consecuencia de ella que nacen los derechos públicos de los ciudadanos. En reconocimiento de esta realidad ineluctable, y como ocurre en todas las demás jurisdicciones dentro del territorio de Estados Unidos, nuestra Asamblea Legislativa ha exigido desde 1919 la ciudadanía de la comunidad política a la que pertenecemos, Estados Unidos, a los fines de ejercer el derecho al voto en Puerto Rico. Esta exigencia encarnada en los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3053 y 3073, responde a un legítimo y apremiante interés legislativo de incuestionable validez constitucional y es por ello que la persona que renuncia voluntaria y conscientemente a la ciudadanía de Estados Unidos rompe con ese vínculo determinante en nuestra vida y con el deber de

lealtad a la Constitución federal, autoexcluyéndose de esta manera del proceso eleccionario puertorriqueño.

Nuestro patrimonio constitucional extiende un derecho fundamental al sufragio pero, dada la envergadura particular del impacto de cada voto y la responsabilidad edificante de éste, la Asamblea Legislativa procede conforme a derecho al imponer requisitos con los que debe cumplir la persona para poder ser elector.

Nuestra comunidad política, según actualmente constituida por los eventos y las circunstancias de nuestra historia, le debe fidelidad a Estados Unidos. Es también indudable que nuestra ciudadanía estadounidense es un ingrediente esencial en la formación de la identidad y del espíritu de los puertorriqueños. Esa ciudadanía nos afecta con privilegios y responsabilidades que nos coloran y que dan forma al panorama político de nuestra sociedad. La Asamblea Legislativa procede en derecho al requerir esa ciudadanía para llegar a su interés de que sea la comunidad política de Puerto Rico la que, a través del voto, disponga lo concerniente a la elección de nuestros funcionarios electos. Es por eso que, de conformidad con nuestra Constitución, los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*, disponen que para ser elector en Puerto Rico se tiene que ser ciudadano de Estados Unidos. Estamos de acuerdo con la opinión que hoy emite el Tribunal en cuanto a la constitucionalidad de esas disposiciones de ley, pero disentimos vigorosamente porque la mayoría recurre a un *deus ex machina* para determinar que el recurrido puede ejercer el voto en Puerto Rico. En síntesis, la Mayoría arguye que la Ley Electoral de Puerto Rico no le aplica al recurrido y que éste puede votar aunque no reúna el requisito de ser ciudadano de Estados Unidos. Esto constituye una flagrante usurpación del poder legislativo. Como explicamos más adelante, esa perspectiva es contraria a las reglas de hermenéutica, las que nos obligan a examinar lo expuesto explícitamente en el estatuto para determinar su aplicación. Nos oponemos al gimnástico intento de primero expresar que el requisito de ciudadanía

de Estados Unidos de la Ley Electoral de Puerto Rico es constitucional para entonces, "de la manga", crear una excepción para poder aplicársela al recurrido. La Mayoría en su opinión parece considerar lo explícitamente expuesto en la ley un obstáculo que puede sobrepasarse mediante un caso omiso a esas reglas que han regido nuestra interpretación estatutaria. La opinión falla, además, al no reconocer el efecto jurídico de la renuncia expatriante del recurrido, y cómo éste, por sus propios actos, es un "extranjero" a los fines electorales. Entre otros errores, la opinión de la Mayoría presenta una tesis, no legal sino ideológica, sobre los confines jurídicos del Estado Libre Asociado y el llamado "pacto bilateral". En un débil intento de justificar esta controvertible e innecesaria discusión, la Mayoría apunta a la conveniencia de analizar las facultades de la Asamblea Legislativa de Puerto Rico para regular los procesos electorales. El argumento de la Mayoría resulta absurdo, dedicándose una tercera parte de la opinión a la consideración del "status político" para sostener el poder de Puerto Rico para legislar en materia electoral, cuando ésta es una facultad que se encuentra expresamente establecida en la Sec. 4 del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, y que ha sido reconocida por el Tribunal Supremo de Estados Unidos en *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982). Este poder de legislar para exigir la ciudadanía de Estados Unidos para votar es uno que ejerce Puerto Rico desde 1919, al promulgarse la primera ley electoral luego que el Congreso nos concedió la ciudadanía de Estados Unidos en 1917.

Más aún, la discusión mayoritaria sobre el particular ignora el historial legislativo congresional sobre la Ley Pub. Núm. 600 de 3 de julio de 1950 (64 Stat. 314) Documentos Históricos, L.P.R.A., Tomo 1, y la jurisprudencia del Tribunal Supremo de Estados Unidos, entre otros, *Califano v. Torres*, 435 U.S. 1 (1978), y *Harris v. Rosario*, 446 U.S. 651 (1980), los cuales reflejan claramente que el *status* territorial de la isla permaneció inalterado luego de la

aprobación de la Constitución de 1952, y que Puerto Rico continúa sujeto a los poderes del Congreso bajo la Cláusula Territorial. Por ello consideramos que la tesis "estadolibrista" esbozada por la Mayoría en su opinión constituye una innecesaria manifestación política propugnada utilitariamente en la víspera de una posible consulta plebiscitaria.

Sin embargo, el "malabarismo jurídico" que realiza la Mayoría al reconocerle el derecho al voto en Puerto Rico a una persona que ha renunciado voluntariamente a la ciudadanía y la nacionalidad estadounidenses es el mayor error en el cual incurre la opinión del Tribunal. Con la ratificación del Tratado de París, y el consiguiente traspaso de soberanía, el deber de lealtad a la Corona española se transfirió a Estados Unidos, por lo que conforme al Derecho Internacional Público y la legislación federal, la nacionalidad (*nationality*) de los puertorriqueños pasó de española a estadounidense. Véase *Gonzales v. Williams*, 192 U.S. 1 (1904). De esta manera, aún la ciudadanía puertorriqueña creada por el Acta Foraker, 31 Stat. 77, Documentos Históricos, L.P.R.A., Tomo 1, se encontraba inseparablemente unida a la nacionalidad (*nationality*) estadounidense; al concedérsele la ciudadanía de Estados Unidos a los puertorriqueños en 1917, la ciudadanía de Puerto Rico no tiene, para fines electorales, otro alcance que no sea el de domicilio y residencia. Reconocer el derecho al voto en Puerto Rico a un no nacional de Estados Unidos en virtud de una cuestionable soberanía de la fórmula política del Estado Libre Asociado, excede el límite de poderes locales de autogobierno conferidos por la Ley Púb. Núm. 600, *supra*, y atenta contra la naturaleza de nuestra relación con Estados Unidos según se establece en la Ley de Relaciones Federales la cual refleja inequívocamente que Puerto Rico continúa siendo una posesión territorial de Estados Unidos. Véase el Art. 4 de la Ley de Relaciones Federales con Puerto Rico, L.P.R.A., Tomo 1.

Invocando un imaginario ámbito de soberanía que es privativo para el Estado Libre Asociado de Puerto Rico, libre de la autoridad superior del Congreso, que a veces se

asemeja paradójicamente a la soberanía de los estados federados y otras aparenta sugerir la soberanía de una especie de república asociada, la Mayoría proclama una ciudadanía puertorriqueña con vida propia y desligada de la estadounidense de manera que toda persona nacida en Puerto Rico que haya renunciado a la nacionalidad y ciudadanía estadounidenses puede permanecer en Puerto Rico ejerciendo a plenitud sus derechos políticos. Este resultado, dimanante de un análisis de alto contenido ideológico político es insostenible dentro de nuestra actual relación con Estados Unidos e irreconciliable con la condición de ciudadanos estadounidenses que ostentamos desde 1917.

La ciudadanía puertorriqueña contenida en el Acta Foraker, *supra*, y consecuentemente reflejada por nuestro Código Político, no sobrevivió a las doscientas ochenta y ocho (288) personas que conforme a lo dispuesto por la Sec. 5 del Acta Jones, 39 Stat. 953, Documentos Históricos, Sec. 5, L.P.R.A., Tomo 1, hicieron una declaración jurada a los efectos de preservar su condición política y hacer valer su oportunidad de no convertirse en ciudadanos de Estados Unidos dentro del término específico de seis (6) meses posteriores al 2 de marzo de 1917, fecha en la que entró en vigor la referida ley. La intención del Legislador federal claramente consistía en que una vez hubiese transcurrido dicho término, la opción de poseer *con exclusividad* la ciudadanía de Puerto Rico se cerró irremediablemente a los demás puertorriqueños que no quisieron o no pudieron ejercer dicha facultad reconocida en la ley, por lo que el resultado alcanzado por el Tribunal es una artificiosa y acomodaticia interpretación que tergiversa la inequívoca voluntad congresional.

Nótese, además, que contrario a la situación de una persona que renuncia a la ciudadanía y a la nacionalidad estadounidenses, las doscientos ochenta y ocho (288) personas que optaron por permanecer como ciudadanos de Puerto Rico en 1917 continuaron siendo también nacionales de Estados Unidos, sujetos al deber de fidelidad hacia

dicha nación, y siendo beneficiarios de su protección. Es por ello que la ciudadanía puertorriqueña contenida en el Acta Foraker, *supra*, es inaplicable a una persona que nacida en Puerto Rico con posterioridad a 1917, haya renunciado a su nacionalidad estadounidense. Por ello, carece de seriedad la afirmación mayoritaria sobre la vigencia de la ciudadanía puertorriqueña contenida en la Sec. 7 del Acta Foraker, *supra*, L.P.R.A. Tomo 1, en cuanto ésta no fue recogida por la vigente Ley de Relaciones Federales con Puerto Rico. El reconocimiento de esta ciudadanía puertorriqueña, separada de la ciudadanía de Estados Unidos, contraviene además toda la legislación federal sobre la ciudadanía de Puerto Rico y de Estados Unidos en la isla, toda vez que en 1927 el Congreso enmendó el Acta Jones, a los fines de definir el término "ciudadano de Puerto Rico" de la manera siguiente:

> Todos los ciudadanos de los Estados Unidos que han residido, o que en lo sucesivo residieren, en la isla por un año, serán ciudadanos de Puerto Rico .... Sec. 2 de la Ley de Relaciones Federales con Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 218.[1]

Queda así confirmada la naturaleza domiciliaria de la ciudadanía puertorriqueña y la inseparable unión entre ésta y la ciudadanía estadounidense.

La opinión mayoritaria es también irreconciliable con la Ley de Inmigración y Nacionalidad de 1952 (8 U.S.C. sec. 1402), en la medida en que le reconoce derechos políticos a un expatriado (*alien*) dentro del territorio estadounidense, lo cual constituye no sólo una invasión a un campo ocupado por el Congreso sino que interfiere con uno de los ámbitos más amplios del poder congresional de acuerdo con lo dispuesto por el Tribunal Supremo de Estados Unidos; establecer una regla uniforme de naturalización como expresa-

---

[1] Enmienda de 4 de marzo de 1927, cap. 503, Sec. 2 (44 Stat. 1418).

mente lo reconoce la Sec. 8 del Art. I de la Constitución de Estados Unidos, L.P.R.A., Tomo 1.

Más aún, como discutiremos extensamente en el Acápite VIII de nuestra opinión, a la luz de lo resuelto en *Jolley v. Immigration and Naturalization Service*, 441 F.2d 1245, 1249 (5to Cir. 1971), la renuncia a la ciudadanía y nacionalidad de Estados Unidos representa también una renuncia a la ciudadanía de Puerto Rico.

La opinión mayoritaria pretende abrir la puerta a una nueva clase de electores en Puerto Rico, la de "ciudadanos de Puerto Rico" que no son "ciudadanos de Estados Unidos", a pesar de que en el Preámbulo de nuestra Constitución se establece firmemente que "consideramos *factores determinantes* en nuestra vida la ciudadanía de los Estados Unidos de América y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas ...". (Énfasis suplido.) Preámbulo, Const. E.L.A., *supra*.

Indudablemente, la opinión que hoy emite este Tribunal erosiona y debilita la ciudadanía americana de todos los puertorriqueños, al aceptar como miembros de la "comunidad política" con derecho al voto a personas que no ostentan dicha ciudadanía.

Ello resulta un absurdo cuando en el plebiscito de 1967 se definió el Estado Libre Asociado y así se le presentó esta fórmula al pueblo, como basado en "[l]a inviolabilidad ... de la unión permanente entre Puerto Rico y Estados Unidos" y en "el indisoluble vínculo de la ciudadanía de Estados Unidos". 1966 Leyes de Puerto Rico 95. La opinión que hoy emite este Tribunal, en la que admite como miembros de la "comunidad política" a electores que no son ciudadanos de Estados Unidos, viola el Preámbulo de la Constitución de Puerto Rico y es contraria a la definición del Estado Libre Asociado predicado sobre la indisolubilidad de la ciudadanía de Estados Unidos, por lo que constituye un engaño monumental y uno de los errores más graves en la historia de nuestro Alto Foro.

# I

El recurrido Juan Mari Brás, abogado y destacado líder político, nació el 2 de diciembre de 1927 en la ciudad de Mayagüez, Puerto Rico. Como persona nacida dentro de los confines territoriales de nuestra isla para dicha fecha, el licenciado Mari Brás nació ciudadano de Estados Unidos. El recurrido retuvo esa ciudadanía y gozó de los derechos brindados por ésta hasta que renunció voluntariamente a ella el 11 de julio de 1994. Luego de su renuncia a la ciudadanía de Estados Unidos, el recurrido regresó a Puerto Rico, donde continúa residiendo.

El 15 de mayo de 1996 la Dra. Miriam Ramírez de Ferrer, aquí recurrente, presentó, ante la Junta de Inscripción Permanente del Precinto 38 de Mayagüez (en adelante la J.I.P.), el Formulario R-001-95 provisto por la Comisión Estatal de Elecciones (en adelante la C.E.E.). Mediante ese formulario, la recurrente solicitó la recusación del recurrido del cuerpo electoral. Acompañando el formulario de recusación, la recurrida presentó una declaración jurada en la que señala que el recurrido ya no es ciudadano de Estados Unidos, lo que, según el Art. 2.003 de la Ley Electoral de Puerto Rico, *supra*, le impide ejercer el voto en Puerto Rico.

La J.I.P. recibió la recusación y expidió el correspondiente emplazamiento para que la recusante lo hiciera llegar al recurrido. La recusante diligenció el emplazamiento personalmente y así lo notificó a la J.I.P. Sin embargo, posteriormente, la recusante se percató de que el emplazamiento de la recusación yacía inválido por no haber sido diligenciado por una persona distinta. Ante esa situación, la recusante acudió de nuevo a la J.I.P., de la cual recibió un segundo emplazamiento, que se diligenció debidamente y dentro del término reglamentario.

Como parte del procedimiento de recusación, el 4 de junio de 1996 se celebró una vista ante la Comisión Local de la C.E.E. En esa vista el recurrido se sometió voluntaria-

mente a la jurisdicción de dicha entidad administrativa. No obstante, ese cuerpo encontró que la recusación en controversia no fue notificada al recurrido debidamente, por lo que no había adquirido jurisdicción sobre éste.

Inconforme, la parte recusante, aquí recurrente, apeló el 8 de junio de 1996 a la C.E.E., la cual confirmó la determinación de la Comisión Local el 13 de junio de 1996.

La recurrente acudió entonces al Tribunal de Primera Instancia, Sala Superior de San Juan (Hon. Ángel G. Hermida, Juez), el 21 de junio de 1996, para solicitar revisión judicial. Ese escrito fue enmendado el 8 de agosto de 1996.

El 25 de septiembre de 1996, el recurrido presentó ante ese foro un escrito denominado "Memorando de Derecho del Ciudadano Puertorriqueño Juan Mari Brás", en el que fundamentó su oposición a la recusación. En éste el recurrido arguyó que el aludido Art. 2.003 de la Ley Electoral de Puerto Rico requiere que la persona sea ciudadano de Estados Unidos *o* de Puerto Rico para poder ejercer el voto. El recurrido reclamó ser ciudadano de Puerto Rico y que, por lo tanto, ese artículo le permite votar en la Isla. Como segundo argumento, el recurrido sostuvo que el interpretar ese artículo a los efectos de que los "ciudadanos puertorriqueños" que no sean nacionales estadounidenses no pueden votar, contravendría los derechos constitucionales básicos.

El 4 de octubre de 1996 el Tribunal de Primera Instancia invitó al Secretario de Justicia del Estado Libre Asociado de Puerto Rico a expresar su posición, ya que la controversia giraba en torno a la constitucionalidad de los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*. El Secretario de Justicia compareció el 14 de octubre de 1996, representado por el Procurador General, en defensa de la constitucionalidad del estatuto.

El Tribunal de Primera Instancia dictó sentencia el 21 de octubre de 1996, mediante la cual declaró la inconstitucionalidad de los Arts. 2.003 y 2.023 de la Ley Electoral de

Puerto Rico, *supra*.[2] El Tribunal a quo reconoció al recurrido como "ciudadano de Puerto Rico" de acuerdo con su interpretación de los derechos naturales que encontró existentes y aplicables. Copia de la notificación de la sentencia fue archivada en autos ese mismo día.

Ante el dictamen del Tribunal de Primera Instancia, tanto la C.E.E. como la recurrente presentaron, oportunamente, sendas peticiones de *certiorari* ante el Tribunal de Circuito de Apelaciones, Región Judicial de San Juan, el 24 de octubre de 1996 y el 25 de octubre de 1996, respectivamente. Además, el 24 de octubre de 1996 la C.E.E. presentó una petición de certificación ante este Tribunal. En vista de dicho recurso, emitimos resolución el 25 de octubre de 1996 mediante la cual expidió el auto de certificación solicitado. El 28 de octubre de 1996 la recurrente presentó ante nos una moción solicitando la consolidación de la certificación expedida con su recurso, el cual estaba aún pendiente ante el Tribunal de Circuito de Apelaciones. Ordenamos la consolidación mediante resolución emitida el 1ro de noviembre de 1996.

Los recursos consolidados han sido perfeccionados, presentando sus alegatos tanto las partes como el Estado interventor. Al respecto de esta controversia celebramos una vista oral el 14 de abril de 1997. Nos encontramos en posición de disponer del recurso y procedemos a hacerlo.

## II

Las controversias legales que surgen de una contienda electoral deben ser estudiadas y resueltas por los tribunales con fundamentos jurídicos sin el apasionamiento natural que implica el evento electoral, sin ataques a la capaci-

---

[2] La sentencia emitida por el Tribunal de Primera Instancia es correcta al dictaminar que, al recusado haberse sometido voluntariamente a la jurisdicción de la Comisión Local, tal recusación no debió desestimar la recusación por dudas sobre la calidad del emplazamiento. Sentencia del Tribunal de Primera Instancia, Caso Civil KAC-96-0856, pág. 2. Véanse, también: *Claudio v. Casillas Mojica*, 100 D.P.R. 761, 772 (1972); *Franco v. Corte*, 71 D.P.R. 686, 689 (1950).

dad e integridad de los miembros de la Judicatura, sin diatribas y estridencias, y con el decoro correspondiente. *Granados v. Rodríguez Estrada V*, 127 D.P.R. 1, 6 (1990); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981), y *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980).

Por ende, no le compete a este Tribunal deliberar sobre las razones que llevaron al recurrido a renunciar a su ciudadanía. Nuestra potestad nos limita a concentrar nuestra evaluación a los efectos jurídicos de tal renuncia. Por ello es necesario determinar primero si el recurrido efectuó su expatriación debidamente.

En *Afroyim v. Rusk*, 387 U.S. 253 (1967), el Tribunal Supremo de Estados Unidos dispuso que el ciudadano estadounidense tiene el derecho constitucional de retener esa ciudadanía hasta que la renuncie voluntariamente.[3]

> In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship. *Afroyim v. Rusk*, supra, pág. 257.

Del derecho de retener la ciudadanía de Estados Unidos hasta que ésta se renuncie voluntariamente se deriva que el ciudadano cuenta con la potestad de renunciar a esa condición. Éste es el derecho a la expatriación. Véase *Davis v. District Director, Immigration and Naturalization Service*, supra, pág. 1180, afirmado sin opinión, 652 F.2d 195 (Cir. D.C. 1981), *certiorari* denegado, 454 U.S. 942 (1981), y *Jolley v. Immigration and Naturalization Service*, supra, pág. 1249, esc. 6, *cert.* denegado, 404 U.S. 946 (1971). El Tribunal Supremo federal ha indicado que la renuncia voluntaria es la única manera mediante la cual se puede perder la ciudadanía de Estados Unidos.[4]

---

[3] Más aún, en *Trop v. Dulles*, 356 U.S. 86, 93–104 (1958), el Tribunal Supremo federal señaló que la expatriación de un ciudadano estadounidense constituye un castigo cruel que está prohibido por la Octava Enmienda de la Constitución federal, L.P.R.A. Tomo 1. Véase, también, *Schneider v. Rusk*, 377 U.S. 163, 167–169 (1964).

[4] Sin embargo, el Tribunal Supremo federal dispuso en *Rogers v. Bellei*, 401 U.S. 815 (1971), que la ciudadanía estadounidense concedida mediante estatuto no está garantizada al extremo que lo está la ciudadanía adquirida por medio de lo dispuesto por la Decimocuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1.

La capacidad para renunciar a la ciudadanía de Estados Unidos es un derecho del cual gozan todos los ciudadanos. Como para todos los derechos constitucionales renunciables, la renuncia a la ciudadanía requiere una intención voluntaria, compuesta por un verdadero consentimiento. Véanse: *Vance v. Terrazas*, 444 U.S. 252, 263 (1980), y A.G. James, *Cult-Induced Renunciation of United States Citizenship: The Involuntary Expatriation of Black Hebrews*, 28 San Diego L. Rev. 645, 659 (1991).

El Tribunal Supremo de Estados Unidos ha interpretado que la Constitución federal le prohíbe al Congreso federal adoptar leyes que despojen a un ciudadano de esa condición sin su consentimiento,[5] pero ese cuerpo legislativo sí puede establecer el procedimiento que ha de ser empleado por un ciudadano para hacer constar jurídicamente su renuncia. *Vance v. Terrazas*, supra, págs. 264–267, y T. Alexander Aleinkoff, *Theories of Loss of Citizenship*, 84 Mich. L. Rev. 1471, 1481–1483 (1986). Reconociendo ese derecho, las leyes federales pertinentes contienen el propósito de respetar y reconocer la decisión del renunciante de autodespojarse de su ciudadanía.

Las leyes federales han establecido el procedimiento que un ciudadano de Estados Unidos debe seguir para renunciar a su ciudadanía. Para su renuncia, el recurrido siguió esos procedimientos. Específicamente, llevó a cabo los trámites señalados por la Sec. 1481(a)(5) de la Ley de Inmigración y Nacionalidad de 1952, según enmendada, (*The Immigration and Nationality Act*).[6] En su sección pertinente, esa ley dispone:

(a) A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by volun-

---

No entramos a discutir, por no estar ante nuestra consideración, si la ciudadanía de Estados Unidos obtenida por una ley del Congreso y no en virtud de la Decimocuarta Enmienda, *supra*, es decir, por nacimiento en uno de los cincuenta (50) estados o por naturalización, tiene el mismo rango que éstas y si puede o no abrogarse subsiguientemente por el Congreso retroactiva y/o prospectivamente.

[5] Véase *Afroyim v. Rusk*, 387 U.S. 253, 257–261 (1967).

[6] 8 U.S.C. sec. 1481(a)(5) (1988).

tarily performing any one of the following acts with the intention of relinquishing United States nationality—

. . . . . . . .

(5) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State ... 8 U.S.C. sec. 1481(a)(5) (1988).

El reglamento aplicable a esa ley dispone lo siguiente en la parte pertinente:

*Sec. 50.50 Renunciation of Nationality*
(a) A person desiring to renounce his U.S. nationality under section 349(a)([5]) of the Immigration and Nationality Act shall appear before a diplomatic or consular officer of the United States in the manner and form prescribed by the Department. 22 C.F.R. sec. 50.50 (1988).

A tenor con lo anterior, el Departamento de Estado federal ha establecido el procedimiento que ha de regir para el procedimiento de expatriación. Ese procedimiento contiene cuidadosos mecanismos para asegurar la competencia, la capacidad y el libre consentimiento del renunciante a la ciudadanía. Ver 7 *Foreign Affairs Manual*, 1984, págs. 1251–1253.

Para acatar ese procedimiento, se requiere de los oficiales encargados en las embajadas o consulados que le expliquen al renunciante las consecuencias resultantes de su expatriación. Luego de esa concienzuda explicación de lo que conlleva la renuncia de la nacionalidad, se le requiere al renunciante firmar una declaración jurada en presencia del oficial diplomático y dos (2) testigos. Mediante esa declaración jurada, el renunciante también expresa, en detalle, que renuncia voluntariamente a la ciudadanía; que está consciente de que esa renuncia tiene como consecuencia el que se le considere extranjero a Estados Unidos, y que se le apercibe de las repercusiones de su renuncia.

Por último, tras este oficial diplomático cerciorarse de que la decisión es tomada de manera voluntaria, inteligente y con conocimiento de sus implicaciones, se le requiere al renunciante pronunciar un juramento solemne,

el cual expresa la voluntad del expatriante de renunciar a su ciudadanía estadounidense y a todos los derechos, privilegios, y obligaciones. Sobre ese juramento se ha entendido que "[a] voluntary oath of renunciation is a clear statement of desire to relinquish United States citizenship [...]" *Davis v. District Director, Immigration and Naturalization Service,* supra, pág. 1181.

Después que el renunciante tramita estos procedimientos, el oficial diplomático encargado prepara un certificado de pérdida de ciudadanía (*Certificate of Loss of Citizenship*). Véase 22 C.F.R. sec. 50.50(b) (1988). Ese certificado explica, en términos generales, los hechos del caso, detallando los procedimientos administrados y hace constar la renuncia de ciudadanía efectuada. Ese certificado y demás documentos complementarios son entonces enviados al Departamento de Estado de Estados Unidos. 18 U.S.C. sec. 1501.

De la prueba presentada ante el tribunal de instancia[7] se desprenden los siguientes hechos relacionados al procedimiento seguido en el caso de autos. Para tramitar su expatriación, el recurrido acudió a la Embajada de Estados Unidos en Caracas, Venezuela, el 11 de julio de 1994, donde voluntaria y formalmente llevó a cabo el procedimiento correspondiente. En la embajada, el recurrido firmó los documentos requeridos por el Departamento de Estado de Estados Unidos y le entregó al Oficial Consular encargado una copia de una declaración jurada, preparada el 19 de noviembre de 1993, en la cual declaraba renunciar a la ciudadanía estadounidense, mientras reclamaba ser un "ciudadano de Puerto Rico".

Para tramitar su expatriación, el recurrido firmó un documento titulado *Statement of Understanding,* en el cual declaró que ejercía voluntariamente su derecho a la expatriación de Estados Unidos; que estaba consciente de que se convertiría en un extranjero (*alien*) respecto a Estados

---

[7] Sentencia del Tribunal de Primera Instancia, Caso Civil Núm. KAC-96-0856, págs. 5–6.

Unidos, sujeto como tal a las leyes sobre entrada y control de extranjeros; que de no poseer la nacionalidad de otro país al momento de su renuncia a la estadounidense, se convertiría en una persona sin Estado (*stateless person*), lo que podría ocasionarle impedimentos en viajar de país a país, y que llevaba a cabo su expatriación luego de habérsele explicado sus repercusiones por los oficiales consulares pertinentes.[8]

Ese mismo 11 de julio, finalizados los trámites de expatriación, el Cónsul emitió el correspondiente certificado de pérdida de la ciudadanía de Estados Unidos. Ese certificado contiene el sello oficial y cumple con los requisitos procesales pertinentes. Posteriormente, el 22 de noviembre de 1995, el Director de la Oficina de Asuntos Consulares (*Office of Citizens Consular Affairs*) del Departamento de Estado federal aprobó dicha renuncia expatriante.

En cuanto a la prueba sobre la voluntariedad de la pérdida de la ciudadanía estadounidense del recurrido, cabe señalar que existe una presunción aplicable de que la persona que renuncia a la ciudadanía de Estados Unidos lo hace voluntariamente. 8 U.S.C. sec. 1481(b). Véase, también, *Vance v. Terrazas*, supra. Aunque esa presunción es controvertible, en ningún momento de la trayectoria del caso de autos surge que el acto expatriante del recurrido no fuera voluntario.

Por los fundamentos expuestos, concluimos que el recurrido ha demostrado su intención específica de renunciar a su nacionalidad estadounidense y que con esa voluntad llevó a cabo debidamente los procedimientos pertinentes para efectuarla. Por lo tanto, estamos obligados a reconocer la renuncia del recurrido a su ciudadanía, así como sus consecuencias. Más allá, nuestro deber se extiende a asegurar que el recurrido goce de todos los derechos como persona y las protecciones que no requieran la ciudadanía de Estados Unidos. El reverso de esa moneda también le

---

[8] Dicho documento consta en el Apéndice de la Petición de *certiorari* presentada por la recurrente, pág. 191, y en el Alegato del Procurador General, págs. 3–4.

afecta al recurrido. Al expatriarse, éste perdió su reclamo a aquellos derechos que anteriormente disfrutaba, pero que dependen de su condición de ciudadano estadounidense.

## III

La Constitución de Estados Unidos le confiere a los estados la determinación de quién podrá ejercer el voto, tanto para los efectos de las elecciones estatales como para las federales.(9) A tales efectos, el Art. I, Sec. 2 de la Decimoséptima Enmienda de la Constitución federal dispone:

> The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and *the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature*. (Énfasis suplido.) Emda. XVII, Const. EE. UU., Art. I, Sec. 2, pág. LIII.

La capacidad de reglamentar lo relativo a los comicios electorales, concedida por la Constitución federal a los estados, ha sido reiteradamente reconocida por el Tribunal Supremo federal. Véanse: *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Kramer v. Union School District*, 395 U.S. 621, 625 (1969); *Katzenbach v. Morgan*, 384 U.S. 641, 647 (1966); *Gray v. Sanders*, 372 U.S. 368, 379 (1963), y *Lassiter v. Northampton Election Bd.*, 360 U.S. 45, 50 (1959).

El Tribunal Supremo federal ha reconocido que es provincia de cada estado la determinación de quién podrá ser elector en su jurisdicción. *Marston v. Lewis*, 410 U.S. 679 (1973); *Burns v. Fortson*, 410 U.S. 686 (1973); *Evans v. Cornman*, 398 U.S. 419 (1970); *McDonald v. Board of Election*, 394 U.S. 802, 807 (1969); *Carrington v. Rash*, 380

---

(9) El Tribunal Supremo federal ha señalado que la Cláusula de Supremacía federal no desplaza a los estados sobre ciertas determinaciones de política pública relacionada con los inmigrantes. Consistentemente con esa perspectiva, ha deferido a los estados la determinación de la reglamentación de acceso de extranjeros a posiciones públicas. *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982), y *Ambach v. Norwick*, 441 U.S. 68 (1979).

U.S. 89 (1965), y *Harman v. Forssenius*, 380 U.S. 528 (1965).

En *Rodriguez v. Popular Democratic Party*, supra, pág. 8, el Tribunal Supremo de Estados Unidos reconoció que la Asamblea Legislativa de Puerto Rico tiene la potestad de reglamentar el derecho al voto, aunque Puerto Rico no sea un estado.

Por lo tanto, la determinación de quiénes pueden ejercer el voto en Puerto Rico le compete a la Asamblea Legislativa. Reiteradamente hemos reconocido la potestad legislativa de reglamentar los procedimientos electorales. Véanse: *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 256 (1980), y *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 744 (1976).

El Art. 2.003 de la Ley Electoral de Puerto Rico, *supra*, establece los requisitos con los que el elector debe cumplir para ejercer esa función.

> Sec. 3053. *Requisitos del Elector*
> *Será elector de Puerto Rico todo ciudadano de los Estados Unidos de América y de Puerto Rico domiciliado en la Isla* que, a la fecha de una elección haya cumplido los diez y ocho (18) años de edad, esté debidamente calificado con antelación a la misma, y no se encuentre legalmente incapacitado para votar. (Énfasis suplido.) 16 L.P.R.A. sec. 3053.

Esa disposición, declarada inconsistente con nuestra Constitución por el tribunal a quo establece taxativamente que uno de los requisitos para poder ejercer el voto en Puerto Rico es el ser ciudadano de Estados Unidos.

El otro artículo declarado inconstitucional por el tribunal de instancia enfatiza la importancia del claro propósito de la Ley Electoral de Puerto Rico de que los electores sean ciudadanos de Estados Unidos. El Art. 2.023, *supra*, así lo establece, de forma explícita, al señalar la primera causa para solicitar que se le prive a una persona del voto.

> Sec. 3073. *Procedimiento de Recusación*
> Para que se proceda a la eliminación de un elector que aparezca en la lista de peticiones de inscripción, deberá presen-

tarse ante el Presidente de la Comisión Local de Elecciones una solicitud de exclusión de dicho elector, por uno o mas de los siguientes fundamentos:

(a) *Que el elector no es ciudadano de los Estados Unidos de América.* (Énfasis suplido.) 16 L.P.R.A. sec. 3073(a).

Nuestro Código Civil nos guía en la interpretación del contenido de los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra.* Las disposiciones de los mencionados artículos de la Ley Electoral de Puerto Rico contienen un lenguaje clarísimo que no está sujeto a la libre interpretación de su contenido.[10] Es evidente e incontrovertible que la Asamblea Legislativa ha consagrado que el elector en Puerto Rico sea ciudadano de Estados Unidos.

No obstante, en contra de la expresa intención legislativa del Art. 2.003, *supra,* el recurrido arguye que por "ciudadano de los Estados Unidos de América y de Puerto Rico", el estatuto intenta declarar que cualquiera de las ciudadanías aludidas satisfacen el requisito para el voto. No le asiste la razón.

Subrayamos, como cuestión de construcción gramatical, que la Asamblea Legislativa empleó la conjunción "y" en el Art. 2.003 de la Ley Electoral de Puerto Rico, *supra,* lo que significa que el elector en Puerto Rico debe ser, como requisito mínimo, poseedor de ambas ciudadanías. Si la Legislatura hubiese querido que cualquiera de las "ciudadanías" concedieran el derecho al voto, hubiera establecido que el contar con una de las ciudadanías mencionadas concede el sufragio, irrespectivamente de tener o no la otra. En los términos más simples, si ese hubiera sido el cometido de la Asamblea Legislativa, ésta hubiera utilizado la conjunción "o" en vez de la "y".[11]

---

[10] Es regla de hermenéutica de nuestra jurisdicción que cuando la ley es clara y libre de toda ambigüedad, la letra no debe ser menospreciada bajo el pretexto de cumplir con su espíritu. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Véanse, también: *Rojas v. Méndez & Co., Inc.,* 115 D.P.R. 50 (1984); *Díaz v. Srio. de Hacienda,* 114 D.P.R. 865 (1983); *Robert Vizcarrondo v. Srio. de Hacienda,* 114 D.P.R. 566, 573 esc. 3 (1983); *Román v. Superintendente de la Policía,* 93 D.P.R. 685 (1966); *Partido Popular v. Junta Insular Elecciones,* 63 D.P.R. 296, 337 (1944).

[11] Se ha establecido por este Tribunal que "el uso de la conjunción disyuntiva 'o' tiene el efecto de desvincular las palabras entre las que es usada. *Mari Bras v.*

Por otra parte, el Art. 2.023, *supra*, al establecer los fundamentos para las recusaciones del elector, menciona la falta de la ciudadanía de Estados Unidos como uno de ellos, sin mencionar la falta de la ciudadanía de Puerto Rico. Los artículos de la Ley Electoral de Puerto Rico en cuestión son ciertamente congruentes en su intención de requerir la ciudadanía de Estados Unidos para poder ser elector.

R.E. Bernier y J.A. Cuevas Segarra, en su obra *Aprobación e interpretación de las leyes de Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, explican de la siguiente manera la regla de hermenéutica aplicable a la interpretación de diferentes artículos de una misma ley.

> Es un principio fundamental en la interpretación estatutaria que todo (cada parte) del estatuto debe ser considerado para determinar el significado de cada una de sus partes. Con ello se persiguen dos propósitos: aclarar ambigüedades y hacer de la ley un todo armónico y efectivo. Esto significa que toda ley debe ser examinada y comparadas sus partes, de suerte que sean hechas consistentes y tengan efecto. Para ello, *deben interpretarse las diferentes secciones, las unas en relación con las otras, completando o supliendo lo que falte o sea oscuro en una con lo dispuesto en la otra, procurando siempre dar cumplimiento al propósito del legislador.* (Énfasis suplido.) Bernier y Cuevas Segarra, *op. cit.*, pág. 315. Véase, también, *Martínez Reyes v. Tribunal Superior*, 104 D.P.R. 407, 410–411 (1975); *Carr v. Nones*, 98 D.P.R. 236, 245 (1970); *Pueblo v. Pérez Escobar*, 91 D.P.R. 10, 19 (1964); *Orta v. Registrador*, 60 D.P.R. 789, 793 (1942).

Podemos resumir el principio de interpretación estatutaria descrito de la forma siguiente: "No se pueden tomar

---

*Alcaide*, 100 D.P.R. 506 (1972); *Pueblo v. Febres Colón*, 95 D.P.R. 172 (1967), y *Pueblo v. Mantilla*, 71 D.P.R. 36 (1950)". *Alejandro Rivera v. E.L.A.*, 140 D.P.R. 538, 544 (1996). También hemos dispuesto que, en algunas situaciones, estas conjunciones son intercambiables entre sí, *en los casos en que esa sustitución fuese necesaria para atener la intención dispuesta por el Legislador.* Véanse: *Pérez Pellot v. J.A.S.A.P.*, 139 D.P.R. 588 (1995); *Pueblo v. Colón Rosa*, 96 D.P.R. 601, 607 (1968); *Pueblo v. Mantilla*, supra, págs. 42–43; *De Castro v. Junta de Comisionados*, 57 D.P.R. 153 (1940); *Monllor & Boscio, Sucrs. v. Sancho Bonet, Tes.*, 49 D.P.R. 576 (1936), y R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., Pubs. J.T.S., 1987, Vol. 1, pág. 353. Sin embargo, el Art. 2.003 de la Ley Electoral de Puerto Rico, *supra*, no requiere tal variación para llevar a cabo el propósito que le fue asignado por la Asamblea Legislativa. El estatuto es claro, lo que nos obliga a interpretarlo de acuerdo con el lenguaje seleccionado por la Asamblea Legislativa.

aisladamente los distintos apartados de la ley, sino que deben tomarse todos en conjunto, o sea íntegramente." Bernier y Cuevas Segarra, *op. cit.,* pág. 315.[12]

Es menester señalar, además, que otro artículo de la propia Ley Electoral de Puerto Rico dispone que para que una persona pueda inscribirse como elector en Puerto Rico deberá ser ciudadano de Estados Unidos. El Art. 2.007(f) señala:

> *Sec. 3057. Petición de Inscripción*
> Todo peticionario de inscripción comparecerá personalmente a un local de inscripción en el precinto de su domicilio ... y ... consignará bajo juramento, la siguiente información:
>
> . . . . . . .
> (f) *Si es ciudadano de los Estados Unidos.* (Énfasis suplido.) 16 L.P.R.A. sec. 3057(f).

De manera que, aun si existiera confusión sobre lo que requiere el Art. 2.003, *supra,* para ser elector, en lo que concierne a la conjunción "y", debemos interpretar dicho artículo a la luz de lo dispuesto por los Arts. 2.007 y 2.023 de la misma ley, *supra.*

---

[12] A ese respecto, véanse: *Xerox Corp. v. Srio. de Hacienda,* 115 D.P.R. 668 (1984); *P.R. Tel. Co. v. Martínez,* 114 D.P.R. 328, 341 (1983); *Cancora Marina, Inc. v. Srio. de Hacienda,* 114 D.P.R. 248, 254 (1983); *Delgado v. D.S.C.A.,* 114 D.P.R. 177, 182 (1983); *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64, 90 (1983); *P.P.D. v. Gobernador,* 111 D.P.R. 8 (1981); *J. Soler Motors v. Kaiser Jeep Int'l.,* 108 D.P.R. 134, 141 (1978); *Arcelay Rivera v. Srio. de Salud,* 106 D.P.R. 196, 200–201 (1977); *Fraticelli v. Comisión Industrial,* 105 D.P.R. 363, 367 (1976); *A.C.A.A. v. Yantín,* 103 D.P.R. 59, 62, (1974); *Pueblo v. Dones,* 102 D.P.R. 118, 122 (1974); *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378, 386 (1973); *Vda. de Carlo v. Toro,* 99 D.P.R. 200, 235–236 (1970); *Pueblo v. Olivencia Román,* 98 D.P.R. 1, 4 (1969); *Robles Ostolaza v. U.P.R.,* 96 D.P.R. 583, 586 (1968); *M. Mercado e Hijos v. Junta Azucarera,* 95 D.P.R. 852, 860 (1968); *Sánchez v. Municipio de Cayey,* 94 D.P.R. 92, 102 (1967); *Sales v. Samac Motor Corp.,* 92 D.P.R. 529, 540 (1965); *Cirino v. Fuentes Fluviales,* 91 D.P.R. 608, 616 (1964); *Central Aguirre Sugar v. Srio. Hacienda,* 91 D.P.R. 340, 348 (1964); *Pueblo v. Barriera González,* 89 D.P.R. 772, 776 (1964); *Arroyo Merino v. Junta Azucarera,* 89 D.P.R. 622, 630 (1963); *Correa Suárez v. Junta Retiro para Maestros,* 88 D.P.R. 590, 597–598 (1963); *Vachier v. McCormick, Alcaide & Co.,* 86 D.P.R. 714, 735, 746–747 (1962); *Pueblo v. Villalba,* 86 D.P.R. 318, 323 (1962); *Cortés v. Comisión Industrial,* 85 D.P.R. 241, 244 (1962); *Álvarez & Pascual, Inc. v. Srio. Hacienda,* 84 D.P.R. 482, 489–490 (1962); *A. Roig, Sucrs. v. Junta Azucarera,* 77 D.P.R. 342, 353 (1954); *Sorrentini y Cía. v. Méndez,* 76 D.P.R. 690, 696 (1954); *Central Coloso v. Descartes, Tes.,* 74 D.P.R. 481, 485 (1953); *Descartes, Tes. v. Tribl. Contrib. y Sucn. Cautiño,* 71 D.P.R. 248, 253 (1950); *Ana María Sugar Co. v. Tribl. de Contribuciones,* 69 D.P.R. 938, 940–941 (1949); *De Ca[s]tro v. Junta de Comisionados,* 59 D.P.R. 676, 686 (1942).

El desarrollo de las leyes electorales de Puerto Rico es significativo en demostrar que la intención de la Ley Electoral de Puerto Rico es que se requiera la ciudadanía de Estados Unidos para ejercer el voto, según lo indican explícitamente los Arts. 2.003, 2.007 y 2.023 de esa ley, *supra*. El antecesor jurídico de la vigente ley electoral es la Ley Núm. 9 de 25 de junio de 1919, Leyes de Puerto Rico, pág. 531, conocida como la Ley Electoral y de Inscripciones, la cual en su Sec. 4 disponía:

> Sección 4.—Las elecciones se celebrarán con libertad e igualdad y todo varón, *ciudadano de los Estados Unidos*, cuyo nombre constare en la lista de inscripciones, según lo que más adelante se dispone, deberá votar en el distrito municipal en que reside.

El requisito de la ciudadanía de Estados Unidos se reiteró en la Sec. 15 de esa ley. Disponía esa sección:

> Sección 15.—Todo varón, *ciudadano de los Estados Unidos*, de veinte y un años de edad o más, el día de las elecciones, que no estuviere legalmente incapacitado y que hubiere residido durante un año, con antelación a la fecha de las elecciones, en el municipio donde se celebre la elección, deberá votar en el precinto electoral donde estuviere inscrito su nombre .... (Énfasis suplido.) 1919 Leyes de Puerto Rico 537.

Nótese que la Ley Electoral y de Inscripciones requería la ciudadanía de Estados Unidos para poder ejercer el voto en Puerto Rico, sin disponer excepciones a esa norma ni hacer referencia alguna a la "ciudadanía de Puerto Rico". Las subsiguientes enmiendas a la Ley Electoral y de Inscripciones reafirmaron con firmeza ese requisito. Véanse: la Sec. 15 de la Ley Núm. 15 de 12 de mayo de 1920, Leyes de Puerto Rico, pág. 103; las Secs. 15 y 23 de la Ley 27 de 18 de abril de 1929, Leyes de Puerto Rico, pág. 181; la Sec. 5 de la Ley Núm. 4 de 23 de marzo de 1935, Leyes de Puerto Rico, pág. 147 (extendiéndole el voto a la mujer); la Sec. 15 de la Ley Núm. 9 de 23 de marzo de 1939, Leyes de Puerto Rico, pág. 309; la Sec. 15 de la Ley Núm. 115 de 12 de mayo de 1943, Leyes de Puerto Rico, pág. 333; la Sec. 15

de la Ley Núm. 48 de 31 de julio de 1947, Leyes de Puerto Rico, pág. 215; la Sec. 15 de la Ley Núm. 3 de 5 de octubre de 1965, Leyes de Puerto Rico, pág. 75. Véase, también, la Sec. 9 de la ley adoptada para la celebración de una consulta plebiscitaria sobre el *status* político de Puerto Rico, Ley Núm. 95 de 21 de junio de 1960, Leyes de Puerto Rico, pág. 220. En efecto, en la petición de inscripción para participar como elector en ese proceso plebiscitario se juramentaba ser ciudadano de Estados Unidos. Ley Núm. 95, *supra,* pág. 220. Además, el Código Electoral de Puerto Rico, instituido por la Ley Núm. 1 de 13 de febrero de 1974, Leyes de Puerto Rico, pág. 3, en su Art. 4-002 requiere ser ciudadano de Estados Unidos para ser elector. Varias de estas leyes electorales fueron aprobadas luego de entrar en vigor la Constitución de Puerto Rico en 1952.

El lenguaje estatutario permaneció esencialmente intacto en cuanto al requisito de la ciudadanía de Estados Unidos, hasta que se adoptó el Art. 2.003 de la Ley Núm. 4, *supra,* que ahora es vigente. En esta ley electoral se modificaron los requisitos para ser elector para requerir la ciudadanía de Estados Unidos y la de Puerto Rico. La evolución de las leyes electorales de Puerto Rico apunta a que la interpretación de que la conjunción "y" debe ser sustituida por una "o" es incongruente con el historial legislativo de los impugnados artículos de la vigente Ley Electoral de Puerto Rico. Las previas encarnaciones de la Ley Electoral de Puerto Rico demuestran que siempre se ha requerido la ciudadanía de Estados Unidos para votar y que la adulteración de su letra y espíritu saca totalmente fuera de contexto lo exigido para ejercer el voto en Puerto Rico.

Ante la clara y explícita intención del Legislador, es obvio que bajo el Art. 2.003, *supra,* se requiere ser ciudadano de Estados Unidos para ejercer el voto y que la "ciudadanía de Puerto Rico" no es suficiente para cualificar como elector. Las reglas de hermenéutica y la simple lectura del Art. 2.003, *supra,* prohíben la imposición de la sustitución, mediante un fíat judicial, de una conjunción en el estatuto que modificaría su significado hasta el punto de frustrar su

letra y su espíritu. Por eso discrepamos enérgicamente de la postura de que la Ley Electoral de Puerto Rico, aunque dice requerir ambas ciudadanías, lo que quiere decir es que se requiere una nada más. Dicho parecer, de forma inexplicable, edita y reescribe el estatuto impugnado para que su lenguaje sea el conveniente al dictamen que se pretende. Nuestro sistema republicano constitucional está moldeado expresamente para repudiar el que un tribunal pueda sustituir e imponer su criterio particular sobre el dispuesto por la ciudadanía por medio de sus representantes en la Asamblea Legislativa cuando la letra y la intención de la ley es clara.

## IV

Establecido el claro significado de los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*, analicemos su constitucionalidad ante el marco jurisprudencial de la Constitución federal y ante los parámetros de nuestro propio patrimonio constitucional.

El derecho al sufragio ha sido reconocido por el Tribunal Supremo federal como uno fundamental para una sociedad democrática. *Bullock v. Carter*, 405 U.S. 134 (1972); *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964), y *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966). Ese Tribunal expresó en *Dunn v. Blumstein*, supra, pág. 336:

> ... [W]hen a state or the Commonwealth of Puerto Rico has provided that its representatives be elected, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction".

Sin embargo, en el esquema constitucional de Estados Unidos, los ciudadanos y los extranjeros no comparten una misma posición sociopolítica. La Constitución de Estados Unidos contiene once (11) referencias a la distinción entre ciudadanos y extranjeros. Por otro lado, las enmiendas de este documento supremo prohíben la restricción del derecho a ejercer el voto por razones de raza, color y condición

de servidumbre (Enmienda XV); por razón de sexo (Enmienda XIX), o por razón de edad si el votante ha llegado a los dieciocho (18) años de edad (Enmienda XXVI).

En *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886), el Tribunal Supremo federal estableció firmemente que un extranjero está cobijado por las protecciones brindadas por la cláusula de debido proceso de ley de la Decimocuarta Enmienda de la Constitución de Estados Unidos, *supra*. Véanse, también: *Sugarman v. Dougall*, 413 U.S. 634, 641 (1973); *Graham v. Richardson*, 403 U.S. 365, 371 (1971); *Takahashi v. Fish Comm'n*, 334 U.S. 410 (1948); *Oyama v. California*, 332 U.S. 633 (1948); *Clarke v. Deckebach*, 274 U.S. 392 (1927); *Terrace v. Thomson*, 263 U.S. 197 (1923); *Webb v. O'Brien*, 263 U.S. 313 (1923); *Crane v. New York*, 239 U.S. 195 (1915); *Patsone v. Pennsylvania*, 232 U.S. 138 (1914), y *Wong Wing v. United States*, 163 U.S. 228 (1896).

La protección que se extiende a los que no son ciudadanos, sin embargo, no tiene el alcance de ofrecerles todos los derechos con los que opera la ciudadanía. Véase J.C. Drimmer, *The Nephews of Uncle Sam: The History, Evolution, and Application of Birthright Citizenship in the United States*, 9 Geo. Immigr. L.J. 667 (1995).

En *Graham v. Richardson,* supra, se estableció que un Estado no puede condicionar los servicios sociales que presta a base de la ciudadanía del recipiente. Además, el Tribunal Supremo federal interpretó que el papel desempeñado por los extranjeros en nuestra sociedad califica a éstos como una minoría sujeta a las protecciones brindadas por la Constitución federal. Íd., pág. 372. En esa decisión, el Tribunal Supremo indicó que las clasificaciones que separan a los extranjeros de los ciudadanos son "inherentemente sospechosas", por lo que ameritan un escrutinio estricto. Íd.

No obstante el dictamen de *Graham v. Richardson,* supra —sólo dos (2) años más tarde, en *Sugarman v. Dougall,* supra— ese Alto Foro creó una excepción a la rígida aplicación del escrutinio estricto. Esa excepción se ha denomi-

nado la doctrina de "función política".([13]) Esta doctrina predica que la discriminación estatutaria contra los que no son ciudadanos es permisible siempre y cuando no sea arbitraria y contenga un interés del Estado relacionado a la creación o ejecución de su política pública.

En *Sugarman v. Dougall*, supra, el Tribunal Supremo federal invalidó una ley de Nueva York que dictaba que sólo los ciudadanos estadounidenses podían desempeñarse en posiciones permanentes en el servicio público de ese estado, luego de aplicar el escrutinio estricto al estatuto. En esa decisión el Tribunal recalcó que reconocía el interés de los estados en limitar la participación en su gobierno a aquellos que sean miembros de la "comunidad política".

> We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within "the basic conception of a political community". *Sugarman v. Dougall*, supra, pág. 642, citando a *Dunn v. Blumstein*, supra, pág. 344.

El mismo año que se emitió *Sugarman v. Dougall*, supra, el Tribunal Supremo federal resolvió *In re Griffiths*, 413 U.S. 717 (1973), en el cual invalidó una ley del estado de Connecticut que requería la ciudadanía estadounidense para poder ejercer como abogado en esa jurisdicción. *In re Griffiths,* supra, sirvió de vehículo para que el Tribunal Supremo dispusiera el criterio operativo en cuanto a la constitucionalidad, bajo el escrutinio estricto, de estos estatutos de la manera siguiente:

> In order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally

---

([13]) Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1184.

Es necesario mencionar que, posterior a *Sugarman v. Dougall*, 413 U.S. 634 (1973), el Tribunal Supremo federal, siguiendo la doctrina jurisprudencial establecida en *Graham v. Richardson*, 403 U.S. 365 (1971), aplicó el escrutinio estricto a una serie de contextos relacionados a la clasificación de segmentos de la población por razón de extranjería o ciudadanía. Véanse: *Plyler v. Doe*, 457 U.S. 202 (1982); *Ambach v. Norwick*, supra; *Nyquist v. Mauclet*, 432 U.S. 1 (1977) (los tres (3) invalidando estatutos estatales que restringen los beneficios docentes a los ciudadanos), y *Examining Board v. Flores de Otero*, 426 U.S. 572 (1976) (que invalidan estatutos para prohibir que extranjeros se desempeñaran como ingenieros).

permissible and substantial, and that its use of the classification is "necessary ... to the accomplishment" of its purpose or the safeguarding of its interest. (Escolios omitidos.) *In re Griffiths*, supra, págs. 721–722.

No obstante, en *Foley v. Connelie*, 435 U.S. 291 (1978), el Tribunal Supremo federal aplicó la doctrina de función política esbozada en *Sugarman v. Dougall*, supra, y convalidó el que el estado de Nueva York requiriera la ciudadanía estadounidense para poder pertenecer a su cuerpo de policía. Véase, también, *Cabell v. Chavez-Salido*, supra. El Tribunal expone sus razones para no requerir la aplicación del escrutinio estricto al marco fáctico, y aplicar a su vez el escrutinio de nexo racional. Lo explica el Juez Burger en la opinión mayoritaria de *Foley v. Connelie*, supra, págs. 296–297:

[W]e must necessarily examine each position in question to determine whether it involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community.

The essence of our holdings to date is that although we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens. (Escolio omitido.)

Mediante el escrutinio de nexo racional, en *Ambach v. Norwick*, supra, pág. 73, el Tribunal Supremo declaró inconstitucional una ley estatal, la cual requería que los maestros de escuela pública fuesen ciudadanos de Estados Unidos.[14] Como lo expuso el Tribunal Supremo federal,

---

[14] Como indicó el Juez Asociado Señor Hernández Denton, en la ponencia mayoritaria de *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 482 (1989), la casuística federal sobre las clasificaciones de extranjería refleja que es un "punto de intenso conflicto". El Juez Powell del Tribunal Supremo federal ha admitido que las decisiones de ese Tribunal sobre las clasificaciones de extranjería no han seguido una línea recta a través de los años. *Ambach v. Norwick*, supra, pág. 71. Sin embargo, entendemos que el Tribunal Supremo federal ha sido consistente en aplicar el escrutinio estricto a los casos en que la doctrina de función política es inaplicable, mientras ha enfocado el lente del escrutinio de nexo racional cuando el estatuto se refiere a funciones que afectan la formulación de política pública. Véanse: *Ambach v. Norwick*, supra, pág. 73; *Foley v. Connelie*, 435 U.S. 291 (1978), y *Perkins v. Smith*, 426 U.S. 913 (1976).

cuando el estatuto discrimina contra los que no son ciudadanos, pero su interés es de índole íntimamente relacionada con la operación del gobierno como una comunidad política, no se amerita un escrutinio tan severo. *Ambach v. Norwick*, supra, pág. 74.

En *Foley v. Connelie*, supra, pág. 296, ese Tribunal definió el criterio evaluativo a ser aplicado bajo la doctrina de función política:

> *"The State need only justify its classification by a showing of some rational relationship between the interest sought to be protected and the limiting classification."* (Énfasis suplido.)

En su opinión disidente en *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 499 (1989), el Juez Asociado Señor Negrón García explicó la doctrina de función política de la forma siguiente:

> ... [L]a misma propugna que los estados pueden tener un legítimo interés en preservar para los ciudadanos ciertos puestos públicos relacionados estrechamente con el proceso de autogobierno o que conllevan el ejercicio de poderes importantes en la comunidad.

La doctrina de función política se ha aplicado principalmente a casos concernientes a empleados públicos,[15] pero en *Perkins v. Smith*, 370 F. Supp. 134 (D. Md. 1974), confirmado en 426 U.S. 913 (1976), un tribunal extendió la doctrina para convalidar una ley que requería la ciudadanía de Estados Unidos para poder ser miembro de jurados estatales. Nótese que el servir como jurado no equivale a ser un empleado público, sino que la persona que labora en

---

En términos generales, hemos dispuesto que "[l]as expresiones vertidas por el Tribunal Supremo federal en esta área son obligatorias para este Tribunal toda vez que los derechos protegidos por las cláusulas del debido proceso de ley y de la igual protección de las leyes de la Constitución de los Estados Unidos son aplicables a Puerto Rico". *De Paz Lisk v. Aponte Roque*, supra, pág. 486. Véanse: *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328 (1986); *Examining Bd. v. Flores de Otero*, supra, págs. 599–601; *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668 (1974), y J.J. Álvarez González, *La protección de los derechos humanos en Puerto Rico*, 57 Rev. Jur. U.P.R. 133, 143 *et seq.* (1988).

[15] Véanse: *De Paz Lisk v. Aponte Roque*, supra, pág. 487, y *Cabell v. Chavez-Salido*, supra, págs. 439–441.

dicha función presta un servicio a la comunidad y cumple con una responsabilidad análoga a la que responde el elector. En ambos casos la persona cumple con una obligación pública de brindar su tiempo, dedicación y juicio para el beneficio de la sociedad. Ante ese contexto, entendemos que la doctrina tiene un alcance más abarcador que la limitada aplicación a empleados públicos. La doctrina tiene su génesis en el concepto de la importancia de que el autogobierno se lleve a cabo por los miembros de la comunidad política.([16]) Los electores que cada cuatro (4) años eligen su gobierno y formulan su política pública claramente ejercen el tipo de influencia para la cual se estableció la doctrina. Es en lo pertinente al sufragio donde la doctrina de función política encuentra su perfecta operación.

> ... [T]he general principle [is] that some state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government. *Ambach v. Norwick*, supra, págs. 73–74.

No cabe duda que el voto es uno de los ejercicios más impactantes que una persona puede realizar para afectar la composición de su gobierno y, por consiguiente, la formulación de la política pública de éste.

---

([16]) El Tribunal Supremo federal en *Bernal v. Fainter*, 467 U.S. 216 (1984), estableció el esquema con el cual examinar un estatuto para determinar si este se encuentra cobijado bajo la doctrina de función política. En esa decisión el Tribunal dictaminó que la naturaleza de la profesión del notario, refiriéndose al notario de tradición anglosajona, es en esencia "oficinesca y ministerial" y no va "al corazón del gobierno representativo". Véase Serrano Geyls, *op. cit.* El esquema que se aplicó es el siguiente:

" 'First, the specificity of the classification will be examined: a classification that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the classification serves legitimate political ends. ... Second, even if the classification is sufficiently tailored, it may be applied in the particular case only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions,' those who 'participate directly in the formulation, execution, or review of broad public policy' and hence 'perform functions that go the to the heart of representative government.' " *Bernal v. Fainter*, supra, págs. 221–222.

Sin embargo, el Tribunal Supremo federal ha aplicado una fórmula menos estricta en cuanto a estatutos congresionales que imponen restricciones a los extranjeros. Véanse: *Matthews v. Diaz*, 426 U.S. 67 (1976), y Serrano Geyls, *op. cit.*, pág. 1186.

Por otro lado, sobre el contexto específico de que el Estado limite el derecho al voto a sólo los ciudadanos, es pertinente notar que ninguna jurisdicción de Estados Unidos ha extendido a extranjeros (los que no son ciudadanos) el derecho al sufragio. G.M. Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote?*, 75 Mich. L. Rev. 1092, 1100 (1977).

Todos los estados de la Unión, al igual que Puerto Rico, requieren de sus electores el ser ciudadanos de Estados Unidos.([17]) Cuarenta y cuatro (44) estados de la Unión contienen expresamente en su Constitución el requisito de ciudadanía americana para poder votar.([18]) Cuatro (4) de los seis (6) restantes contienen el requisito en sus leyes electorales.([19]) La Ley Electoral del estado de Carolina del Norte provee que un elector puede ser recusado bajo el

---

([17]) La Constitución del estado de Wyoming, incluso, especifica que aquellos que no hayan sido ciudadanos al momento de su ratificación, no podrán ser electores posteriormente, a menos que dentro de los cinco (5) años posteriores reciban la ciudadanía de Estados Unidos. Dispone esa Constitución:

"... Nothing herein contained shall be construed to deprive any person of the right to vote who has such right at the time of the adoption of this constitution, unless disqualified by the restrictions of section six of this article. *After the expiration of five (5) years from the time of the adoption of this constitution, none but citizens of the United States shall have the right to vote.*" (Énfasis suplido.) Wyo. Stat. Art. 6, Sec. 10 (1959).

([18]) Véanse: Ala. Code Art. VIII Sec. 177; Alaska Stat. Art. V Sec. 1; Ariz. Rev. Stat. Ann. Art. VII Sec. 2 (1984); Ark. Code Ann. Art. 3 Sec. 1 (Bobbs-Merril 1947); Cal. Code Art. II Sec. 2; Colo. Stat. Art. VII Sec. 1; Conn. Gen. Stat. Art. VI Sec. 1; Fla. Stat. Ann. Art. VI Sec. 2; Ga. Code.Ann. Art. II Sec. 1 P. II; Haw. Rev. Stat. Art. II Sec. 1; Idaho Code Art. VI Sec. 2 (1932); Ill. Rev. Stat. Art. III Sec. 1; Indiana Code Ann. Art. II Sec. 2 (Burns 1955); Iowa Code Ann. Art. Sec. 1 (West 1949); Kan. Stat. Ann. Art. V Sec. 1; Ky. Rev. Stat. Ann. Sec. 145; La. Rev. Stat. Ann. Art. 197; Me. Rev. Stat. Ann. Art II Sec. 1; Md. Code Ann., Const. Art. I Sec.1; Mich. Comp. Laws Ann. Art II Sec. 1; Minn. Stat. Art VII Sec. 1; Miss. Code Ann. Art. XII Sec. 241; Mo. Rev. Stat. Art. VIII Sec. 2; Mont. Code Ann. Art. IX Sec. 2; Nev. Rev. Stat. Art. II Sec. 1; N.J. Stat. Ann. Art. II Sec. 1(3)(a); N.M. Stat. Ann. Art. VII Sec. 1; N.C. Gen. Stat. Art. VI Sec. 1; N.D. Cent. Code Art. II Sec. 1; Ohio Rev. Code Ann. Art. V Sec. 1 (Anderson 1994); Okla. Stat. Ann. Art. III Sec. 1; Or. Stat. Art. II Sec. 2; Pa. Stat. Ann. Art. VII. Sec. 1; Pa. Stat. Ann. Const. Art. VII Sec. 1; R.I. Gen. Laws Art. II Sec. 1; S.C. Code Ann. Art. II Sec. 4; S.D. Codified Laws Art. VII Sec. 2; Tenn. Code Ann. Art. IV Sec. 1; Tex. Code Ann. Art. VI Sec. 2; Utah Code Ann. Art. IV Sec. 2; Vt. Stat. Ann. Art. II Sec. 42; Va. Code Ann. Art. II Sec. 1; Wash. Rev. Code Ann. Art. VI Sec. 1; Wis. Stat. Ann. Art. III Sec. 1; Wyo. Stat. Art. VI Sec. 2.

([19]) Del. Code Ann. Art. V Sec. 2; Del. Code Ann. tít. 15 Sec. 1701; N.H. Rev. Stat. Ann. Const. Pt. 1 Art. 11; N.H. Rev. Stat. Ann. Títs. 63–64, Cap. 654:1; N.Y. Art. 11 Sec. 1, (McKinney); N.Y. Elect. Tít. 1, Sec. 5–102 (McKinney); W. Va. Code Art. 4 Sec. 1; W. Va. Code Sec. 3–2–2.

fundamento de que no es ciudadano americano.([20]) La Constitución de Luisiana guarda silencio al respecto, pero su ley electoral contiene lenguaje que presupone la existencia del requisito de ciudadanía americana.([21])

En términos generales, el Tribunal Supremo federal ha establecido la constitucionalidad de una clasificación para requerir que electores ostenten la ciudadanía estadounidense. Nótese que en *Sugarman v. Dougall*, supra, pág. 647, el Tribunal Supremo federal expresó:

> This Court has never held that aliens have a constitutional right to vote or to hold high public office under the Equal Protection Clause. Indeed, implicit in any of this Court's voting rights decisions is the notion that citizenship is a permissible criterion for limiting such rights.

En *Kramer v. Union School District*, supra, pág. 625, el Tribunal Supremo federal invalidó un requisito de que los participantes en una votación para elegir los funcionarios de una junta de distrito escolar tengan un interés particular en los asuntos docentes particulares a esa entidad. El Tribunal Supremo federal hizo claro su criterio de que una restricción al derecho al voto requiere su estricto escrutinio. *Kramer v. Union School District*, supra, págs. 626–627. El demandante en ese caso era un hombre soltero que no tenía hijos, pero el Tribunal invalidó el estatuto por ser inaceptablemente amplio en su disposición. Sin embargo, el Tribunal tuvo la cautela de señalar que los estados tienen la potestad constitucional de imponer requisitos razonables de ciudadanía y edad para conceder el sufragio. Véanse, también: *Cipriano v. City of Houma*, 395 U.S. 701 (1969), y *Phoenix v. Kolodziejski*, 399 U.S. 204 (1970) (en ambos, el escrutinio estricto invalidó un requisito de ser contribuyente para participar en elecciones sobre la expedición de bonos públicos); *Salyer Land Co. v. Tulare Water*

---

([20]) N.C. Gen. Stat. Const. Art. VI Sec. 2; N.C. Gen. Stat. Art. 8, Sec. 163–85.

([21]) La. Rev. Stat. Ann. Const. Art. 1 Sec. 10; La. Rev. Stat. Ann. Vol. 4, Sec. R–S 18:101; Opiniones del Procurador General Federal: 1950–52, pág. 71; 1938–40, pág. 354; 1938–40, pág. 351; 1916–18, pág. 487.

*District*, 410 U.S. 719 (1973), y *Ball v. James*, 451 U.S. 355 (1981) (en los que requisitos de intereses particulares en la votación sobrevivieron el escrutinio), y *Dunn v. Blumstein*, supra, pág. 336.

Con esa infraestructura doctrinal persuasiva, pasamos a examinar lo dispuesto por los preceptos de nuestra Constitución.

## V

El Art. II, Sec. 2 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 261, establece el derecho al sufragio universal:

> Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

Es pertinente, además, la Sec. 1 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, pág. 257:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. ... Véase, también, *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28 (1993).

Relevante también para el caso de autos es la Sec. 7 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 275, que dispone en lo pertinente:

> Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. ... Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negara a persona alguna en Puerto Rico la igual protección de las leyes.

Ante estos preceptos de rango constitucional, debemos determinar el escrutinio aplicable a la presente evaluación sobre la constitucionalidad de los impugnados artículos de la Ley Electoral de Puerto Rico. Como es axiomáticamente

sabido, existen tres (3) criterios para determinar la razonabilidad de una clasificación a la luz de la cláusula de la igual protección de las leyes. Éstos son: el escrutinio estricto o examen minucioso, el intermedio y el tradicional mínimo o de nexo racional. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 537 (1984), y *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980).

El más riguroso de estos criterios, el escrutinio estricto, se aplica ante una clasificación sospechosa. Las clasificaciones sospechosas son aquellas que se establecen por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562, 582 (1992). También se utiliza este escrutinio cuando la ley infringe derechos fundamentales. Entre los derechos fundamentales se han reconocido el derecho al voto, a la libertad de culto, a la libertad de expresión, a la vida, a la protección de ley contra ataques abusivos a la honra y el derecho a la intimidad. Íd., pág. 577. El escrutinio estricto presume la inconstitucionalidad de la ley atacada y le impone al Estado el peso de probar que ésta no es arbitraria y que constituye la medida menos onerosa de cumplir con un interés público tan apremiante que justifica la clasificación. *Defendini Collazo et al. v. E.L.A., Cotto*, supra; *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988); *López Vives v. Policía de P.R.* 118 D.P.R. 219 (1987); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986), y *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982).

El escrutinio intermedio se utiliza cuando la clasificación legislativa afecta "intereses individuales importantes, aunque no sean necesariamente fundamentales, y el uso de criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos". *León Rosario v. Torres*, supra, pág. 814. Bajo este escrutinio se requiere que la clasificación adelante un interés gubernamental legítimo y que esté sustancialmente relacionada con éste. 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.3, págs. 326–327 (1986). El escrutinio intermedio ha sido uti-

lizado por el Tribunal Supremo de Estados Unidos en casos relativos a clasificaciones basadas en sexo, nacimiento y extranjería. *Treatise on Constitutional Law*, supra. En Puerto Rico nunca se ha empleado este escrutinio. *Almodóvar v. Méndez Román*, 125 D.P.R. 218, 254 esc. 24 (1990).

Finalmente, el escrutinio de nexo racional es el de mayor lenidad. Éste se utiliza primordialmente para la legislación de tipo socioeconómico. *Salas v. Municipio de Moca*, 119 D.P.R. 625, 632 (1987); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 332–333 (1987), y *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456, 461 (1980). Al examinar una ley bajo este escrutinio se presume su constitucionalidad. Por lo tanto, quien alega su inconstitucionalidad tiene el peso de probarla. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975). Este escrutinio dispone que una clasificación legislativa no será declarada inválida "a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado". *Vélez v. Srio. de Justicia*, supra, pág. 538. Mediante el uso del escrutinio de nexo racional se mantendrá la constitucionalidad de la ley si puede concebirse razonablemente una situación de hechos que justifique la clasificación. *Rodríguez Rodríguez v. E.L.A.*, supra, pág. 583.

Tenemos que subrayar que en *De Paz Lisk v. Aponte Roque*, supra, pág. 484, este Tribunal interpretó que la Asamblea Constituyente no concibió el discrimen por razón de extranjería como uno de los expresamente prohibidos por la Sec. 1 del Art. II de nuestra Constitución, *supra*. Entendimos en esa ocasión que el término "nacimiento" incluido en la aludida sección tiene el propósito de "eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio" y no de hacer referencia a una determinación a base de la procedencia nacional del afectado.[22]

---

[22] Véase el Informe de la Comisión de Carta de Derechos, 4 Diario de Sesiones de la Convención Constituyente 2560, 2562 (1962); 2 Diario de Sesiones de la Convención Constituyente 1374 (1961).

El término "nacimiento" mencionado no tiene que ver con controversias sobre extranjería o ciudadanía, ya que los miembros de la Asamblea Constituyente expresaron su consternación de que la sección aludida se malinterpretara como que establecía que " 'las personas nacidas fuera de Puerto Rico' " debían recibir también las protecciones brindadas. *De Paz Lisk v. Aponte Roque*, supra, pág. 485; 2 Diario de Sesiones de la Convención Constituyente, *supra*, pág. 1375, y 4 Diario de Sesiones de la Convención Constituyente 2560, 2562 (1962). Si los propios miembros de la Asamblea Constituyente se preocuparon de que esa sección no fuera interpretada como que concedía protección a extranjeros, cualquier argumento proponiendo una intención diferente carece de razón.([23])

Sin embargo, aunque el término "nacimiento" colocado en la Sec. 1 del Art. II de la Constitución, *supra*, no versa sobre extranjeros, en *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972), incluimos jurisprudencialmente el término "nacionalidad" a los criterios discriminatorios prohibidos por esa sección. "[A]ñadimos el vocablo 'nacionalidad' al catálogo del Art. II, Sec. 1 de la Constitución ... en evidente reconocimiento de que dicha disposición no es *numerus clausus*". *De Paz Lisk v. Aponte Roque*, supra, pág. 485. Véanse, también: *Zachry International v. Tribunal Superior*, supra, pág. 277, y *Wackenhut Corp. v. Rodríguez Aponte*, supra, pág. 531.

Ampliando lo establecido en *Wackenhut Corp. v. Rodríguez Aponte*, supra, en *León Rosario v. Torres*, supra, pág. 813, encontramos que una clasificación a base de nacionalidad es inherentemente sospechosa. Por lo tanto, dispusi-

---

([23]) De hecho, los delegados de la Asamblea Constituyente estaban tan conscientes de la importancia de que el término "nacimiento" expuesto en la Sec. 1 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, no se interpretara como referente a "personas nacidas fuera de Puerto Rico" (Diario de Sesiones, *supra*, Vol. 2, pág. 1375, y Diario de Sesiones, *supra*, Vol. 4, pág. 2562), que uno de los delegados sometió una enmienda para eliminar por completo la palabra del texto de nuestra Constitución. Diario de Sesiones, *supra*, Vol. 2, pág. 1375. Esa enmienda no fue acogida ya que los Delegados quedaron confiados de que el significado asignado al término no sería interpretado incorrectamente para incluir controversias sobre los derechos de un extranjero que resida en Puerto Rico.

mos que el nivel de sospecha a la que llegan las clasificaciones fundamentadas por "nacionalidad" ameritan una rigurosa evaluación constitucional. De esta forma, hemos interpretado la Carta de Derechos de nuestra Constitución a la luz de la interpretación que el Tribunal Supremo federal dictaminó en *Graham v. Richardson,* supra, al interpretar la Constitución federal.

*De Paz Lisk v. Aponte Roque*, supra, presentó para nuestra revisión constitucional una ley que requería que el maestro de escuela pública sea ciudadano de Estados Unidos. Se encontró que un maestro de escuela pública no se desempeña sobre la creación o ejecución de política pública requerida para la vigencia de la doctrina de función política. *De Paz Lisk v. Aponte Roque*, supra, pág. 490. Ante eso, utilizando el escrutinio estricto, el criterio que este Tribunal utilizó para llegar a esa decisión recayó en la determinación de si la ciudadanía de Estados Unidos constituye una condición indispensable a la idoneidad profesional del maestro. *De Paz Lisk v. Aponte Roque*, supra, pág. 488. Luego de considerar los intereses involucrados en el caso, invalidamos las disposiciones de ley impugnadas. *De Paz Lisk v. Aponte Roque*, supra, págs. 491–492.

Aunque la posición del maestro de escuela pública no cumple con la lógica doctrinal de la doctrina de función política, el voto sí es un ejercicio de índole formativa a la política pública. Existe otra razón, muy particular al presente caso, que nos sugiere aplicar el escrutinio de nexo racional a la controversia ante nos. El recurso en este caso incumbe una situación distinguible de lo tradicionalmente enmarcado dentro del uso del escrutinio estricto. No podemos perder de vista la causa de la pérdida del sufragio del recurrido. La presente no es una situación en que el Estado, de manera caprichosa o arbitraria, invade las protecciones constitucionales que cobijan a cada persona para privarle del ejercicio de algún derecho. Ante nos se presenta una persona que renunció voluntariamente a un *status* identificante, y tenemos la obligación de notar que fue esa renuncia, y no una acción discriminatoria por parte del

Estado, la que le costó el derecho al voto.[24] El hecho de que el recurrido voluntariamente *renunció* a la ciudadanía de Estados Unidos es un factor esencial al determinar la constitucionalidad de los aludidos artículos de la Ley Electoral de Puerto Rico.

No obstante lo expuesto, apliquemos el escrutinio estricto al caso de autos.[25] No podemos perder de vista que el recurrido es un puertorriqueño que reside en Puerto Rico, y que aquí ha ejercido sus derechos y funciones políticas en el pasado. Decidimos por la más estricta y minuciosa fórmula para ofrecerle la más alta protección a la parte recusada en su reclamo al derecho del sufragio en Puerto Rico, el cual hemos reconocido como fundamental. Aplicamos ese escrutinio para responder al alto nivel de sospecha inherente que hemos establecido que existe en las clasificaciones de extranjería.[26] Es por eso que hoy seguimos las huellas de los pasos que emprendimos en *De Paz Lisk v. Aponte Roque*, supra, y nos disponemos a exa-

---

[24] Toda persona que nazca en Puerto Rico y resida en la Isla es ciudadano de Estados Unidos para los efectos de la Ley Electoral de Puerto Rico y, por lo tanto, tiene derecho a ejercer su voto en las elecciones generales. Recordemos que "la Constitución no impide que las leyes dispongan situaciones distintas cuando el discrimen no es arbitrario ni responde a un propósito de hostilidad contra determinado grupo". *De Paz Lisk v. Aponte Roque*, supra, pág. 487. En efecto, de la única forma que tal ciudadano puede perder el derecho al voto es renunciando a la ciudadanía de Estados Unidos. Estamos claro en que fue el recurrido, y no el Estado, quien provocó su propia restricción al voto que nos ocupa hoy.

[25] No hacemos caso omiso a los señalamientos de comentaristas de que, independientemente de la doctrina de función política, toda restricción estatutaria al sufragio por razón de extranjería debe ser expuesta al escrutinio estricto. G.M. Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote?* 75 Mich. L. Rev. 1092, 1105 (1977).

[26] Al aplicar el escrutinio estricto a estos casos, no podemos perder de perspectiva la importante distinción que impone la Constitución entre ciudadanos y otros, y que, por lo tanto, no se devalúe la condición de ciudadano.

"It would be inappropriate ... to require every statutory exclusion of aliens to clear the high hurdle of 'strict scrutiny,' because to do so would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship'." *Foley v. Connelie*, supra, pág. 295, citando a *Nyquist v. Mauclet*, supra, pág. 14, opinión disidente del Juez Burger.

El riesgo, sin embargo, de que se subordinen inconstitucionalmente los derechos del individuo, en especial cuando ante nos se encuentra el derecho al sufragio, nos motiva a enfocar el escrutinio estricto a los intereses que chocan en el presente caso.

minar la constitucionalidad de las leyes atacadas con la lupa del escrutinio estricto.

## VI

Formulamos la pregunta que ha de contestarse para aplicar el escrutinio estricto: ¿Es imprescindible ser ciudadano de Estados Unidos para constituir, mediante el sufragio, el gobierno de Puerto Rico y, de esta forma, formular su política pública? Somos del criterio que la Asamblea Legislativa actuó conforme a derecho al dictaminar que ese requisito para poder ejercer el voto es, en efecto, imprescindible. Bajo el actual estado de derecho, la ciudadanía de Estados Unidos es esencial para formar parte de la "comunidad política" en Puerto Rico, como territorio de Estados Unidos.

Debemos primeramente examinar el interés del Estado esbozado en las secciones atacadas de la Ley Electoral de Puerto Rico.

El Estado tiene el interés de que las personas con madurez y capacidad que compongan su comunidad política sean quienes diseñen el rostro de su gobierno y dicten las facciones de su política pública. En nuestro sistema democrático y pluralista de gobierno, en el cual el Estado no es un ente separado o superior a las personas a quienes sirve, sino una extensión de éstas, el sufragio es el conducto entre la persona y su gobierno. La síntesis de nuestra tradición democrática es que el elector escoge los gobernantes. De esa manera el elector determina, de forma representativa y directa, la política pública de su gobierno. Por lo tanto, el Estado tiene un interés de que sean los integrantes de su comunidad política los que ejerzan su voto, para así darle dirección al desarrollo de la sociedad.

Nos parece imposible sobreestimar la responsabilidad y obligación que carga el elector sobre sus hombros cada vez que entra a una caseta electoral y deposita su voto en la urna. A través del voto los miembros de una comunidad

política determinan su futuro y su identidad. El tratadista estadounidense Laurence H. Tribe ha expresado: "[I]n deciding who may and who may not vote in its elections, a community takes a crucial step in defining its identity." L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1084. El voto tiene un significado particular en nuestra sociedad política, pues éste afecta la vida y política pública de nuestro pueblo.

Por ende, el derecho al sufragio no es tan sólo uno de los derechos del ciudadano, es el derecho y la responsabilidad más importante del ciudadano como miembro de la comunidad política. Rosberg, *supra*, pág. 1134. El sufragio es el derecho que puede crear o eliminar derechos. "The political franchise of voting .... is regarded as a fundamental political right, because it is preservative of all rights." *Yick Wo v. Hopkins*, supra, pág. 370. A ese respecto, el Tribunal Supremo federal expuso que:

> No right is more precious in a free country than that of having a choice in the election of those who make the laws under which, as good *citizens*, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. (Énfasis suplido.) *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

En este sentido, al escoger sus representantes, el pueblo selecciona la política pública de su gobierno; es el voto que subordina el gobierno al pueblo y le permite a éste influir cada cuatrienio en la política pública que le ha de afectar. Esta concepción del poder del voto es de conocimiento general para nuestro pueblo, el cual ha tenido la gracia de gozar por varias décadas de su historia los frutos de su democracia. No nos parece necesario pronunciarnos más al respecto.

Dada la importancia del sufragio en nuestra sociedad, es improcedente cualquier duda sobre la capacidad constitucional que tiene la Asamblea Legislativa para reglamentar el ejercicio del voto en Puerto Rico. Es la propia Constitución de Puerto Rico, en la Sec. 4 de su Art. VI, *supra*, ed. 1988, pág. 367, la que dispone en lo pertinente:

Será elector toda persona que haya cumplido dieciocho años de edad, *y reúna los demás requisitos que se determine por ley.* Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad. (Énfasis suplido.)

La Constitución, en primer lugar, dispone algunos de los requisitos mínimos para ejercer el voto y le adjudica a la Asamblea Legislativa la responsabilidad de determinar los demás que deben ser impuestos. A esos efectos, el Informe de la Comisión de Disposiciones Transitorias y Asuntos Generales, 4 Diario de Sesiones de la Convención Constituyente, *supra*, pág. 2617 expone lo siguiente:

> *Siguiendo las normas generalmente prevalecientes en el derecho constitucional, tal como resulta de las cartas fundamentales de la mayoría de los estados de la Unión y de los países de actuación democrática, se establecen ciertos requisitos mínimos para el ejercicio de la franquicia electoral.* Queda investida del derecho a votar toda persona que, a la fecha de una elección —sea ésta general o especial— tenga veintiún años cumplidos y reúna las demás condiciones que se determinen por ley. La ley nunca podrá, sin embargo, exigirle a *ningún ciudadano*, como requisito para poder votar, alguno que envuelva la posesión de propiedad o saber leer o escribir .... *Dentro de esos·requisitos fundamentales ... la Asamblea Legislativa está autorizada para señalar las circunstancias que pueden impedir que una persona vote, tales como incapacidad mental, falta de residencia, declaración judicial de incapacidad, etc.* Ninguna de esas circunstancias puede ser la posesión de propiedad o la aptitud para leer o escribir. (Énfasis suplido.) Diario de Sesiones de la Convención Constituyente, *supra*, pág. 2620.

De la misma forma que se requiere que el elector alcance una edad para asegurar un grado mínimo de madurez, nuestra Ley Electoral de Puerto Rico requiere también que el elector sea ciudadano de Estados Unidos para cerciorarse que es parte de nuestra comunidad política. Estos requisitos persiguen que el electorado tenga la capacidad y el interés de actuar responsablemente al ejercer su función. Teniendo esa intención y propósito, se muestra clara la relación —lógica y apremiante— entre el interés del Estado descrito y el estatuto que correspondientemente requiere la ciudadanía para ejercer el voto. Examinemos

las características que tiene la ciudadanía para entender su importancia en relación con el sufragio.

Es indudable que el ciudadano tiene una esencial relación particular con su Estado. El Profesor Antonio Fernós explica la etimología del término "ciudadano" de la forma siguiente:

> La idea de la ciudadanía nace como descripción del vínculo o relación entre la persona y el orden o régimen de las antiguas ciudades griegas. El vocablo es romano, y significa socio o miembro de la organización que se crea: la ciudad, esto es, Roma. Con el tiempo ha quedado para significar y representar el vínculo de la persona con el país, la nación, y más modernamente, el Estado. Ciudadano es aquel quien pertenece al grupo que constituye el régimen, el sistema, el orden colectivo y político. Modernamente, bajo el constitucionalismo y el Estado de Derecho, ciudadano es aquel que es miembro y participa del colectivo. A. Fernós, *La ciudadanía puertorriqueña y otras controversias del llamado caso del licenciado Mari Brás*, 30 Rev. Jur. U.P.R. 341, 343–344 (1996). Véase, también, M.A. Rigau, *El derecho a la ciudadanía y la ciudadanía americana de los puertorriqueños*, 37 Rev. Jur. U.P.R. 817, 818–819 (1968).

Es por eso que tradicionalmente se ha reconocido el poder del Estado de excluir de sus instituciones políticas a aquellos que no sean ciudadanos. *Sugarman v. Dougall*, supra, pág. 648.

El vínculo particular que une al ciudadano con su Estado le exige a esa persona su interés y esfuerzo en el desempeño de las obligaciones que llevan al mejoramiento de la comunidad. Es el poder para ejercer los derechos de índole político y la fidelidad (*fidelity of allegiance*) lo que distingue al ciudadano del extranjero. *Herriott v. City of Seattle*, 81 Wash.2d 48 (1972).

> The critical attribute which distinguishes the citizen from the alien is that the citizen possesses political rights: the right to vote, to hold elective office and to serve as a juror. They differ from private or civil rights held by aliens in common with citizens, such as the right not to be excluded from employment solely on the ground of alienage, to hold property, and, if qualified, to receive public assistance. (Escolios omitidos.) *Herriot v. City of Seattle*, supra.

De manera que "para poder participar de lleno en la vida de la colectividad es imprescindible antes ser ciudadano". Rigau, *op. cit.*, pág. 819. Los ciudadanos cuentan con esa capacidad política y confiamos en que su pertenencia, lealtad y amor por su comunidad les lleven a ejercer esas funciones de una manera responsable y preocupada por el bien común.

> Citizens [...] must turn from the private interests and occasionally take a look at something other than themselves. A. de Tocqueville, *Democracy in America*, Nueva York, Ed. Harper & Row Pub., 1969, pág. 510.

Es por esa razón que el Estado le puede imponer responsabilidades especiales a los ciudadanos. "The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State." *Ambach v. Norwick*, supra, pág. 75.

El próximo escalón lógico es que, como ciudadanos, la responsabilidad más importante es, ciertamente, el ejercer el voto. En el pasado nos hemos expresado a ese respecto de la forma siguiente:

> La ciudadanía condiciona y define importantes derechos y obligaciones en nuestra sociedad. Basta decir que sirve de fundamento al ejercicio de los derechos políticos. *De Paz Lisk v. Aponte Roque*, supra, pág. 487.[27]

Considérese, también, que en *Sugarman v. Dougall*, supra, el Tribunal Supremo federal vinculó la preservación

---

[27] Al respecto, el Tribunal Supremo de Estados Unidos distingue, de la siguiente manera, al ciudadano del residente, especificando que el factor distintivo es que el ciudadano cuenta con derechos políticos.

"The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of the Nation, part of a people distinct from others. ... The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized 'a State's historical power to exclude aliens from participation in its democratic political institutions' ... as part of the sovereign's obligation to 'preserve the basic conception of political community'.

"Thus, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions." *Foley v. Connelie*, supra, págs. 295–296.

de esa comunidad política al requisito de que los electores sean dueños de esa ciudadanía.

Aún nos queda por examinar el rol que la ciudadanía de Estados Unidos tiene en relación con la sociedad puertorriqueña, para calcular si esa condición justifica la impugnada clasificación de la Ley Electoral de Puerto Rico.

Para los puertorriqueños, el ser ciudadano de Estados Unidos no es solamente una denominación política, sino uno de los más importantes componentes de nuestra identidad como pueblo. En Puerto Rico existe una agitada polémica sobre la naturaleza de nuestro *status* y sobre la definición futura de nuestra relación con Estados Unidos. Esa es una cuestión política que nuestro pueblo debe resolver según su conciencia electoral. Este Tribunal carece de facultad para emprender el camino hacía la resolución de esta polémica que preocupa a cada puertorriqueño. Dentro del orden constitucional y legal existente, sobre el cual nos corresponde emitir nuestra decisión, existe una realidad insoslayable: el ser ciudadano de Estados Unidos es uno de los componentes que definen la identidad del puertorriqueño. Los puertorriqueños, además, en su propia Constitución, expresan lealtad a los postulados de la Constitución federal.

Mediante el Art. 7 del Tratado de París de 1898, España le cedió a Estados Unidos la isla de Puerto Rico.[28] Este tratado efectúo la transferencia de la soberanía de Puerto Rico y de la fidelidad de los puertorriqueños, de España a Estados Unidos.[29] El Acta Foraker,[30] adoptada por el Congreso estadounidense el 12 de abril de 1900, estableció un gobierno civil para Puerto Rico. Desde esos eventos históricos, es claro que el cuerpo político que llegó a denomi-

---

[28] Art. IX, Tratado de París de 1898, Documentos Históricos, L.P.R.A., Tomo 1.

[29] La norma de derecho internacional establece que, al efectuarse una transferencia de la soberanía de un territorio, la fidelidad de la ciudadanía residente en el mismo también se transfiere al nuevo régimen. Véase *United States v. Uhl*, 137 F.2d 898, 902 (2do Cir. 1943), y *American Insurance Co. v. Cotton*, 1 Pet. (26 U.S.) 511, 542 (1828).

[30] Carta Orgánica de 12 de abril de 1900, cap. 191, 31 Stat. 79.

narse el "Pueblo de Puerto Rico" le debe fidelidad a Estados Unidos. *Martinez v. Asociacion de Senoras*, 213 U.S. 20, 24 (1909); *Gonzalez v. Williams,* supra, pág. 11, y J.A. Cabranes, *Citizenship and the American Empire*, 127 U. Pa. L. Rev. 391 esc. 12 (1978). La relación que ya era estrecha entre los puertorriqueños y Estados Unidos se hizo aún más estrecha cuando, el 2 de mayo de 1917, el Acta Jones([31]) le concedió la ciudadanía de Estados Unidos a los puertorriqueños.

Esa ciudadanía de Estados Unidos es enunciada como primordial para nuestra identidad como comunidad política por nuestra Constitución, la cual en su preámbulo proclama:

> [C]onsideramos factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas; la lealtad a los postulados de la Constitución Federal; la convivencia en Puerto Rico de las dos grandes culturas del hemisferio americano. (Énfasis suplido.) Preámbulo, Const. E.L.A., *supra*, ed. 1988, pág. 251.

No es sólo en el nivel conceptual que la ciudadanía de Estados Unidos es un elemento constituyente de la identidad de nuestro pueblo. Sin poder reducirlo a términos más controlables, tomamos el concepto "cultura" como

> ... esa totalidad compleja que incluye la tecnología y otros artefactos materiales que resultan del trabajo del hombre; *las pautas tradicionales de conducta o sistemas sociales de hábitos, que gobiernan las relaciones interpersonales; las normas éticas, estéticas y legales; los sistemas especiales de símbolos como el lenguaje o las matemáticas*; las ciencias y el conocimiento (factual o empírico) acumulados; y otros productos de la actividad humana en sociedad. *Cultura es, pues, el mundo histórico del hombre en su más amplio sentido.* (Énfasis suplido.) E. Fernández Méndez, *Historia Cultural de Puerto Rico, 1493–1968*, San Juan, Eds. El Cemi, 1970, pág. 4.

---

([31]) 8 U.S.C. sec. 1402; 64 Stat. 319.

Al aplicar ese concepto de cultura a la nuestra, se hace claro que sugiera que la relación que tenemos con Estados Unidos, y la correspondiente ciudadanía en la que enfocamos hoy, es parte de la cultura que nos caracteriza como pueblo. Nuestro pasaporte indica tal fidelidad y nos presenta de esa forma a otras naciones. Nuestra juventud ha respondido con sacrificio y lealtad cada vez que le ha tocado servir en conflictos militares para defender los ideales que esa ciudadanía simboliza. Miles de ellos han servido voluntariamente en las fuerzas armadas de Estados Unidos. Recordemos también que un extraordinario número de puertorriqueños se trasladó a Estados Unidos y allí reside al amparo de su ciudadanía estadounidense.[32] La ciudadanía de Estados Unidos permea, de alguna manera u otra, a diferentes niveles, sobre toda faceta de la vida puertorriqueña. No se puede argumentar, entonces, que tal ciudadanía no es imprescindible para concebir nuestra comunidad política actual. Este es un hecho que no está sujeto a rectificaciones históricas. Véase el Preámbulo de la Constitución del Estado Libre Asociado, *supra*, que hoy estamos llamados a interpretar.

En fin, nuestra relación con Estados Unidos es una de las bases de nuestra personalidad colectiva. Nuestra ciudadanía estadounidense es uno de los pilares formativos que nos definen como una comunidad política. Ante esa realidad, entendemos que el Estado tiene el legítimo y

---

[32] Se calcula que para mediados de la década del setenta, más de un millón y medio (1,500,000) de puertorriqueños dejaron los confines de la Isla para vivir en Estados Unidos. Véase B.G. Silvestrini y M.D. Luque de Sánchez, *Historia de Puerto Rico: trayectoria de un pueblo*, San Juan, Cultural Puertorriqueña, Inc., 1987, págs. 582–584.

En 1990, la población de puertorriqueños que residía en Estados Unidos, fuera de Puerto Rico, ascendió a dos millones setecientos veintiocho mil (2,728,000) personas. Statistical Abstract of the United States, 112ma ed., Washington, D.C., U.S. Government Printing Office, 1992, pág. 17. Publicado por el Negociado del Censo del Departamento de Comercio de Estados Unidos. Para ese mismo año, Puerto Rico tenía tres millones quinientos veintiocho mil (3,528,000) habitantes. J.E. López Reyes, ed., *Comparative Compendium of Puerto Rico & The United States*, San Juan, Puerto Rico, Merlion Press, 1995, pág. A5.

apremiante interés de proteger la integridad de su comunidad política. El requerir la ciudadanía de Estados Unidos para constituir las filas del electorado no contraviene los preceptos constitucionales.[33] Si en el día de mañana una mayoría del pueblo de Puerto Rico vota para constituir una república y el Congreso de Estados Unidos aprueba una ley para conceder la independencia y soberanía nacional a Puerto Rico, el actual orden jurídico-constitucional cambiará. Ésa es, desde luego, una cuestión política que compete al pueblo y no a este Tribunal resolver. Renunciar, previamente a ese momento, la ciudadanía de Estados Unidos es un acto que el recurrido puede realizar pero no puede sustraerse de las consecuencias que tal acto tiene respecto a su derecho al voto *en nuestra comunidad política actual.* Por otra parte, los derechos de expresión del recurrido no serán coartados y podrá llevar al mercado de las ideas su forma de pensar sobre el particular.

La opinión mayoritaria que hoy emite este Tribunal por voz del Juez Asociado Señor Fuster Berlingeri reconoce la importancia apremiante del interés que tiene el Estado de definir su comunidad política mediante el requisito de la ciudadanía de Estados Unidos para poder ejercer el voto. A ese respecto se expresa en dicha opinión que "es evidente, pues, que existen intereses apremiantes del Estado que justifican la referida reglamentación del derecho al voto" y que "[p]or ello, es errónea la determinación del foro de instancia que declaró inconstitucional los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*". Opinión mayoritaria, pág. 195.

---

[33] Recordemos también que el requisito de ciudadanía estadounidense dispuesto por la Ley Electoral de Puerto Rico no es un ejemplo aislado o único de la intención legislativa de proteger la vigencia e importancia de ese elemento de nuestra identidad. Las leyes de Puerto Rico requieren la ciudadanía de Estados Unidos para ejercer un sinnúmero de funciones. Nuestra Constitución requiere que la persona sea ciudadana estadounidense para poder ser gobernador (Art. IV, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1; legislador (Art. II, Sec. 5 Const. E.L.A., L.P.R.A., Tomo 1, o juez del Tribunal Supremo (Art. V, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1). Las Secs. 10 y 36 de la Ley de Relaciones Federales, 48 U.S.C. 731 *et seq.*, requieren la ciudadanía estadounidense para poder ejercer como Comisionado Residente de Puerto Rico en Washington.

Concurrimos con la mayoría en cuanto a que es errónea la determinación del foro de instancia que declaró inconstitucional los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*. Emitimos esta opinión disidente, sin embargo, por diferir diametralmente de los demás fundamentos de la opinión de la mayoría y de su resultado.

En la opinión de la mayoría de este Tribunal se hace amplio uso de sus recursos imaginativos, creando lo que no existe y obviando lo que es claro. La mayoría inventa y aplica una excepción no dispuesta en los artículos impugnados de la Ley Electoral de Puerto Rico, mientras que niega el hecho jurídico de que la renuncia expatriante del recurrido lo convirtió en un extranjero (*alien*) para Estados Unidos y, por ende, fuera del registro electoral en Puerto Rico. Disentimos ante el gimnástico intento de, primero, convalidar el requisito de ciudadanía de Estados Unidos de la Ley Electoral de Puerto Rico, para entonces "de la manga" crear una excepción que releve al recurrido de los efectos jurídicos de su expatriación.

## VII

Atendemos el argumento presentado en el alegato de la parte recurrida sobre su "ciudadanía de Puerto Rico" y delineamos el alcance de nuestra evaluación constitucional.

En su alegato, el recurrido sostiene que puede ejercer el derecho al voto por ser ciudadano puertorriqueño, y que tal "ciudadanía" antecede la estadounidense.[34] No obstante, recordemos que el derecho se clarifica y perfecciona a pasos tomados por cada decisión judicial. Este Tribunal debe medir los pasos que toma en sus decisiones, para extenderse sólo a la distancia a la que se necesita llegar. El paso que yace más allá de tal distancia es incongruente con nuestra función y responsabilidad. Consideramos impropio que nos

---

[34] El recurrido en su alegato arguye que varios tratados internacionales le conceden el derecho al voto en Puerto Rico. Esa aseveración es incorrecta, ya que los tratados y convenciones internacionales no desvirtúan lo dispuesto por la Ley de Inmigración y Naturalización Federal y la Ley Electoral de Puerto Rico.

expresamos hoy sobre la "ciudadanía" de Puerto Rico y mucho más impropio que utilicemos este caso para pretender fundamentar dicha ciudadanía en la Constitución de Puerto Rico, siendo ello innecesario. Sin embargo, la opinión de la mayoría nos obliga a discutir este asunto más adelante en el acápite IX de esta opinión. Reiteramos que no es necesario deliberar sobre la extensión o sustancia de esa "ciudadanía" para ventilar el recurso que nos ocupa. Nos basta con entender que las doctrinas constitucionales, las directrices legislativas pertinentes y la jurisprudencia correspondiente son herméticas al señalar que una persona que renuncia a la ciudadanía de Estados Unidos está impedida de ejercer el voto en Puerto Rico. Esa conclusión es inevitable, independientemente de cualquier otra ciudadanía que tenga la persona recusada. Aceptando que el recurrido es, como reclama, "ciudadano de Puerto Rico", todavía estaría inhabilitado, bajo las leyes de Puerto Rico, de ejercer el voto en la Isla al desprenderse de la ciudadanía de Estados Unidos. En juego está la constitucionalidad del efecto jurídico de su carencia de la ciudadanía de Estados Unidos, y la Ley Electoral de Puerto Rico no provee que esta ciudadanía puede ser reemplazada por la "ciudadanía de Puerto Rico".

Para la controversia que nos ocupa, es igualmente innecesario el que este Tribunal se exprese sobre la interrogante de si Puerto Rico es una "nación". El dictaminar sobre la dicotomía de "nación" o "estado" requeriría nuestra inmersión en una materia tangencial que no está en controversia en el caso de autos y que, por su contenido primordialmente político, yace fuera de las fronteras justiciables de este Tribunal. Irrespectivamente de si Puerto Rico es nación, estado, territorio o colonia en términos "sicosociológicos", la Ley Electoral de Puerto Rico, de su faz, requiere que el elector cuente con la ciudadanía de Estados Unidos. Ese requisito se sostiene independientemente de si Puerto Rico es una "nación" a los ojos del mundo o una "nación" a los ojos de unos y no de otros.

Creemos firmemente que la definición y aclaración de la "ciudadanía de Puerto Rico" y el *status* de Puerto Rico como "nación", "estado", o "territorio", será de alto beneficio para el desarrollo del puertorriqueño para el próximo milenio. Nos preocupa grandemente, sin embargo, que estos conceptos sean definidos por este Tribunal. El presente caso no debe ser utilizado como un vehículo para solucionar en una decisión judicial lo que nuestro pueblo no ha podido determinar aún en su participación electoral. La presente controversia versa sobre los derechos electorales del recurrido, no sobre la configuración política de Puerto Rico.

Por lo expuesto, enmarcado nuestro criterio en la controversia que nos ocupa para cumplir con nuestro deber de autolimitación, hemos anclado nuestro análisis a los estatutos declarados como inconstitucionales por el tribunal de instancia. Entendemos necesario corregir otro error cometido por el tribunal de instancia en su sentencia emitida sobre el caso de autos. En su sentencia, el tribunal de instancia plantea que varias disposiciones estatutarias reconocen, y disponen la vigencia de, la "ciudadanía de Puerto Rico" y que el recurrido es miembro de esa ciudadanía. Dicho tribunal entiende que el recusado tiene un derecho natural a ser miembro de la comunidad política puertorriqueña y a participar en el proceso electoral. Con vista a esos postulados, razonó el tribunal a quo que son inconstitucionales los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra.*

La premisa que sirve de pilar para sostener el argumento preconizado por el tribunal de instancia es que existe un derecho natural al voto,[35] el cual el recurrido puede reclamar como "ciudadano de Puerto Rico", aun sin ser ciudadano de Estados Unidos. No obstante, nuestra jurisprudencia ha dispuesto claramente que esa proposición es incorrecta. En *Martínez Nadal v. Saldaña, Sec. Ejecu-*

---

[35] Sentencia del Tribunal de Primera Instancia, Caso Civil KAC-96-0856, pág. 25.

*tivo*, 38 D.P.R. 446, 453 (1928), años antes de que se adoptara la Constitución de Puerto Rico, este Tribunal expresó que:

> El poder gubernamental supremo puede reglamentar o disponer la celebración de elecciones en la forma que le plazca. Hasta que una constitución o un estado lo confiera, no existe el derecho natural al voto .... Cuando se redacta una constitución concediendo el derecho a ejercer la franquicia electoral, el derecho de la Legislatura queda claramente limitado por esa constitución.

Por lo tanto, el derecho fundamental al voto no es uno de los derechos que anteceden a nuestra Constitución, sino que emana de ese documento supremo o de las leyes electorales anteriores y subsiguientes a su aprobación.

Además, como ya hemos discutido, nuestra Constitución impone requisitos para poder ejercer el voto en Puerto Rico. La citada Sec. 4 del Art. VI de ese Documento Supremo establece que el elector debe tener una edad mínima de dieciocho (18) años y cumplir con los otros requisitos que las leyes puedan disponer. Por su parte, entre los requisitos impuestos por la Ley Electoral de Puerto Rico se encuentra que la persona acate unos procedimientos, como son la inscripción y la ciudadanía de Estados Unidos. Ante esas disposiciones razonables y necesarias, entendemos que el derecho al sufragio no tiene un origen natural y está sujeto a las restricciones legalmente aceptables.

## VIII

Disentimos de la opinión mayoritaria emitida por el Juez Asociado Señor Fuster Belingeri ya que ésta pretende ignorar que la renuncia del recurrido a la ciudadanía de Estados Unidos tiene un efecto jurídico y soslaya el impacto que éste tiene en relación con la Ley Electoral de Puerto Rico. El Tribunal llega a ese resultado por dos (2) vías: (*a*) se dice que no podemos entender sobre la aplicación de la Ley Electoral de Puerto Rico, pues al redactarla la Asamblea Legislativa nunca consideró la exclusión de

puertorriqueños por haber renunciado a su ciudadanía de Estados Unidos; (*b*) se entiende que la renuncia no califica al recurrido como un "extranjero" (*alien*) para los efectos de la Ley de Inmigración y Nacionalidad Federal y, por ende, bajo la Ley Electoral de Puerto Rico. La opinión mayoritaria también se extiende, sorprendentemente y sin necesidad, en expresiones políticas que no deberían ser parte de una opinión emitida por este Tribunal. Estamos obligados a señalar estos errores jurídicos extremadamente peligrosos.

En la opinión del Tribunal por conducto del Juez Asociado Señor Fuster Berlingeri se indica que este Tribunal no puede interpretar las impugnadas disposiciones de la Ley Electoral de Puerto Rico a la luz de la renuncia del recurrido de su ciudadanía americana, por cuanto dicha situación nunca fue prevista por la Asamblea Legislativa.([36]) Sin embargo, como expresamos anteriormente, es

---

([36]) La opinión de la mayoría señala que al aprobarse la Ley Púb. Núm. 600 de 3 de julio de 1950 (64 Stat. 314), Documentos Históricos, L.P.R.A., Tomo 1, y crearse el Estado Libre Asociado, se eliminó de nuestro ordenamiento constitucional el requisito de ser ciudadano de Estados Unidos como condición para ser elector en Puerto Rico. Ese postulado es categóricamente falso. Desde que la primera ley para reglamentar las elecciones en Puerto Rico tuvo su génesis en 1919, hasta la última encarnación de la Ley Electoral de Puerto Rico en 1995, se ha requerido de los electores el ser ciudadano de Estados Unidos. La vigencia estatutaria de ese requisito no fue afectada por la Ley Púb. Núm. 600, *supra*, ni por el Estado Libre Asociado. Antes y después de la Ley Púb. Núm. 600, *supra*, y del Estado Libre Asociado, las leyes electorales de Puerto Rico han requerido el ser ciudadano de Estados Unidos para ejercer el voto en Puerto Rico.

Más aún, contrario a la tesis que esboza la Mayoría del Tribunal, la Ley Electoral de Puerto Rico no comenzó a requerir la ciudadanía de Puerto Rico hasta 1977, cuando fue enmendada para requerir la ciudadanía de Estados Unidos y de Puerto Rico para poder ejercer el voto en la Isla. El Art. 2.003 de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3053) dispone:

*Artículo 2.003. —Requisitos del Elector.—*

Será elector de Puerto Rico todo ciudadano de los Estados Unidos de América y de Puerto Rico domiciliado en la Isla que, a la fecha de una elección haya cumplido los diez y ocho (18) años de edad, esté debidamente inscrito con no menos de cuatro (4) meses de antelación a la misma y no se encuentre legalmente incapacitado para votar. 1977 Leyes de Puerto Rico 665.

El historial legislativo de esa ley no indica el propósito de requerir la ciudadanía de Puerto Rico. Las expresiones de los legisladores Oreste Ramos y Edison Misla Aldarondo sostienen que los requisitos dispuestos por la Ley Electoral de 1977 son para mantener en efecto lo anteriormente requerido, desde la Ley Núm. 79 de 25 de junio de 1919 (16 L.P.R.A. ant. sec. 1 *et seq.*), para poder ejercer el voto en Puerto Rico. Véanse: Informe de la Comisión de Gobierno de la Cámara de Representantes

claro que la letra de los Arts. 2.003 y 2.023 de la Ley Elec-
toral de Puerto Rico, *supra*, establecen el requisito de ciu-
dadanía de Estados Unidos para poder ejercer el voto en
Puerto Rico. Recuérdese que todo estatuto tiene un sentido
literal a menos que lo expresado carezca de sentido. *Natio-
nal City Bank v. Llonín*, 41 D.P.R. 163, 168 (1930). Una
lectura de los Arts. 2.003 y 2.023 de la Ley Electoral de
Puerto Rico, *supra*, hace desvanecer cualquier duda sobre
su aplicación al recurrido, al éste ya no ser ciudadano de
Estados Unidos.

Aun si presumiéramos, *arguyendo*, que los Arts. 2.003 y
2.023 de la impugnada ley, *supra*, no cobijan explícita-
mente en su texto al recurrido,([37]) la lógica interpretativa
que esboza la opinión mayoritaria contiene una falacia ju-
rídica de grave magnitud, pues en ella se infiere que las
leyes no rigen sobre los acontecimientos de nuestra socie-
dad, a menos que el estatuto contenga un listado perfecto
que especifique su aplicación. Claramente, "al aplicar una
ley siempre es necesario interpretarla". *Pueblo v. Tribunal
Superior*, 98 D.P.R. 750, 751 (1970). Véase, también, *Pue-
blo v. Tribl. Superior*, 81 D.P.R. 763, 788 (1960). Lo dictado
por un estatuto se extrapola a lo acontecido para determi-
nar su aplicación y alcance. La interpretación de una ley
con palabras claras y propósitos entendibles, como son los

---

sobre el P. de la C. 446 de 1ro de diciembre de 1977, 8va Asamblea Legislativa, 2da
Sesión Ordinaria; Informe del Presidente de la Comisión de Gobierno del Senado de
Puerto Rico sobre el P. del S. 424, 8va Asamblea Legislativa, 2da Sesión Ordinaria,
Senador Oreste Ramos, pág. 23, y las expresiones del representante Misla Alda-
rondo, sobre el particular en el debate en el hemiciclo de la Cámara. Diario de Se-
siones de la Asamblea Legislativa (Cámara), 2 de diciembre de 1977, págs. 105–106.

Sin embargo, los estatutos electorales previos a 1977 no requerían la ciudada-
nía de Puerto Rico para ejercer el voto, sólo la de Estados Unidos, por lo que no
podemos concluir que la Asamblea Legislativa que enmendó la ley electoral en 1977
perseguía imponer un requisito independiente de ser ciudadano de Puerto Rico, sino
que se quería mantener como requisito de ciudadanía el tener la de Estados Unidos.

([37]) Enfatizamos que la opinión de la mayoría por voz del Juez Asociado Señor
Fuster Berlingeri *supone* que la Asamblea Legislativa no tuvo el propósito de reque-
rir la ciudadanía de Estados Unidos a electores que la hayan tenido y perdido por
voluntad propia. Sin embargo, no encontramos fundamentos para sostener esa
suposición. El historial legislativo de la Ley Electoral de Puerto Rico no indica que la
Asamblea Legislativa, al explícitamente decretar que sólo los ciudadanos de Estados
Unidos podrían ejercer el voto en Puerto Rico, pretendía también exceptuar a los
expatriados de esa ciudadanía.

artículos impugnados de la Ley Electoral de Puerto Rico es espontánea. Como expresamos anteriormente, así lo requiere el Art. 14 de nuestro Código Civil, *supra.* En términos más específicos, en *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 688–689 (1966), establecimos como hermenéutica la norma de que un tribunal no está autorizado, bajo el pretexto de buscar la intención legislativa en un estatuto, a adicionarle limitaciones o restricciones que no aparecen de su texto. Véase, también, Bernier y Cuevas Segarra, *op. cit.*, pág. 259. Dirigida esta regla de interpretación a lo dispuesto por la Ley Electoral de Puerto Rico, queda claro el error que comete la Mayoría del Tribunal al interponer sus condiciones sobre las dispuestas por el Legislador, sin contar con razones que justifiquen el fíat.

Nos extraña la inconsistencia en la que se involucra el Juez Asociado Señor Fuster Belingeri al emitir la opinión de la mayoría, ya que ésta rehúsa respetar lo señalado por la Asamblea Legislativa en los Arts. 2.003 y 2.023 de la Ley Electoral de Puerto Rico, *supra*, después de convalidar la constitucionalidad de sus requisitos. Mediante fíat judicial, se arriesga el Tribunal al concebir, de manera sofista, unos confines a la aplicabilidad de los artículos impugnados de la Ley Electoral de Puerto Rico que nunca fueron dispuestos por las varias Asambleas Legislativas que han revisado y enmendado, en repetidas ocasiones, las disposiciones de esa ley que requieren reiteradamente la ciudadanía de Estados Unidos para poder ejercer el voto en Puerto Rico.

Es necesario concluir que el criterio que la opinión de la mayoría expone constituye una adulteración judicial de lo establecido como un requisito por la Ley Electoral de Puerto Rico. Es necesario también entender la magnitud del daño que ese criterio ocasiona al encontrar que el requisito que impone la Ley Electoral de Puerto Rico, de ser ciudadano de Estados Unidos para poder ejercer el voto en Puerto Rico, no le aplica al recurrido, a pesar de éste haberse expatriado voluntariamente de Estados Unidos. El resultado de esa errada postura es anular la función normativa de la Ley Electoral de Puerto Rico. Ésta se torna

incapaz de definir la comunidad política que debe participar en los comicios electorales. La Ley Electoral de Puerto Rico establece que sólo aquellos que tengan un compromiso y responsabilidad ciudadana pueden ser confiados con el poder del voto, ya que es en éstos que se deposita la capacidad de dictar nuestro mejor futuro; la Asamblea Legislativa dispuso que entre los requisitos que permiten la identificación de aquellas personas que cuentan con el compromiso y la responsabilidad ciudadana, está la ciudadanía de Estados Unidos, lo cual queda consagrado en el Preámbulo y en varios artículos de nuestra Constitución. La mayoría hoy abre la cortina de la caseta electoral para permitir un acceso adulterado a ésta, ya que, aunque se convalida el requisito de la ciudadanía de Estados Unidos, se hace impracticable su implantación al permitir que personas que han renunciado a dicha ciudadanía puedan votar. Se erosiona y desvirtúa así para nuestro pueblo el valor de la ciudadanía de Estados Unidos que preconiza nuestra Constitución y la propia Ley Electoral de Puerto Rico.

En segundo lugar, la Opinión del Tribunal emitida por el Juez Asociado señor Fuster Berlingeri fue preparada con el cuidado que requiere redactar con los ojos cerrados ante una ineludible realidad jurídica: el recurrido es técnicamente un extranjero (*alien*) para los efectos de la Ley de Inmigración y Nacionalidad Federal, y esa condición tiene un impacto jurídico para los efectos de la Ley Electoral de Puerto Rico.

Mediante el procedimiento descrito, el recurrido renunció a su ciudadanía de Estados Unidos y adquirió la clasificación de extranjero. Como indicamos anteriormente, el recurrido formuló para su expatriación un *Statement of Understanding*, en el cual declaró:

2. I am exercising my right of renunciation [of citizenship] *freely and voluntarily* without any force, compulsion, or undue influence placed upon me by any person.
3. *Upon renouncing my citizenship I will become an alien with respect to the United States*, subject to all the laws and

procedures of the United States regarding entry and control of aliens.

. . . . . . . . .

6. If I do not possess the nationality of any country other than the United States, *upon my renunciation I will become a stateless Person* and may face extreme difficulties in traveling internationally and entering most countries.

. . . . . . . . .

8. *The extremely serious and irrevocable nature of the act of renunciation has been explained to me by* [(Vice) Consul Ken Durkin at the American Embassy, Caracas, Venezuela,] and I fully understand its consequences .... (Énfasis suplido.) Caso Núm. CT-96-14, Parte I, Petición, Apéndice, pág. 211.

Es indiscutible, pues, que el recurrido renunció a la ciudadanía de Estados Unidos con pleno conocimiento de que esa expatriación tenía el efecto jurídico de convertirlo en un extranjero. La Ley de Inmigración y Nacionalidad, la cual dispone el procedimiento seguido por el recurrido para renunciar a la ciudadanía, también establece que el efecto de la expatriación es convertir al recurrido en extranjero ante Estados Unidos. Esa ley define a un extranjero de la manera siguiente: "[A]ny person not a citizen or national of the United States". 8 U.S.C. sec. 1101(a)(3). Véanse, también: *Oliver v. United States Dept. of Justice, I. & N. Serv.*, 517 F.2d 426 (2do Cir. 1975), *cert.* denegado, 423 U.S. 1056 (1976); *Galvan v. Press*, 74 S. C. 737, 742 (1954). Quiera reconocer la Mayoría de este Tribunal ese hecho jurídico o no, el resultado es el mismo: al recurrido no poder ser clasificado como ciudadano o nacional (*"national"*)(38) de Estados Unidos, se convirtió en un extranjero (*alien*).(39)

---

(38) La ley define al "nacional" como aquella persona, ciudadana o no, que le debe fidelidad a Estados Unidos. 8 U.S.C. sec. 1101(a)(22). Véase, también, *Oliver v. United States Dept. of Justice, I. & N. Serv.*, 517 F.2d 426 (2do Cir. 1975).

(39) Este criterio está libre de desprecio hacia los que no son ciudadanos de Estados Unidos y demás extranjeros que residen como respetados vecinos en nuestra comunidad. Recalcamos y hacemos nuestras las palabras del Tribunal Supremo federal, cuando expuso en *Foley v. Connelie*, supra:

"This is not intended to denigrate the valuable contribution of aliens who benefit from our traditional hospitality. It is no more than recognition of the fact that a democratic society is ruled by its people. Thus, *it is clear that a State may deny aliens the right to vote*, or to run for elective office, for these lie at the heart of our political institutions." (Énfasis suplido.) *Foley v. Connelie*, supra, pág. 296.

A este respecto, *Davis v. District Director, Immigration & Naturalization Service*, supra, es persuasivo. Garry Davis nació en Estados Unidos, pero renunció debidamente a la ciudadanía estadounidense en una embajada extranjera. Como el recurrido Mari Brás, Davis cumplió con los entonces vigentes requisitos de ley para efectuar su expatriación; mediante esos trámites y voluntariamente aceptó convertirse en un extranjero a Estados Unidos, al juramentar las siguientes expresiones:

> I hereby absolutely and entirely renounce my nationality in the United States, and all rights and privileges thereunder pertaining and abjure all allegiance and fidelity to the United States of America. *Davis v. District Director, Immigration & Naturalization Service*, supra, pág. 1179.

Davis se expatrió de Estados Unidos por entender que sus creencias ideológicas ya no eran compatibles con la ciudadanía de una sola nación. Davis no tenía otra ciudadanía con que sustituir la estadounidense, pero se aferraba a que existía una ciudadanía del Mundo con validez jurídica internacional. El Departamento de Estado emitió el certificado de pérdida de ciudadanía el 25 de mayo de 1948. Al no existir tal cosa como un ciudadano del Mundo en términos del derecho internacional, Davis quedó sin ciudadanía propia, pero continuó laborando para el establecimiento de un gobierno mundial. Esos esfuerzos le llevaron a visitar Estados Unidos con regularidad, hasta que en una ocasión intentó entrar a Estados Unidos con un pasaporte expedido por el *World Service Authority*, una organización de la cual Davis era fundador y Presidente, y la cual fomentaba la ciudadanía mundial, pero que Estados Unidos no reconocía como una entidad internacional. Por eso las autoridades federales denegaron su entrada al territorio estadounidense.

---

Esto es, nuestro pronunciamiento de que es apremiante y permisible el requisito de que sean los ciudadanos de Estados Unidos los que ejerzan el voto en Puerto Rico, no contiene diseño alguno de menospreciar el importante papel que los extranjeros desempeñan en nuestra comunidad.

Davis se opuso al dictamen del Departamento de Inmigración Federal, lo que llevó a una vista adjudicativa ante esa agencia. El Oficial Examinador encontró que Davis estaba sujeto a la deportación y que no tenía potestad de acceso a Estados Unidos, por éste ya no ser ciudadano estadounidense y por no contar con los documentos debidos para la entrada a la nación. Davis entonces instó un recurso de hábeas corpus, para el cual arguyó que las declaraciones que había prestado para su expatriación eran ambiguas y, por lo tanto, no fundamentaban una renuncia a la ciudadanía. También argumentó que la Declaración Universal de los Derechos Humanos, documento emitido por las Naciones Unidas, le extendía a cada persona un derecho inalienable y absoluto de regresar a su país natal.

La Corte de Distrito federal encontró que Davis había cumplido voluntariamente con los procedimientos de expatriación. Se determinó que las declaraciones para la expatriación no eran ambiguas en expresar la intención del expatriado de renunciar a su ciudadanía de Estados Unidos, con la intención de adquirir la mundial. También se reconoció que una expatriación voluntaria no requiere la sustitución de la ciudadanía renunciada por otra, y que el renunciante podía quedar como una persona sin Estado (*stateless person*); esto, al amparo de lo expuesto por la leyes federales de inmigración.[40] Ante estas circunstancias, la Corte declaró que Davis era un extranjero a Estados Unidos, que no contaba con el derecho de entrada a la nación.[41] La decisión también estableció que Davis no te-

---

[40] A este respecto, la Corte Suprema en *Afroyim v. Rusk*, supra, ha establecido que:

"In some instances, loss of citizenship can mean that a man is left without the protection of citizenship in any other country in the world —as a man without a country." *Afroyim v. Rusk*, supra, pág. 268. Véase, también, *Jolley v. Immigration and Naturalization Service*, 441 F.2d 1245, (5to Cir. 1971).

[41] Cabe señalar que la Corte de Distrito federal, consciente de que Davis se había expatriado por razones ideológicas, limitó su criterio a las controversias legales que versaban sobre su ciudadanía y derecho de inmigración. Dejando claro que no se pretendía la restricción de los derechos de expresión de Davis, concluyó el tribunal:

nía derecho de entrada a Estados Unidos, sólo por éste considerarse ciudadano del estado de Maine; se encontró que una vez un ciudadano de Estados Unidos renuncia a esa ciudadanía, esa renuncia también le expatria de las ciudadanías de una subdivisión de la nación. Por lo tanto, de la misma forma que Davis perdió su ciudadanía de Maine al renunciar a la de Estados Unidos, el recurrido en el caso ante nos, al hacer lo mismo, perdió un reclamo a la ciudadanía de Puerto Rico.

Como salvedad, destacamos que no exponemos que el recurrido es un extranjero a Puerto Rico en el sentido social y cultural; el recurrido nació en Puerto Rico y mantiene su residencia en la isla. No entramos en la dimensión cultural de calificar a una persona como extranjera a una comunidad. Nuestra determinación de que el recurrido es un extranjero a Estados Unidos, por razón de que él así lo tramitó, es una evaluación legal. En esos términos, de la misma forma que se resolvió *Davis District Director, Immigration & Naturalization Service*, supra, procede reconocer que el recurrido es un extranjero a los Estados Unidos y está sujeto a las restricciones de esa condición; entre éstas se encuentra su impedimento de ejercer el voto en Puerto Rico, según lo dispone la Ley Electoral de Puerto Rico. No obstante, reiteramos lo expresado anteriormente en esta opinión, de que aún si el recurrido se considerase "ciudadano de Puerto Rico" y no extranjero, no tendría derecho a votar por no ser ciudadano de Estados Unidos, colocándose así fuera del grupo de personas que constituyen la comunidad política para fines electorales.

---

"The Court in no way wishes to deprecate the honesty of belief or depth of conviction that the petitioner feels for the cause of world citizenship. This opinion fails to prevent the petitioner or any other person from continuing to work for world peace through the vehicle of world citizenship and world government. Any person who desires to pursue this goal while residing in the United States, however, must obey this nation's immigration and naturalization laws." *Davis v. District Director, Immigration & Naturalization Service*, supra, pág. 1184.

Nótese que el tribunal distinguió entre ese derecho a una ideología y los derechos políticos relacionados a la ciudadanía.

## IX

La opinión emitida en el día de hoy por este Tribunal por voz del Juez Asociado Señor Fuster Berlingeri, no sólo constituye un pronunciamiento reprochable sobre una controvertible y obsoleta teoría del estadolibrismo, sino que además, la controversia planteada ante nos no justifica la prolongada discusión que hace la Mayoría del Tribunal sobre este peligroso particular.

El débil pretexto invocado para discutir los supuestos "ámbitos privativos de poder político del Estado Libre Asociado de Puerto Rico", ha sido la necesidad de fundamentar la facultad de la Asamblea Legislativa para reglamentar todo lo relativo a los comicios electorales. Como es obvio, ese punto nunca estuvo realmente en controversia, por lo que la mayoría lo utiliza burdamente para entrar en una disertación bizantina sobre el "pacto bilateral".

Como señaláramos en el acápite III de esta opinión, en el caso de *Rodriguez v. Popular Democratic Party*, supra, el Tribunal Supremo de Estados Unidos le reconoció expresamente a la Asamblea Legislativa de Puerto Rico la facultad para reglamentar los procesos electorales, por lo que huelga toda la perorata sobre el pacto plasmada en la Opinión del Tribunal emitida por el Juez Asociado Señor Fuster Berlingeri.[42]

En virtud de la aludida teoría del pacto, la relación entre Puerto Rico y Estados Unidos se vio transformada de tal manera que con la aprobación de la Ley Púb. Núm. 600, *supra*, alegadamente nació un convenio entre ambas partes que no puede ser alterado unilateralmente.

Ciertamente, dicha ley autorizó el histórico proceso para establecer en Puerto Rico un gobierno local de rango constitucional, permitiéndole participar por vez primera a los puertorriqueños en la organización de las instituciones políticas locales y en la creación de una Carta de Derechos bajo una Constitución que sería aprobada por los electores

---

[42] Véase, además, la Sec. IV, Art. VI de la Constitución de Puerto Rico, *supra*.

de la isla. Sin embargo, la naturaleza territorial de Puerto Rico no se vió alterada con la aprobación de la Ley Púb. Núm. 600, *supra.* Como prueba de ello, la ley proveía, además, para que luego de la aprobación de la Constitución de Puerto Rico por parte de la Asamblea Constituyente y el pueblo de Puerto Rico, la ley debía contar con el *imprimatur* del Presidente de Estados Unidos antes de que éste la enviara al Congreso federal, donde estaría sujeta a enmiendas para la aprobación por dicho cuerpo.([43]) De hecho, en la ley mediante la cual se aprobó nuestra Constitución, Ley Púb. Núm. 447 (66 Stat. 327 (1952)), el Congreso eliminó la Sec. 20 de la Carta de Derechos, *supra.*

La Mayoría pretende ignorar lo que sí constiuye un hecho histórico insoslayable: que han transcurrido más de dos (2) siglos desde que se firmó la Declaración de la Independencia en Filadelfia y la Declaración de los Derechos del Hombre en Francia y Puerto Rico todavía está sujeto a los poderes plenarios del Congreso dimanantes de la Cláusula Territorial, Art. IV, Sec. 3, Cl. 2 de la Constitución federal, L.P.R.A., Tomo 1, ed. 1982, pág. 181, la cual, en lo pertinente, establece que:

> El Congreso podrá disponer de, o promulgar todas las reglas y reglamentos necesarios en relación con, el territorio o cualquier propiedad pertinente a los Estados Unidos.

En apoyo a esta posición, contamos con el copioso historial legislativo congresional, el cual refleja paladinamente la total ausencia de una intención del Congreso para alterar la naturaleza del *status* territorial de la isla.

De ello también dan fe las numerosas manifestaciones ofrecidas por los líderes políticos puertorriqueños de la época que acudieron a las vistas que antecedieron la apro-

---

([43]) El Art. 3 de la Ley Púb. Núm. 600, *supra,* ed. 1982, pág. 144, dispone:

"Art. 3. Al ser adoptada la constitución por el pueblo de Puerto Rico, el Presidente de los Estados Unidos queda autorizado para enviar tal constitución al Congreso de los Estados Unidos, si él llega a la conclusión de que tal constitución está de acuerdo con las disposiciones aplicables de esta Ley y de la Constitución de los Estados Unidos."

bación de la Ley Púb. Núm. 600, *supra,* así como las expresiones de los propios congresistas que participaron en ellas.

El propio padre del Estado Libre Asociado de Puerto Rico, el exgobernador Luis Muñoz Marín, reconoció ante el Comité Cameral federal que deliberaba sobre el proyecto que se convirtió en la Ley Púb. Núm. 600, *supra,* que una vez aprobada la nueva Constitución, el Congreso podría alterar la relación con Puerto Rico y legislar nuevamente:

> ... [Y]ou know of course, that if the people of Puerto Rico would go crazy, Congress can always get around to legislate again.([44])

Igualmente, el Comisionado Residente en Washington en aquella época, Antonio Fernós Isern, expresó que:

> ... Senate 3336 would not change the status of the island of Puerto Rico relative to the U.S. It would not alter the powers of sovereingty acquired by the U.S. over Puerto Rico under the terms of the Treaty of Paris.([45])

Además, el Informe de la Cámara de Representantes Núm. 2275 de 81er Congreso (2da Sesión)([46]) señaló lo siguiente sobre el referido proyecto de ley:

> It is important that the nature and general scope of S.3336 [A Bill to Provide for the Organization of a Constitutional Government by the People of Puerto Rico, 81st Cong.2d. Sess. (1950)] be made absolutely clear. *The bill under consideration would not change Puerto Rico's fundamental political, social and economic relationship to the United States.*([47]) (Énfasis suplido.)

Luego que se aprobara por la Asamblea Constituyente de Puerto Rico y contara con el visto bueno del Presidente,

---

([44]) Véase *Hearings Before the House Committee on Public Lands on H.R. 7674 and S. 3336,* 81st Cong., 2d Sess. 17–34 (1950).

([45]) 81st Cong., 2d Sess. 17–34 (1950).

([46]) Reimpreso en 1959 U.S. Code Cong. and Ad. News 2681.

([47]) Véase J.A. Cabranes, *Citizenship and the American Empire,* 127 U. Pa. L. Rev. 391 esc. 434 (1978).

la Constitución fue sometida a los respectivos comités del Interior y Asuntos Insulares en la Cámara y Senado federales. Allí se reprodujeron las manifestaciones sobre la invariabilidad de la condición territorial de Puerto Rico.[48] El Presidente del Comité del Interior y Asuntos Insulares del Senado, el Senador Joseph C. O'Mahoney, se expresó sobre el proceso realizado en Puerto Rico entre 1950 y 1952 de la manera siguiente: *"[I]t is fundamental that the Constitution of the United States gives the Congress complete control and nothing in the Puerto Rican constitution could affect or ammend or alter that right"*. Hearings Before the Senate Committee on Interior and Insular Affairs, 82nd. Cong., 2nd Sess. (1952).

El récord congresional refleja prístinamente que los legisladores federales en ningún momento tuvieron en mente la intención de alterar o modificar la naturaleza de la relación existente entre Puerto Rico y Estados Unidos. El Congreso fue inequívoco al señalar durante todo el proceso llevado a cabo para aprobar la Constitución de Puerto Rico que la isla permanecería siendo un territorio no incorporado sujeto a los poderes plenarios del Congreso bajo el Art. IV, Sec. 3, Cl. 2 de la Constitución federal, *supra.*

Si bien es cierto que con la promulgación de la Constitución de Puerto Rico los puertorriqueños adquirimos el mayor grado de autogobierno experimentado en nuestra historia, este hecho solamente representó una mayor delegación de poderes sobre asuntos locales y no tuvo un efecto práctico o real en cuanto a los poderes que el Congreso ejercía y continúa ejerciendo sobre Puerto Rico.

Con posterioridad a la aprobación de la Constitución de Puerto Rico en 1952, los Tribunales federales han resuelto expresamente que el historial legislativo de la Ley Núm. 600, *supra,* no demostraba intención alguna del Congreso para realizar un cambio en el *status* territorial de Puerto

---

[48] Véanse: *Hearings Before the House Committee on Interior and Insular Affairs*, 82nd. Cong., 2nd Sess. (1952), y *Hearings Before the Senate Committee on Interior and Insular Affairs*, 82nd. Cong., 2nd Sess. (1952).

Rico. *Americana of P.R., Inc. v. Kaplus*, 368 F.2d 431, 436 (3er Cir. 1966); *Detres v. Lions Building Corporation*, 234 F.2d 596, 600 (7mo Cir. 1956); *Lummus Company v. Commonwealth Oil Refining Co.*, 195 F. Supp. 47, 50 (S.D. N.Y. 1961).

Más aún, los poderes plenarios que el Congreso ejerce sobre Puerto Rico quedaron patentemente establecidos en las decisiones de *Califano v. Torres*, supra, y *Harris v. Rosario*, supra, (Per Curiam), en las cuales el Tribunal Supremo federal sostuvo la validez de legislación congresional que discriminaba en contra de Puerto Rico y los puertorriqueños.

En *Harris v. Rosario*, supra, el Tribunal Supremo de Estados Unidos sostuvo una ley congresional donde la ayuda que se le ofrecía a Puerto Rico a través del programa de Ayuda a Familias con Hijos Dependientes (AFDC), 49 Stat. 627, 42 U.S.C. Sec. 601 *et seq.*, era menor a la recibida por los demás estados. Cuestionada la constitucionalidad de la ley, el Supremo federal señaló que no existía una violación a la cláusula de la igual protección bajo la Quinta Enmienda y, por lo tanto, la acción congresional era válida en virtud del poder que le confería la cláusula territorial.

> Congress, which is empowered under the Territory Clause of the Constitution, U.S. Const., Art. IV, Sec. 3, cl. 2, to "make all needful Rules and Regulations respecting the Territory ... belonging to the United States", may treat Puerto Rico differently from States so long as there is a rational basis for its actions.[49] *Harris v. Rosario*, supra, págs. 651–652.

De este modo el Tribunal Supremo de Estados Unidos reconoce expresamente la condición territorial de Puerto

---

[49] Véase, además, *National Bank v. County of Yankton*, 101 U.S. 129, 133 (1879), donde se interpretó que según la Constitución federal, un territorio sujeto a la soberanía de Estados Unidos, que no tenga el rango de Estado de la Unión, queda bajo el gobierno del Congreso de Estados Unidos.

Rico y permite que se le discrimine en relación con el trato que el Congreso le otorga a los demás estados.(⁵⁰)

Pese a las palmarias razones que militan en contra de la obsoleta teoría del pacto que incomprensiblemente sostiene la mayoría de este Tribunal, la opinión emitida por el Juez Asociado Señor Fuster Berlingeri insiste en señalar que Puerto Rico goza de "un grado de autonomía e independencia normalmente asociados con los estados de la Unión" y por ello existe un ámbito de poder que es "privativo". Por consiguiente, dicho ámbito se encuentra al margen del poder congresional.(⁵¹)

---

(⁵⁰) Para otras opiniones que confirman la condición territorial de la isla, véanse: *Torres v. Puerto Rico*, 442 U.S. 465 (1979); *U.S. v. Sanchez*, 992 F.2d 1143 (11mo Cir. 1993), *cert.* denegado, 510 U.S. 110 (1994). En *U.S. v. Sanchez*, el Undécimo Circuito Federal de Apelaciones expresó:

"With each new organic act, first in the Foraker Act in 1900, then the Jones Act in 1917, and then the Federal Relations Act in 1950 and later amendments, Congress has simply delegated more power to Puerto Rico over local matters. But this has not changed in any way Puerto Rico's constitutional status as a territory, or the source of power over Puerto Rico. Congress continues to be the ultimate source of power pursuant to the Territory Clause of the Constitution." *U.S. v. Sanchez*, supra, pág. 1152, citando *U.S. v. Lopez Andino*, 831 F.2d 1164, 1176 (1er Cir. 1987), opinión concurrente del Juez Torruella, *cert.* denegado, 486 U.S. 1034. Véase, también, *Government of Virgin Islands v. Schneider*, 893 F. Supp. 490 (D. Vi. 1995).

Véase, además, J. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal*, Río Piedras, Ed. U.P.R., 1985.

(⁵¹) Con el objeto de negar la naturaleza territorial del Estado Libre Asociado, y de probar la existencia del supuesto "pacto bilateral", la Mayoría también hace referencia a la Resolución 748 aprobada el 27 de septiembre de 1953 por la Asamblea General de las Naciones Unidas, al igual que a las diversas expresiones de varios funcionarios diplomáticos estadounidenses destacados ante dicho organismo internacional.

La Resolución 748 eximió al gobierno de Estados Unidos de la obligación que hasta la fecha tenía de trasmitir información a las Naciones Unidas sobre la situación de Puerto Rico como parte del proceso de descolonización inspirado en la Carta de las Naciones Unidas.

La debilidad del argumento esgrimido por la Mayoría es evidente, toda vez que es completamente absurda la proposición de que las actuaciones y manifestaciones que los funcionarios diplómaticos estadounidenses ante la Organización de las Naciones Unidas tuvieron el efecto de modificar o alterar la condición territorial de Puerto Rico.

Más aún, el comunicado oficial enviado a las Naciones Unidas, en el cual se informaba sobre la posición formal de los Estados Unidos en el caso de Puerto Rico, señalaba inequívocamente la limitada naturaleza del sistema de autogobierno establecido en la isla, además de la sujeción del Estado Libre Asociado a la Constitución federal y a la interpretación que los tribunales federales hicieran sobre la relación entre Puerto Rico y Estados Unidos.

Sin embargo, el Tribunal aparenta confundir *la apariencia* de soberanía con la existencia real de soberanía. Puerto Rico no goza de la misma protección que poseen los estados de la Unión frente al poder federal, de la misma manera que los ciudadanos que residimos en Puerto Rico no gozamos de los mismos derechos y privilegios que los demás ciudadanos estadounidenses.

La soberanía de la que gozan los estados surge del reconocimiento que les confiere la Constitución federal como entes autónomos y separados del gobierno nacional. Este reconocimiento surge más claramente de la Décima Enmienda de la Constitución, la cual dispone que:

> Las facultades que esta Constitución no delegue a los Estados Unidos, ni prohíba a los estados, quedan reservadas a los estados respectivamente o al pueblo. Emda. X, Const. EE.UU., L.P.R.A., Tomo 1, ed. 1982, pág. 194.

Es en virtud de esta enmienda que se consagra el principio constitucional de la división del poder soberano entre el Gobierno federal (el cual goza de poderes limitados y enumerados que se le han conferido expresamente en la Constitución) y los estados de la Unión (los cuales se reservan todos aquellos poderes que no le han sido reconocidos al Gobierno federal). Este principio fue consignado por Alexander Hamilton en *el Federalista* No. 33 donde expresa que:

> The necessity of a concurrent jurisdiction in certain cases results from the division of the sovereign power; and the rule that all authorities of which the States are not explicitly divested in favour of the Union remain with them in full vigour, is not only a theoretical consequence of that division, but is clearly admitted by the whole tenor of the instrument which

---

Es por ello que conforme a lo aceptado actualmente por la *opinio iuris* y el Derecho Internacional Público, el Estado Libre Asociado reconocido en la referida Resolución 748, la cual fue aprobada por el cuestionable margen de veintidós (22) votos a favor, dieciocho (18) en contra y diecinueve (19) abstenciones, no cumple con los requisitos establecidos en las distintas resoluciones de la O.N.U. para definir las fórmulas desconolizadoras. Véase la Resolución 742 (VIII) de 1953 y las Resoluciones 1514 y 1541(XV) de 1960.

contains the articles of the proposed constitution.[52] A. Hamilton, *The Federalist*, 1961, Núm. 33, pág. 203.

En este sentido, el Tribunal Supremo federal ha resuelto que la Décima Enmienda de la Constitución de Estados Unidos, *supra*, representa un límite constitucional expreso a la autoridad del Congreso sobre los estados, de manera que aquél no puede ejercer su poder de una forma que disminuya la integridad de los estados o su habilidad para funcionar eficazmente dentro del sistema federal. Véase *Fry v. United States*, 421 U.S. 542, 547 esc. 7 (1975).

Por consiguiente, toda actuación congresional que sea inconsistente con la condición independiente y separada de los estados será invalidada por ser contraria a este principio que permea la Constitución federal. Véase *Nevada v. Hall*, 440 U.S. 410, 433 (1979).

Sin embargo, la soberanía de los estados no se ve protegida verdadera y significativamente si no es dentro del proceso político federalista. El profesor Tribe, comentando el caso de *Helvering v. Gerhardt*, 304 U.S. 405, 416 (1938), señala que el Tribunal Supremo de Estados Unidos sostuvo:

> State sovereignty is adequately protected by the political process regardless of the existence of any judge-created immunity "... as was pointed out by Chief Justice Marshall in *McCulloch v. Maryland*, ... the people of all the states have created the national government and are represented in Congress". L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 382.

Es precisamente en ese proceso político, con la particularidad de la representación formal o territorial de la que gozan los estados en el Senado federal, donde se materializa la garantía más efectiva a la soberanía de los estados en el balance de poderes con el Gobierno federal.[53]

---

[52] "A través de todas sus disposiciones, la Constitución mira hacia una Unión indestructible integrada por estados indestructibles." (Traducción nuestra.) Voto disidente del Juez Rehnquist, al cual se unió el Juez Burguer.

[53] Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 378–385.

350

Lamentablemente, Puerto Rico no cuenta con una representación adecuada que participe en el proceso político federal ni goza de la protección constitucional que le confiere la Décima Enmienda de la Constitución de EE. UU., *supra*, a los estados de la Unión. Nuestra relación con el Gobierno federal no es de rango constitucional, sino que continúa siendo regulada por la Ley de Relaciones Federales con Puerto Rico. Esta ley, al igual que la Ley Pub. Núm. 600, *supra*, e incluso la propia ley que aprueba nuestra Constitución (66 Stat. 327), son leyes federales, y como tales están sujetas a derogación o enmienda congresional bajo el principio establecido de que un Congreso no puede obligar a otro Congreso posterior.[54] Véase *Eurim-Pharm Gmbtt v. Pfizer Inc.*, 593 F.2d 1102, 1103 (Cir. D.C. 1978).[55]

Esto quiere decir que no existe impedimento constitucional alguno para que el Congreso modifique, o hasta suprima, la relación existente entre Estados Unidos y Puerto Rico. Ciertamente, en el ejercicio de las facultades que le confiere la cláusula territorial, el Congreso puede definir, y en efecto ha definido, quiénes son ciudadanos de Puerto Rico y a éstos les ha conferido la ciudadanía de Estados Unidos, o la clasificación de "nacionales" de Estados Unidos.

En vista de la precaria situación que presenta la "teoría del pacto" esbozada por el Juez Asociado Señor Fuster Berlingeri en nombre de la Mayoría, dicha opinión constituye una innecesaria y gratuita manifestación de índole política en la víspera de un proceso plebiscitario, que no se ajusta a la realidad constitucional que vive Puerto Rico en su relación con el Gobierno federal.

Por otra parte, consideramos que es necesario expresar-

---

[54] De hecho, un ejemplo del poder congresional para alterar unilateralmente lo dispuesto en la Ley de Relaciones Federales con Puerto Rico se produjo en 1984 cuando el Congreso enmendó, sin consultar a los puertorriqueños, el Art. 9 de la referida ley, *supra*, Sec. 9, a los fines de limitar los beneficios concedidos a Puerto Rico por ésta. Véase 26 U.S.C. 7652(f).

[55] "To be sure, Congress is generally free to change its mind; in ammending legislation Congress is not bound by the intent of an earlier body."

nos sobre la conclusión a la que llega la mayoría de este Tribunal en cuanto a la existencia de una ciudadanía de Puerto Rico, desligada de la ciudadanía y nacionalidad (*nationality*) de Estados Unidos. De esta manera, el resultado alcanzado por la opinión permite que personas, que para los efectos de la Ley de Inmigración y Nacionalidad son extranjeros (*aliens*), puedan ejercer todos los derechos ciudadanos dentro del territorio de la nación estadounidense.([56])

Para llegar a dicha conclusión, la Opinión del Tribunal realiza una cuestionable interpretación del inciso primero del Art. 10 del Código Político de 1902 (1 L.P.R.A. sec. 7) el cual dispone, en lo pertinente, que:

> Son ciudadanos de Puerto Rico:
> 1. Toda persona nacida en Puerto Rico y sujeta a su jurisdicción.

Según la Opinión de la Mayoría, la ciudadanía contenida por el inciso primero del Art. 10, *supra,* fue la acogida en la Convención Constituyente como definitoria de la ciudadanía del Estado Libre Asociado de Puerto Rico, plasmada en la Sec. 5 del Art. IX de la Constitución, L.P.R.A.,

---

([56]) Debemos señalar que desde la aprobación de la Sección 202 de la Ley de Nacionalidad de 1940, seguida por la entrada en vigor de la Sec. 302 de la Ley de Inmigración y Nacionalidad *(Immigration and Nationality Act)* de 1952 (8 U.S.C. sec. 1402), todas las personas que eran ciudadanos de Estados Unidos o "ciudadanos de Puerto Rico" bajo el Acta Jones de 1917, adquirieron la condición de ciudadanos de Estados Unidos, al igual que la nacionalidad *(nationality)* subyacente establecida por el Artículo IX del Tratado de París. La condición de "ciudadano de Puerto Rico" no constituye una nacionalidad separada o sustituta de la condición de ciudadano de Estados Unidos conforme fue establecida en favor de los habitantes de Puerto Rico en el Immigration and Nationality Act de 1952. Mucho menos se puede interpretar que la ciudadanía de Puerto Rico surge como la nacionalidad de los habitantes de Puerto Rico a raíz del Tratado de París.

La Sec. 302 de la Ley de Inmigración y Nacionalidad, *supra,* dispone:

"All persons born in Puerto Rico on or after April 11, 1899, and prior to January 13, 1941, subject to the jurisdiction of the United States, residing on January 13, 1941, in Puerto Rico or other territory over which the United States exercises rights of sovereignty and not citizens of the United States under any other Act, are declared to be citizens of the United States as of January 13, 1941. All persons born in Puerto Rico on or after January 13, 1941, and subject to the jurisdiction of the United States, are citizens of the United States at birth."

352

Tomo 1. Como fundamento para ello, se cita el Informe de la Comisión de Disposiciones Transitorias de la Constituyente en el cual se hace mención pasajera que el término de "ciudadano de Puerto Rico" también está mencionado en el Código Político de Puerto Rico en vigor cuando el recurrido votó en 1996.

Luego de señalarnos la vigencia de la Sec. 7 del Acta Foraker, *supra,* mediante la cual se estableció la ciudadanía puertorriqueña, la Mayoría señala que a pesar de que ésta no tiene rango de ciudadanía nacional con subjetividad internacional, ésta "tampoco significa un mero domicilio". Se sostiene, además, que la ciudadanía puertorriqueña corresponde a la colectividad política que forma parte del sistema federal, donde "la dualidad de ciudadanía es inherente". Opinión mayoritaria, pág. 201. Según la Mayoría, la ciudadanía puertorriqueña antecede a la estadounidense, y aunque inicialmente fue establecida por ley federal, su existencia jurídica "no descansa ya en tal ley federal". Opinión mayoritaria, pág. 202. De acuerdo con la Opinión del Tribunal, el fundamento jurídico de la ciudadanía de Puerto Rico "es la propia Constitución del E.L.A.". Opinión mayoritaria, pág. 202. Finalmente, se señala que el origen más fundamental de la ciudadanía puertorriqueña "radica en el hecho incontestable de que Puerto Rico es un pueblo, un país formalmente organizado en una colectividad política, por lo que las personas que lo forman son ciudadanos suyos". Opinión mayoritaria, pág. 202.

No podemos sino permanecer perplejos ante los múltiples apriorismos y la bonanza de conclusiones desprovistas de un proceso analítico intermedio que esgrime la Mayoría para, literalmente, fabricar artificiosamente una ciudadanía puertorriqueña divorciada de la ciudadanía y nacionalidad *(nationality)* de Estados Unidos.

Para poder comprender la verdadera naturaleza de la ciudadanía puertorriqueña, debemos remontarnos nuevamente al Tratado de París de 1898, mediante el cual la Corona española cedió Puerto Rico a Estados Unidos.

El Art. IX de dicho tratado estableció que los españoles nacidos en la península podrían permanecer fieles a la Corona española mediante declaración formal. A falta de tal declaración, dispone el artículo, "se considerará que han renunciado a dicha nacionalidad y adoptado la del territorio en el cual pueden residir". Art. IX, Tratado de París de 1898, *supra*, ed. 1982, pág. 22.

Dispone, además, el mencionado artículo que:

> Los derechos civiles y la condición política de los habitantes naturales de los territorios aquí cedidos a los Estados Unidos se determinarán por el Congreso. Art. IX, Tratado de París de 1898, *supra*, ed. 1982, pág. 22.

Con el traspaso de soberanía, el deber de lealtad y fidelidad que los puertorriqueños le debíamos a la Corona española pasó a ser debido a Estados Unidos. De esta forma, la nacionalidad de los habitantes de Puerto Rico pasó, ipso facto, de ser española a ser estadounidense.[57]

Nótese que conforme al Derecho Internacional y a la ley federal, el término "nacional" de Estados Unidos se refiere a aquella persona, ya sea ciudadana o no, que le debe fidelidad a Estados Unidos.[58] El término "nacional" es, pues, distinto al de ciudadano e incluye a aquellas personas que le deben fidelidad a una nación pero que no gozan de todos los derechos políticos y civiles en ésta.[59]

Es por ello que, con la cesión de Puerto Rico a Estados Unidos, la mayoría de los habitantes en Puerto Rico pasaron a ser nacionales de Estados Unidos sin ser ciudadanos

---

[57] Véase *Cabebe v. Acheson*, 84 F. Supp. 639 (9no Cir. 1949). Véase, además, E.J. Huot Calderón, *The Concept of Puerto Rican Citizenship*, 35 Rev. Der. Pur. 321 (1996).

[58] Véase 8 U.S.C. sec. 1101(a)(22); *Oliver v. United States Dept. of Justice, I. & N. Serve*, 517 F.2d 426 (2do Cir. 1975). Véase, además, C.S. Rhyne, *International Law*, 1ra ed., Washington, D.C., CLB Pubs., Inc., 1971, pág. 85: "A national is an individual who owes allegiance to a certain state and has a claim to the protection of that state."

[59] Véase J.B. Moore, *A Digest of International Law*, Washington, D.C., Goverment Printing Office, 1906, Vol. III, pág. 273.

estadounidenses. Se creó así la condición híbrida de "nacional-no ciudadano".([60])

Ahora bien, con la aprobación del Acta Foraker, todos los habitantes de Puerto Rico (excepto aquellos que optaron por mantener su fidelidad a la Corona de España), es decir, todos los nacionales estadounidenses residentes en la isla a partir de 11 de abril de 1899, fecha en que se promulgó el Tratado de París, fueron declarados "ciudadanos de Puerto Rico". Éstos, junto a los ciudadanos de Estados Unidos residentes en Puerto Rico, formaron el cuerpo político bajo el nombre de "Pueblo de Puerto Rico".([61])

Dos (2) años más tarde se aprobó el Código Político de 1902, cuyo Art. 10 define quiénes son los ciudadanos de Puerto Rico:

Son ciudadanos de Puerto Rico:
1. Toda persona nacida en Puerto Rico y sujeta a su jurisdicción.
2. Toda persona nacida fuera de Puerto Rico que sea ciudadano de los Estados Unidos y resida dentro del territorio.
3. Toda persona que haya sido súbdito español, y residiendo en Puerto Rico el día once de abril de 1899, no hubiere optado por conservar su fidelidad a la Corona de España el día once de abril de mil novecientos, o con anterioridad a dicha fecha, se-

---

([60]) Véase M.M. Whiteman, *Digest of International Law*, Washington, D.C., Goverment Printing Office, 1967, Vol. 8, pág. 7.

" 'With the cession of populated areas by the Crown of Spain to the United States, however, persons collectively became nationalized but not naturalized, Spanish subjects residing in ceded territory becoming nationals of the United States unless it was otherwise provided by treaty. ... Accordingly, it was realized that while all citizens of the United States were nationals, not all nationals were citizens. A hybrid status appeared, the so called 'non-citizennational'.' "

([61]) Sec. 7, Acta Foraker, 31 Stat. 77, Documentos Históricos, L.P.R.A., Tomo 1, ed. 1982, págs. 31–32, la cual disponía:

Que todos los habitantes que continúen residiendo allí, los cuales eran súbditos españoles el día once de abril de mil ochocientos noventa y nueve, y a la sazón residían en Puerto Rico, y sus hijos con posterioridad nacidos allí, *serán tenidos por ciudadanos de Puerto Rico*, y como tales con derecho a la protección de los Estados Unidos; excepto aquellos que hubiesen optado por conservar su fidelidad a la Corona de España el día once de abril de mil novecientos, o antes, de acuerdo con lo previsto en el Tratado de Paz entre los Estados Unidos y España, celebrado el día once de abril de mil ochocientos noventa y nueve; y ellos, en unión de los ciudadanos de los Estados Unidos que residan en Puerto Rico, constituirán un cuerpo político bajo el nombre de "El Pueblo de Puerto Rico", con los poderes gubernamentales que se confieren más adelante, y la facultad de demandar y ser demandados como tales.

gún los términos del tratado de paz entre los Estados Unidos y España, celebrado en abril once de mil ochocientos noventa y nueve. Art. 10 del Código Político, *supra.*

Dentro de esta definición se incluyen únicamente los nacionales de Estados Unidos, ciudadanos estadounidenses o no, que residan en o estén sujetos a la jurisdicción de Puerto Rico.

La ciudadanía de Puerto Rico en 1902 agrupaba a tres (3) tipos distintos de ciudadanos puertorriqueños: aquellos nacidos en Puerto Rico, los ciudadanos de Estados Unidos residentes en Puerto Rico y los súbditos españoles que no mantuvieron su fidelidad a la Corona española conforme a los términos del Tratado de París. Por lo tanto, sólo los nacionales de Estados Unidos podían ser ciudadanos de Puerto Rico. Así lo expresó el Tribunal Supremo de Estados Unidos en *Gonzalez v. Williams*, supra, págs. 9–10, donde se resolvió que los ciudadanos puertorriqueños eran nacionales de Estados Unidos y, como tales, no podían ser considerados extranjeros (*aliens*) para efectos de la Ley de Inmigración Federal de 1891.

Posteriormente, con la aprobación del Acta Jones, los ciudadanos puertorriqueños, salvo aquellos que la objetaron expresamente, recibieron la ciudadanía de Estados Unidos.([62]) Más aún, dicha ley fue enmendada en 1927, a los fines de añadir la Sec. 5a, la cual define el término de ciudadano de Puerto Rico. Dicha sección fue incorporada en la vigente Ley de Relaciones Federales con Puerto Rico, la cual define el término "ciudadano de Puerto Rico" de la manera siguiente:

> Sec. 5a. Citizens of Puerto Rico
> That all citizens of the Unites States who have resided or who shall hereafter reside in the island for one year shall be citizens of Puerto Rico: ....

La nueva definición ofrecida por esta enmienda a la Carta Orgánica consagra el concepto de la "ciudadanía

---

([62]) Sólo doscientas ochenta y ocho (288) personas repudiaron la ciudadanía estadounidense. Véase *Cabranes*, supra, esc. 12.

dual" dentro de un sistema federal, contenido en la Décimocuarta Enmienda de la Constitución de Estados Unidos, donde la ciudadanía nacional o federal sirve para fines internacionales, y la ciudadanía estatal o local cumple con objetivos de índole doméstico y es equivalente al domicilio de la persona.([63])

Esta interpretación del alcance de la ciudadanía puertorriqueña fue explicada en *Martínez v. Vda. de Martínez*, 88 D.P.R. 443, 452 (1963), donde sostuvimos que:

> En el presente, la mayoría de los países sigue el principio de la nacionalidad y así lo ha seguido la Conferencia de la Haya sobre Derecho Internacional Privado. La teoría de la nacionalidad parece más completa desde el punto de vista teórico pero la teoría del domicilio resulta más práctica, *y para los países que, en una forma u otra, forman parte de un sistema federal la teoría del domicilio parece ser la indicada.* Esto es así porque aunque para fines internacionales los ciudadanos de una federación tienen una ciudadanía federal, para fines internos y para fines relacionados con áreas jurídicas en las cuales no hay legislación federal aplicable existe la ciudadanía local o estatal. Esta dualidad de ciudadanía,

---

([63]) Luego de la Guerra de Secesión y con el objeto de proteger a los esclavos libertos en los estados del sur, el Congreso aprobó la Décimocuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1, cuya Sección 1 consagra por vez primera y de forma expresa el principio de la dualidad de ciudadanías. Dicha sección le impone a los estados la obligación de respetar los privilegios e inmunidades de los ciudadanos de Estados Unidos, al igual que los derechos conferidos por el *Bill of Rights* de la Constitución federal. La Sección 1 de la referida enmienda dispone que:

"SECCION 1. Toda persona nacida o naturalizada en los Estados Unidos y sujeta a su jurisdicción, será ciudadana de los Estados Unidos y *del estado en que resida.* Ningún estado aprobará o hará cumplir ninguna ley que restrinja los privilegios o inmunidades de los ciudadanos de los Estados Unidos; ni ningún estado privará a persona alguna de su vida, de su libertad o de su propiedad, sin el debido procedimiento de ley, ni negará a nadie, dentro de su jurisdicción, la igual protección de las leyes." (Énfasis suplido.) Emda. XIV, Sec. 1, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 196.

Sin embargo, es necesario señalar que, contrario a lo que sugiere la Mayoría, en Puerto Rico la Décimocuarta Enmienda no opera directamente como ocurre en el caso de los estados, sino a través del Art. 2 de la Ley de Relaciones Federales con Puerto Rico. Esta disposición, añadida a nuestra Carta Orgánica en Agosto 5 de 1947, cap. 490, sec. 7, 61 Stat. 772, y dejada en vigor el 3 de julio de 1950 por 64 Stat. 319, reconoce el carácter territorial de Puerto Rico al disponer que:

"Los derechos, privilegios e inmunidades de los ciudadanos de Puerto Rico hasta el mismo grado que si Puerto Rico fuera un Estado de la Unión *y sujeto a las disposiciones del inciso 1 de la sec. 2 del art. IV. de la Constitución de los Estados Unidos.*" (Énfasis suplido.) Art. 2 de la Ley de Relaciones Federales con Puerto Rico, *supra.*

inherente en los sistemas federales, hizo necesario que esos sistemas adoptasen la teoría territorial o del domicilio. ... Debido a esa dualidad de jurisdicciones que contienen dentro de sí los sistemas federales, éstos siguen la doctrina del domicilio.[64]

También sostuvimos en *Fiddler v. Srio. de Hacienda*, 85 D.P.R. 316 (1962), que conforme a lo dispuesto en la Sec. 5a de la Ley de Relaciones Federales con Puerto Rico, la ciudadanía puertorriqueña estaba predicada en el domicilio de Puerto Rico.[65] Véase, también, *Tes. v. Tribl. Contribuciones y Solé*, 69 D.P.R. 905 (1949), y *Buscaglia, Tes. v. Tribl. de Contribuciones*, 68 D.P.R. 345 (1948).

Es por ello que, contrario a lo que sin fundamento alguno señala la mayoría, la ciudadanía de Puerto Rico tiene dentro del concepto de la dualidad de ciudadanías inherente al ámbito federal el carácter limitado de domicilio.[66]

Por último, la Sec. 5 del Art. IX de la Constitución de Puerto Rico, *supra*, ed. 1982, pág. 387, dispone que:

En lo sucesivo la expresión "ciudadano del Estado Libre Asociado de Puerto Rico" sustituirá a la expresión "ciudadano de Puerto Rico" según ésta ha sido usada antes de la vigencia de esta Constitución.

No suscribimos la forzada interpretación de la Mayoría en cuanto a que la intención de los miembros de la Asam-

---

[64] Para un buen resumen de esta situación, véanse: Reed, *Domicile and Nationality in Comparative Conflict of Laws*, 23 U. Pitt. L. Rev. 979 (1962). También sobre el particular, véanse: R. Gallardo, *La Ley de Domicilio: punto de conexión admirable en el Derecho Internacional Privado latinoamericano*, 2 Inter-Am. L. Rev. 15 (1960); E. Rabel, *The Conflict of Laws*, 1945, Vol. I, Caps. 4–5; Goodrich, *Conflict of Laws*, 3ra ed. (1949), y los trabajos que aparecen en el Capítulo I de la excelente colección *Selected Readings on Conflict of Laws*, St. Paul, Minnesota, Ed. West Publishing Co., 1956, editado por la Asociación de Escuelas de Derecho Americanas.

[65] *Fiddler v. Srio. de Hacienda*, 85 D.P.R. 316, 323–324 (1962).

[66] Aunque se sostiene que la ciudadanía de Puerto Rico no tiene el alcance de una nacionalidad, en la práctica se le está confiriendo tal naturaleza. El absurdo jurídico que esto representa es evidente; si una persona que ostenta la "ciudadanía puertorriqueña" que hoy le confiere este Tribunal al recurrido decidiera establecerse permanentemente en un estado de la Unión, ésta continuaría siendo ciudadana de Puerto Rico, independientemente del tiempo que resida en dicho estado. Este resultado le conferiría un carácter extraterritorial a una ciudadanía que el propio inciso 1 del Artículo 10 del Código Político, citado por la mayoría expresamente la limita a las personas "nacidas en Puerto Rico y sujetos a su jurisdicción".

blea Constituyente era crear a través de esta sección una *nueva ciudadanía* del Estado Libre Asociado de Puerto Rico, predicada en la "ciudadanía puertorriqueña" de los tiempos del Acta Foraker y apoyada en la definición de "ciudadanía puertorriqueña" contenida en el Art. 10 del Código Político de 1902 (1 L.P.R.A. sec. 7).

Precisamente, el Informe de la Comisión de Disposiciones Transitorias citado por la Mayoría señala que "los ciudadanos de Puerto Rico antes de constituirse el Estado Libre Asociado de Puerto Rico están definidos en la Ley Orgánica". Esta referencia a la Ley Orgánica no quiere decir otra cosa que los constituyentes mantuvieron el concepto de ciudadanía contenido por la Sec. 5a del Acta Jones, Documentos Históricos, *supra*, mantenida en vigor por la Ley de Relaciones Federales con Puerto Rico, donde se define la ciudadanía puertorriqueña en términos de domicilio dentro de un sistema federal. Más aún, evidenciando la farsa histórico-jurídica que representa esta opinión, la Mayoría se limita a citar el primer inciso del Art. 10 del Código Político de 1902, *supra*, para sustentar su posición, soslayando los otros dos (2) incisos que incluyen a los ciudadanos estadounidenses residentes en la isla y a los peninsulares españoles que no se mantuvieron fieles a la Corona española. Como señaláramos anteriormente, al incluirse estos otros dos (2) grupos de personas dentro de la definición se estaba codificando, dentro de la ciudadanía puertorriqueña, la nacionalidad estadounidense.

Es manifiesto el error cometido por la Mayoría al concluir que existe una ciudadanía de Puerto Rico que surge jurídicamente de la Constitución del Estado Libre Asociado de Puerto Rico, separada de la nacionalidad y ciudadanía estadounidense, la cual es consustancial con los "poderes y las facultades que la colectividad política tiene dentro del sistema federal". Opinión mayoritaria, pág. 201. Dicha ciudadanía, sostiene la Mayoría, "existe como parte del ám-

bito de autoridad que le corresponde al E.L.A. de Puerto Rico ...". Íd.[67]

Una lectura objetiva e integral del Tratado de París de 1898, la Carta Orgánica de 1900 y el Art. 10 del Código Político de 1902, *supra*, refleja que en ningún momento ha existido una ciudadanía puertorriqueña desligada de la nacionalidad *(nationality)* estadounidense. Además, en *Gonzalez v. Williams*, supra, se confirmó que esta peculiar condición de "ciudadanos puertorriqueños" creada por el Acta Foraker, Documentos Históricos, *supra*, se encontraba enmarcada dentro de la nacionalidad estadounidense. Dicha situación atípica fue corregida con la concesión de la ciudadanía de Estados Unidos a los puertorriqueños en 1917 y sólo las doscientas ochenta y ocho (288) personas que repudiaron esta ciudadanía de acuerdo con el procedimiento establecido en el Acta Jones se mantuvieron en el anómalo estado jurídico de ciudadano de Puerto Rico y nacional de Estados Unidos.[68] En cualquier caso, es descabellada la proposición de que la ciudadanía puertorriqueña

---

[67] Esta teoría de la Opinión de la Mayoría es absurda. Catorce (14) años después de promulgada la Constitución del Estado Libre Asociado, la Legislatura de Puerto Rico aprobó la Ley Núm. 1 de 23 de diciembre de 1966, Leyes de Puerto Rico, pág. 93. para disponer la celebración de un plebiscito sobre el *status* político de Puerto Rico. En dicha ley se definió el "Estado Libre Asociado", y así se le presentó al pueblo que lo refrendó con el cincuenta y nueve porciento (59%) de los votos, de la forma siguiente en la parte pertinente:

"Un voto a favor del Estado Libre Asociado significará:

"(1) La reafirmación del Estado Libre Asociado establecido por común acuerdo bajo los términos de la Ley 600 de 1950 y la Resolución Conjunta 447 de 1952 del Congreso de Estados Unidos como comunidad autónoma permanentemente asociada a Estados Unidos de América;

"(2) *La inviolabilidad de la común ciudadanía como base primordial e indispensable* de la unión permanente entre Puerto Rico y Estados Unidos;

"(3) La autorización para desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximo de gobierno propio compatible con la común defensa, el común mercado, la común moneda y *el indisoluble vínculo de la ciudadanía de Estados Unidos ....*" (Énfasis suplido y escolio omitido.) 1966 Leyes de Puerto Rico 95.

La "ciudadanía de Puerto Rico", ciertamente, no conlleva una implicación más allá de la de residencia y domicilio a los fines electorales. Pretender darle bajo el "Estado Libre Asociado" una implicación mayor a esa ciudadanía, significaría que se perpetró contra el pueblo un engaño monumental en el plebiscito de 1967 y en el Preámbulo de la Constitución.

[68] Acta Jones, 39 Stat. 951, Documentos Históricos, Sec., L.P.R.A., Tomo 1.

creada por el Acta Foraker en 1900 pueda existir fuera de los casos específicos de las personas que cumplían con los requisitos establecidos para acogerse al procedimiento de repudiación de la ciudadanía estadounidense dentro del término de seis (6) meses contenidos en el Acta Jones.

Más aún, con la enmienda de 1927, en las que se definió a los ciudadanos de Puerto Rico como aquellos ciudadanos de Estados Unidos que residieran en Puerto Rico por más de un año, se consagró el carácter domiciliario de la ciudadanía de Puerto Rico y el vínculo inquebrantable entre ambas ciudadanías. La Mayoría ignora la Sec. 5a de la Ley de Relaciones Federales con Puerto Rico, *supra*, al igual que lo resuelto anteriormente por este Tribunal en torno a la naturaleza de la ciudadanía de Puerto Rico.

Por último, tampoco existió una intención por parte de la Asamblea Constituyente de modificar este concepto de ciudadanía y sustituirlo por la antigua ciudadanía de Puerto Rico contenida en el Acta Foraker. Por lo tanto, la cábala en la cual incurre la Mayoría al interpretar que la Sec. 5 del Art. IX de la Constitución del Estado Libre Asociado, *supra*, crea una ciudadanía del Estado Libre Asociado de Puerto Rico —la cual recoge la ciudadanía del Acta Foraker, y que al mismo tiempo existe como parte del ámbito de autoridad que le corresponde al Estado Libre Asociado de Puerto Rico— es contraria a la letra clara de la referida Sec. 5 del Art. IX de nuestra Constitución, *supra*, y al propio texto del informe citado por la Mayoría.

Contrario a la expresa voluntad legislativa, y en virtud de esta nueva "ciudadanía puertorriqueña" manufacturada en el taller "jurídico" de la Mayoría, el recurrido puede ejercer el derecho al voto en Puerto Rico, a pesar de que renunció voluntaria y expresamente a la nacionalidad y ciudadanía estadounidense.

No estamos de acuerdo. Toda vez que el recurrido renunció voluntariamente a la nacionalidad y a la ciudadanía de Estados Unidos, éste se convirtió en un expatriado *(alien)* de acuerdo con la Ley de Inmigración y Nacionalidad, 8 U.S.C. sec. 1101(a)(3), por lo que a la luz de lo re-

suelto en *Davis v. District Director, Immigration and Naturalization Service*, supra, perdió no sólo la ciudadanía estadounidense, sino también la ciudadanía de Puerto Rico.([69])

## X

Se sostiene por algunos que el recurrido es un objetor por conciencia y que tal condición amerita que se le trate como exento a que tenga que cumplir con los requisitos para poder ejercer el voto en Puerto Rico, según lo dispuesto por la Ley Electoral de Puerto Rico. Se sugiere que el recurrido no debe estar sujeto a los requisitos, admitidamente constitucionales, de la Ley Electoral de Puerto Rico, porque éstos son incongruentes con su ideología particular, la que éste pretende expresar mediante el ejercicio de su franquicia electoral. No podemos suscribir esa teoría por dos (2) razones: (*a*) el recurrido no es un objetor por conciencia; (*b*) los requisitos de la Ley Electoral de Puerto Rico no impiden que los puertorriqueños independentistas expresen su posición en el foro político mediante su participación electoral. Nos explicamos a fondo.

El declarar que la expatriación del recurrido Mari Brás y su subsiguiente impugnación como elector lo hace un objetor de conciencia es estirar radicalmente la doctrina.([70])

---

([69]) Es incomprensible cómo la opinión del Tribunal, emitida por el Juez Asociado Señor Fuster Berlingeri, ignora toda la normativa federal aplicable en este caso cuando podría haber invadido un campo reservado exclusivamente al Congreso de Estados Unidos de acuerdo con lo dispuesto por la Sec. 8 del Art. I de la Constitución federal, L.P.R.A., Tomo 1, ed. 1982, pág. 173, la cual establece que "[e]l Congreso tendrá facultad ... [p]ara establecer una regla uniforme de naturalización ...".

Conforme a la casuística del Tribunal Supremo de Estados Unidos, no existe otro poder congresional más amplio que el que dicho cuerpo posee para definir el proceso a través del cual se adquiere o se pierde la ciudadanía y la nacionalidad, y para fijar las consecuencias de la adquisición o pérdida de la ciudadanía estadounidense. Véanse: *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), citando a *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909); *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972); *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953); *The Chinese Exclusion Case*, 130 U.S. 581 (1889).

([70]) El comentarista M.S. Satow en la obra *Conscientious Objectors: Their Status, the Law and its Development*, 3 Geo. Mason Civ. R. L.J. 113 (1992), enmarcó de

362

Como pasamos a ver, la doctrina que define a los objetores de conciencia no es tan elástica. Se pretende definir la objeción de conciencia como "la negativa de un individuo, por motivos éticos dimanantes de una conciencia sincera, a someterse a una conducto (norma legal), que en principio resultaría jurídicamente exigible a la sociedad en general a la que pertenece".(⁷¹) Bajo esa definición, cualquier persona que por razones de conciencia se oponga a una norma legal, no tendría que acatarla, siempre que su objeción sea sincera. Nuestro derecho no extiende excepciones por mera subjetividad y la doctrina del objetor de conciencia no va tan lejos. La persona puede moralmente no acatar, pero se atiene a las consecuencias legales de sus actos.

En nuestra sociedad no consideramos la perspectiva subjetiva del individuo para determinar si éste está sujeto a nuestras leyes. Por otro lado, para asegurar que el Estado no infrinja indebidamente sobre los derechos del individuo, nuestro mandato constitucional reconoce derechos inviolables. Como discutimos, entre éstos tiene fundamental valor el derecho al voto. El recurrido no perdió el derecho al voto por ser independentista, sino por haber renunciado voluntariamente a ser ciudadano de Estados Unidos. La Ley Electoral de Puerto Rico no contiene un efecto discriminatorio contra los independentistas ni contra ninguna de las posiciones que componen el mosaico ideológico de Puerto Rico. De manera que el requisito de la ciudadanía de Estados Unidos para ejercer el voto de ninguna manera

---

la siguiente manera el contexto tradicional en que se ha desarrollado la doctrina del objetor por conciencia:

"The history of conscientious objector exemptions in the United States has developed in one central premise: *those opposed to all war as a matter of religious conscience should be excused from conscription.* As a result, relevant legislative history and case law have, in the main, dealt with three issues: whether the exemption extends to those who object to a particular war as opposed to war in general; whether it is constitutionally required; and the breadth of the definition of religion in the statute."

Aunque la doctrina ha sido extendida para proteger ciertas formas de expresión, a nuestro entender ésta nunca ha sido empleada para eximir a una persona de estar sujeta a las disposiciones legales que imponen requisitos para poder ejercer derechos electorales.

(⁷¹) Véase la Opinión concurrente del Juez Asociado Señor Negrón García.

obliga a los puertorriqueños a renunciar a sus convicciones políticas.

De hecho, muchos independentistas ejercen el derecho al voto precisamente para adelantar su causa y otros han sugerido que es elemento importante para el logro de la independencia que se permita a los puertorriqueños, que así lo deseen, retener la ciudadanía de Estados Unidos bajo ese *status* político. No existen fundamentos para concluir que los derechos de expresión e ideología del recurrido han sido de alguna manera limitados por las impugnadas disposiciones de la Ley Electoral de Puerto Rico.

El recurrido tiene derecho a renunciar a la ciudadanía de Estados Unidos y tiene derecho a convertir su renuncia en una forma de expresión política; lo que no puede hacer es renunciar a esa ciudadanía y reclamar el derecho al voto cuando para ello claramente se requiere la ciudadanía que renunció.

Se ha reconocido, como parte del derecho de expresión, que una persona queme la bandera de Estados Unidos, pero ello no conlleva que el Estado tenga la obligación de proveérsela.

Reconocemos la obligación de proteger la identidad ideológica del recurrido, pero debemos recalcar que la Ley Electoral de Puerto Rico no infringe sobre la conciencia de éste. El recurrido renunció voluntariamente a la ciudadanía de Estados Unidos y, de esa manera, deliberadamente incumple con un vital requisito para ejercer el voto en Puerto Rico.

## XI

La aplicación del derecho no es tarea fácil y se torna aun más·ardua cuando su correcta interpretación lleva a que un puertorriqueño no pueda ejercer el voto en su patria. No obstante, la función de este Tribunal es la de interpretar la ley conforme al derecho y la razón, para así hacer justicia. Nuestro criterio no puede ser sometido a consideraciones personales o ideologías particulares ni regirse por la publi-

cidad que haya adquirido la controversia particular. Es por este compromiso a nuestra función judicial que hoy disentimos de que el Tribunal reconozca la Ley Electoral de Puerto Rico a medias para acomodar una excepción que anule el efecto jurídico de la expatriación voluntaria del recurrido, quien por sus propios actos se colocó en esa situación.

En conclusión, reiteramos que sólo dos (2) hechos son esencialmente pertinentes a nuestra revisión del recurso presentado. Primero, el recurrido nació en Puerto Rico, por lo que fue ciudadano de Estados Unidos hasta que voluntariamente renunció a tal condición en julio de 1994. Segundo, el recurrido tuvo el derecho de ejercer su voto en las Elecciones Generales de Puerto Rico hasta que renunció a su ciudadanía estadounidense. Ante esos hechos, es nuestro criterio que la decisión del recurrido de renunciar a la ciudadanía estadounidense tiene el efecto jurídico de destituirle de su reclamo a los derechos y responsabilidades que su decisión conlleva.

Un último tema exige nuestra aclaración. El recurrido comienza su memorando de derecho, presentado el 14 de octubre de 1996 ante el tribunal de instancia, citando las siguientes palabras que expresó nuestro Tribunal en *Noriega v. Gobernador*, 122 D.P.R. 650, 695 (1988):

> En nuestra sociedad democrática, el Estado no tiene jurisdicción sobre los dictados de conciencia y sentimientos individuales del individuo.

Subrayamos que nuestro criterio se extiende sólo sobre la constitucionalidad de dos (2) artículos de la Ley Electoral de Puerto Rico. Estas disposiciones de ley cuentan con la capacidad, no prohibida por nuestra Constitución, de impedir que el recurrido emita su voto en Puerto Rico, pero éstas no pueden, ni a nuestro entender pretenden, restringir la libertad de expresión ni la actividad intelectual y política del recurrido.

Por los fundamentos expresados, estamos de acuerdo

que la Ley Electoral de Puerto Rico es constitucional al requerir que los electores en Puerto Rico sean ciudadanos de Estados Unidos; sin embargo, disentimos de la errónea decisión de la mayoría al eximir al recurrido de cumplir con los requisitos de dicha ley.

*In re* C.R.R.

*Número:* EM-97-3 *Resuelto:* 21 de noviembre de 1997